**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| v. | § | No. 1:19-cr-00395 |
| | § | |
| LARRY DEAN HARMON | § | |

**DEFENDANT LARRY HARMON'S MOTION TO REVOKE**
**THE MAGISTRATE'S DETENTION ORDER**

TO THE HONORABLE CHIEF JUDGE BERYL HOWELL:

Defendant Larry Harmon, pursuant to 18 U.S.C. § 3145, moves the Court to revoke the

Detention Order entered on February 12, 2020 by the Honorable Kathleen Burke, United States

Magistrate Judge.

## I.      SUMMARY

Mr. Harmon is a 36-year-old citizen with no criminal history.  Based on the allegations, he

is presumed to receive bond.  The allegations against him present novel questions of law and fact.

By their own admission, the Government has never before attempted a prosecution on this theory.

In fact, at the bond hearing the Government admitted that despite Mr. Harmon being charged with

laundering proceeds of an unlawful narcotics transaction they had not traced or identified a single

narcotics transaction.  The Government presented no evidence that Mr. Harmon is a danger and

Magistrate Burke found that he had significant and lengthy ties to the community. Magistrate

Burke made no effort to explore alternatives to incarceration and despite no significant ties to any

other country and an established lifelong residence in Ohio, Magistrate Burke erroneously found

Mr. Harmon to be a serious flight risk.

## II.  <u>PROCEDURAL HISTORY</u>

Mr. Harmon was indicted on December 3, 2019 (dkt #1).  On February 6, 2020, federal law enforcement agents arrested Mr. Harmon in Akron, Ohio.  Hours before the scheduled detention hearing on February 11, 2020, the government filed a memorandum in support of pretrial detention (**Exhibit 1**).  The Honorable Kathleen Burke of the Northern District of Ohio held a detention hearing (*See* Transcript attached as **Exhibit 2**). Following the two hour hearing the Magistrate ordered that Mr. Harmon be detained for the following factors: 1) preponderance of evidence that no condition or combination of conditions of release will reasonably assure the defendant's appearance as required; 2) the weight of evidence against the defendant is strong; 3) defendant is subject to lengthy period of incarceration if convicted, and 4) significant family or other ties outside of the United States.  Attached as **Exhibit 3** is the Magistrate Burke's Order of Detention Pending Trial.

## III.  <u>STANDARD OF REVIEW</u>

The Government did not suggest nor did the Court consider dangerousness as basis for detention.[1]  Thus, the sole issue for this Court is whether there are conditions that could reasonably assure Mr. Harmon's presence at future proceedings.  Under 18 U.S.C. § 3145, this Court acts *de novo* to make its own independent bond determination.  *United States v. Smith*, 160 F. Supp. 3d 280 (D.D.C. 2016) citing, *United States v. Hassanshahu,* 989 F. Supp. 2d 110, 113 (D.D.C. 2013) (citing 18 U.S.C § 3142(e)(1)).  "The Court is free to use in its analysis any evidence or reasons relied on by the magistrate judge, but it may also hear additional evidence and rely on its own reasons." *United States v. Hubbard*, 962 F. Supp. 2d 212, 215 (D.D.C. 2013) (quoting *United*

---

[1] See **Ex. 2 at 92** (the Magistrate Court observed: "…what the government is contending is not that defendant is a danger to the community, but rather that he is a risk of flight.").

*States v. Sheffield*, 799 F. Supp. 2d 18, 20 (D.D.C. 2011)); *see also United States v. Hitselberger*, 909 F. Supp. 2d 4, 7 (D.D.C. 2012).

## IV.  <u>PRESUMPTION IN FAVOR OF BAIL</u>

The provisions of the Bail Reform Act should be narrowly construed in favor of release. *See, e.g., United States v. Singleton*, 182 F.3d 7, 23 (D.C. Cir. 1999); *United States v. Hinote*, 789 F.2d 1490, 1941 (11th Cir. 1986) (It is required "that we strictly construe provisions of the Bail Reform Act of 1984). *Cf. Williams v. United States*, 458 U.S. 279, 290 (1982) (Criminal statutes should be narrowly construed in favor of the defendant).  The United States Supreme Court has long instructed that only in rare circumstances should release be denied[2] and that any doubts regarding the propriety of release should be resolved in favor of the defendant.[3] The Bail Reform Act "does not require that the risk be zero, but that conditions imposed 'reasonably assure' appearance." *United States v. Madoff,* 586 F. Supp. 2d 240, 249 (S.D.N.Y. 2009).

This rationale favoring release is even more pronounced when, as here, the case raises novel question of law or fact.  As the Government stated: "By all accounts, this is the first U.S. prosecution involving a bitcoin mixer, and the combination of unusual elements - including the Darknet, Tor, and bitcoin - will undoubtedly raise issues of first impression and require specialized analysis and preparation for trial." [dkt 11 at p. 6].  Based on the Government's own analysis, Mr. Harmon will be drastically hampered from meaningfully assisting counsel in review of the voluminous discovery and pretrial detention will operate as a violation of due process. *See, e.g., United States v. Khashoggi,* 717 F.Supp. 1048, 1051 (S.D.N.Y. 1989) ("[T]raditional notions of

---

[2] *Sellers v. United States*, 89 S.Ct. 36, 38 (1968); *see also Truong Dinh Hung v. United States*, 439 U.S. 1326, 1329 (1978) (right to bail should be denied only for the strongest of reasons).
[3] *Herzog v. United States*, 75 S.Ct. 349, 351 (1955).

due process cannot countenance protracted pretrial detention of an individual presumed innocent."); *United States v. Ailemen,* 165 F.R.D. 571, 601 (N.D. Cal. 1996) (prolonged pre-trial detention attributable to the Government and judicial system violated Due Process rights). The judicial officer considering the propriety of pretrial detention must consider four factors:

> (1) the nature and circumstances of the offense charged;
> (2) the weight of evidence against the person;
> (3) the history and characteristics of the person, including . . . the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and . . . whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law;
> (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

18 U.S.C. § 3142(g).

## V.    THE FACTOR'S PURSUANT TO 18 § 3142(g)

### A.    Count One: Money Laundering

### i.    The Nature and Circumstances of the Charged Offense:

This prosecution sits on the battleground between privacy and governmental intrusion. Mr. Harmon is accused of running the Helix computer program on the "dark web" or Tor network. The Tor (an acronym for the original program The Onion Router) network is a free worldwide volunteer network which consists of thousands of relays. Addresses on the Tor network are anonymous and there are no physical locations within the network. The purpose of the network is to protect the personal privacy of its users, as well as their freedom and ability to conduct confidential communication by keeping their internet activities unmonitored.[4]

---

[4] Wikipedia, https://en.wikipedia.org/wiki/Tor_(anonymity_network)

The program which Harmon is accused of operating received an amount of bitcoin from one address and sent different bitcoin back. This event, known as "mixing" or "tumbling" is not illegal. **[Ex. 2 at p. 55]**. There was no information provided to the program or its operator regarding the source of the bitcoin, the country of origin, the country of receipt, the purpose of the transfer, or any other identifying information. The only thing the program received was an address and an amount. There is no allegation that at any point the bitcoin was converted or exchanged with any other currency. Harmon is accused of utilizing this program to intentionally and knowingly launder the proceeds of the felonious manufacture, importation, receiving, concealment, buying, selling, and otherwise dealing in a controlled substance and with knowingly transacting in these unlawful proceeds to conceal the location source, ownership or control of the proceeds of the controlled substance transaction.

ii.     **Weight of The Evidence:**

The testimony at the bond hearing showed that the Government identified approximately 10-15% of the transactions that went through the Helix program as having originated at what they deem "Darknet marketplaces" located in the Tor network. The source of the vast majority of the bitcoin processed through Helix was from unknown users. Special Agent Jeremy Haynie testified during cross examination:

> Q:     But as it stood with just you entering -- like on Government Exhibit 3, you're just entering numbers. As it stood, these are unknown people, right? I mean, it even says you guys have identified 40,000 of them as these criminal guys, but you have 290,000 bitcoins from unknown people, right?
>
> A.     Correct.
>
> Q.     And so what is that?  12 -- 40 percent -- what percentage is that? That's -- you've got 10, 15 percent coming from who you believe are going to these markets, right?

> A.    Approximately.

*See* **Ex. 2 at p. 60.**

The government also conceded at the bond hearing that these marketplaces transact in both licit and illicit goods. So, while the 10-15% of bitcoin going through Helix could be identified as having some "Darknet marketplace" address in its blockchain ledger there is no way of knowing what (if anything) was purchased.[5]

More importantly, the government conceded that it had not traced a single bitcoin transaction that went through the Helix program back to a controlled substance transaction.

> Q:    But my point Agent, is although you have identified these markets, you haven't identified any of the products, right?
>
> A:    Well, I put in on these markets, yes.
>
> Q:    No, I mean specific to these transactions that you have in the flow chart on Exhibit 4, while you all have identified some marketplaces, have you identified specific transactions and know what the product was?
>
> A:    I know that we've used undercover transactions to send bitcoin through, but I am not sure if those transactions came from --- they definitely came from AlphaBay, for example, but I'm not sure if the bitcoin that funded that undercover account was, like, as a result of an illegal transaction.
>
> [...]
>
> Q.    But you have not tied these specifics transactions to illegal goods?
>
> A:    That's correct.

*See* **Ex. 2 at p. 61-62.**

---

[5] For instance, AlphaBay users deposited bitcoins into their AlphaBay bitcoin wallet. Their wallet was used for purchases from other users of AlphaBay. However, those users could withdraw their bitcoin from AlpaBay and it would contain an AlpaBay address in the blockchain ledger despite no sale or purchase having occurred.

Mr. Harmon's knowledge that the currency was the proceeds of narcotics transactions is an essential element of the Government's allegation – yet they admitted that they have no evidence in this regard.  This hole in the Government's proof goes directly to a key element in the money laundering prosecution.  The evidence did not suggest a strong case that knowledge of the funds are actually proceeds of specified unlawful activity.  The Government did not trace any of the Bitcoin to an illegal transaction – without "dirty" money there can be no money laundering.

**B.     Counts Two and Three: Operating an Unlicensed Money Transmitting Business**

**i.      The Nature and Circumstances of the Charged Offense:**

Mr. Harmon is charged with violating Federal and District laws against Operating an Unlicensed Money Transmitting Business.

**ii.      Weight of The Evidence:**

At the hearing the Government did not address Counts Two and Three with regard to Helix operating a money transmitting business without a license.  The only discussion of Helix violating Counts Two and Three came during the cross examination of Agent Haynie.  In somewhat convoluted logic, Agent Haynie testified that had Helix registered as a money transmitting business, Helix would have then discovered the source of the bitcoin.  The agent's logic turns their burden on its head.  Due to the nature of its services, Helix was not required to register as a money transmitting service pursuant to 31 U.S.C.§ 5330.  Additionally, Helix was not required to register as money services business, pursuant to 31 CFR § 1022.380.[6]  Because Helix did not meet these registrations requirements it was not required to have a license and cannot be prosecuted for a violation of 18 U.S.C. § 1960(a).

---

[6] It should also be noted that this is the first Title 18 U.S.C. § 1960(a) prosecution regarding a "bitcoin to bitcoin" transaction with absolutely no involvement of banks or United States currency.

### iii.      <u>History and Characteristics of the Defendant</u>

The Magistrate Court made a finding that Mr. Harmon had strong ties to his community. **Ex. 2 at p. 91.**   His immediate family - his wife, parents and siblings - all live in and around Akron, Ohio and have provided letters of support.   *See* **Exhibit 4**.  Mr. Harmon does not suffer from any known physical or mental impairments, nor are there any reports of a drug or alcohol abuse problem.  Mr. Harmon has no criminal history prior to this arrest, and therefore was not on any type of parole or probationary status at the time of his arrest.  As stated in several of the support letters, Mr. Harmon "would never flee", "wants to work with his legal defense team", "if he fled it would be a stain to his family, community and discouragement to other entrepreneurs within the cryptocurrency community" "owes it to his entire community, to remain cooperative and compliant with law enforcement" . *Id.* **Ex. 4.**

### VI.      **Magistrate Burke Failed to Consider Whether Alternatives to Detention Could <u>Reasonably Assure Mr. Harmon's Appearance at Trial</u>**

A defendant can only be detained before trial as flight risk if the Government establishes by preponderance of the evidence that no condition or set of conditions under 18 U.S.C. §3142 (c) will reasonably assure the defendant's appearance.   *United States v. Simpkins,* 826 F2.d 94, 96 (D.C. Cir. 1987); see also *United States v. Vortis,* 785 F.2d 327, 329 (D.C. Cir. 1986). "That preponderance must, of course go to the ultimate issue: that no combination of conditions – either those set in the Bail Reform Act itself or any others that the magistrate or judge might find useful can "reasonably" assure that the defendant will appear for trial." *United States v. Xulam*, 84 F.3.d 441, 442 (D.C. Cir 1996) (citing U.S.C. § 3142(c)).   The constitutionality of the Bail Reform Act depends on adherence both to its procedural protections and to its requirements that the judicial officer make the detention

determination guided by the enumerated statutory factors, see *United States v. Salerno*, 481 U.S. 739, 750-53 (1987). As a result, the Act can only be constitutionally applied to Mr. Harmon if the Court evaluated alternatives to detention. Failure to consider those alternatives violated the statutes governing pretrial detention. This error is critical because an examination of the options for release compels the conclusion that there are available conditions of release that can be imposed on Mr. Harmon that are reasonably likely to assure his appearance at trial, making pretrial detention unnecessary and improper. Section 3142(c) sets out a laundry list of alternatives to detention, including the possibilities of requiring the defendant to:

- remain in custody of a designated person, who agreed to assume supervision;

- abide by specific restrictions on personal associations, place of abode, or travel;

- report on a regular basis to a designated law enforcement agency, pretrial services agency, or other agency;

- comply with a specified curfew

- execute an agreement to forfeit property upon failing to appear;

- execute a bail bond guaranteed by sureties;

- return to custody for specified hours following release for limited purposes; or

- satisfy any other condition that is reasonably necessary to assure the appearance of the person as required and to assure the safety of any other person and the community.

*Id.* 18 U.S.C. § 3142(c)

Mr. Harmon is willing to comply with each and every of the alternatives suggested by 3142(c). Additionally, Mr. Harmon is also willing to voluntarily participate 24-hour Active

GPS monitoring at his own expense[7], sign a waiver of extradition, and abide by any other conditions as determined by the Court.  The Government has already seized the passport of Mr. Harmon's wife Margo and she is willing to allow the Government to hold her passport during the pendency of this case.  His father, Larry Harmon Sr. is willing to pledge property for security for bond (**Ex. 2 at p. 76**).

The Magistrate based her findings on the potential for lengthy penalty, but the Government's evidence at the hearing directly contradicted their statements in their Memorandum in Support of Pretrial Detention.  In their motion they falsely indicated that the darknet markets were Helix' largest customers.  However, the testimony at the hearing proved that darknet markets were only 10-15% of the total amount of bitcoin processed through Helix.  By far the largest amount of bitcoin was from unknown sources. Even assuming the Government could trace some transaction that produced illegal proceeds, a proper calculation would be for less. Additionally, in calculating the proposed Sentencing Guideline range, the Government included a 6 level enhancement for knowledge that the funds were proceeds of or intended to promote drug offenses while in reality the Government admitted that they have not tracked a single transaction to a drug transaction.

The Magistrate Court also based its decision on "significant family or other ties outside the Unites States" but this connection is at best illusory.  Mr. Harmon rented a vacation property and Belize and would travel there to vacation.  While Mr. Harmon apparently kept some computer drives there, the Government admitted at the February 28, 2020 status conference that a large part

---

[7] Counsel has already contacted Ohio AMS which is a company which provides both voluntary and court ordered GPS supervision in Cleveland, Akron and the surrounding areas. www.ohioams.com

of the evidence seized in Belize appears to be movies.  There is absolutely no evidence that Mr. Harmon would be able to return to Belize.  Indeed, the Government has seized all of his assets in Ohio as well as all of his assets at his rental properties in California and Belize.  Both he and his wife's passports have been seized and he has agreed to be placed on an ankle-monitor.  The notion that he could flee to a rental property in a foreign country without a passport is far too tenuous to support Pretrial detention.

Lastly, the Court in its verbal finding found Mr. Harmon to be a flight rise based on an "unknown" and "potential" that Mr. Harmon could has access to funds if released from detention. This "unknown" "potential" is not enough to support a "serious risk of flight".

Courts have honored the presumption on bond even with dual citizens with much stronger ties to their foreign home countries,  In *United States v. Karni*, [8] the defendant never lived in the United States, owned no property in the United States, had no family or community ties in the United States, resided in a foreign county for the previous eighteen years and currently lived there with his wife and child.  *Id.* at 132.  The court granted bond and held that home detention, electronic monitoring, $100,000 bond secured by defendant's own funds, $75,000 bond signed by a co-signer, and release to custody of a rabbi, who must have someone with defendant 24 hours a day, 7 days a week, assured the defendant's appearance at future proceedings. *Id*. at 133.

 In the case involving the Madoff Ponzi scheme, the largest financial fraud in U.S. history, the Court ultimately decided that pretrial release was appropriate.  Madoff faced a maximum of 150 years in prison (a sentence which he ultimately received). Madoff also had access to substantial assets, presumed connections abroad, and even had violated the court's preliminary injunction

---

[8] *United States v. Karni*, 298 F.Supp.2d  (D.D.C. 2004).

prohibiting any transfer or dissipation of assets by "gifting" valuable jewelry and other items to his wife and friends. *Id.* at 245-46. Despite this, the court found that the Government failed to meet its burden to show that no condition or combinations of conditions would assure his presence and denied the Government's motion to detain. Madoff, *Id.* at 255.

In *United States v. Tomasz Holda*,[9] where the defendant faced mandatory consecutive sentences if convicted, had close ties to a few foreign countries, and had substantial financial resources, the court granted bond and held that cash and home equity deposits, home detention, 24 hour monitoring by FBI agents, weekly reports to AUSA and Pretrial Services by guards, electronic monitoring, and consent to searches at any time assured the defendant's appearance at future proceedings in the case.

In short, it is evident that there is an available set of conditions short of detention that can reasonably assure Mr. Harmon's appearance at trial. Magistrate Burke, however, simply failed to consider any of the alternatives. In doing so, she ignored the statutory procedures set in place to ensure that a defendant is not detained before trial without good reason.

WHEREFORE, Mr. Harmon respectfully request that this Court release him on some combination of conditions that it deems will reasonably assure his appearance at trial. As stated above, Mr. Harmon agreed to every additional condition within 3142(c) and will voluntarily pay for and comply with GPS monitoring.

---

[9] *United States v. Thomas Holda*, No. 1:04-CR-368 (N.S. Ga. July 28, 2004).

-12-

Respectfully submitted,


*/s/ Charles Flood*
Charles Flood
Flood & Flood Law Office
914 Preston at Main, Suite 800
Houston, TX 77002
(713) 223-8877; Fax (713) 223-8877
charles@floodandflood.com
Texas Bar License# 00798178
Fed I.D. 22508
**COUNSEL FOR LARRY HARMON**




## CERTIFICATE OF SERVICE

I hereby certify that on March 4, 2020, I filed the foregoing document to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing which will send such notice of filing to all filing users.


*/s/ Charles Flood*
Charles Flood