IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | CASE NO.: 5:20-MJ-1030 |
| ) | |
| Plaintiff, ) | KATHLEEN B. BURKE |
| ) | UNITED STATES MAGISTRATE JUDGE |
| v. ) | |
| ) | |
| LARRY DEAN HARMON, ) | GOVERNMENT'S MEMORANDUM IN |
| ) | SUPPORT OF PRETRIAL DETENTION |
| Defendant. ) | |

    The United States of America, by and through its attorneys Justin E. Herdman, United States Attorney for the Northern District of Ohio and Daniel J. Riedl, Assistant U.S. Attorney, Timothy Shea, United States Attorney for the District of Columbia, and Christopher B. Brown, Assistant U. S. Attorney, and Department of Justice Trial Attorneys C. Alden Pelker and S. Riane Harper, and respectfully moves this Court to detain the defendant, Larry Dean Harmon ("Harmon" or the "defendant"), as a serious risk of flight pending trial in this case. As the Indictment and evidence in this case demonstrate, Harmon is a sophisticated cyber criminal who ran one of the Darknet's largest bitcoin money laundering services, HELIX, without detection for more than three years. HELIX laundered more than $311 million in bitcoin transactions, mostly on behalf of some of the Darknet's most infamous illegal marketplaces, such as AlphaBay. Harmon has both the incentive and the means to flee. He is facing a *recommended Guidelines sentence* that begins at more than 19 years and goes well above the statutory maximum penalty of 20 years in prison, not to mention millions of dollars in forfeiture and other financial penalties. He has millions of dollars in cryptocurrency assets and significant foreign

EXHIBIT 1

ties including many connections to Belize.  Harmon is a serious flight risk and should be detained pending trial pursuant to 18 U.S.C. § 3142(f)(2)(A).

## APPLICABLE LAW

Under the Bail Reform Act, the defendant must be detained pending trial if the Court determines that no condition or combination of conditions "will reasonably assure the appearance of the person as required and the safety of any other person and the community."  18 U.S.C. § 3142(e).  A finding of either risk of flight or danger is sufficient for detention.  *See, e.g.*, *United States v. Ferranti*, 66 F.3d 540, 543-44 (2d Cir. 1995).

The government must prove the defendant presents a risk of flight only by a preponderance of the evidence, not by clear or convincing evidence or other, more demanding standards.  *United States v. Namer*, 238 F.3d 425, 2000 WL 187012, at *1 (6th Cir. Dec. 12, 2000) (unpublished) ("However, the government need only demonstrate the risk of flight by a preponderance of evidence."); *see also United States v. Alexander*, 742 F. Supp. 421, 423 (N.D. Ohio 1990) (same).

At a detention hearing, the government may present evidence by way of a proffer.  *United States v. Stone*, 608 F.3d 939, 948-49 (6th Cir. 2010) ("[C]onducting a bail hearing by proffer is acceptable under the law and at the discretion of the district court."); *United States v. Webb*, 238 F.3d 426, 2000 WL 1721060, at *2 (6th Cir. Nov. 6, 2000) (unpublished) ("The government may proceed in a detention hearing by proffer or hearsay.").

In assessing the risk of flight presented by the defendant, the Court must assess factors including (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; and (3) the history and characteristics of the defendant.  18 U.S.C.

2

§ 3142(g)(1)-(3).[1] As set forth below, each of these factors weighs in favor of detaining the defendant, Harmon.

## Bail Reform Act's Procedure for Out-of-District Arrests

The Bail Reform Act governs both the procedures for detention and the factors that courts should consider when evaluating a motion for pretrial detention. While a defendant may choose to challenge a detention motion in his district of arrest, the Act makes clear that the prosecuting district—here, the U.S. District Court for the District of Columbia—makes the final determination. 18 U.S.C. § 3145(a). *See, e.g.*, *United States v. Torres*, 86 F.3d 1029, 1031 (11th Cir. 1996) ("The plain language of section 3145 dictates that the district court with original jurisdiction over the offense, *i.e.*, the prosecuting district, here the Southern District of Texas, is the only proper one to review the order in question.").

Any order of release on bond in the arresting district is subject to an immediate stay pending an appeal in the prosecuting district, where the defendant would be transported in custody. *Torres*, 86 F.3d at 1031. Congress did not give authority to the courts in the arresting district to "dissolve the stay" of any bail order, as "a district judge in the district of arrest may not effectuate the defendant's release on bail and deprive the district of prosecution of the power to hear a revocation motion." *United States v. Velasco*, 879 F. Supp. 377, 378 (S.D.N.Y. 1995); *see also Torres*, 86 F.3d at 1031 (noting that under 18 U.S.C. § 3145 the arresting district lacks jurisdiction to challenge any stay order from the prosecuting district).

---

[1] The government is not relying on the defendant's danger to the community for detention under 18 U.S.C. § 3142(g)(4). However, it is worth noting that, should the defendant flee the United States before he is brought to trial, he has potentially huge cryptocurrency assets, foreign ties, and the Darknet programming abilities that would enable him to return to a life of cyber crime from anywhere in the world.

3

## FACTUAL BACKGROUND

On December 3, 2019, a federal grand jury in the District of Columbia returned a sealed, three-count indictment (the "Indictment") against Larry Dean Harmon on charges of Conspiracy to Launder Monetary Instruments, in violation of 18 U.S.C. § 1956(h); Operating an Unlicensed Money Transmitting Business, in violation of 18 U.S.C. § 1960(a); and Money Transmission Without a License, in violation of D.C. Code § 26-1023(c). An arrest warrant was issued the same day.

As summarized in the Indictment, which is incorporated by reference herein, Harmon operated a suite of Darknet services including GRAMS and HELIX.[2] Starting in or about April 2014, Harmon launched GRAMS, a Darknet search engine that enabled users to search for drugs or other illegal goods across multiple Darknet markets at once. Starting in or about July 2014, HARMON began operating HELIX, which was linked to and affiliated with GRAMS. HELIX was a bitcoin money laundering service, commonly referred to as a bitcoin "mixer" or "tumbler."[3] HELIX allowed customers to send bitcoins in a manner designed to obfuscate the source or ownership of the bitcoins.

Harmon advertised HELIX to customers on the Darknet as a way to conceal transactions

---

[2] The Darknet refers to a collection of hidden websites available through a network of globally distributed relay computers called the Tor network. They are hidden websites because, unlike standard Internet websites, on the Tor network there is no publicly available listing of the Internet Protocol (IP) addresses of servers hosting websites on the Tor network. The Darknet includes a number of hidden websites that sell illegal goods, like guns and drugs, and illegal services, like hacking and money laundering.

[3] Bitcoin is a virtual currency that exists in electronic form and is transacted through the Internet. The bitcoin protocol, or software, allows users to create "bitcoin addresses," roughly analogous to accounts. For security and privacy reasons, it is common for a single bitcoin user to control numerous bitcoin addresses, which are stored and controlled in a "bitcoin wallet." Each bitcoin address is controlled through the use of a unique "private key," akin to a password. Bitcoin is sometimes called a "cryptocurrency" because transactions are executed using public-key cryptography.

from law enforcement. Indeed, HELIX partnered with the Darknet market AlphaBay to provide bitcoin money laundering services for AlphaBay customers. At the time, AlphaBay was the largest Darknet marketplace in operation, offering a platform for customers to purchase a variety of illegal drugs, guns, and other illegal goods. The AlphaBay website recommended that customers use a bitcoin tumbler service and provided an embedded link to the Tor website for GRAMS/HELIX.

In total, HELIX laundered at least 354,468 bitcoins—the equivalent of approximately $311 million at the time of the transactions. The largest volume of funds sent through HELIX came from Darknet markets including AlphaBay, Agora Market, Nucleus, and Dream Market.

In or about December 2017, HARMON began to shut down operations for GRAMS/HELIX.

On February 6, 2020, federal law enforcement agents from the Internal Revenue Service-Criminal Investigation ("IRS-CI") and the Federal Bureau of Investigation ("FBI") arrested Harmon and executed search warrants for Harmon's residence and office properties in the Akron, Ohio area. On the same date, authorities in Belize executed a search of Harmon's vacation property in Belize pursuant to a Mutual Legal Assistance Treaty request.

**ARGUMENT**

**The Nature and Circumstances of the Offense**

Harmon is charged with serious felony offenses that could subject him to substantial criminal penalties. In Count One of the Indictment, Harmon is charged with money laundering conspiracy in violation of 18 U.S.C. § 1956(h), exposing him to a maximum sentence of up to 20

5

years imprisonment.[4]  Moreover, under the U.S. Sentencing Commission Guidelines Manual (the "Guidelines"), the *bottom* of the estimated Guidelines range is very near the 20-year statutory maximum.  As the Indictment states, Harmon conspired with co-conspirators including the administrator of AlphaBay to launder bitcoin transactions through HELIX.  Investigators tracked at least 21,996.74 bitcoin transactions sent from AlphaBay to HELIX, valued at more than $13 million at the time of the transactions.  With such a large volume of laundering activity (even assuming no significant criminal history), the estimated Guidelines range for Harmon begins at 235 months, *i.e.*, 19 years and 7 months, and goes well above the applicable 20-year statutory maximum:

| | | |
|---|---|---|
| U.S.S.G. § 2S1.1(a)(2) | Base offense level | 8 |
| U.S.S.G. § 2B1.1(b)(1)(K) | More than $9,500,000 | +20 |
| U.S.S.G. § 2S1.1(b)(1) | Knowledge that funds were proceeds of or intended to promote drug offenses | +6 |
| U.S.S.G. § 2S1.1(b)(2)(C) | Defendant in business of laundering | +4 |
| | Total offense level: | 38 |
| | **Sentencing range:** | **235-293 months** |

Although the actual sentence may end up being less than the statutory maximum of 20 years, this level of criminal exposure creates a significant incentive to flee.  Indeed, the assigned Article III judge in the District of Columbia, who would hear any appeal of this Court's detention decision, has found pretrial detention warranted in a money laundering case involving similar criminal exposure but with a *lower* Guidelines range.  *See United States v. Bikundi*, 47 F. Supp. 3d 131, 134 (D.D.C. 2014) (Howell, J.) (finding, where defendant faced 20-year statutory maximum on

---

[4] Under 18 U.S.C. § 1956(h), the penalty for money laundering conspiracy is "the same" as the penalty "prescribed for the offense the commission of which was the object of the conspiracy."  Here, the objects of the conspiracy included promotional money laundering under 18 U.S.C. § 1956(a)(1)(A)(i) and concealment money laundering under 18 U.S.C. § 1956(a)(1)(B)(i), both of which are 20-year offenses.

6

money laundering counts and a "substantial advisory sentencing Guideline range" of "168 to 210 months' incarceration," that "[t]his considerable punishment gives the defendant a substantial incentive to flee the United States") (internal quotations omitted).

In addition to any period of incarceration, Harmon is also facing millions of dollars in financial penalties. Those penalties include a forfeiture money judgment equal in value to all property involved in the operation of HELIX; as well as the forfeiture of specific properties—including real estate, vehicles, financial assets, and millions of dollars in cryptocurrency assets—that Harmon accumulated from HELIX or purchased with his illegal proceeds.

The nature of Harmon's criminal scheme also weighs in favor of detention. As the grand jury found in the Indictment, HELIX was specifically designed to enable users to make untraceable transactions online and evade law enforcement. In comments posted online under a pseudonymous moniker, Harmon boasted that "Helix uses new addresses for each transaction so there is no way LE would able [*sic*] to tell which addresses are helix addresses," referring to law enforcement by its common abbreviation, LE. Harmon further promoted HELIX with the line, "No one has ever been arrested just through bitcoin taint, but it is possible and do you want to be the first?" Harmon posted that he believed the Darknet primarily sold drugs and illegal items. And he partnered HELIX with some of the most infamous Darknet markets, such as AlphaBay, selling dangerous and illegal drugs to buyers worldwide. In total, HELIX laundered at least 354,468 bitcoins, the equivalent of $311 million at the time of the transactions.

Harmon's money laundering enterprise, moreover, was built on stealth and deception. Harmon operated HELIX for more than three years without being caught, before he decided to wind up operations in December 2017.[5] In additional online comments, Harmon discussed his

---

[5] Coincidentally, the market value of bitcoin peaked at its all-time high on or about

7

efforts to evade law enforcement scrutiny:

- "I don't want any UC [*i.e.*, undercover] working for me . . . Can you guys think of any ways I could make him prove he wasn't a UC?"
- "My server is not in the US unlike reddit's and has less of a chance of LE taking control . . ."

In sum, Harmon's extensive criminal exposure, the scope and sophistication of his enterprise, and his record of evading law enforcement all support the conclusion that he cannot be trusted to remain in the United States and face prosecution if he is released.

**The Weight of the Evidence Against the Defendant**

The government's case against the Defendant is strong. To begin with, this is an indicted case in which the grand jury found probable cause to believe Harmon is guilty of the charged offenses. The government's case rests on comprehensive electronic records and extensive financial analysis. For example, the government obtained records from Harmon's primary email account, d********@gmail.com, which was registered using the name "Larry Harmon" and Harmon's phone number. In that account, investigators found a photograph ("PHOTOGRAPH A") taken by a Google Glass device showing an open laptop computer with several browser tabs open.[6] Among other things, the computer in PHOTOGRAPH A was accessing *administrator* pages for GRAMS and TorAds (a Darknet advertising service associated with GRAMS), as well as an open page for HELIX. In other words, the person who took PHOTOGRAPH A was the

---

December 17, 2017, at $20,089.00 per bitcoin. *See* CoinMarketCap, Bitcoin (BTC) Historical Data, at https://coinmarketcap.com/currencies/bitcoin/historical-data/.

[6] Google Glass is a digital device similar to a mobile phone or smart watch attached to a pair of eyeglasses. A Google Glass device includes a camera mounted on the eyeglass frame that allows the user to take a photo from his or her vantage point.

8

administrator of GRAMS/HELIX.

There is no doubt that Harmon took the photograph. Photo metadata confirms that the photo was taken on or about October 23, 2014—shortly after the launch of GRAMS and HELIX earlier in 2014—in the vicinity of San Pedro, Belize. A lease agreement in Harmon's name shows that Harmon was leasing a vacation home at the Grand Caribe Resort in San Pedro, Belize, beginning in August 2014. The interior of the room shown in PHOTOGRAPH A matches publicly available photographs of rooms in the Grand Caribe Resort in San Pedro, Belize. Indeed, on February 6, 2020, Belizean authorities executed a search of Harmon's unit at the Grand Caribe Resort pursuant to a Mutual Legal Assistance Treaty request and recovered evidence corroborating Harmon's operation of GRAM/HELIX, including external hard drives, a cryptocurrency storage device, and a recovery seed key.[7]

Extensive additional evidence shows that Harmon was the GRAMS/HELIX administrator, including web history showing Harmon accessing administrative pages for GRAMS, text messages and emails related to payment for a server used in connection with GRAMS, and a massive volume of bitcoin traced from HELIX to cryptocurrency and other assets under Harmon's control. The government expects that full review of the digital devices and other items recovered through the searches on February 6, 2020 will yield additional evidence of Harmon's guilt.

**The Defendant's History and Characteristics**

Two factors weigh overwhelmingly in favor of detention: (1) Harmon's massive hoard of cryptocurrency assets, which are virtually untraceable and can be accessed from anywhere in

---

[7] A seed key or seed phrase is a list of words used to encode a bitcoin wallet address. Wallet software will typically generate a seed phrase and instruct the user to write it down on paper. The same software can be used to decode the seed phrase and reconstitute the wallet.

9

the world; and (2) Harmon's significant foreign ties, including financial and other ties to Belize.

First, Harmon is believed to have accumulated a massive amount of bitcoins through operation of HELIX. As the Indictment states, HELIX laundered at least 354,468 bitcoins while charging a 2.5% fee. That works out to fee income for Harmon of approximately 8,900 bitcoins—an astronomical volume of illegal proceeds, which would be close to $80 million at today's prices.[8]

Evidence collected in this case confirms that Harmon controls massive cryptocurrency assets. Law enforcement recovered a spreadsheet from Harmon's cloud storage entitled "Accounts.xlsx," dated October 18, 2018. The spreadsheet appears to be an accounting of Harmon's assets. It lists cryptocurrency and U.S. dollar assets totaling $56,939,610.00, including 6,284 in bitcoin and substantial holdings in other cryptocurrencies (1,013 Ethereum; 2,055 BitcoinCash; and 519 Bitcoin Gold). When Harmon was arrested on February 6, 2020, his mobile phone contained financial management app (similar to Mint.com) that appeared to show Harmon was monitoring a portfolio of cryptocurrency assets worth approximately $47,000,000. Searches of Harmon's residence and office space in Ohio and his vacation property in Belize recovered multiple cryptocurrency storage devices and recovery seed keys, showing Harmon's access to additional cryptocurrency assets held entirely offline. It is entirely possible that Harmon has additional cryptocurrency holdings not yet identified by the government—and, because cryptocurrencies like bitcoin can be accessed from anywhere in the world by someone with the right private key, Harmon could use these cryptocurrency assets to finance his flight from prosecution.

---

[8] The market value of bitcoin has fluctuated substantially between April 2014 and today. As of February 10, 2020, the price was $9,823.29 per bitcoin. *See* CoinMarketCap, Bitcoin (BTC) Historical Data, at https://coinmarketcap.com/currencies/bitcoin/historical-data/.

Second, Harmon has significant foreign ties in Belize. As noted above, Harmon leased a vacation property in San Pedro, Belize since at least 2014. When Belizean authorities searched Harmon's unit pursuant to a Mutual Legal Assistance Treaty request on February 6, 2020, they found a safe containing external hard drives, a cryptocurrency storage device, a recovery seed key, and a small amount of foreign currency—just the sort of supplies Harmon might need to finance a life on the run. In addition, an individual representing himself to be a lawyer for the resort and a personal acquaintance of Harmon showed up at Harmon's unit and engaged with the Belizean authorities while they were in the midst of their search.

In short, Harmon has the means to escape and a place to escape *to*. His enormous cryptocurrency holdings and his ties to Belize weigh heavily in favor of detention, and substantially outweigh any other considerations (such as Harmon's negligible criminal history—which is simply testament to his ability to evade law enforcement since at least 2014—or his family ties in the area). Combined with the other factors under 18 U.S.C. § 3142(g)—including Harmon's exposure to a lengthy term of imprisonment and significant financial penalties, as well as the government's strong evidence against him—the balance of considerations strongly favors detention of Harmon without bail pending trial.

# CONCLUSION

For the foregoing reasons, there is no condition or combination of conditions that can reasonably assure the defendant's appearance for proceedings in this case. The government respectfully requests that the Court grant the government's motion to detain the defendant without bail pending trial in this case.

                              Respectfully submitted,

                              JUSTIN E. HERDMAN
                              United States Attorney

By:    /s/ *Daniel J. Riedl*
         Daniel J. Riedl (OH: 0076798)
         Assistant United States Attorney
         United States Court House
         801 West Superior Avenue, Suite 400
         Cleveland, OH 44113
         (216) 622-3669
         (216) 685-2378 (facsimile)
         Daniel.Riedl@usdoj.gov


                              TIMOTHY SHEA
                              United States Attorney

By:    /s/ *Christopher B. Brown*
         Christopher B. Brown (D.C.: 1008763)
         Assistant United States Attorney
         555 4th Street, N.W.
         Washington, D.C. 20530
         Phone: (202) 252-7153
         Facsimile: (202) 514-6010
         Christopher.Brown6@usdoj.gov