1
2          UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF OHIO
3                  EASTERN DIVISION

4     UNITED STATES OF AMERICA,

5              Plaintiff,          Case No. 5:20MJ1030
                                   Akron, Ohio
6          vs.                     Tuesday, February 11, 2020
                                   3:09 p.m.
7     LARRY DEAN HARMON,

8              Defendant.

9

10         TRANSCRIPT OF IDENTITY/DETENTION HEARING
           BEFORE THE HONORABLE KATHLEEN B. BURKE
11              UNITED STATES MAGISTRATE JUDGE

12
      APPEARANCES:
13
      For the Government:  Daniel J. Riedl
14                         Office of the U.S. Attorney - Cleveland
                           Carl B. Stokes U.S. Courthouse
15                         801 Superior Avenue, West, Suite 400
                           Cleveland, Ohio 44113
16                         (216) 622-3600

17                         Christopher B. Brown
                           Office of the U.S. Attorney - DC
18
      For the Defendant:   Charles Flood
19                         Flood & Flood Law Office
                           914 Preston at Main, Suite 800
20                         Houston, Texas 77002
                           (713) 223-8877
21
      Court Reporter:      Caroline Mahnke, RMR, CRR, CRC
22                         Federal Building & U.S. Courthouse
                           2 South Main Street, Suite 568
23                         Akron, Ohio 44308
                           (330) 252-6021
24

25    Proceedings recorded by ECRO; transcript produced by
      computer-aided transcription.

EXHIBIT 2

Case: 1:19-cr-00385-BAH Document 152 Filed: 03/04/20 Page 2 of 95
Case 5:20-mj-01030-KBB Doc #: 13 Filed: 02/25/20 2 of 95. PageID #: 54

2

1       <u>Tuesday, February 11, 2020</u>

2               THE DEPUTY CLERK:  All rise.  This Honorable

3   United States Court for the Northern District of Ohio is now

4   open for the transaction of business.  The Honorable

5   Kathleen B. Burke presiding.

6           You may be seated.

7           The case before the Court carries Case Number

8   5:20MJ1030, United States of America versus Larry D. Harmon.

9               THE COURT:  Good afternoon.

10          Would counsel for the United States please introduce

11  himself for the record?

12              MR. RIEDL:  Good afternoon, Your Honor.  Thank

13  you.  Dan Riedl on behalf of the United States.  I'm joined

14  at counsel table with AUSA Chris Brown from the District of

15  Columbia, and also present are Riane Harper and Alden Pelker

16  from Main Justice.

17              THE COURT:  Who will be speaking for the

18  government?

19              MR. RIEDL:  I will be, Your Honor.

20              THE COURT:  Okay.

21          Would counsel for defendant please introduce himself?

22              MR. FLOOD:  Good afternoon, Your Honor.  Charles

23  Flood for Mr. Harmon, appearing pro hac vice.

24              THE COURT:  Good afternoon.

25          We did see on the docket your motion to be admitted

Case 1:19-cr-00395-BAH Document 152 Filed 03/04/20 Page 3 of 95
Case 5:20-mj-01086-KBB Doc #: 13 Filed: 02/25/20 3 of 95. PageID #: 55

3

1    pro hac vice, and I believe that's been granted.

2              MR. FLOOD:  Thank you, Your Honor.

3              THE COURT:  All right.  We also have in the

4    courtroom our Pretrial Services officer, Officer Julie Gray.

5         Good afternoon.

6              THE PRETRIAL SERVICES OFFICER:  Good afternoon,

7    Your Honor.

8              THE COURT:  All right.  This hearing was

9    scheduled as both an identity hearing and a detention

10   hearing.

11        The purpose of the identity hearing is to determine

12   whether probable cause exists to believe that the defendant

13   in the courtroom is the defendant named in the charging

14   document which is the indictment issued out of the District

15   of Columbia.

16        The purpose of the probable cause hearing is to

17   determine whether the government's motion for detention

18   should be granted or denied.

19        And before we begin, I do want to note that defendant

20   has a right to a detention hearing which may take place

21   either in this district or in the charging district which is

22   the District of Columbia.

23        However, he is entitled to only one detention hearing.

24   He may choose which district he wishes to have the hearing

25   in.

Case 1:19-cr-00395-BAH Document 152 Filed 03/04/20 Page 4 of 95
Case 5:20-mj-01086-KBB Doc #: 1-3 Filed: 02/25/20 4 of 95. PageID #: 56

4

1        So it's my understanding, Mr. Flood, that Mr. Harmon

2    does wish to have the detention hearing in this district; is

3    that correct?

4            MR. FLOOD:  That's correct, Your Honor.

5            THE COURT:  All right.  I'm going to start by

6    having counsel for the United States state the charges that

7    have been made against Mr. Harmon as well as the penalties

8    associated with those charges.

9            MR. RIEDL:  Thank you, Your Honor.

10        Mr. Harmon is charged in a three-count indictment.

11        Count 1 of the indictment alleges a violation of Title

12    18, United States Code, Section 1956(h).  That is conspiracy

13    to launder monetary instruments.

14        It carries a potential maximum penalty of 20 years of

15    imprisonment, a $250,000 fine, and three years of supervised

16    release.

17        Count 2 of the indictment alleges a violation of Title

18    18, United States Code, Section 1960(a).  That is operating

19    an unlicensed money transmitting business.

20        That carries a maximum potential penalty of five years

21    of imprisonment, a $250,000 fine, and three years of

22    supervised release.

23        Count 3 of the indictment alleges a violation of

24    District of Columbia Code Section 26-1023(e).  That alleges

25    a violation of money transmission without a license.

Case 1:19-cr-00395-BAH Document 152 Filed 03/04/20 Page 5 of 95
Case 5:20-mj-01036-KBB Doc #: 13 Filed: 02/25/20 4 of 95 PageID #: 57

5

1          That carries a maximum potential penalty of five years

2     of imprisonment, a $250,000 fine, and three years of

3     supervised release.

4          Each of those counts of conviction will also require a

5     $100 mandatory special assessment.

6          The indictment also has forfeiture provisions, Your

7     Honor.

8              THE COURT:  Mr. Riedl, you said, with respect to

9     Count 3, that it alleged a violation of D.C. Code Section

10    26-1023(e) whereas in the indictment it says 26-1023(c).

11             MR. RIEDL:  Thank you, Your Honor.  You're

12    correct.  It is (c).  My copy, it was difficult for me to

13    read.  But it is (c).

14             THE COURT:  All right.

15         Another preliminary matter -- and I did state this at

16    the time of the last hearing; I will state it again

17    today -- that since this is a case that comes from another

18    district, Mr. Harmon -- or defendant has the right to an

19    identity hearing to determine whether he is the person named

20    in the indictment.

21         During the hearing today as well as during the hearing

22    last week I indicated that I would address the defendant as

23    Mr. Harmon, but that my doing so or his responding when I

24    address him in that way is neither a finding on my part nor

25    an admission on his part that he is in fact the person named

Case 1:19-cr-00395-BAH Document 152 Filed 03/04/20 Page 6 of 95
Case 5:20-mj-01086-KBB Doc #: 13 Filed: 02/25/20 4 of 95 Page ID #: 58

6

1      in the indictment.  We will make that determination later

2      on.

3          All right.  Mr. Harmon, have you received a copy of

4      the indictment?

5               THE DEFENDANT:  Yes.

6               THE COURT:  And have you had an opportunity to

7      review the indictment with your attorney?

8               THE DEFENDANT:  Yes.

9               THE COURT:  All right.  As I advised you at the

10      time of your initial appearance in this matter, you do have

11      a constitutional right to be represented by an attorney at

12      every stage of the proceedings in the case.

13          I also advised you that if you could not afford to

14      hire an attorney, the Court would appoint one without cost

15      to you to represent you.

16          Do you understand your right to an attorney?

17               THE DEFENDANT:  Yes.

18               THE COURT:  I understand that you have retained

19      Mr. Charles Flood who is seated next to you to be your

20      attorney in this matter.

21          Is that correct?

22               THE DEFENDANT:  Yes.

23               THE COURT:  The other thing I advised you of at

24      the time of the last proceeding is that you have a right to

25      remain silent.

1          You are not required to make any statement, and any

2     statement you do make may be used against you.  If you start

3     to make a statement, you may stop at any time.  You may also

4     speak with your attorney at any time.

5          Do you understand your right to remain silent?

6               THE DEFENDANT:  Yes.

7               THE COURT:  All right.  Let me now ask both

8     counsel, have you received a copy of the Pretrial Services

9     report?

10         Mr. Riedl?

11              MR. RIEDL:  Yes, Your Honor.

12              THE COURT:  And Mr. Flood?

13              MR. FLOOD:  Yes, Your Honor.

14              THE COURT:  All right.  Are both parties -- have

15    both parties had an adequate opportunity to prepare?

16         Mr. Riedl?

17              MR. RIEDL:  Yes, Your Honor.

18              THE COURT:  And Mr. Flood?

19              MR. FLOOD:  Yes, Your Honor.

20              THE COURT:  Okay.  Let me now confirm that this

21    is not a case as to which a presumption applies under 18

22    United States Code, Section 3142.

23         Mr. Riedl?

24              MR. RIEDL:  That's correct, Your Honor.

25              THE COURT:  And Mr. Flood?

1    MR. FLOOD:  Yes, Your Honor.  Correct.

2    THE COURT:  All right.  Mr. Harmon, at this

3  hearing you have the right to cross-examine any witnesses

4  that the government may present, and you also have the right

5  to present evidence in your own behalf.

6    You have the right to testify, but you're not required

7  to do so.

8    As I mentioned earlier, you do have the right to

9  remain silent.

10   You also have the right to speak with your attorney at

11  any time during the hearing.

12   The rules of evidence do not apply to this proceeding.

13  Both parties have the right to proceed in whole or in part

14  by way of proffer.

15   The evidence and the examinations are limited to the

16  identity and detention determinations.  In other words, the

17  hearing is not to be used to obtain discovery or to produce

18  testimony that can be used for subsequent impeachment at

19  trial.

20   The Court will not consider motions to suppress

21  evidence or objections to evidence allegedly obtained

22  unlawfully at this hearing.

23   The order of presentation is that the government will

24  proceed first with its evidentiary presentation and should

25  present evidence to both the -- relevant to both the

Case 5:19-cr-00385-RBH Document 152 Filed 03/04/20 Page 9 of 95
Case 5:19-mj-01088-KBB Doc # 13 Filed 02/25/20 9 of 95 Page ID #: 61

9

1    identity and detention determinations.

2         That will be followed by the defense's presentation of

3    evidence.

4         And following the evidentiary presentations, the Court

5    will hear brief argument from both counsel as to the

6    identity and detention determinations and the factors that

7    the Court must consider.

8         Is the government ready to proceed, Mr. Riedl?

9              MR. RIEDL:  Yes, Your Honor.

10              THE COURT:  All right.  You may present your

11   first witness.

12              MR. RIEDL:  Thank you, Your Honor.  The

13   government calls Special Agent Jeremy Haynie.

14                        JEREMIAH HAYNIE,

15         of lawful age, a witness called by the Government,

16           being first duly placed under oath, was examined

17                     and testified as follows:

18              THE COURT:  You may proceed.

19              MR. RIEDL:  Thank you, Your Honor.

20           DIRECT EXAMINATION OF JEREMIAH HAYNIE

21   BY MR. RIEDL:

22   Q.    Could you please state your name and spell your last

23   name?

24   A.    Jeremiah Haynie, H-A-Y-N-I-E.

25   Q.    Thank you.

Case 5:19-cr-00395-BAH Document 152 Filed 03/04/20 Page 10 of 95
Case 5:19-mj-01030-KBB Document 1-2 Filed 02/25/20 10 of 95 PageID #:52

10

```
 1          Where do you work?

 2    A.    I work for the IRS Criminal Investigation Division.

 3    Q.    What do you do there?

 4    A.    I'm a special agent.

 5    Q.    How long have you been a special agent with the IRS?

 6    A.    18 years.

 7    Q.    Where did you go to school?

 8    A.    Alma College.

 9    Q.    That was Alma, A-L-M-A?

10    A.    A-L-M-A, correct.

11    Q.    Thank you.

12          And what was your degree?

13    A.    I have a business degree and a minor in mathematics.

14    Q.    Shortly after graduating from college, did you join

15    the IRS?

16    A.    Yes.

17    Q.    And have you been assigned to multiple roles within

18    the IRS?

19    A.    I have, yes.

20    Q.    Most recently, what is your current assignment?  What

21    unit within the IRS are you assigned to?

22    A.    I'm assigned to the Cyber Crimes Unit out of

23    Washington D.C.

24    Q.    And can you tell us what types of crimes that unit

25    focuses on?
```

1    A.    Financial crimes with a large Internet component.

2    Q.    You said the unit is headquartered in D.C.  Are you

3    personally stationed in D.C.?

4    A.    No.  I sit in Lancing, Michigan.

5    Q.    Have you investigated crimes involving cryptocurrency?

6    A.    I have, yes.

7    Q.    Could you briefly describe that?

8    A.    Conducted a number of investigations, currently

9    conducting a number of investigations involving tracing

10   bitcoin and other cryptocurrency.

11   Q.    Were you involved in the Liberty Reserve

12   investigation?

13   A.    I was.

14   Q.    What was your role in that investigation?

15   A.    I was the lead IRS special agent in that

16   investigation.

17   Q.    Could you describe briefly what that case was?

18   A.    Liberty Reserve was a virtual currency, similar to

19   PayPal, except they did not verify the identities of their

20   customers.  They did not have any anti money laundering

21   controls in place.  Therefore, it was used primarily by

22   criminals engaged in, largely, investment schemes, selling

23   stolen credit card data, and other Internet fraud.

24   Q.    Have you received training in tracing cryptocurrency?

25   A.    Yes.

1    Q.    Can you briefly describe that?

2    A.    The IRS is provided training from individuals that

3    provide blockchain type analysis services and products.  I

4    received training from those companies.

5    Q.    Have you also taught or provided training to others

6    regarding cryptocurrency?

7    A.    Yes.  I coauthored the IRS training module that's used

8    down at our Federal Law Enforcement Training Center in

9    Georgia.

10   Q.    Have you also put on trainings for others?

11   A.    I have, yes.

12   Q.    Could you describe that?

13   A.    I put on approximately 12 trainings for other law

14   enforcement agencies, special agents within the IRS,

15   individuals in the banking industry as well.

16   Q.    What is that training about?  Can you give us an

17   overview of what types of categories of things you teach

18   people?

19   A.    Yes.  It's typically a Bitcoin 101 type of training,

20   how it works.

21         As we kind of advance further into the training,

22   depending on how long it is, it could entail tracing

23   bitcoin, what to do if you come across a bitcoin address,

24   how to figure out if there is any transactions associated

25   with it, or a balance, the address or what.

1    Q.    What about recovering physical evidence relating to

2    bitcoin and digital evidence relating to bitcoin?

3        Do you teach that?

4    A.    So as far as the physical evidence, we do -- I do

5    teach what we look for as far as QR codes, which is kind of

6    like a bar code type of thing, the different hardware

7    wallets or devices that are kind of like thumb drives that

8    you can store bitcoin on, what type of apps to look for if

9    you're looking at somebody's phone that might show that

10    they're trading in the buying and selling of bitcoin.

11    Q.    Are you familiar with the investigation into Larry

12    Harmon?

13    A.    Yes.

14    Q.    How are you familiar with that investigation?

15    A.    So that investigation is being conducted out of my

16    group.  Again, it's based in Washington D.C., the Cyber

17    Crimes Unit.

18    I am not the case agent on the investigation.  I'm

19    just assisting as needed.

20    THE COURT:  I'm sorry.  You said you're not the

21    case agent, but you're what?

22    THE WITNESS:  I'm assisting as needed.

23    THE COURT:  Okay.

24    BY MR. RIEDL:

25    Q.    Specifically, what things have you done in this

1    investigation?

2    A.    I have helped review records, bitcoin transaction type

3    records.  I've participated in surveillance.  And

4    specifically for this hearing, I've reviewed documents.

5    Q.    And have you spoken to the case agent in preparation

6    for this hearing?

7    A.    Yes, I have.

8    Q.    And did you also assist in surveillance during the

9    investigation?

10   A.    Yes, I did.

11   Q.    And you said you assisted with the search warrant; is

12   that right?

13   A.    I'm not sure if I said that, but I did assist with the

14   search warrant last week.

15   Q.    I would like to turn your attention to the exhibit

16   binder that I'm going to hand you.

17               MR. RIEDL:  May I approach the witness, Your

18   Honor?

19               THE COURT:  I want to make sure that you have

20   shared that with opposing counsel.

21               MR. FLOOD:  He has, Your Honor.

22               THE COURT:  And have you had adequate time to

23   review it?

24               MR. FLOOD:  I have, Your Honor.

25               THE COURT:  Okay.  Very good.

1          You may proceed.

2              MR. RIEDL:  Thank you.

3     BY MR. RIEDL:

4     Q.   Are you familiar with all of the exhibits contained in

5     this binder?

6     A.   Yes, I am.

7     Q.   And you had a chance to review them before the

8     hearing; is that correct?

9     A.   Yes, I have.

10    Q.   If you could turn your attention to Government's

11    Exhibit 1, please.

12         How does this relate to the investigation into Larry

13    Harmon?

14    A.   So these are -- I guess I'll start with, the top half

15    of Exhibit 1 is a screen shot of Grams, which is a search

16    engine for searching the Darknet market, or Darknet markets.

17         And we've concluded that Larry Harmon was the

18    administrator of Grams, the person in charge of the website.

19    Q.   And the bottom half?

20    A.   The bottom half is a screen shot of Helix which is a

21    bitcoin mixer.  Bitcoin mixers help -- bitcoin mixers are

22    used to obfuscate the source of bitcoin.

23         We can probably get into that later.

24    Q.   We will.

25         And is this Helix mixer, is that also related to Larry

1    Harmon?

2    A.    Yes, it is.

3    Q.    And we'll get into those in more detail, as you said.

4          So starting first with Grams and turning to

5    Government's Exhibit 2.

6          What does Government's Exhibit 2 show us?

7    A.    This is an example of entering "cocaine" into the

8    Grams search bar and the results that are returned as a

9    result of that.

10         If you look at the different entries there, you can

11   see that these are entries into the dark web marketplace.

12   This is dark web websites where you can purchase cocaine

13   from them.

14         They also include vendor names in there, so where the

15   cocaine will come from, the price of the cocaine.

16         So it helps you be able to search for whatever you're

17   looking for very quickly.

18   Q.    Okay.  I'm going to zoom out for a second, and we're

19   going to define some of the words you just used in that

20   description.

21         So starting first with the dark web.

22         Can you give us a very short or brief overview of what

23   the dark web is?

24   A.    So the dark web is a collection of websites where you

25   need specialized software to access these websites.  That

1     software anonymizes your IP address or things that law

2     enforcement would use to identify you.

3          And that software also anonymizes the website that

4     you're connecting to so me, as a law enforcement agent,

5     would not be able to figure out where that website is

6     hosted.

7     Q.    And you said Grams was a search engine.  Is that

8     similar to how Google is a search engine for the clear web?

9     A.    Yes.  In fact, it's designed the same way basically

10    with the letters and everything.

11    Q.    Okay.  And when I perform a search on Grams, what is

12    it searching?  What database is it looking at?

13    A.    Grams reaches out to the dark web marketplaces and

14    pulls the results directly from the dark web marketplaces.

15    Q.    So what is a dark web marketplace?

16    A.    A dark web marketplace is kind of like an eBay type of

17    shop where buyers and sellers of, in this case it would be

18    illegal items since it's a dark web marketplace, but buyers

19    and sellers of these illegal items can come together and the

20    sellers can sell illegal things to the buyers.

21         Typically it's narcotics, illegal narcotics that are

22    listed on there.  There is also stolen credit card data,

23    malware, those type of illegal items.

24    Q.    Are things on the dark web automatically illegal just

25    by being on the dark web?

1   A.   No.

2   Q.   Okay.  So when you said these marketplaces tended to

3   have illegal things, what are you basing that on?  Is that

4   based on your experience with these marketplaces?

5   A.   Correct.

6   Q.   Okay.  And so would it be common to find items that

7   were legal or allowed to be had, would it be normal to find

8   legal items on dark web marketplaces?

9   A.   No.

10  Q.   We're going to skip ahead briefly to Government's

11  Exhibit 14.

12       Do you recognize that?

13  A.   Yes.

14  Q.   What is that?

15  A.   These are excerpts from an online forum called Reddit.

16  The gramsadmin are things that gramsadmin, which is a user

17  name, has posted on Reddit.

18  Q.   And so Grams is relative to the Grams search engine

19  that we just talked about?

20  A.   Correct.  So admins typically -- the term "admin,"

21  when used on the dark web or these types of investigations,

22  typically means the individual that is controlling the

23  website.

24  Q.   And did the investigation determine who they believe

25  is the author of this subforum?

1   A.   Yes, Larry Harmon.

2   Q.   Who is it?

3   A.   Larry Harmon.

4   Q.   Thank you.

5        And then could you highlight -- there are a couple of

6   items that are already highlighted, but I would like to

7   start in the first paragraph about the third of the way

8   down.

9        There is a mention, "I don't want any UC working for

10  me."

11       What does "UC" stand for?

12  A.   Undercover.

13  Q.   Thank you.

14       And then the first highlighted portion.  Can you tell

15  us what that is and what it means?

16  A.   It says, "My server is not in the U.S. unlike Reddit's

17  and has less of a chance of LE taking control without LE

18  even needing to do a MITM."

19  Q.   So what does LE stand for in common parlance?

20  A.   Law enforcement.

21  Q.   And MITM, is that a phrase that's used on the dark

22  web?

23  A.   Yeah, it's used outside of the dark web as well, but

24  it means man in the middle.  It's an attack where somebody

25  gets in between communication.

Case 1:19-cr-00395-BAH Document 152 Filed 03/04/20 Page 20 of 95
Case 5:20-mj-01030-KBB Document 19-1 Filed 02/25/20 20 of 95 PageID #72

20

1    Q.    And when there is a discussion of "my server," what

2    role does a server play in a dark web marketplace or dark

3    web site?

4    A.    So server is what the user actually communicates with.

5    So it's what produces the images you see on the website.

6    Q.    And then skipping to the second highlighted portion in

7    the bottom paragraph, can you tell us what that says and

8    what that means?

9    A.    Says, "Helix uses new addresses for each transaction

10   so there is no way LE would able to tell which addresses are

11   Helix addresses."

12   Q.    What does that mean?

13   A.    That, again, is an obfuscation technique where if the

14   same addresses were used, we would, we being lawsuit, would

15   have a better idea of what's going on.

16        But in this case, since different addresses are used,

17   it's harder to attribute users to specific addresses.

18   Q.    And we'll talk about that in a little more detail here

19   shortly.

20        We're going to skip back now to where we were and move

21   on to Government's Exhibit 3, please.

22        What is this, please?

23   A.    This is a screen shot showing how Helix worked.

24   Q.    And this looks to be of a web browser.  Is this a

25   normal web browser?

1    A.    No, this is a Tor web browser.

2    Q.    And what is a Tor web browser used for?

3    A.    A Tor browser is used to access the dark web and to

4    access websites that are on Tor.

5    Q.    Once I've installed -- once a user has installed the

6    Tor browser on his or her computer, does it operate

7    generally like a normal Internet browser that we're used to?

8    A.    Yeah, pretty much.

9    Q.    So all of the things that make the communications

10   anonymous, does the user have to be a computer programmer or

11   some sort of genius to use that?  Or from the user's

12   perspective, does it work normally like a normal web browser

13   would work?

14   A.    It would work normally like a web browser would work.

15   Q.    So where does all the anonymizing take place if I'm

16   browsing the dark web?

17   A.    That's in the software itself.

18         And so what the browser does is it directs the

19   Internet traffic to different what are called Tor nodes,

20   which there is encryption involved, and it bounces through

21   different Tor nodes to anonymize the Internet traffic.

22   Q.    Thank you.

23         So going back to Exhibit 3, you said this was an

24   advertisement or a description on the dark web of how Helix

25   worked.  And can you describe what this -- what this says?

1    A.    Yeah, so the very bottom image is a blow-up of what's

2    at the top here.

3          So how Helix works, "enter your bitcoin address in the

4    box above," "send your dirty coins to the Helix address,"

5    "new clean coins sent to your bitcoin address."

6    Q.    "Dirty coins," what does that mean?

7    A.    Coins that had been used for illegal means -- or

8    received for likely selling illegal things.

9    Q.    And when we say "coins," are we talking about change

10   in my pocket?

11   A.    No, bitcoin.

12   Q.    And then "clean coins," "new clean coins," what does

13   it mean, like when you talk about new coins, what are we

14   referring to here?

15   A.    So the way these mixers work is after receiving

16   bitcoin from a number of users, they tumble and mix those

17   coins together.

18         And "tumble" just means they send it to additional

19   bitcoin wallets that they control to distance that bitcoin

20   from the original illegal source.

21         And then what I guess is called the clean coins is

22   what then they are able to pay out to their users after

23   having laundered the bitcoin for them.

24   Q.    And if an individual has used a tumbler like Helix, if

25   they passed their bitcoin through a tumbler like Helix, does

1    that make it easier or harder for you as law enforcement to

2    identify the true source of that bitcoin?

3    A.    Harder.

4    Q.    I would like to turn now to the next exhibit.  That is

5    Government's Exhibit 4.

6          What is that, please?

7    A.    This is a chart that was created to illustrate how

8    bitcoin passed through Helix.

9    Q.    So on the far left side we see two sources of bitcoin.

10         And what were those sources?

11   A.    On the left side we have known illegal entities

12   sending bitcoin into Helix.

13         On the bottom we have unknown entities or customers

14   sending bitcoin into Helix.

15   Q.    And when, after the coin got processed -- gets

16   processed into Helix, it's shown going in two different

17   directions on the right there.  What are those two

18   directions?

19   A.    So after it goes through Helix, the bitcoin is sent to

20   the users and minus a transaction fee which goes to the

21   administrator of Helix.

22   Q.    And who was the administrator of Helix?

23   A.    Larry Harmon.

24   Q.    I would like to skip ahead to Government's Exhibit 10.

25         Is this essentially a portion of the last chart we

Case 1:19-cr-00395-BAH Document 152 Filed 02/23/24 Page 24 of 95
Case 5:19-mj-01030-HBB Doc #: 13 Filed: 02/25/20 Page: 24 of 95 PageID #: 76

24

1    just looked at?

2    A.    Yes.

3    Q.    So it shows some money going, on the top right, to

4    Helix users and then some money going to Larry Harmon; is

5    that correct?

6    A.    It is, yes.

7    Q.    How much -- there is a number here, 8,861 bitcoin.

8    Where did that number come from?  How is that number

9    determined?

10   A.    That came from multiplying two and a half percent

11   times the total number of bitcoin that we've identified that

12   went through Helix, which is 354,468.

13   Q.    Why two and a half percent?  How did you come up with

14   the two and a half percent transaction fee?

15   A.    That was the transaction fee that Helix took from each

16   transaction.

17   Q.    So that was a known or a publicly announced fee?

18   A.    Correct.

19   Q.    And did IRS actually process some bitcoin through

20   Helix?

21   A.    Yes.

22   Q.    And was that transaction fee taken out of those funds?

23   A.    Yes.

24   Q.    The amount here, 8,861 bitcoin, doesn't seem like a

25   terribly high figure.

Case 5:19-cr-00395-RBH Document 152 Filed 02/25/20 Page 25 of 57
Case 5:19-cr-00395-RBH Document 152 Filed 02/25/20 Page ID #57

25

1          What is that worth in today's United States dollars?

2     A.    Approximately $80 million.

3     Q.    I'd like to turn back now to Government's Exhibit 5.

4          When we looked at Government's Exhibit 4, it showed

5     that there was bitcoin coming in from marketplaces and

6     bitcoin coming in from unknown customers.

7          Where did most of the bitcoin come from?

8     A.    Most of the bitcoin came from unknown customers.

9     Q.    And is that illustrated in Government's Exhibit -- is

10    that what's illustrated in Government's Exhibit 5?

11    A.    So most of the known bitcoin that came into Helix came

12    from illegal marketplaces.

13    Q.    Thank you.

14         And is that what's illustrated in Government's Exhibit

15    5?

16    A.    It is, yes.

17    Q.    So what is this?  Can you tell us what this is showing

18    us?

19    A.    This shows the amount of bitcoin that we traced from

20    illegal marketplaces that were deposited into the Helix

21    mixer.

22    Q.    And so all of those names and logos sitting around

23    Helix on the left side of Government's Exhibit 5, what are

24    those?

25    A.    Those are Darknet marketplaces.

1    Q.    And what types of things did those marketplaces sell?

2    A.    Mostly illegal narcotics, fraudulently obtained stolen

3    credit card information, malware. Those type of things.

4    Q.    So did any of those sites primarily sell Beanie Babies

5    or any other legal items?

6    A.    No.

7    Q.    And then the chart on the right, what does that show?

8    A.    That shows the amount. So, for example, the first

9    market, reading from left to right, is AlphaBay Market.

10    21,996 bitcoin that we traced from AlphaBay directly to

11    Helix. And that had an equivalent at the time, or a U.S.

12    dollar value at the time of the transaction of over $13

13    million.

14    Q.    Turning now to Government's Exhibit 6.

15    Did Helix have a special relationship with the Darknet

16    market AlphaBay?

17    A.    Yes.

18    Q.    So can you tell us briefly what AlphaBay was?

19    A.    AlphaBay, as we've discussed, is a Darknet market, and

20    it sold primarily illegal narcotics.

21    Q.    What was the special relationship that Helix had with

22    AlphaBay?

23    A.    Helix had access to the listings on AlphaBay.

24    So -- or I'm sorry. I'm thinking of Grams.

25    Helix -- AlphaBay suggested or recommended to its

1    customers that they run their bitcoin through Helix.

2    Q.    And so where did Government's Exhibit 6, where was

3    that taken from?

4    A.    This is a screen shot from the AlphaBay website.

5    Q.    And the last paragraph talks about Grams Helix.

6          And what does it say about Grams Helix?

7    A.    It says, "Grams Helix is a tumbler and Darknet content

8    indexer.  They are the Google of the Darknet and have a

9    tumbling service."

10   Q.    So when it says "they are the Google of the Darknet,"

11   you started to talk about the fact that Grams had the

12   ability to search AlphaBay.  Is that what they're describing

13   there, the Google of the Darknet?

14   A.    Yes.

15   Q.    And then "and have a tumbling service."  Which service

16   are they referring to there?

17   A.    Helix.

18   Q.    And I would like to talk primarily, though, about the

19   first paragraph of text that was on the AlphaBay Market.

20         What does that say?

21   A.    It says, "Tumbling your coins is a popular way to

22   erase any trace of your coins coming from AlphaBay."  It

23   says, "In some cases, using the blockchain, a determined

24   investigator can trace you back to AlphaBay.  Tumbling your

25   coins for a small fee, normally one to three percent,

1    ensures that you will never be traced back to here.  We

2    recommend two tumblers who have proven themselves as

3    reliable."

4    Q.    Thank you.

5          I would like to turn now to the next exhibit.  That is

6    Government's Exhibit 7.

7          What is that?

8    A.    This is a document that we received pursuant to a

9    search warrant to Google for the gmail account

10   doolbman1@gmail.com.

11   Q.    Whose account was that?

12   A.    Larry Harmon.

13   Q.    And is that actually also the name on the account?

14   A.    Yes, it is.

15   Q.    Are there other identifiers on the account that tell

16   you that that was in fact Larry Harmon's e-mail account?

17   A.    Yes.  Highlighted a little more than halfway down the

18   page is the recovery e-mail address, larry@hwisite.com.

19   Q.    What is a recovery e-mail account?

20   A.    It's used in case you lose access to your primary

21   e-mail account, Google can send you a password reset.  They

22   can also use it to talk to you outside of your primary

23   e-mail if you lose access to it.

24   Q.    And this larry@hwisite.com, whose e-mail account is

25   that?

Case 5:19-cr-00395-BAH Document 152 Filed 03/04/20 Page 29 of 95
Case 5:19-mj-01080-KBB Doc #: 18-1 Filed: 02/25/20 29 of 95. PageID #: 81

29

1   A.   Larry Harmon.

2   Q.   How do you know that?

3   A.   We've seen it on many different documents, but, for

4   example, one place that we saw it was on a -- it's the Apple

5   I.D. for the telephone that we found next to Mr. Harmon when

6   we did the search warrant.

7        Also the H-W-I part of the hwisite at the end of the

8   domain there stands for Harmon Web Innovations.

9        And hwisite.com is under construction but lists Larry

10  Harmon as the owner.

11  Q.   What is Harmon Web Innovation?

12  A.   It's a business operated by Larry Harmon.

13  Q.   Thank you.

14       And there is a phone number that's also highlighted.

15  Were you able to associate that phone number with Larry

16  Harmon?

17  A.   Yes.

18  Q.   How?

19  A.   We found this phone number -- this phone number was

20  used to register a PayPal account in the name of Larry

21  Harmon.

22  Q.   Under "Services," jumping back up higher in that

23  section, it lists Services.

24       Generally when it says "services," what are we

25  referring to?

1   A.    So these are services that Google provides to its
2   customers.  And this tells us which services the individual
3   listed here is registered to be using.
4   Q.    And one of the services listed on the second line is
5   Glass.  Are you familiar with what that is?
6   A.    Yes.  Google Glass are glasses that Google created,
7   developed.  They have a camera facing out, and they have a
8   display on the inside that the user can see, kind of operate
9   like a smartphone.
10  Q.    I'm going to ask you to skip ahead now to Government's
11  Exhibit 12, please.
12        What is this, please?
13  A.    This is an e-mail that we recovered as a result of a
14  search warrant to Google.  It's from Larry Harmon, and the
15  e-mail address is larry@hwisite.com.
16  Q.    That's the same e-mail account we saw as the recovery
17  account on Government's Exhibit 7; is that right?
18  A.    That's correct.
19  Q.    Thank you.
20        Go ahead.
21  A.    Its subject says "driver's license," and it looks to
22  be sent to a car dealership.
23        And the body of the e-mail says, "Hey, you called
24  about needing a copy of my driver's license for the juke we
25  paid in cash.  It is attached, and my social is," which has

1    been redacted in this copy.

2    Q.    So there are several items in this copy that have been

3    redacted; is that right?

4    A.    That's correct.

5    Q.    Have you reviewed the original unredacted version of

6    this e-mail?

7    A.    Yes, I have.

8    Q.    And in the original version, those portions that are

9    redacted, are those Larry Harmon's personal identifying

10   information?

11   A.    Yes, they are.

12   Q.    And the Larry Harmon that we've been discussing so far

13   throughout this case, do you see him in the courtroom here

14   today?

15   A.    Yes, I do.

16   Q.    Could you please point him out and describe what he's

17   wearing?

18   A.    He's sitting at the defendant's table wearing an

19   orange jumpsuit.

20            MR. RIEDL:   Thank you.

21       Your Honor, I would ask that the record reflect that

22   the witness has identified the defendant.

23            THE COURT:   The record will reflect that the

24   witness has identified the defendant seated at the table in

25   the front of the courtroom.

Case 5:19-cr-00395-BAH Document 152 Filed 03/04/20 Page 32 of 95
Case 5:19-cr-00395-BAH Document 119 Filed 02/25/20 Page 10 of 84

32

1      MR. RIEDL:  Thank you, Your Honor.

2    BY MR. RIEDL:

3    Q.    I would like to turn now to Government's Exhibit 8.

4          What is that?

5    A.    This is a photo that we recovered from the search

6    warrant to Google.

7    Q.    And when you say "recovered from the search warrant to

8    Google," whose Google account was that search warrant to?

9    A.    Larry Harmon.

10   Q.    And was this photo saved in that Google account?

11   A.    Yes.

12   Q.    What is this a picture of?

13   A.    The background shows the condo that Larry Harmon has,

14   a vacation type condo, located in Belize.  We know this

15   because we've been to that condo.  We've also seen public

16   pictures of condos of similar nature.  And we also know this

17   because this photo itself has metadata within it, which is

18   just data that accompanies a photo, showing the latitude and

19   longitude where this photo was taken which correlates to San

20   Pedro, Belize.

21   Q.    Was the IRS able to determine whether Larry Harmon was

22   actually in Belize when this photo was taken?

23   A.    Yes.  There was a social -- well, this photo was taken

24   October 23, 2014.  There was a social media post dated

25   October 5, 2014 that showed that Larry Harmon was in Belize.

1    Q.    Thank you.

2          I would like to turn now to Government's Exhibit 9.

3          What is that, please?

4    A.    So this is just a blow-up or a zooming-in of the

5    computer screen that's pictured in the Government's Exhibit

6    Number 8.

7    Q.    So it's the same as Government's Exhibit 8, just blown

8    up on the computer screen?

9    A.    That's correct.

10   Q.    And what does this show?

11   A.    Starting from the annotation on the left, "GramsAdmin

12   Page," you can show that -- you can see that that tab has

13   "Admin" on it and "Testing."

14         And then you can also see that it's highlighted,

15   meaning it's a brighter color than the other tabs around it.

16         So if you kind of follow that tab down and to the

17   left, you can see "Grams," the same logo that we saw in

18   Exhibit Number 1, on that page.

19              THE COURT:  I'm sorry.  I'm trying to see where

20   you're looking.  You're looking next to the black bar, it

21   says "Grams"?

22              THE WITNESS:  That's correct.

23   BY MR. RIEDL:

24   Q.    So is it in the bottom left of the photograph that you

25   can read "Grams"?

34

1    A.    That's correct.

2    Q.    And how do you know that that is the tab that's

3    selected and is related to "Admin - Testing"?

4    A.    It's highlighted.  The tab is highlighted.  So it's a

5    brighter color than the tabs behind it.

6          So as you click on these other tabs, they'll highlight

7    and that one will darken.

8              MR. RIEDL:  Does that make sense, Your Honor?

9              THE COURT:  Yes.

10             MR. RIEDL:  Okay.

11   BY MR. RIEDL:

12   Q.    If we could move on to the next annotation.

13         What is that?

14   A.    Yes.  The next one to the right is labeled "Helix

15   Update Tab."  And reading the tab, there is some

16   random -- well, it looks random letters to me, and there is

17   a slash, and then it says "Helix Update," which ends that

18   tab.

19   Q.    And the next annotation?

20             THE COURT:  You know, I don't know that I know

21   where you were just looking.

22         I have the "Admin - Testing."  Where are you looking

23   now?

24             THE WITNESS:  So I've moved two tabs to the right

25   under our next yellow arrow.

1    THE COURT:  Okay.  Thank you.

2    BY MR. RIEDL:

3    Q.    And then the third annotation, "TorAds Admin Tab."

4    Can you describe that?

5    A.    So TorAds was a banner advertising service that was

6    provided by Grams.  So this is another link to Grams and a

7    link to Larry Harmon.

8    Q.    And then we've already covered Government's Exhibit

9    10.  So we'll skip then to Government's Exhibit 11, please.

10   A.    Government's Exhibit 11 was obtained, again, through

11   the search warrants at Google.  This was part of documents

12   that were stored in Larry Harmon's Google Drive account.

13        This shows cash in cryptocurrencies, and at the

14   bottom, the total gives a total of 56,939,610 in bitcoin and

15   U.S. dollars.

16   Q.    So to be clear, did the IRS create this chart?

17   A.    No.

18   Q.    Who created -- well, where was it found?

19   A.    This was found in Larry Harmon's Google Drive.

20   Q.    And it lists a total of almost $57,000,000 equivalent.

21   But then to the right of that, what are those columns to the

22   right of the United States dollar column?

23   A.    Bitcoin.

24   Q.    So you're looking at the very top line of the third

25   column; is that right?

1   A.   Correct.

2   Q.   It says "BTC."  Why do you say that that's bitcoin?

3   A.   That's the abbreviation for bitcoin.

4   Q.   So just like United States dollars is commonly

5   abbreviated as "USD," do cryptocurrencies also have

6   three-letter abbreviations?

7   A.   Yes, they do.

8   Q.   Okay.  And so the next one, "ETH," what is that?

9   A.   That stands for ethereum.

10   Q.   Is that is also a cryptocurrency?

11   A.   Yes, it is.

12   Q.   And "BCH"?

13   A.   Bitcoin cash.

14   Q.   And "BTG"?

15   A.   Bitcoin gold.

16   Q.   And then on the first column on the far left, it says

17   "Location."

18   Can you tell us what you believe this means based on

19   the investigation done to date?

20   A.   So this -- I believe this means where this either

21   bitcoin or cash is being stored.

22   Q.   And it lists a number of computers.  And then lower

23   down it says T-R-E-Z-O-R, Trezor.

24   What is a Trezor?  Are you familiar with what a Trezor

25   is?

1   A.   Yes.

2   Q.   What is it?

3   A.   It's what we call -- or what's called a hardware

4   wallet.  It is used to store bitcoin offline.  It helps to

5   mitigate losing your bitcoin.

6        So if you stored bitcoin on a computer that was

7   attached to the Internet, there is a possibility that

8   computer could get hacked and your bitcoin could be stolen.

9        If you store it on a Trezor, which is like a hard

10  drive, like a thumb drive type looking device, you can store

11  that off the Internet, offline, and you're not -- bad guys

12  are not able to hack into it and steal your bitcoin.

13  Q.   So if I store a lot of bitcoin -- so here one of these

14  Trezors claims to have $31 million worth of bitcoin.

15       If I store that much money or bitcoin on a Trezor and

16  then my house burns down or someone steals the Trezor, have

17  I lost that money forever?

18  A.   Potentially, but there are backups to Trezors.

19  Q.   Could you describe how that works?

20  A.   So it works, when you set up your Trezor, the software

21  gives what you are called seed keys.  And normally with

22  Trezors those are 24 words that are used in the event that

23  you lose your Trezor.

24       So you are instructed to write those down, write those

25  seed keys down in order, and you're even quizzed on it.  At

1    the end they will tell you, tell me what seed key number 11

2    was.  And you have to tell it what it was in order for it to

3    work.

4        So you write those down, and you store those somewhere

5    away from your Trezor in case it's stolen or the house burns

6    down.

7    Q.   Would it also be possible to memorize those seed keys?

8    A.   Yes.

9    Q.   And if I have memorized my seed keys and someone

10   steals my Trezor or my house burns down, what would I do to

11   get my money back?

12   A.   You just get another Trezor, load the seed keys into

13   that Trezor, and now you have access to your bitcoin.

14   Q.   And you said it also -- the software instructs you to

15   write that down.  Is there a limit to how many copies you

16   can make of that?

17   A.   No.

18   Q.   Can you store that anywhere on the Internet, those

19   words?

20   A.   You can, yes.

21   Q.   Is there anything special about those words, or are

22   they just random words that the software picks for you?

23   A.   They're random words.  They're taken from a set of

24   known words, though.

25   Q.   When was this document last edited?  Does Google Drive

Case 1:19-cr-00395-BAH Document 152 Filed 03/04/20 Page 39 of 95
Case 8:20-mj-01030-KSB Doc #: 13-1 Filed: 02/25/20 39 of 95. PageID #: 91

39

1   tell you when the document was last edited?

2   A.    Yes, it does.

3   Q.    When was this exact document last edited?

4   A.    October 18, 2018.

5   Q.    Thank you.

6         So we've already reviewed Government's Exhibit 12, 13,

7   and 14.

8         I'm sorry.  We have not reviewed 13, but we'll come

9   back to that.

10        I would like to skip to 15, please.

11        Do you recognize Government's Exhibit 15?

12  A.    Yes, I do.

13  Q.    What is that?

14  A.    So this is a Trezor that I found during the search

15  warrant that was taped underneath the desk on the second

16  floor, or on the -- in the HWI business suite.

17  Q.    And we'll talk about that search warrant in more

18  detail.

19            THE COURT:  I'm sorry.  You just said this was

20  taped under the desk where?

21            THE WITNESS:  In HWI.

22  BY MR. RIEDL:

23  Q.    Which stands for?

24  A.    Harmon Web Innovations.

25            THE COURT:  Okay.

1   BY MR. RIEDL:

2   Q.   So during the search of the Harmon Web Innovations

3   place of business, did you participate in that search?

4   A.   Yes, I did.

5   Q.   And was this one of the items that you located?

6   A.   Yes, it is.

7   Q.   And you said this is a Trezor like you just described,

8   capable of containing cryptocurrency?

9   A.   Yes, it is.

10  Q.   And it was specifically found in what state, or where

11  was it recovered?

12  A.   It was underneath a desk, taped or attached to the

13  underside of a desk using double-sided tape.

14  Q.   And is that why the picture is kind of crummy?

15  A.   Yes.

16  Q.   Okay.  And we'll come back to that in a little bit.

17       I would like to skip back now to Government's Exhibit

18  13.

19       What is that, please?

20  A.   This is a photo of a phone that we recovered right

21  next to Larry Harmon when we executed the search warrant.

22  Q.   Were you able to determine whose phone it was?

23  A.   Yes.

24  Q.   Whose?

25  A.   Larry Harmon.

1    Q.    How do you say that?  Why do you say that?

2    A.    Number one, it was right next to him when we did the

3    search warrant.

4          We've also done forensic analysis of the phone, and

5    we've found out the Apple I.D. of the phone is

6    larry@hwisite.com, e-mail address that we discussed earlier.

7    Q.    Thank you.

8          And the screen that's live on the phone right here,

9    what is this?

10   A.    This is an app where you can enter in your

11   cryptocurrency, the volume that you have, and it will update

12   with the different price changes of cryptocurrency.

13   Q.    So it will update based on the current value of the

14   cryptocurrency?

15   A.    Correct.

16   Q.    And this is done in realtime, or near realtime, as you

17   run the app; is that correct?

18   A.    That's correct.

19   Q.    And in the top left, or near the top left of that

20   screen, it lists a value.

21         What is the value listed there?

22   A.    $47,740,800.

23   Q.    And is that in United States dollars?

24   A.    Yes.

25   Q.    We briefly touched on the fact that there were search

1    warrants executed in this case.

2          Are you familiar with the search warrants that were

3    executed?

4    A.    Yes.

5    Q.    You mentioned you participated in one at a business,

6    but I would like to first talk about a search warrant in

7    Belize.

8          Are you aware that there was a search warrant executed

9    in Belize?

10   A.    Yes, I am.

11   Q.    And was that search warrant conducted on the same

12   address that was pictured in the Google Glass photograph

13   that we just viewed?

14   A.    Yes.

15   Q.    And that was in Government's Exhibit 8.

16         What was recovered of evidentiary value from that

17   search warrant?

18   A.    There were hard drives that were recovered from there.

19   And there were two Trezors.

20   Q.    So that's in addition to the one that you found in the

21   business, there were two different Trezors found in Belize;

22   is that right?

23   A.    That's correct.

24   Q.    Whose condo was that in Belize?

25   A.    That was Larry Harmon's.

Case 5:19-cr-00395-BAH Document 152 Filed 03/04/20 Page 43 of 95
Case 5:19-mj-01030-KBB Doc #: 13 Filed: 02/25/20 43 of 95. PageID #: 95

43

1    Q.    How long has he owned or had -- "owned" isn't the

2    right word, but how long has he leased that condo?

3    A.    Since October 2014.

4    Q.    And what is the monthly lease payment on that condo?

5    A.    $2,000.

6    Q.    How did he pay that?  In what format did he pay?

7    A.    In cash.

8    Q.    Every month?

9    A.    Yes.

10   Q.    Was there also a search warrant executed at the

11   defendant's residence in Bath, Ohio?

12   A.    Yes.

13   Q.    And what was found in that residence?

14   A.    We found seed keys in a safe, and we found

15   electronics.

16   Q.    So when you say you found seed keys, what does that

17   look like?

18   A.    Those are the written words that are used to generate

19   your Trezor or your other hardware wallet.

20   Q.    So we've talked about Trezors as if they're the only

21   hardware wallet out there.  But there are actually a wide

22   variety of these cryptocurrency hardware wallets around?

23   A.    Yes.

24   Q.    So just finding a list of seed keys, does that

25   automatically tell you which hardware wallet that goes to?

1    A.    No.

2    Q.    Are there also software wallets that don't rely on any

3    physical hardware?

4    A.    Yes.

5    Q.    And do those sometimes rely on seed keys?

6    A.    Yes.

7    Q.    And you said -- was there also at that residence

8    recovered a Cobo vault?

9    A.    Yes.

10   Q.    What is that?

11            THE COURT:  I'm sorry.  Could you repeat that

12   word?

13            MR. RIEDL:  A Cobo vault, C-O-B-O vault.

14            THE COURT:  Okay.

15            THE WITNESS:  That's a hardware wallet similar to

16   a Trezor, but it advertises having military grade

17   encryption, meaning more secure than a typical hardware

18   wallet.

19   BY MR. RIEDL:

20   Q.    We've talked already about the fact there was a search

21   done at a business that you participated in; is that right?

22   A.    Yes.

23   Q.    And was the search -- were there two different search

24   warrants, one for the second floor and one for the third

25   floor?

1    A.    Yes, there were.

2    Q.    Which floor did you assist in searching?

3    A.    The second floor.

4    Q.    Thank you.

5          And what was, generally, what was the second floor of

6    this building?  What was its business?

7    A.    The label on the door was HWI, Harmon Web Innovations.

8          Inside of the business itself was kind of part

9    business, part living quarters.

10         The business part of it, there was a desk with a

11   couple monitors on it.  And then the living quarter side of

12   it, there was a large couch, projector TV, kitchen area.

13         And then towards the back there were other rooms that

14   were -- looked to be used for storage.

15   Q.    Was there any evidence that HWI had employees?

16   A.    No.

17   Q.    Has the IRS conducted an investigation into the

18   financial means of HWI --

19   A.    Yes.

20   Q.    -- where its money came from?

21         Can you tell us what you found?

22   A.    We found that 95 percent of the deposits into HWI came

23   from bitcoin that had been converted either to cash or to

24   U.S. dollars and then wired into the account.

25   Q.    When IRS agents first made entry into that second

1    floor, was the defendant there?

2    A.    Yes.

3    Q.    Where was he?

4    A.    He was on the couch.

5    Q.    Okay.  And what items were near him on the couch of

6    relevance to this case?

7    A.    The cell phone.

8    Q.    And the couch was adjacent to, I think you already

9    said, a desk; is that right?

10   A.    Yes.

11   Q.    What was found on that desk?

12   A.    On the desk was a laptop.  And then underneath the

13   desk is where I found the Trezor.

14   Q.    Did you also find documents relating to the

15   defendant's identity?

16   A.    Yes.

17   Q.    What was found?

18         That was a bad question.

19         Did you find the defendant's wallet?

20   A.    Yes.

21   Q.    Where was that found?

22   A.    That was next to the desk, kind of on a window sill.

23   Q.    And did you look inside the wallet?

24   A.    Yes.

25   Q.    What was in there?

Case 5:19-cr-00395-BAH Document 152 Filed 03/04/20 Page 47 of 95
Case 5:19-mj-01030-KBB Document 13 Filed 02/25/20 47 of 95. PageID #:99

47

1    A.    There were credit cards, there was cash, and there was

2    a driver's license.

3    Q.    Whose name was the driver's license in?

4    A.    Larry Harmon.

5    Q.    And was it in fact Larry Harmon's driver's license?

6    A.    Yes.

7    Q.    The other items in the wallet, the credit cards, were

8    those also in Larry Harmon's name?

9    A.    Yes.

10   Q.    The phone that we've already talked about and we've

11   seen in Government's Exhibit 13, has a search been started

12   of that phone?

13   A.    Yes.

14   Q.    And were items of interest relating to this

15   investigation found on that phone?

16   A.    Yes.

17   Q.    Can you describe that?

18   A.    So we found an invoice dated April 2018 that showed a

19   private plane that was used to fly from Cleveland to

20   Jamaica.  And that was four passengers, including Larry

21   Harmon and his wife.

22   Q.    Were there also items relating to Helix on the phone?

23   A.    Yes.

24   Q.    Can you describe that?

25   A.    We found bitcoin addresses that were traced -- or had

Case 1:19-cr-00395-BAH Document 115-2 Filed 03/04/20 Page 48 of 95
Case: 20-3101 Document: 13 Filed: 07/29/20 Page: 48 of 95

48

1    received bitcoin that was traced back to known Helix

2    addresses.

3    Q.    Were there SMS messages on the phone relating to

4    Helix?

5    A.    Yeah -- well, we believe they're related to Helix.

6          What we found were text messages that were received

7    that said "RPC_dirty."  And there was a value there, for

8    example, 34.1784632, but just -- that's not what it actually

9    said, but it was a long -- I'm getting at, it was a long

10   string of numbers which would be similar to how bitcoin is

11   handled.

12         And then there was an "RPC_" I believe it said

13   "clean."  And then there was another number after that.

14   Q.    And so that language of "dirty" and "clean," is that

15   the same language we saw back in the exhibit talking about

16   how Helix works in Government's Exhibit 3?

17   A.    Yes.

18   Q.    During the investigation -- you already mentioned the

19   private flight to Jamaica -- did the IRS uncover evidence

20   that the defendant took other private flights?

21   A.    Yes.  In December 2018, the FBI did a surveillance on

22   Larry Harmon and followed him to Cleveland --

23              THE COURT:  I'm sorry, that was December what?

24              THE WITNESS:  2018.

25         Followed him and watched him board a charter flight.

Case 1:19-cr-00395-BAH Document 15-2 Filed 03/04/20 Page 49 of 95
Case 8:20-mj-02039-KBB Doc # 13 Filed 02/25/20 4 of 95 PageID #: 101

49

1    BY MR. RIEDL:

2    Q.    Did the defendant travel to -- in addition to the

3    private flights we've discussed, did the investigation

4    reveal that the defendant traveled to Belize frequently?

5    A.    Yes.

6    Q.    We talked about the fact that there was also a search

7    warrant signed for the third floor of that same building.

8    You searched the second floor.  There was also a search

9    warrant on the third floor.

10          Were there items relevant to this investigation

11   recovered on the third floor?

12   A.    Yes.  There was a safe on the third floor that

13   contained seed keys.  There were electronics also on the

14   third floor that were seized.

15   Q.    And when we've talked about electronics being seized,

16   is the investigation or search of those electronics complete

17   as we sit here today?

18   A.    No.

19   Q.    Is that effort ongoing?

20   A.    Yes.

21   Q.    What was the third floor of that building?  What was

22   there?

23   A.    Coin Ninja, which was a business operated by Larry

24   Harmon.

25   Q.    And what did it do?

Case 1:20-mj-00395-kBH Doc #: 13 Filed: 02/28/20 50 of 95 PageID #: 102

1    A.    It did -- I would say similar to an app called Venmo,

2    but I would have to explain that, too.

3        But it basically does -- it has an app called DropBit,

4    and if you download the app on your phone, you can receive

5    bitcoin from other DropBit users just via text or e-mail.

6    Q.    So it allowed people to send and receive bitcoin?

7    A.    Correct.

8    Q.    And in a business operating like that, is a business

9    like that required to register itself as a money remitting

10    business?

11    A.    Yes.

12    Q.    And was Coin Ninja registered as a money remitter?

13    A.    No.

14    Q.    To the best of your knowledge in this investigation,

15    was Coin Ninja following Know Your Customer procedures to

16    register users?

17    A.    I'm not sure.

18    Q.    Was there also a search warrant conducted of a

19    residence in California?

20    A.    Yes.

21    Q.    When was that conducted?

22    A.    These days are blending together.  It was yesterday.

23    Q.    And whose name was that lease in at the residence in

24    California?

25    A.    Larry Harmon.

1    Q.    And how much does he pay per month for that lease?

2    A.    $3,500.

3    Q.    Was there a Ledger wallet that was recovered in that

4    residence?

5    A.    Yes.

6    Q.    What is a Ledger wallet?

7    A.    Ledger is another hardware wallet very similar to

8    Trezor.

9    Q.    How did agents become aware that there was a residence

10   in California?

11   A.    We found documents during the search warrants on

12   Thursday.

13   Q.    So is it fair to say that the investigation into

14   locations and additional wallets is ongoing?

15   A.    Yes.

16              MR. RIEDL:  Could I have one moment, Your Honor?

17              THE COURT:  Yes.

18              MR. RIEDL:  I have no further questions for the

19   witness at this time.  Thank you.

20              THE COURT:  All right.  Your witness.

21              MR. FLOOD:  Your Honor, do you mind if we take a

22   90-second break before I start my questions?

23              THE COURT:  Okay.  It's already five minutes

24   after 4:00.  So you're taking a short break?

25              MR. FLOOD:  Just one minute, Your Honor.

1         THE COURT:  All right.

2         (Pause.)

3         MR. FLOOD:  Thank you.

4    Do you want questioning from the podium?

5         THE COURT:  I would prefer that.

6         MR. FLOOD:  Okay.  Thank you.

7         CROSS-EXAMINATION OF JEREMIAH HAYNIE

8  BY MR. FLOOD:

9  Q.   Good afternoon, Agent.

10 A.   Good afternoon.

11 Q.   I want to back up a little bit and go kind of big

12 picture on bitcoin.

13      What is a bitcoin?

14 A.   It's an electronic transfer of value.

15 Q.   But just in its basic sense, it's a string of numbers

16 and letters, right?

17 A.   A bitcoin address is, yes.

18 Q.   A bitcoin address is.

19      And a bitcoin address is what one uses to transact

20 bitcoin?  It is the address itself, right?

21 A.   It's like an account number.

22 Q.   It's like an account number.

23      And bitcoin, contrary to popular belief, is traceable,

24 right, because it has the addresses built into it, correct?

25 A.   We call it pseudoanonymous.

1   Q.   Right, because cash is anonymous.  I mean, cash, if I

2   had a $20 bill, it has a number on it that the Treasury put

3   on there, but no one knows where it's been, right?

4   A.   Yeah.  So if you continue with that analogy, if you

5   send me bitcoin, I know it came from you.  I know your

6   bitcoin address.  If you give me cash, I know that cash came

7   from you.  So that's why we call it pseudoanonymous.

8   Q.   Right, and so bitcoin is a little bit -- if cash had,

9   every time it changed hands it gave the identifier of the

10  last person who had it, right?  So when you had the $20

11  bill, it lists the 50 people who've ever had it.  Does that

12  make sense?

13  A.   You're talking about the actual, like, identifying

14  information for these people?

15  Q.   Yeah -- well, no.  The address of where it came from

16  and who it went to?

17  A.   Okay.

18  Q.   That's what a bitcoin has?

19  A.   Yes.

20  Q.   And so this mixer or tumbler takes off or it

21  adds -- doesn't take off anything, correct?  The tumbler or

22  mixer doesn't take any digits from the bitcoin?

23  A.   Oh, no.  You can't change the bitcoin address.

24  Q.   You can't change the address.  So what this mixer does

25  is it adds so much information you can't tell where it came

1    from recently, correct?

2    A.    I'm not sure what you mean by adding information.

3    Q.    You can't tell the address the bitcoin came from

4    because it has been mixed in with other bitcoins?

5    A.    Yes, but it also, in doing that -- so the steps to

6    mixing your bitcoin -- or from a user standpoint, using a

7    mixer as a user, what I do is I send my bitcoin to the

8    mixer.

9         And then -- so I send my bitcoin to the user -- or to

10   the mixer, and it -- before I even do that, I log into the

11   mixer or I access the mixer, and it gives me a bitcoin

12   address to send my bitcoin to.

13        I send my bitcoin to that address.

14   Q.    And we don't have to be so -- looking at Government's

15   Exhibit 3, say this is what you were using, right?  You're

16   using this Helix program, and it's

17   changing -- re-anonymizing the bitcoin, right?  Does that

18   make sense?

19   A.    It's laundering the bitcoin.

20   Q.    Well, it wasn't dirty.  It's just changing where it

21   came from, right?

22   A.    Okay.  So if we're -- in your example the bitcoin is

23   coming from?

24   Q.    Me.  Let's say I send you a bitcoin.  When you get it,

25   it would have my address on it.  Right?

1  A.   Okay.  Yes.

2  Q.   If I didn't want you to know my address, I would send

3  it to a mixer who would send it to you, right?

4  A.   That would work, yes.

5  Q.   And it would no longer come from me?  I mean, it would

6  no longer say that it came from me on the bitcoin?

7  A.   Correct.

8  Q.   Okay.  Is that legal?

9  A.   The bitcoin that you're sending is not from an illegal

10  source?

11  Q.   Right.

12  A.   And we're not transacting anything illegally?

13  Q.   Right.

14  A.   That's legal, yes.

15  Q.   And so there is nothing illegal about mixing bitcoin?

16  A.   As long as the mixer is not transacting anything dirty

17  and also registered with FinCEN and the state that it's

18  dealing with.

19  Q.   So if registered --

20          THE COURT:  Sorry.  You said a couple things

21  there.  As long as what?

22          THE WITNESS:  As long as the mixer -- as long as

23  the bitcoin that's being transacted is not dirty, it doesn't

24  come from an illegal source, and that mixer is required,

25  being a money transmitter, to register as a money service

1    business with FinCEN and with the states of both me and you,

2    wherever we are residing or transacting from.

3    BY MR. FLOOD:

4    Q.    How long has that been the law on these

5    cryptocurrencies because I know it's changing all the time?

6    A.    I believe FinCEN came out with that guidance in

7    definitely 2015, but maybe as far back as 2013.

8    Q.    And just for the record, a lot of this stuff we're

9    talking about is somewhat historical.  This Helix thing shut

10   down in 2017; is that right?

11   A.    Correct.

12   Q.    And so when we talk about that, we're talking about an

13   older -- or a relatively older investigation into Helix,

14   correct?

15   A.    Relatively, sure.

16   Q.    And going back to Exhibit 3, this is the way it works.

17   So you put in the address -- in the box that says "Let's

18   Go," this is a bitcoin address, I'm assuming?

19   A.    Yes.

20   Q.    And the user types in this, types "Let's Go," and then

21   does it tell Helix where the money goes to after that?

22   A.    In this case here, it is telling Helix, I want to send

23   my bitcoin to 1Hsn76.

24   Q.    Oh, I see.  Okay.  So that's the -- that's not the

25   "from."  That's the "to" box?

Case 1:19-cr-00395-BAH Document 15-2 Filed 02/29/20 Page 57 of 95
Case 1:19-cr-00395-BAH Document 113 Filed 03/04/20 Page 57 of 95 PageID #: 509

57

1    A.    Correct.

2    Q.    Where is the "from" box?

3    A.    So the from would be just from me.  But what happens

4    after you hit "Let's Go" is another address appears.  This

5    one from Helix.  And that's where you send your bitcoin.

6          You send it to that address.  Helix now has control

7    over that bitcoin.  And you've already given it a place to

8    send it which is the address you put into the "Let's Go"

9    box.

10   Q.    So it's basically just an exchange of bitcoin for a

11   fee, right?

12   A.    Yes.

13   Q.    And so all you're doing is saying, okay, I don't want

14   this bitcoin associated with my address, so give me one that

15   doesn't have my address on it and I'll pay you two and a

16   half percent to do so?

17   A.    Yeah.  As it says, it says "send your dirty coins to

18   the Helix address," and then clean coins come to your

19   bitcoin address.

20   Q.    All right.  And turning to Government Exhibit 4, so

21   this bad guy looking criminal on the top and left here,

22   there is approximately -- these are the marketplaces, right?

23   A.    Correct.

24   Q.    And these marketplaces would, I guess, I think later

25   in the exhibits you all identified I think approximately

1    40,000 -- okay.  That's Exhibit 5.

2          There is -- I roughly added up those bitcoin deposits,

3    you know, approximately 40,000 bitcoin deposits from these

4    marketplaces, right?

5    A.    Correct.

6    Q.    When this is used, does it look like it does on

7    number -- on Exhibit 3 where it's just random addresses or

8    random letters and numbers typed into this page?

9          I mean, there is no names or anything, right?

10   A.    Correct.

11   Q.    You don't see "AlphaBay Market" on anything?

12   A.    That's correct.

13   Q.    So when we look at Government's Exhibit 4, we've got

14   approximately 40,000 bitcoin that you all have traced back

15   to these marketplaces.  But there wouldn't be anything

16   within the Helix system that would know that these came from

17   these marketplaces, right?

18   A.    Well, part of registering with FinCEN is having Know

19   Your Customer controls in place and, too, money laundering

20   controls, that type of thing.

21         And so that, doing that correctly would give you

22   access to the same tools that we use to figure this out.

23         So yes, you would be able to see where the bitcoin was

24   coming from.

25   Q.    Yeah, but you answered a different question.

Case 1:20-mj-00305-KBB Doc #: 13 Filed: 02/28/20 5 of 95 Page ID #: 11

1      If they had registered and gone through all this, they

2   would be able to see that this came from the marketplace,

3   right?

4   A.   Well, if they used -- yes.  Right.

5   Q.   But as it stood in 20-what?  How long was this, '14

6   through '17 or something?

7      As it stood then, they did not see the people who had

8   sent the money into the Helix system, right?  They couldn't

9   see who that is?

10  A.   Well, I'm saying they could have.

11  Q.   But they didn't?

12  A.   Okay.

13  Q.   I'm saying, the only way they would know how to do

14  that was if they had gone through the registration process

15  and done all these things?

16  A.   Well, not necessarily.  That's one of the things that

17  will come with that is the fact that you have to have these

18  controls in place.

19     But you could know that without even having to go

20  through those --

21  Q.   How would --

22  A.   Well, number one, the whole point of the mixer is to

23  defeat the bitcoin analytics tools that are out there.

24     And so if Helix was truly intent on keeping money

25  laundering out of its purview, then it would use those same

1    analytics tools to figure out who their customers are and

2    where their bitcoin is coming from.

3    Q.    But as it stood with just you entering -- like on

4    Government Exhibit 3, you're just entering numbers.  As it

5    stood, these are unknown people, right?

6          I mean, it even says you guys have identified 40,000

7    of them as these criminal guys, but you have 290,000

8    bitcoins from unknown people, right?

9    A.    Correct.

10   Q.    And so what is that?  12 -- 40 percent -- what

11   percentage is that?  That's -- you've got 10, 15 percent

12   coming from who you believe are going to these markets,

13   right?

14   A.    Approximately.

15   Q.    Yeah.  I mean, you're not held to the math.

16   A.    Okay.

17   Q.    Although you're probably way, way better at math than

18   I am.

19         So you all can't identify these unknown customers.

20   And the only reason you all can identify these marketplaces

21   is because you have subsequently identified these

22   marketplaces, right?  And you see -- how do you all know

23   that these transactions are going into Helix from that

24   marketplace?

25   A.    A lot of that is from these bitcoin analytics tools

1    who use heuristics and their own type of, I guess,

2    proprietary analysis to label as much as they can of the

3    bitcoin addresses that are out there and who they belong to.

4         So in this case, they're finding Darknet markets and

5    finding their bitcoin addresses, and when we run their

6    software, we can see what that address is.

7    Q.   And I want to talk about the Darknet markets real

8    quick because this Grams thing, Exhibit 1, which I'll give

9    you is probably a blatant Google trademarking problem, but

10   that's not what we're here for.

11        You all have typed "cocaine" into the search bar.  You

12   can type "neck ties," right?

13   A.   You could, yes.

14              THE COURT:  I'm sorry.  Which exhibit are you on?

15              MR. FLOOD:  I'm sorry, Your Honor.  I'm jumping

16   around a little bit.  I was back to the search which is

17   Exhibit 1.

18              THE COURT:  I think it's Exhibit 2.

19              MR. FLOOD:  I'm sorry.  That's the search

20   results.  The search box is 1.  The search results where

21   they have entered "cocaine" and we can see that there are

22   people selling cocaine.

23   BY MR. FLOOD:

24   Q.   But my point, Agent, is although you have identified

25   these markets, you haven't identified any of the products,

1    right?

2    A.    Well, I put it on these markets, yes.

3    Q.    No, I mean specific to these transactions that you

4    have in the flow chart on Exhibit 4, while you all have

5    identified some marketplaces, have you identified specific

6    transactions and know what the product was?

7    A.    I know that we've used undercover transactions to send

8    bitcoin through, but I am not sure if those transactions

9    came from -- they definitely came from AlphaBay, for

10   example, but I'm not sure if the bitcoin that funded that

11   undercover account was, like, as a result of an illegal

12   transaction.

13   Q.    And when AlphaBay got shut down, I guess you all shut

14   down AlphaBay in 2017; is that right?

15   A.    Correct.

16   Q.    Not you all, but the United States government?

17   A.    Correct.

18   Q.    And subsequently Helix was shut down, correct?

19   A.    Helix shut itself down, yeah.

20   Q.    Helix shut itself down.

21         So turning to Exhibit 5, all these marketplaces, you

22   all have researched these and have learned that they

23   transact in illegal goods, correct?

24   A.    Correct.

25   Q.    But you have not tied these specific transactions to

1    illegal goods?

2    A.    That's correct.

3              THE COURT:  Mr. Flood, I want to make sure we

4    know what we're doing here.  This is not a preliminary

5    hearing to determine whether probable cause exists for the

6    charges made against the defendant.  That has already been

7    determined by the grand jury in the District of Columbia.

8              MR. FLOOD:  I understand, Your Honor.  I'm just

9    going into the weight of the evidence against Mr. Harmon

10   pursuant to 18 U.S.C. 3142.

11             THE COURT:  Okay.

12             MR. FLOOD:  As one of the things this Court can

13   consider, Your Honor.

14   BY MR. FLOOD:

15   Q.    And just as a general matter, Agent, there is nothing

16   illegal about wanting anonymity or privacy, correct?  It's

17   one of our fundamental rights as Americans.

18   A.    There is nothing illegal about that, correct.

19   Q.    And so the notion of taking your address off of your

20   bitcoin isn't illegal, and it doesn't violate our -- meaning

21   it's not improper to want to do?

22   A.    Correct.

23   Q.    And so when the term "dirty coins" is used, you said

24   that's because they're from illegal gains.  But the "dirty"

25   in that word could be because it has your address on it.

1    Right?  And the goal is to not have your address on it.

2    A.    I'm not sure where -- I don't agree with the statement

3    the goal is not to have your address on it.

4    Q.    Well, isn't -- the goal of using this mixer is to

5    conduct the transaction anonymously, correct?

6    A.    Yes.

7    Q.    And so this mixer takes your address out of it so it's

8    no longer tied to you, correct?

9    A.    Correct.

10   Q.    And so the goal of using it is to take your address

11   off of it, right?  Isn't that the whole point?

12   A.    Well, it can be used for that, yes.  More of the goal

13   when we're talking about transactions from the dark web

14   here, though, is for dark web vendors who receive bitcoin

15   for selling drugs, for example, those vendors are typically

16   not able to pay their rent in bitcoin.  So they need to get

17   that bitcoin out.

18        Well, right now it's in AlphaBay, which these bitcoin

19   analytics tools and law enforcement know the bitcoin

20   addresses associated with AlphaBay, for the most part.

21        So if they went direct from AlphaBay to an exchange, a

22   company that exchanges bitcoin for U.S. dollars, if they

23   went direct there, that exchange would, again, the same

24   tools we're using, would see that that money is coming from

25   AlphaBay, and they would close the account.  Might file a

1    suspicious activity report.  It would come on law

2    enforcement's radar.

3         So instead, these vendors use Helix and other mixers

4    and tumblers to kind of erase AlphaBay from their history,

5    and then they can go through the exchange and cash out.

6    Q.   So the tumbler or mixer could be used on both sides of

7    that transaction, is that right, because it's used by the

8    buyer and then by the market afterward?

9    A.   It can be.

10   Q.   I'll go into the notion of money because the

11   government spent a lot of time going over potential assets

12   that Mr. Harmon may or may not have.

13        You all seized a number of storage devices commonly

14   used to store bitcoin, correct?

15   A.   Correct.

16   Q.   And those are maintained by you in evidence, right?

17   A.   Correct.

18   Q.   And the only way Mr. Harmon would be able to access

19   any of those would be to have a 24-word code for each one,

20   correct?

21   A.   He could also have copies of those Trezors or those

22   hardware wallets with family, friends, places that we didn't

23   search.

24   Q.   But, I mean, to be frank, the one taped to the bottom

25   of a desk, you would assume he did not want anyone to have.

1    That was a valuable one, correct?  It was hidden?

2    A.    It was hidden, correct.

3    Q.    And you don't have any reason other than speculation

4    to think that there are additional copies of those anywhere,

5    do you?

6              THE COURT:  Additional copies of what?

7              MR. FLOOD:  Of the hardware wallets, Your Honor,

8    that hold the bitcoins.

9              THE COURT:  All the conceivable hardware wallets,

10   or which ones are you talking about?

11             MR. FLOOD:  I believe they seized four or five.

12   BY MR. FLOOD:

13   Q.    And my question is, really, if --

14             MR. FLOOD:  I'll make the point better in

15   argument, I promise.  But the point is, Your Honor, they

16   already have these devices.  And I'm asking the government

17   whether they have any reason to believe that there are

18   copies of these devices anywhere else, or any others out

19   there that you believe belong to Mr. Harmon?

20             THE WITNESS:  Yes.  Just based on the fact

21   that -- how spread out these devices were, right?  We found

22   one here in Akron under the desk.  We found two in Belize.

23   We found one in California.  All these places are in the

24   name of Larry Harmon.  They're all leases or things that are

25   owned by him.

1    And so who knows the places that we weren't able to

2    search.  Just the nature of how spread out these were and

3    the fact that they were concealed, who knows how many other

4    places they are.  Who knows the places that we may have

5    missed in the places that we actually did search.

6    BY MR. FLOOD:

7    Q.    Right.  So you can speculate, but you don't know.  Who

8    knows?

9    A.    Well, if I knew, then we would have --

10   Q.    Right.  And you did a lot of these searches and you

11   went to these places he leases and you found these devices,

12   correct?

13   A.    Correct.

14   Q.    And each one would require a 24-word code.  Would it

15   be a different one for each?

16   A.    So the 24-word code is only to generate or renew or

17   whatever.  Like, if you had a brand new Trezor wallet, you

18   entered in those 24 code, that would give you access to your

19   private key that was on another Trezor wallet.

20   Q.    I see.

21   A.    But if you have just a Trezor wallet that's already

22   ready to go, it already has those words entered in, then all

23   you do is enter a pin to unlock it.  You have to plug it

24   into your computer, run the software, and enter a pin.

25   Q.    I want to turn real quickly to Government's Exhibit 8.

1           THE COURT:  Excuse me a minute.  I need to check

2     something.

3           MR. FLOOD:  Sure.

4        (Pause.)

5           THE COURT:  I would like to get an estimate from

6     counsel for how much longer you believe you're going to be

7     because we do have transport issues to get the defendant

8     back to the facility that the marshals need to transport.

9           MR. FLOOD:  I have probably five minutes of

10    questioning at the most.  I was solely going to proffer his

11    family members.  So I'm not going to have much of a case,

12    Your Honor.  It will -- I can be done in ten minutes.  I

13    don't know about the government.

14          MR. RIEDL:  As it stands now, Your Honor, I would

15    have approximately a five-minute redirect.

16          THE COURT:  All right.  But then we have,

17    following that, you have -- this is your witness.  You have

18    additional evidence you're planning to present?

19          MR. RIEDL:  The government has no additional

20    evidence.  We would proffer the indictment and the

21    government's brief that we filed but no additional

22    witnesses.

23          THE COURT:  And then both sides will be

24    presenting arguments?

25          MR. RIEDL:  I could be done in five minutes with

Case 2:19-cr-00305-BAH Document 15-2 Filed 03/04/20 Page 69 of 95
Case 2:19-mj-00309-KBB Doc #: 13 Filed 07/29/03 Page ID #: 521

69

1   argument.

2           THE COURT:  And what about defendant's argument,

3   Mr. Flood?

4           MR. FLOOD:  Yes, Your Honor.  Five minutes at the

5   most.

6           THE COURT:  All right.  Well, we'll continue.

7       Of course I have heard counsel make statements before

8   like "I've only got five minutes" and it turns into

9   considerably longer than that.  Hopefully that won't be the

10  case today.  But counsel do tend to use more time than they

11  estimate.

12          MR. FLOOD:  I'm going to use less, Your Honor.

13  BY MR. FLOOD:

14  Q.   Agent, the picture on Government's Exhibit 8 and 9,

15  you don't know who took that photo, right?

16  A.   No.

17  Q.   This Coin Ninja and DropBit, the business you raided

18  the other day, there is nothing illegal there, is there?

19  A.   Coin Ninja is not registered as an MSB.

20  Q.   But it's on the clear web, meaning it's on the web

21  that everyone sees all the time that's not hidden in any

22  way, correct?

23  A.   Correct.

24  Q.   But it may not be properly registered as a money

25  transmitting business; is that right?

1    A.    That's correct.

2              THE COURT:  You had another name you were asking

3    him about.  What was that, besides Coin Ninja?

4              MR. FLOOD:  DropBit is, I believe, the program

5    that the app that Coin Ninja made.  Is that --

6              THE WITNESS:  That's my understanding, yes.

7    BY MR. FLOOD:

8    Q.    Okay.  And that doesn't have anything to do with the

9    dark web.  That's just something that one coin -- one holder

10   of a bitcoin could send someone else a bitcoin using that

11   program?

12   A.    Correct.

13             MR. FLOOD:  That's all I have, Your Honor.

14             THE COURT:  All right.  Mr. Riedl.

15             MR. RIEDL:  Thank you, Your Honor.

16             REDIRECT EXAMINATION OF JEREMIAH HAYNIE

17   BY MR. RIEDL:

18   Q.    Are bitcoin addresses associated with an individual

19   just like a bank account would be?

20   A.    No.

21   Q.    Can you describe that?

22   A.    Just on its own, a bitcoin address -- if all I had was

23   a bitcoin address, I do not know typically who it's

24   associated with unless it's -- unless it's spent with

25   somebody I know, for example.  Then I would know who has it.

1    But just a bitcoin address itself, no.

2    Q.    And as an investigator, if all you have is that

3    bitcoin address, can you send a subpoena to a bank to find

4    out who owns that address?

5    A.    No.

6    Q.    But you were asked questions about whether bitcoin is

7    traceable.  You said it was pseudoanonymous.

8          So how can you trace or track bitcoin?

9    A.    So if we know one side of the transaction when bitcoin

10   is spent, then, you know, we can take the steps to trace

11   where it came from.

12         If our blockchain analysis software knows where the

13   addresses came from or knows from its heuristics who the

14   address might be controlled by, then we can take steps to

15   try to figure out who actually controls the address.

16   Q.    And what if that bitcoin passed through a tumbler?

17   How does that affect your ability to trace the bitcoin?

18   A.    It's typically a dead end.

19   Q.    You were asked questions if you can -- whether an

20   individual looking at the blockchain can tell if bitcoin

21   came from an illegal source.  And you answered just based on

22   looking at an address you can't tell that.

23         But are there sometimes surrounding evidence that you

24   can use to tell whether someone knew if bitcoin came from an

25   illegal source?

1    A.    Again, we would use blockchain analysis software to

2    try to figure out how close that bitcoin was to an illegal

3    entity like the Darknet market.

4    Q.    And I would like to ask specifically about Helix.  Did

5    the IRS uncover evidence that Helix, or the administrator of

6    Helix, you've already said is Larry Harmon, knew that the

7    money going into Helix was from an illegal source?

8    A.    Yes.  Helix worked closely with AlphaBay.

9    Q.    And was, according to Government's Exhibit 5, was

10   AlphaBay the number one contributor of funds to Helix?

11   A.    Yes.

12   Q.    If someone went to AlphaBay, you were asked questions

13   about -- well, we'll get to that in a second.

14         But if someone went to AlphaBay, would they have any

15   doubt what AlphaBay is selling?

16   A.    No.  Once you log in, there is, similar to

17   these -- there is vendor advertisements and there is photos

18   of drugs for the most part.

19         And on the left-hand side there were categories which

20   were different drugs, MDMA, meth, ectasy, marijuana.  Those

21   type of categories were on the website.

22   Q.    And you were asked -- in Exhibit 2 there was a search

23   typed in for cocaine, and you were asked could you also have

24   searched Grams for neck ties.  And you said, well, you

25   could.

1      Have you ever seen a neck tie for sale on the dark

2   web?

3   A.   I have not.

4   Q.   And so based on your training and experience, what was

5   Grams used to search for?  If you're searching the

6   marketplace as the Grams wiped, what were you searching for?

7   A.   You were searching for illegal items.

8   Q.   You were asked several questions about whether items

9   had been seized and assets had been seized.

10      Government's Exhibits 11 and 13 are charts,

11   Government's Exhibit 11 being the Google Drive chart and 13

12   the list from the defendant's phone.

13      Have all of the assets that are listed there, those

14   tens of millions of dollars, have those assets already been

15   seized by law enforcement in this investigation?

16   A.   No.

17   Q.   Are there in fact tens of millions of dollars that

18   have not yet been seized in this investigation?

19   A.   Yes.

20   Q.   Switching gears slightly, can a single bitcoin address

21   be stored on multiple devices?

22   A.   Yes.

23   Q.   And in addition to being stored on multiple hardware

24   devices, can that same old bitcoin address also be stored on

25   electronic or soft wallets?

1    A.    Yes.

2    Q.    We talked about things that you could find on the dark

3    web.  And you said you'd never seen neck ties.

4          Have you seen fraudulent identity documents for sale

5    on the dark web?

6    A.    Yes, I have.

7    Q.    Is that a commonly listed item for sale?

8    A.    Yes, it is.

9                MR. RIEDL:  Thank you.  No further questions.

10               MR. FLOOD:  Your Honor, just three quick ones.

11               THE COURT:  I'm not going to let this go on

12   forever.

13               MR. FLOOD:  No, I understand.

14               THE COURT:  You'll get your three questions, and

15   then he's going to want questions.

16         So we're shortly going to conclude.

17               MR. FLOOD:  Okay.  I understand, Your Honor.

18               RECROSS EXAMINATION OF JEREMIAH HAYNIE

19   BY MR. FLOOD:

20   Q.    Agent, to your knowledge has there been another money

21   laundering prosecution of bitcoin mixing ever?

22               MR. RIEDL:  Objection.  Relevance.

23               THE COURT:  I'll allow it.

24               THE WITNESS:  The Bestmixer out of the

25   Netherlands, an investigation by the Netherlands police into

1    a mixer called Bestmixer.io was just a year ago, maybe.

2    BY MR. FLOOD:

3    Q.    In e-mail prior from the government, they said they

4    were monitoring Mr. Harmon's bitcoin accounts.

5          Can you all monitor his accounts to see whether

6    transactions are made from his accounts while he's in

7    custody?

8    A.    The accounts we know about, yeah.

9                MR. FLOOD:  That's all I have, Your Honor.  Thank

10   you.

11               THE COURT:  All right.

12         Mr. Riedl, did you have anything else?

13               MR. RIEDL:  No, Your Honor.  Thank you.

14               THE COURT:  You may step down.

15         I did have one question for you.  At the very outset

16   you were stating your name.  And I had been told your name

17   was Jeremy, but I thought I heard you say Jeremiah.

18               THE WITNESS:  Jeremiah it is, yes.

19               THE COURT:  Okay.  All right.  Thank you.  That

20   was all I wanted to know.

21         So, Mr. Riedl, have you concluded your evidentiary

22   presentation?

23               MR. RIEDL:  Essentially, Your Honor, we would ask

24   the Court to take note of the indictment which I believe you

25   essentially have in your statements but also proffer the

1     statements in the government's memorandum in support of

2     pretrial detention.

3               THE COURT:  Well, both of those items are on the

4     docket.  So they're part of the case file.  The memorandum

5     was filed this morning, I believe.

6               MR. RIEDL:  That's correct, Your Honor.  Thank

7     you.

8               THE COURT:  All right.  And at this point, it's

9     defendant's opportunity to present evidence.  So, Mr. Flood.

10              MR. FLOOD:  Thank you, Your Honor.  I would just

11    proffer that Mr. Harmon's family and friends are present,

12    Your Honor.

13         Present are his father, Larry Senior; his sister,

14    Carrie; his mother, Mary; Mr. Harmon's wife, Margo; and his

15    brother, Darrie.

16         I would ask the Court to take note of the Pretrial

17    Services report.

18         And the testimony, if they were called, would be that

19    each of them would put up whatever they can in terms of

20    bond.  I know Mr. Harmon Senior, Larry Harmon Senior, has

21    been interviewed and does have sufficient property, if the

22    Court wanted property security for bond.

23         I think that would be -- in terms of the proffer from

24    the defense, Your Honor, that would be it, that he is a

25    life-long resident of Akron, Ohio.  He does not own any

1    property in Belize or California.  Those are leased

2    properties, Your Honor.

3         In terms of evidence, that's all.

4              THE COURT:  All right.  So you did, I believe,

5    proffer -- you didn't use the word "proffer."  You asked me

6    to take note of the Pretrial Services report.

7              MR. FLOOD:  I'm sorry.  I would proffer the

8    Pretrial Services report also, Your Honor.

9              THE COURT:  Okay.

10             MR. FLOOD:  Thank you.

11             THE COURT:  In that regard, we do have our

12   Pretrial Services officer here, Officer Julie Gray.

13        And as I usually do, and I may ask you again later on,

14   you did submit a Pretrial Services report.  I saw that

15   earlier today.

16        So you have now heard the evidentiary presentations of

17   the parties.  So I would ask you at this point, did you have

18   anything you wish to -- do you stand by your report or

19   anything you wish to change about the report or add to it?

20             THE PRETRIAL SERVICES OFFICER:  Your Honor, after

21   listening to the evidence presented today, I do have more

22   concerns regarding risk of flight based on the potential of

23   other assets, other residences.  While he may or may not own

24   them, he has a lease.  That's information he did not provide

25   to this officer during the interview.

1        I believe he is a risk of flight, and for that reason

2   I would change my recommendation to detention.

3            THE COURT:  All right.  Thank you.

4        So at this point, does that conclude your evidentiary

5   presentation, Mr. Flood?

6            MR. FLOOD:  Your Honor, I failed to make the

7   Court aware that they have seized his passport also in the

8   search.  I think that's important to the Court to know as

9   well.

10           THE COURT:  All right.

11           MR. FLOOD:  And I would also proffer, Your Honor,

12   that the Belize residence is leased by the company Coin

13   Ninja.  It is not leased by Mr. Harmon personally.

14           THE COURT:  And the company Coin Ninja, however,

15   is controlled by Mr. Harmon, correct?

16           MR. FLOOD:  Is controlled by -- yes, I believe

17   it's a registered Delaware corporation.  Yes, Your Honor,

18   controlled by him.

19           THE COURT:  All right.  Does that complete your

20   evidentiary --

21           MR. FLOOD:  Yes, Your Honor.  Thank you.

22           THE COURT:  Okay.  So at this time I'll hear

23   brief argument from the parties and bearing in mind that we

24   need two determinations to make.

25        The first is whether defendant sitting in the

1     courtroom is the individual named in the indictment issued

2     out of the District of Columbia.

3          The second determination is whether defendant should

4     be detained pursuant to the government's motion for

5     detention or whether he should be released on bond.

6          So you need to address both of those issues.

7          Mr. Riedl, you may proceed.

8               MR. RIEDL:   Thank you.

9          Your Honor, as to the identity of the defendant, the

10    Court heard from Special Agent Jeremy Haynie from the IRS.

11    He testified -- he specifically identified the defendant in

12    the courtroom as the individual he was describing throughout

13    his testimony as Larry Harmon.

14         He detailed why he believed that that was the same

15    individual.  Specifically, the e-mail accounts that were in

16    common with the defendant and with the conspiracy, or the

17    evidence of the conspiracy here, also the cell phone of the

18    defendant, the fact that that was in fact Larry Harmon's

19    cell phone, that Larry Harmon was found on the second floor

20    of the business in immediate proximity to that cell phone

21    that contained information about the bitcoin, and in

22    addition, in very close proximity to that Trezor wallet that

23    was taped with double-sided tape under the desk immediately

24    adjacent to where the defendant was when the search warrant

25    was executed.

Case 1:19-cr-00395-BAH Document 15-2 Filed 03/04/20 Page 80 of 95
Case 1:20-mj-01038-KBB Doc # 13 Filed 02/25/20 1 of 95 Page ID # 132

80

1          If the Court would like to hear more about that, I

2     could go on, but I believe that that should be sufficient

3     for identity of the defendant.

4          THE COURT:  I don't think I need anything further

5     at this point.

6          You may proceed with the rest of your argument.

7          MR. RIEDL:  Thank you, Your Honor.

8          The government's argument in favor of detention relies

9     on risk of flight pursuant to 18 United States Code, Section

10    3142(e).

11         The state of the evidence for finding risk of flight

12    is preponderance of the evidence.

13         There are three factors that the Court can consider

14    here.  First is the nature and circumstances of the offense.

15         To briefly summarize what's set forth in great detail

16    in the government's memorandum, the defendant was

17    responsible for laundering more than $300 million in

18    bitcoin, the vast majority of which came from Darknet

19    marketplaces.  And those Darknet marketplaces that he was

20    associated with, or his company was associated with, were

21    involved primarily in the sale of drugs.

22         And I point to paragraph 2 of the indictment in which

23    the defendant himself stated that he believed that the

24    Darknet primarily sold drugs.

25         And also in paragraph 5 of the indictment, the

1    defendant, Mr. Harmon, himself, was advertising how Helix

2    assists in avoiding law enforcement.

3         So he was well aware that the money that he was

4    laundering was in fact drug money, was from a specific

5    unlawful activity, and he was well aware that the goal of

6    Helix was cleaning.

7         In fact, in the statement that the government

8    introduced in Government's Exhibit 3, it showed what Helix

9    does in the simplest terms.  You put in dirty bitcoin, and

10   you get out clean bitcoin.  And if there were a more

11   succinct description of laundering money, I don't know what

12   it would be.

13        The defendant --

14             THE COURT:  Mr. Flood's theory is dirty could

15   simply mean that it would identify you.  I take it you don't

16   agree with that.

17             MR. RIEDL:  We don't, Your Honor, and the fact is

18   there is no evidence of that.

19        The evidence is that Helix was directly tied to

20   Darknet marketplaces that were immediately responsible for

21   selling drugs.

22        As Agent Haynie testified, if you go to AlphaBay, what

23   you're immediately confronted with is meth and cocaine and

24   drugs for sale.

25        That's what the marketplace was for.  It wasn't for

1    neck ties.  It was for illegal drugs.  And if you went to

2    the marketplace, you would immediately be confronted with

3    that.

4         And, again, the defendant himself stated that, as put

5    forth in the indictment, the defendant himself stated that

6    he believed that the purpose of the Darknet was primarily

7    for the sale of drugs.

8         The defendant, again, talking about the nature and

9    circumstances of the offense, he is facing 235 to 293 months

10   of incarceration.  And the total statutory max here would be

11   30 years if these individual offenses were run

12   consecutively.

13        So Count 1 is a stat max of 20 years, and the other

14   two offenses five years each.  So he could very well be

15   facing decades in prison.

16        And he has access to the means to flee.  He has access

17   to tens of millions of dollars, potentially, and he has a

18   history of international travel.

19        From the Presentence Services report, we know that as

20   recently as December of 2019, so just over two months ago,

21   he was in Belize for Christmas.  And he had a residence in

22   Belize.

23        And as you heard from Special Agent Haynie, the

24   investigation is ongoing.  And the agents, as recently as

25   yesterday, searched a residence tied to the defendant in

1    California that they were not aware of despite a yearslong

2    investigation until after they executed the search warrants

3    last week.

4        And so that investigation is ongoing, the

5    investigation into the assets, into the devices that were

6    seized, and even the investigation into locations that are

7    controlled or were controlled by the defendant.

8        And in that California search warrant as recently as

9    yesterday, they did find another hard wallet that

10   potentially contains cryptocurrency.

11       And Agent Haynie testified that there are tens of

12   millions of dollars in cryptocurrency currently unaccounted

13   for in this investigation.  And he provided ample testimony

14   about how easy it would be for someone to recreate those

15   wallets if they were free in the community.

16       We know also from testimony that the defendant has a

17   history of using private jets to travel.  So he has traveled

18   to both Jamaica and Belize on private jets.

19       And so that should also certainly cause concern for

20   the Court that he poses a risk of flight.

21       He has 47 million reasons to flee the community given

22   the length of sentence that he is serving and the

23   substantial resources that he potentially has at his

24   fingertips that the government does not have access to now.

25       I would also note for the Court that the defendant did

1    not report those assets to Pretrial Services.  You heard

2    substantial evidence that the defendant has access to tens

3    of millions of dollars in cryptocurrency both from that

4    Google Drive spreadsheet on his own Google Drive and the app

5    on his own phone, both showing more than $45 million in

6    assets and neither of which the defendant reported to

7    Pretrial Services.

8         I would note, finally, that this is an out-of-district

9    arrest.  And ultimately the decision of detention would be

10   forwarded to the district court in the District of Columbia,

11   and so that judge ultimately will make the decision.  But

12   obviously as we sit here today, it is this Court's decision.

13        Based on the assets the defendant has, based on his

14   history of travel, based on his false reporting to Pretrial

15   Services, he poses a very real risk of flight.  There are no

16   circumstances, no conditions the Court could put in place

17   that would ensure that he will not flee this community.

18   Therefore, we would ask that he be detained.

19        Thank you.

20             THE COURT:  All right.  Thank you.

21             MR. FLOOD:  Thank you, Your Honor.

22             THE COURT:  Mr. Flood.

23             MR. FLOOD:  At the outset, Your Honor, I would

24   like to point out Mr. Harmon informed Pretrial Services that

25   the government had seized all of his bitcoin.  So it's not

1   listed as an asset there, but it has all been seized by the

2   government.

3          And so, you know, I don't know why the report doesn't

4   reflect that.  But that's what he told Pretrial Services,

5   Your Honor.

6          THE COURT:  Well, there may be a distinction

7   between what he told Pretrial Services and what the facts

8   are.

9          MR. FLOOD:  Right, but the government -- okay.

10  The government has seized, and you heard from the agent, all

11  of these devices from numerous locations.  And they have

12  seized those devices, and you cannot, unless you go a

13  difficult route, you cannot access that money, okay.

14         You need the devices to access the money, unless you

15  go a much different longer harder more difficult route.

16         Okay.  As --

17         THE COURT:  What I did hear the agent testify to

18  was that not all the assets were seized, that he believes

19  that tens of millions of dollars haven't been -- remain that

20  have not been seized.

21         MR. FLOOD:  And I think the reality is, Your

22  Honor, they don't know what's on those devices because

23  they're locked.  So they don't know if there is outstanding

24  assets seized or not, Your Honor.

25         THE COURT:  Okay.  And nor do you.

Case 1:19-cr-00395-BAH  Document 15-2  Filed 03/04/20  Page 86 of 95
Case 1:19-cr-00395-BAH  Document 113  Filed 02/25/20  Page 86 of 95  PageID #: 138

86

1          MR. FLOOD:  Nor do I.

2          We have, just for the Court's edification, we have

3     offered to the government to unlock those devices.  And we

4     did so, saying if your concern is that he will, if released,

5     get this money and flee, you may transfer the money into

6     your accounts, like a regular fraud case.

7          We have made that offer to the government, Your Honor.

8          MR. RIEDL:  And to be clear, Your Honor, we

9     accept that offer.  We would happily accept the information.

10         What was offered to us is if he provides you the pins,

11    would you agree to his release.  And the answer there was

12    no.

13         But certainly to the extent he wishes to provide the

14    passwords and the PINs and the information that would allow

15    us to access that bitcoin, we would happily accept that

16    offer.

17         THE COURT:  All right.

18         MR. FLOOD:  And the point is, Your Honor, the

19    whole gist of their motion for detention is the notion that

20    he has access to money and he will, therefore, flee.

21         He's had access to money since this thing shut down,

22    obviously, in 2017 when he -- when it was shut down, not by

23    law enforcement, not by anybody else, but shut down

24    volitionally and voluntarily.

25         Your Honor, I would remind the Court that the default

1    position of the law is that the defendant should be released

2    pending trial.  It is only upon a showing that no condition

3    or combination of conditions will reasonably assure the

4    appearance of Mr. Harmon at his trial.

5         Mr. Harmon is a life-long resident of Akron.  His

6    grandmother was born here.  They still have his

7    grandfather's ranch.  His parents are here.  His family is

8    here.

9         He has, despite having flown on a private plane to

10   Jamaica and having a lease on a condo in Belize, there is no

11   evidence to suggest that he would flee.  There is a

12   speculation the government has that he can get out and

13   obtain this money and go to Belize.

14        That's simply not the case, Your Honor.  And they've

15   not met their burden.  The original Pretrial Services

16   report, not the new amended Pretrial Services report,

17   recommended a $50,000 unsecured bond.

18        Whether or not the defendant has money is not

19   something the Court should consider greatly.  Very

20   frequently we're detaining people who don't have any money.

21   And now they want to detain someone because they say he has

22   money.

23        Mr. Harmon will appear for his trial in Washington

24   D.C., Your Honor.  I suggest that he be restricted to travel

25   to the Northern District of Ohio, the D.C. district.

1       I would ask that he be allowed to travel to the

2    Southern District of Texas.  If you want to do GPS

3    monitoring, we would agree to that.

4       But I don't think that they have addressed all the

5    conditions that this Court could impose that would

6    significantly monitor his behavior and make sure he appears

7    for trial, Your Honor.

8       We would ask that you either grant the $50,000

9    unsecured bond, or if, at the Court's request, I know his

10    father has property that he can put up as bond.  Or they

11    could post a surety bond, I'm sure, Your Honor.

12       That's all I have, Your Honor.

13         THE COURT:  All right.

14       I did have another question for Pretrial Services.

15    The question was raised as to whether defendant had been

16    candid or truthful in his statement to the Office of

17    Pretrial Services, specifically with regard to his assets, I

18    believe.

19       So, Officer Gray, having again heard what has

20    transpired through the testimony, the evidence presented,

21    the argument, can you tell me whether you have a conclusion

22    as to whether the defendant was truthful when interviewed by

23    you or by your office?

24         THE PRETRIAL SERVICES OFFICER:  Your Honor, when

25    I asked the defendant about his employment, he did tell me

1    he had been operating Coin Ninja for about two and a half

2    years.  He said he has been paying himself for some things,

3    but selling bitcoin, the company is not making, really

4    making money, that he is not earning any income from that,

5    was his report to myself.

6          He did report the residence where he resides in Bath,

7    a property in -- he wasn't sure if it was in Franklin or

8    Green, and a home in Kent that his mother resides in as his

9    only assets.

10          He told me the only debt that he pays out are $4,000 a

11    month mortgage on his current residence and about $10,000 in

12    credit card debt.  He reported no other lease payments, no

13    other properties that were in his name, leased or owned.

14                THE COURT:  Did he make any disclosure with

15    regard to any bitcoin assets or bank accounts or other

16    financial assets?

17                THE PRETRIAL SERVICES OFFICER:  He did not.  He

18    did mention that there may be some stock, but -- he did

19    mention that the government has seized assets from him.

20                THE COURT:  All right.  Thank you.

21          Well, the Court is required at this time to make two

22    determinations.  The first is whether the government has

23    presented sufficient evidence to conclude or to determine

24    that there is probable cause to believe that the defendant

25    seated in the courtroom is the defendant named in the

Case 2:19-cr-00395-BAH Document 15-2 Filed 03/04/20 Page 90 of 95
Case 8:20-mj-02030-KBB Document 113 Filed 02/25/20 Page 90 of 95 PageID #:142

90

1    indictment issued out of the District of Colombia.

2         With regard to that, and there was not any serious

3    contesting of that or any contesting at all of that in the

4    defendant's argument.

5         So the Court will conclude that the government has

6    satisfied its burden there and that there is probable cause

7    to believe that the defendant seated in the courtroom is the

8    defendant named in the indictment issued out of the District

9    of Columbia.

10        With regard to the second determination that the Court

11   is required to make, and that is whether the government's

12   motion for detention should be granted, we've heard

13   considerable evidence as to the nature and circumstances of

14   the offenses that defendant is charged with in the

15   three-count indictment.

16        Those offenses do carry a substantial penalty.  The

17   statutory penalty is a maximum of 20 years.

18        The government has submitted a memorandum indicating

19   that under the sentencing guidelines, the sentence that

20   could be imposed but not necessarily -- it's obviously the

21   Court's determination as to what sentence will be imposed.

22        But the sentencing range would be 235 to 243 months.

23   So considerably above the 20 years, taking into account the

24   enhancement factors for the amount of funds, the defendant's

25   knowledge, etcetera.

Case 1:19-cr-00395-BAH   Document 15   Filed 02/29/20   Page 91 of 95
Case 1:19-cr-00395-BAH   Document 13-2   Filed 03/04/20   Page 91 of 143

91

1      Obviously sentencing in the final analysis is

2   something that the Court will determine.

3      The statutory penalty as well as the potential

4   guideline range that applies to this case does indicate to

5   the Court that this is a serious offense and is regarded as

6   such by Congress which sets forth -- and by the Sentencing

7   Commission which sets forth the sentencing parameters that

8   apply to the offense.

9      The weight of the evidence against the defendant,

10  while the defendant did raise some -- his counsel raised

11  questions as to whether defendant potentially didn't know

12  where the bitcoin was coming from or that it was coming from

13  Darknet sources engaged in illegal activity, it appears that

14  notwithstanding those questions raised by the defendant,

15  that the government's case against this defendant is a

16  strong one.

17     The investigation has been lengthy and thorough.  And

18  it appears that -- as I said, at the end of the day, the

19  case will be tried, and a jury might conclude otherwise.

20  But at this juncture, it certainly appears that the

21  government's case is strong.

22     With regard to the history and the characteristics of

23  the defendant, this defendant has strong ties to this

24  community.  His family resides here.  He has a residence

25  here, although he has residences in other locations as well.

1     So he's been a resident for a considerable period of time.

2          His criminal history is, I would say, described as

3     negligible.  It consists of a single arrest for possession

4     of marijuana back in 2005.

5          So his criminal history category -- criminal history

6     is small.  His family ties to the community are strong.

7     Those are factors that weigh in favor of the defendant.

8          What the defendant is contending is not that the

9     defendant -- excuse me, what the government is contending is

10    not that the defendant is a danger to the community, but

11    rather that he is a risk of flight.

12         And in that regard, the government's burden of proof

13    is preponderance of the evidence to establish that the

14    defendant is a risk of flight.  It's not a clear and

15    convincing standard.

16         Here it appears that the defendant has considerable

17    assets.  While some of his assets have been seized by the

18    government, it appears that he has considerable assets

19    remaining.  Those assets, we don't know, but they

20    potentially could be accessed by him through other persons

21    who may have access to them.

22         These are things that are unknown to the Court but

23    certainly are potential and, you know, he does appear to

24    have control or the means of control over a considerable

25    amount of assets that have not yet been seized.  The agent

1      estimated in the range of tens of millions of dollars of

2      assets that have not been seized, that the government has

3      not seized.

4          The defendant is also charged with, as mentioned

5      earlier, crimes that carry heavy penalties, in particular,

6      the first crime he is charged with, which has a statutory

7      maximum of 20 years and a guidelines range that could

8      approach 30 years.

9          Again, while sentencing ultimately will be the

10     determination of the Court, that at this juncture, faced

11     with those heavy penalties, it does provide defendant a

12     strong incentive to flee.

13         That is a factor that the Court must take into

14     consideration -- or will take into consideration.

15         The defendant, it appears, was not candid with the

16     Office of Pretrial Services in describing his assets.  And

17     there were exhibits submitted and attributed to the

18     defendant.  The defendant didn't contest those exhibits

19     where defendant had indicated and advertised the services

20     that he was providing through Helix as being a means to

21     avoid and evade law enforcement.

22         So it -- defendant has a history, if I can put it that

23     way, a history of using and causing others to use means to

24     avoid law enforcement.

25         That's a factor that the Court must take into

1   consideration when considering whether defendant poses a

2   risk of flight.

3        The conclusion of the Court is that the

4   defendant -- that the government has shown by a

5   preponderance of the evidence that the defendant does pose a

6   risk of flight and that the Court concludes that conditions

7   could not be established that would reasonably assure that

8   this defendant will appear for proceedings in the case as he

9   is required to do.

10        Accordingly, the Court will order the defendant

11   detained.

12        And having established that defendant is the person

13   identified or named in the indictment, defendant will be

14   ordered transferred to the District of Columbia for further

15   proceedings under the indictment.

16        So at this time, Mr. Harmon, you'll be remanded to the

17   custody of the United States marshal for -- you will be in

18   their custody, and they will arrange for your transport to

19   the District of Columbia.

20             THE DEPUTY CLERK:  All rise.

21        (Proceedings concluded at 5:09 p.m.)

22

23

24

25

```
 1                      I N D E X

 2    DIRECT EXAMINATION OF JEREMIAH HAYNIE          9

 3    BY MR. RIEDL

 4    CROSS-EXAMINATION OF JEREMIAH HAYNIE           52

 5    BY MR. FLOOD

 6    REDIRECT EXAMINATION OF JEREMIAH HAYNIE        70

 7    BY MR. RIEDL

 8    RECROSS EXAMINATION OF JEREMIAH HAYNIE         74

 9    BY MR. FLOOD

10

11

12                 C E R T I F I C A T E

13

14         I certify that the forgoing is a correct

15    transcript from the record of proceedings in the

16    above-entitled matter.

17

18              S/Caroline Mahnke          2/25/2020

19              Caroline Mahnke, RMR, CRR, CRC    Date

20

21

22

23

24

25
```