**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | |
| | : | |
| **v.** | : | **Criminal No. 19-395 (BAH)** |
| | : | |
| **LARRY DEAN HARMON,** | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S OPPOSITION TO DEFENDANT'S**
**MOTION TO REVOKE DETENTION ORDER**

The United States, by and through its attorney, the United States Attorney for the District of Columbia, respectfully files its opposition to the Defendant's Motion To Revoke the Magistrate's Detention Order, ECF No. 15.   In support whereof, the government states as follows:

**FACTUAL BACKGROUND**

On December 3, 2019, a federal grand jury in the District of Columbia returned an indictment against the defendant, Larry Dean Harmon ("Harmon" or the "defendant"), on counts of Conspiracy To Launder Monetary Instruments, in violation of 18 U.S.C. § 1956(h); Operating an Unlicensed Money Transmitting Business, in violation of 18 U.S.C. § 1960(a); and Money Transmission Without a License, in violation of D.C. Code § 26-1023(c).

The Indictment is the result of a long-term investigation into Harmon's operation of a Darknet money laundering and money transmission service from 2014 through 2017.[1]   As summarized in the Indictment, Harmon operated a suite of Darknet services including GRAMS

---

[1] The Darknet refers to a collection of hidden websites available through a network of globally distributed relay computers called the Tor network.   They are hidden websites because, unlike standard Internet websites, on the Tor network there is no publicly available listing of the Internet Protocol (IP) addresses of servers hosting websites on the Tor network.   The Darknet includes a number of hidden websites that sell illegal goods, like guns and drugs, and illegal services, like hacking and money laundering.

and HELIX.   Starting in or about April 2014, Harmon launched GRAMS, a Darknet search engine that enabled users to search for drugs or other illegal goods across multiple Darknet markets at once.   Starting in or about July 2014, HARMON began operating HELIX, which was linked to and affiliated with GRAMS.   HELIX was a bitcoin money laundering service, commonly referred to as a bitcoin "mixer" or "tumbler."[2]   HELIX allowed customers to send bitcoins in a manner designed to obfuscate the source or ownership of the bitcoins.

Harmon advertised HELIX to customers on the Darknet as a way to conceal transactions from law enforcement.   Indeed, HELIX partnered with the Darknet market AlphaBay to provide bitcoin money laundering services for AlphaBay customers.   At the time, AlphaBay was the largest Darknet marketplace in operation, offering a platform for customers to purchase a variety of illegal drugs, guns, and other illegal goods.   The AlphaBay website recommended that customers use a bitcoin tumbler service and provided an embedded link to the Tor website for GRAMS/HELIX.

In total, HELIX laundered at least 354,468 bitcoins—the equivalent of approximately $311 million at the time of the transactions.   The largest volume of funds sent through HELIX came from Darknet markets including AlphaBay, Agora Market, Nucleus, and Dream Market.   In or about December 2017, Harmon began to shut down operations for GRAMS/HELIX.   After

---

[2] Bitcoin is a virtual currency that exists in electronic form and is transacted through the Internet.   The bitcoin protocol, or software, allows users to create "bitcoin addresses," roughly analogous to accounts.   For security and privacy reasons, it is common for a single bitcoin user to control numerous bitcoin addresses, which are stored and controlled in a "bitcoin wallet."   Each bitcoin address is controlled through the use of a unique "private key," akin to a password.   Bitcoin is sometimes called a "cryptocurrency" because transactions are executed using public-key cryptography.

shutting down GRAMS/HELIX, Harmon overtly controlled other companies, including Harmon Web Innovations ("HWI"), CoinNinja, and an associated bitcoin payment app called DropBit.

On February 6, 2020, federal law enforcement agents from the Internal Revenue Service-Criminal Investigation ("IRS-CI") and the Federal Bureau of Investigation ("FBI") arrested Harmon and executed three search warrants for Harmon's residence and office properties in the Akron, Ohio area (Harmon leased office space on the second and third floors of a commercial office building in downtown Akron).   On the same date, authorities in Belize executed a search of Harmon's vacation property in Belize pursuant to a Mutual Legal Assistance Treaty ("MLAT") request.   On February 10, 2020, based in part on information discovered through the Ohio search warrants, federal agents executed another search warrant for an apartment Harmon rented in San Mateo, California.

In each location, agents recovered, among other things, cryptocurrency storage devices, including:

- One Trezor seized from the second floor office space in Akron, Ohio.   This Trezor was taped to the underside of a desk using double-sided tape.

- Two Trezors seized from Harmon's vacation property in Belize.

- One Ledger Nano seized from Harmon's apartment in San Mateo, California.

Agents also found a recovery seed key in Harmon's office space.[3]

---

[3] A seed key or seed phrase is a list of words used to encode a bitcoin wallet address.   Wallet software will typically generate a seed phrase and instruct the user to write it down on paper.   The same software can be used to decode the seed phrase and reconstitute the wallet.

<u>**Detention and Identity Hearing and Decision**</u>

On February 11, 2020, U.S. Magistrate Judge Kathleen B. Burke in the Northern District of Ohio held a two-hour combined identity and detention hearing for Harmon.   The government presented live testimony from Special Agent Jeremiah Haynie, an IRS-CI agent who participated in the Ohio searches, and the defense had an opportunity to cross-examine the agent at length.

Also present was Pretrial Services Officer Julie Gray, of U.S. Probation and Pretrial Services for the Northern District of Ohio.   In her interview of Harmon prior to the hearing, Harmon had disclosed only a portion of his assets—specifically, he failed to disclose any of his cryptocurrency holdings.   As a result, Officer Gray had initially recommended that Harmon be released pending trial subject to $50,000 bond and other conditions.   At the conclusion of the testimony, however, Magistrate Judge Burke gave Officer Gray an opportunity to reconsider her recommendation.   Officer Gray changed her recommendation to detention:

> COURT:       So you have now heard the evidentiary presentations of the parties. So I would ask you at this point, did you have anything you wish to – do you stand by your report or anything you wish to change about the report or add to it?
>
> PRETRIAL SERVICES OFFICER:  Your Honor, after listening to the evidence presented today, I do have more concerns regarding risk of flight based on the potential of other assets, other residences.   While he may or may not own them, he has a lease.   That's information he did not provide to this officer during the interview.   I believe he is a risk of flight, and for that reason I would change my recommendation to detention.

2/11/20 Tr. at 77:16-78:2, attached as Ex. A.   Officer Burke also confirmed that Harmon concealed his cryptocurrency assets and not been entirely truthful in his interview with Pretrial Services.

> COURT:       Did he make any disclosure with regard to any bitcoin assets or bank accounts or other financial assets?

> PRETRIAL SERVICES OFFICER:  He did not.   He did mention that there may
> be some stock, but – he did mention that the government has seized assets
> from him.

2/11/20 Tr. at 89:14-19.

At the conclusion of the hearing, Magistrate Judge Burke found that Harmon posed a serious risk of flight pursuant to 18 U.S.C. § 3142(f)(2)(A), based on the weight of the evidence against the defendant, the lengthy period of incarceration he would be subject to if convicted, and his significant ties outside the United States.    The judge ordered that Harmon be detained without bond pending trial.    *See United States v. Larry Dean Harmon*, N.D. Ohio No. 20-mj-1030, ECF No. 9-2 (Feb. 12, 2020), attached as Ex. B.

In announcing her decision, Magistrate Judge Burke cited the substantial statutory penalty and "potential guideline range that applies to this case."    2/11/20 Tr. at 91:3-8.   This significant criminal exposure "has a statutory maximum of 20 years and a guidelines range that could approach 30 years," which "does provide the defendant a strong incentive to flee."   *Id.* at 93:6-8, 93:11-12.   She also stated that "this investigation has been lengthy and thorough" and "the government's case against this defendant is a strong one."   *Id.* at 91:15-17.   She noted that "[t]he defendant didn't contest those exhibits where the defendant had indicated and advertised the services that he was providing through Helix as being a means to avoid and evade law enforcement," which showed "a history of using and causing other to use means to avoid law enforcement."   *Id.* at 93:18-24.   She found that Harmon's substantial cryptocurrency assets were not fully accounted for, and, while the government had seized *some* cryptocurrency storage media, Harmon appeared to have "considerable assets remaining," which "could be accessed by him through other persons who may have access to them."   *Id.* at 92:17-21.   She also faulted Harmon

5

for concealing his assets from Pretrial Services, finding that he "was not candid with the Office of Pretrial Services in describing his assets." *Id.* at 93:15-16.   Magistrate Judge Burke credited Harmon's family support and negligible criminal history, but found that those considerations were outweighed by the other factors showing serious risk of flight.   *Id.* at 91:22-92:7.

Harmon was transported to the District of Columbia and appeared before Magistrate Judge Harvey on February 20, 2020.   Once again, Harmon concealed his assets in his interview with the Pretrial Services Agency for the District of Columbia.   Specifically, in the Pretrial Services Report prepared for Harmon's initial appearance in the District of Columbia, all of his financial information is listed as "Unknown," including personal assets, liabilities, monthly income, and monthly expenses.   No disclosure was made of Harmon's extensive cryptocurrency holdings.

## APPLICABLE LAW

Under the Bail Reform Act, the Court "shall order" the defendant to be detained if it determines after a hearing that no condition or combination of conditions "will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e).   A finding of either risk of flight or danger is sufficient for detention.   *See, e.g.*, *United States v. Ferranti*, 66 F.3d 540, 543-44 (2d Cir. 1995).   The government must prove the defendant presents a risk of flight only by a preponderance of the evidence, not by clear or convincing evidence or other, more demanding standards.   *United States v. Vortis*, 785 F.2d 327, 328-29 (D.C. Cir. 1986); *United States v. Xulam*, 84 F.3d 441, 442 (D.C. Cir. 1996).   At a detention hearing, the government may present evidence by way of a proffer.   *United States v. Smith*, 79 F.3d 1208, 1209-10 (D.C. Cir. 1996).

In reviewing the Magistrate Judge's detention order, this Court conducts a *de novo* review of the record to determine whether the defendant should be detained pending trial.   *United States v. Smith*, 160 F. Supp. 3d 280, 282 (D.D.C. 2016).   "The Court is free to use in its analysis any evidence or reasons relied on by the magistrate judge, but it may also hear additional evidence and rely on its own reasons."   *Id.* (quoting *United States v. Hubbard*, 962 F. Supp. 2d 212, 215 (D.D.C. 2013)).

In assessing the risk of flight presented by the defendant, the Court must assess factors including (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; and (3) the history and characteristics of the defendant.   18 U.S.C. § 3142(g)(1)-(3).[4]

## **ARGUMENT**

### **A. The Nature and Circumstances of the Offense**

#### **1. Harmon's Significant Criminal Exposure Favors Detention**

Harmon is charged with serious felony offenses that could subject him to substantial criminal penalties.   In Count One of the Indictment, Harmon is charged with money laundering conspiracy in violation of 18 U.S.C. § 1956(h), exposing him to a maximum sentence of up to 20 years of imprisonment.[5]   Counts Two and Three charge operation of an unlicensed money

---

[4] The government is not relying on the defendant's danger to the community for detention under 18 U.S.C. § 3142(g)(4).   However, it is worth noting that, should the defendant flee the United States before he is brought to trial, he has potentially huge cryptocurrency assets, foreign ties, and the Darknet programming abilities that would enable him to return to a life of cyber crime from anywhere in the world.

[5] Under 18 U.S.C. § 1956(h), the penalty for money laundering conspiracy is "the same" as the penalty "prescribed for the offense the commission of which was the object of the conspiracy."   Here, the objects of the conspiracy included promotional money laundering under 18 U.S.C. § 1956(a)(1)(A)(i) and concealment money laundering under 18 U.S.C. § 1956(a)(1)(B)(i), both of which are 20-year offenses.

transmitting business in violation of both federal and District of Columbia law, 18 U.S.C. § 1960(a) and D.C. Code § 26-1023(c), both of which are punishable by up to 5 years of imprisonment.

Moreover, under the U.S. Sentencing Commission Guidelines Manual (the "Guidelines" or U.S.S.G.), the *bottom* of the estimated Guidelines range for Count One is very near the 20-year statutory maximum.   As the Indictment states, Harmon conspired with other co-conspirators including the administrator of AlphaBay to launder bitcoin transactions through HELIX. Investigators traced at least 21,996.74 bitcoin sent from AlphaBay to HELIX, valued at more than $13 million at the time of the transactions.   Given that volume of laundering activity—counting *only* the transactions traced to AlphaBay—the estimated Guidelines range for Harmon begins at 235 months, *i.e.*, 19 years and 7 months, and goes well above the applicable 20-year statutory maximum:

| | | |
|---|---|---|
| U.S.S.G. § 2S1.1(a)(2) | Base offense level | 8 |
| U.S.S.G. § 2B1.1(b)(1)(K) | More than $9,500,000 | +20 |
| U.S.S.G. § 2S1.1(b)(1) | Knowledge that funds were proceeds of or intended to promote drug offenses | +6 |
| U.S.S.G. § 2S1.1(b)(2)(C) | Defendant in business of laundering | +4 |
| | Total offense level: | 38 |
| | **Sentencing range:** | **235-293 months** |

Although the actual sentence may end up being less than the statutory maximum of 20 years, this level of criminal exposure creates a significant incentive to flee.   *See, e.g.*, *United States v. Bikundi*, 47 F. Supp. 3d 131, 134 (D.D.C. 2014) (finding, where defendant faced 20-year statutory maximum on money laundering counts and a "substantial advisory sentencing Guideline range" of "168 to 210 months' incarceration," that "[t]his considerable punishment gives the defendant a substantial incentive to flee the United States") (internal quotations omitted).

In addition to any period of incarceration, Harmon is facing the possibility of millions of dollars in financial penalties.   Those penalties include a forfeiture money judgment equal in value to all property involved in the operation of HELIX; as well as the forfeiture of specific properties— including real estate, vehicles, financial assets, and millions of dollars in cryptocurrency assets— that Harmon accumulated from his operation of HELIX or purchased with his illegal proceeds.

### 2.   The Nature and Sophistication of Harmon's Criminal Money Laundering Service Favor Detention

The nature and sophistication of Harmon's criminal scheme also weighs in favor of detention.   *See, e.g.*, *Bikundi*, 47 F. Supp. 3d at 134-35 (citing defendant's "sophistication" and "quite complex" fraud scheme in favor of detention).   As the grand jury found in the Indictment, HELIX was designed to enable users on the Darknet to make untraceable transactions online and evade law enforcement.   Harmon's online comments provide further insight into the nature and intent behind HELIX.   As Agent Haynie testified at the detention hearing, Harmon posted comments in the online forum Reddit, using a pseudonymous moniker that identified him as the administrator of GRAMS.   *See* 2/11/20 Tr. at 18:10-4.   Harmon's online comments confirmed that (a) he was aware the Darknet mostly sold drugs and other illegal items; and (b) he designed HELIX to enable users to evade law enforcement (to which he referred using the abbreviation "LE").   For example, Harmon stated:

- "Right now the Darknet is 90% drugs and illegal items for sale."   Ex. C.

- "I created grams because 90% of the darknet was behind blackmarket sites which required a login to view.   This made it unsearchable by normal search engines. . . . I wanted to make it easier for users to use the darknet."   Ex. C.

- "Helix uses new addresses for each transaction so there is no way LE would [be] able to tell which addresses are helix addresses."   Ex. D-14 (Det. Hr'g Ex. 14).[6]

- "No one has ever been arrested just through bitcoin taint, but it is possible and do you want to be the first?   If you get a controlled delivery and you deny ordering the package the bitcoin taint will be the evidence they need to prove you ordered it.   It is better to be safe than sorry no matter which tumbler or tumbling method you use."   Ex. E.

Notably, "controlled delivery" is law enforcement jargon for an operation in which law enforcement intercepts a parcel containing illegal drugs and attempts to make an undercover delivery of the parcel to its intended recipient.   Controlled deliveries are used to identify drug buyers and investigate drug trafficking networks.   Harmon's example shows his familiarity with law enforcement and his awareness that HELIX was used to facilitate drug trafficking offenses.

Indeed, the largest customers of HELIX were all Darknet markets selling drugs and other illegal items.   As Agent Haynie testified, "most of the known bitcoin that came into Helix came from illegal marketplaces."   2/11/20 Tr. at 25:11-12.   Investigators traced 43,319.68 bitcoin from various Darknet markets to Helix, valued at more than $21 million at the time of the transactions.   Ex. D-5 (Det. H'rg Ex. 5); 2/11/20 Tr. at 25:19-26:13.   Agent Haynie explained that these markets sold "[m]ostly illegal narcotics, fraudulently obtained stolen credit card information, malware.   Those types of things."   2/11/20 Tr. at 26:2-3; *see also id.* at 17:16-17:9 (explaining that Darknet markets typically sell "illegal narcotics" as well as "stolen credit card data, malware, those type of illegal items").[7]   In addition, Harmon's Reddit comments show that

---

[6] The government's detention hearing exhibits (1-15) are attached hereto as Exhibit D to this motion.   They are cited herein as Exhibit D-1, D-2, *etc.*

[7] The defendant incorrectly asserts (at 6) that the government "conceded" that these Darknet marketplaces "transact in both licit and illicit goods."   Because there is no citation it is unclear what the defendant is referring to, but, in fact, Agent Haynie testified repeatedly that the majority of items for sale on Darknet markets were illegal drugs and other contraband.   *See, e.g.,* 2/11/20 Tr. at 17:16-18:9 (testifying that Darknet markets sell "illegal items since it's a dark web marketplace" and agreeing it would not be "normal" to find legal items for sale); *id.* at 73:1-7 (testifying that he had never seen a "neck tie" for sale on the dark web and that, if you were searching a Darknet market, "[y]ou

he actively cultivated relationships with the administrators of various Darknet markets to partner with his GRAMS/HELIX services:

- "I have been talking to outlaw, silkroad2, cloud nine.   They all said they want on grams and are either going to use my api [*i.e.*, Application Program Interface] or give me some of their own.   I consider them with agora which is already on there to be the majors. . . . if there is a strong demand for a market and they are not on there I will make sure we add them."

Ex. F.   Outlaw, Silkroad2, Cloud Nine, and Agora were all Darknet drug trafficking markets. An Application Program Interface (API) would, in effect, integrate HELIX's money laundering service into the operation of those Darknet markets more seamlessly, in the way HELIX was already integrated into AlphaBay.

As the Indictment states, Harmon partnered HELIX with AlphaBay, one of the largest and most infamous Darknet markets at the time (before it was taken down by law enforcement in July 2017).   Agent Haynie testified that a user of AlphaBay would have no doubt the site was an online drug trafficking marketplace:   "Once you log in, there is . . . there is vendor advertisements and there is photos of drugs for the most part.   And on the left-hand side there were categories which were different drugs, MDMA, meth, ectasy, marijuana."   2/12/20 Tr. at 72:16-20.   AlphaBay recommended to its users that they use a bitcoin tumbler "to erase any trace of your coins coming from AlphaBay."   And AlphaBay specifically recommended HELIX, and provided its customers with an embedded link to the Tor website for HELIX.   Ex. D-6 (Det. H'rg Ex. 6); *see also* 2/11/20 Tr. at 26:8-28:3.   As noted above, AlphaBay alone accounted for 21,996.74 bitcoin, or more than $13 million, in HELIX laundering transactions.   Ex. D-5 (Det. H'rg Ex. 5).

---

were searching for illegal items").

On cross-examination, Agent Haynie confirmed that the very purpose of HELIX was to facilitate illegal commerce on the Darknet:

> Most of the goal when we're talking about transactions from the dark web here, though, is for dark web vendors who receive bitcoin for selling drugs, for example, those vendors are typically not able to pay their rent in bitcoin.   So they need to get that bitcoin out.
>
> Well, right now it's in AlphaBay, which these bitcoin analytics tools and law enforcement know the bitcoin addresses associated with AlphaBay, for the most part.
>
> So if they went directly from AlphaBay to an exchange, a company that exchanges bitcoin for U.S. dollars, if they went direct there, that exchange would, again, the same tools we're using, would see that the money is coming from AlphaBay, and they would close the account.   Might file a suspicious activity report.   It would come on law enforcement's radar.
>
> So instead, these vendors use Helix and other mixers and tumblers to kind of erase AlphaBay from their history, and then they can go through the exchange and cash out.

2/11/20 Tr. at 64:12-65:5.

The final confirmation that Harmon knew HELIX was being used to fuel illegal drug trafficking was the fact that he operated it in secret.   Harmon never incorporated GRAMS/HELIX as a legitimate corporation (although he has incorporated several other business entities). Harmon never publicly took credit for GRAMS/HELIX or identified himself as the administrator, but instead concealed his identity and hid behind a pseudonymous moniker online.   In one of his Reddit comments, Harmon expressed concerns about his organization being infiltrated by a "UC," or undercover law enforcement officer:   "I don't want any UC working for me. . . I really like the one guy.   Can you guys think of any ways I could make him prove he wasn't a UC?   I would really like to keep him but I need to be sure."   Ex. D-14 (Det. Hr'g Ex. 14).

In another example of Harmon's efforts to evade law enforcement, he deliberately used an overseas server (in China) for one of the services associated with GRAMS/HELIX, called "GramsFlow."   Ex. G.   On Reddit, Harmon explained that he used this overseas server because of his fear of law enforcement intervention:   "My server is not in the US unlike reddit's and has less of a chance of LE taking control without LE even needing to do a MITM."   Ex. D-14 (Det. Hr'g Ex. 14).   Agent Haynie explained that MITM is an acronym for "man in the middle," referring to a kind of cyber attack.   2/11/20 Tr. at 19:21-25.

To the extent Harmon now claims that HELIX was some sort of "privacy" service and not a money laundering organization designed to facilitate Darknet drug trafficking, his claims are belied by his own words and the efforts he took to conceal his true identity as administrator.

## B.  The Weight of the Evidence Against the Defendant

### 1.  The Government's Evidence Is Overwhelming and Largely Undisputed

The government's case against the Defendant is overwhelming—so overwhelming, indeed, that Harmon has effectively conceded that he was the administrator of HELIX and that HELIX was a bitcoin "mixer" service.   While the defendant's motion questions Harmon's *knowledge* that HELIX was used to facilitate drug trafficking, it does not deny the significant evidence showing that Harmon was, in fact, the administrator of GRAMS/HELIX.[8]

---

[8] To further dispel any doubt, Harmon's family members have given media interviews following his arrest in which they confirmed that he operated HELIX, even while disputing his criminal intent.   *See, e.g.*, *US DOJ Calls Bitcoin Mixing 'a Crime' in Arrest of Software Developer*, Coindesk (Feb. 13, 2020), attached as Ex. H ("Harmon's brother and Coin Ninja coworker . . . said Helix did not directly partner with AlphaBay and the darknet market recommended the mixer without Larry's permission or input."); *Could Privacy Tools for Bitcoin & Cryptocurrencies Get Shut Down?*, Crypto Markets news (Feb. 16, 2020), attached as Ex. I ("When asked her opinion on Larry's Arrest, [Harmon's wife] said 'My opinion of Larry's arrest is this: If the government wants to regulate the use, distribution, tumbling, and ownership of Bitcoin, the proper channel to do that is through the United States congress. . . . There are many bitcoin tumblers up and running today.   (CoinJoin, BitcoinLaundry.com, smartmixer.io cryptomixer.io, bitcoinmix.org)   What does this mean for them?").

Indeed, this is an indicted case in which the grand jury found probable cause to believe Harmon is guilty of the charged offenses.   *See, e.g.*, *United States v. Johnson*, 212 F. Supp. 3d 126, 129 (D.D.C. 2016) (noting indictment is "not dispositive" but still relevant).   At the detention hearing in Ohio, the government introduced significant evidence confirming Harmon's operation of HELIX.   For example, Government Exhibit 8 shows a photograph that was recovered from a search warrant of Harmon's email/cloud account.   The photograph was taken by a Google Glass device and saved in the cloud storage associated with Harmon's account.   In the background, it shows the interior of a room matching Harmon's vacation property in Belize. Metadata confirms that the photograph was taken in San Pedro, Belize—where Harmon's vacation property is located—and it was taken on a date in October 2014 when Harmon was known to be in Belize.   The photograph itself shows an open laptop computer with browser tabs corresponding to *administrator* pages and other Tor pages associated with GRAMS and HELIX.   *See* 2/11/20 Tr. at 32:3-35:7; Exs. D-8, D-9 (Det. H'rg Exs. 8-9).   In other words, Government Exhibit 8 confirms that Harmon, who took the photograph and had it saved within his online account, was working as the administrator for GRAMS/HELIX.

On February 6, 2020, Belizean authorities executed a search of Harmon's vacation property in San Pedro, Belize.   They recovered additional evidence corroborating Harmon's operation of GRAMS/HELIX from Belize, including hard drives and two Trezor cryptocurrency storage devices.   2/11/20 Tr. at 42:18-19.

Significant evidence also shows Harmon's possession and control over a huge sum of cryptocurrency assets consistent with estimates of the illegal proceeds generated by HELIX during its lifetime between 2014 and 2017.   As the Indictment states, HELIX laundered at least 354,468

14

bitcoins while charging a 2.5% fee, which would have generated approximately 8,861 bitcoins (close to $69 million at today's prices).[9]   Government investigators recovered a spreadsheet from Harmon's Google Drive account entitled "Accounts.xlsx," dated October 18, 2018.   Ex. D-11 (Det. Hr'g Ex. 11); 2/11/12 Tr. at 35:10-19.   The spreadsheet appears to be an accounting of Harmon's assets.   It lists cryptocurrency and U.S. dollar assets totaling $56,939,610.00, including 6,284 in bitcoin and substantial holdings in other cryptocurrencies (1,013 Ethereum; 2,055 BitcoinCash; and 519 Bitcoin Gold).   In addition, when Harmon was arrested on February 6, 2020, his mobile phone contained a financial management app (roughly similar to Mint.com) that appeared to show Harmon was monitoring a portfolio of cryptocurrency valued at $47,740,800. Ex. D-13 (Det. Hr'g Ex. 13); 2/11/20 Tr. at 41:10-24.   This huge volume of unexplained cryptocurrency wealth corroborates Harmon's illicit operation of HELIX (and subsequent efforts to self-launder his own illicit proceeds).

Finally, there is ample evidence that Harmon knew exactly what he was doing with HELIX, notwithstanding his present denials.   As noted above, Harmon posted extensive comments on Reddit as the GRAMS/HELIX administrator confirming that he knew the Darknet was mostly used for illegal drug trafficking, and that HELIX was specifically designed to allow users to purchase and sell drugs without fear of detection by "LE."   Magistrate Judge Burke even remarked on the fact that "[t]he defendant didn't contest those exhibits where defendant had indicated and advertised the services that he was providing through Helix as being a means to avoid and evade law enforcement."   2/11/20 Tr. at 93:18-21.   Also noted above, Harmon took

---

[9]  The market value of bitcoin has fluctuated substantially between April 2014 and today.   As of March 9, 2020, the price was $7,809.83 per bitcoin.   *See* CoinMarketCap, Bitcoin (BTC) Historical Data, at https://coinmarketcap.com/currencies/bitcoin/historical-data/.

precautions to conceal his own identity as the administrator of GRAMS/HELIX.   In addition, Agent Haynie testified that Harmon's mobile phone contained text messages referring to "RPC_dirty" and "clean" alongside decimal values that appeared to be consistent with bitcoin. The reference to "dirty" and "clean" coins echoes terms used in Harmon's Reddit posts about HELIX and in statements on the HELIX website itself.   2/12/20 Tr. at 48:6-17.   At the detention hearing, Agent Haynie testified that he understood "dirty" coins to mean "[c]oins that had been used for illegal means – or received for likely selling illegal things."   2/11/20 Tr. at 22:7-8.   In sum, the government's evidence of Harmon's knowledge and intent is just as strong as the (undisputed) evidence of attribution.

### 2.   The Government's Evidence Shows Harmon Knowingly Conspired To Launder the Proceeds of Controlled Substance Offenses

The defendant's entire argument (at 5-7) about the weight of the evidence for Count One is that the government has not traced an individual laundering transaction on HELIX to a specific drug transaction.   But the government has traced *more than $21 million* (43,319.68 bitcoin) in laundering transactions on HELIX to various Darknet markets that specifically catered to the illegal drug trade.   Ex. D-5 (Det. Hr'g Ex. 5); 2/11/20 Tr. at 25:19-26:13.   The majority of goods sold on these Darknet markets were "illegal narcotics," as well as "stolen credit card data, malware, those type of illegal items."   2/11/20 Tr. at 17:16-17:9.   In Reddit posts as the GRAMS/HELIX administrator, Harmon repeatedly confirmed that *he believed* the Darknet was "90% drugs and illegal items for sale," Ex. C, and that HELIX was *designed* to "so there is no way LE would [be] able to tell which addresses are helix addresses."   Ex. D-14 (Det. Hr'g Ex. 14).

Setting aside the ample evidence that HELIX was used to launder Darknet drug trafficking proceeds, the defendant's argument simply misunderstands the legal elements of a money

laundering conspiracy charge, which centers on the conspirators' intent and meeting of the minds. It is black-letter law that a conviction for conspiracy requires only proof of the illegal agreement and the defendant's knowing and voluntary participation in that agreement, not proof of a completed predicate offense. *See, e.g.*, *United States v. Broughton*, 689 F.3d 1260, 1280 (11th Cir. 2012) ("[U]nder 18 U.S.C. § 1956(h), only two elements of a conspiracy need be proven: (1) agreement between two or more persons to commit a money-laundering offense; and (2) knowing and voluntary participation in that agreement by the defendant"); *United States v. Farrell*, No. 03-cr-311, 2005 WL 1606916, at *8 (D.D.C. July 8, 2005) ("[Defendant] stands convicted of a conspiracy to commit money laundering in which the government's required proof included simply the existence of the unlawful agreement and [the defendant's] willful joinder in it."). While the government anticipates providing evidence of individual transactions at trial, the absence of a specific transaction at this stage is irrelevant as a matter of law to the money laundering conspiracy count.

### 3. The Government's Evidence and Well-Established Precedent Show Harmon Operated an Unlicensed Money Transmitting Business

On Counts Two and Three, the defendant baldly asserts (at 7) that, "[d]ue to the nature of its services, Helix was not required to register as a money transmitting business" under *federal* law. The defendant makes no attempt to explain what the "nature of its services" was or why that would have exempted HELIX from the law. Nor does the defendant dispute the *other* two prongs of a violation of 18 U.S.C. § 1960, which are also charged in the Indictment—namely, operation of a money transmitting business without an appropriate *state* license, and operation of a money transmitting business that "otherwise involves the transportation or transmission of funds that are known to the defendant to have been derived from a criminal offense or are intended to be

used to promote or support unlawful activity."   *See* 18 U.S.C. § 1960(b)(1)(A), (C).    And, before addressing the law, it is worth noting that the defendant does not dispute the basic fact that he operated HELIX as a bitcoin mixer service.

In any event, HELIX falls squarely within the definition of an "unlicensed money transmitting business" under 18 U.S.C. § 1960(b)(1).   As Agent Haynie testified, a user would "send" their "dirty" bitcoins to HELIX.   HELIX would provide "tumbling" services by conducting transactions to "mix" multiple users' bitcoins together.   HELIX would then send an equivalent amount of bitcoins (minus the 2.5% fee) to an address designated by the user, except these would be "new clean coins" that are not traceable to the user's original "dirty" bitcoins. 2/11/20 Tr. at 22:3-23:3; 54:5-13; 57:3-19.   Thus, HELIX was literally a money transmission business for bitcoins, allowing users to send bitcoins from Point A to Point B.

Under 18 U.S.C. § 1960(b)(2), "money transmitting" is defined very broadly as conduct that "includes transferring funds on behalf of the public *by any and all means* including *but not limited to* transfers within this country or to locations abroad by wire, check draft, facsimile, or courier" (emphasis added).   HELIX's services clearly constitute transferring funds on behalf of the public "by any and all means."[10]

---

[10]  Bitcoin also qualifies as "money" or "funds" under 18 U.S.C. § 1960.   *See United States v. Murgio*, 209 F. Supp. 3d 698, 707 (S.D.N.Y. 2016) (holding that bitcoins are "funds" under § 1960 "within the plain meaning of that term," because they "can be accepted as a payment for goods and services or bought directly from an exchange with a bank account" and can also be "'easily be purchased in exchange for ordinary currency, act[] as a denominator of value, and [are] used to conduct financial transactions'") (quoting *United States v. Faiella*, 39 F. Supp. 3d 544, 545 (S.D.N.Y. 2014)); *see also United States v. Ulbricht*, 31 F. Supp. 3d 540, 570 (S.D.N.Y. 2014) (holding that bitcoins are "funds" that "can be either used directly to pay for certain things or can act as a medium of exchange and be converted into a currency which can pay for things").

And HELIX falls within the category of money transmitting businesses that are required to register with the U.S. Department of the Treasury, Financial Crimes Enforcement Network ("FinCEN")—the only part of Count Two disputed by the defendant.   To establish a violation of the federal registration prong under 18 U.S.C. § 1960(b)(1)(B), the government is required to further show that the defendant was required to register under the Bank Secrecy Act, *i.e.* under 31 U.S.C. § 5330, or its implementing regulations.   *See* 18 U.S.C. § 1960(b)(1)(B).

Fortunately, this is *not* an issue of first impression: as early as 2008, in *United States v. E-Gold, Ltd.*, 550 F. Supp. 2d 82 (D.D.C. 2008), Judge Collyer in this District thoroughly analyzed whether a virtual currency exchanger and payment service could be held liable under the exact same statute, the federal registration prong of § 1960.   As Judge Collyer explained, the answer was "yes," under the broad statutory definition of money transmitting business in 31 U.S.C. § 5330(d)(1)-(2):

> The definition of "money transmitting business" in Section 5330 states in relevant part that a "money transmitting business" is any business that provides, *inter alia*, "money transmitting or remittance services."   31 U.S.C. § 5330(d)(1).   The term "'money transmitting service' includes accepting currency or *funds* denominated in the currency of any country and transmitting the currency or funds, *or the value of the currency or funds*, by any means through a financial agency or institution."   31 U.S.C. § 5330(d)(2) (emphasis added).   A "transmission" of "funds," in its ordinary sense, is not limited to cash or currency transfers, but may include transfers by check, wire or some other means.   The statute itself even states that a transmission of "funds" may be made "*by any means*."   *Id.* (emphasis added).   In addition, a "money transmitting service" includes a transmission of "the value of the currency or funds."   *Id.*   Clearly, a "money transmitting service" includes not only a transmission of actual currency, but also a transmission of the value of that currency through some other medium of exchange.   Nowhere does this definition purport to suggest that a "money transmitting service" includes only transmissions of actual cash or currency.   According to the plain language of the statute, therefore, Defendants e-Gold and GS & R, who according to the Indictment allegedly engage in the transmission of funds, must be registered, individually or jointly, with the Department of Treasury ("Treasury") under Section 5330.

*E-Gold*, 550 F. Supp. 2d at 94.   Judge Collyer also found that the implementing regulations to the Bank Secrecy Act constituted an additional, and alternative, basis for requiring e-Gold to register with FinCEN.   *See id.* at 95-96 (citing definition of "money services business" under 31 C.F.R. § 103.11(uu)(5) [current 31 C.F.R. § 1010.100(ff)(5)], which covers, *inter alia*, businesses that transfer "funds denominated in currency" "or the value of the currency or funds," as well as "[a]ny other person engaged as a business in the transfer of funds"). [11]   The government respectfully submits that the plain language of 31 U.S.C. § 5330(d)(1)-(2) and 31 C.F.R. § 1010.100(ff)(5), and the persuasive analysis in *E-Gold*, confirm that HELIX was required to register with FinCEN as a money transmitting business.

In addition, as early as 2013, FinCEN issued a regulatory guidance confirming that virtual currency exchangers and transmitters are considered money transmitters and are required to be registered with FinCEN.   *See* Dep't of the Treasury FinCEN Guidance, *Application of FinCEN's Regulations to Persons Administering, Exchanging, or Using Virtual Currencies*, FIN-2013-G001 (Mar. 18, 2013), available at https://www.fincen.gov/sites/default/files/shared/FIN-2013-G001.pdf.   As FinCEN explained:   "The definition of a money transmitter does not differentiate between real currencies and convertible virtual currencies.   Accepting and transmitting anything of value that substitutes for currency makes a person a money transmitter under the regulations implementing the [Bank Secrecy Act.]."   *Id.* at 3.   Accordingly, "[a]n administrator or exchanger that (1) accepts and transmits a convertible virtual currency or (2) buys or sells

---

[11] The Bank Secrecy Act implementing regulations were reorganized in 2010.   The provision cited in *E-Gold* as 31 C.F.R. § 103.11(uu)(5), was transferred to its current location, 31 C.F.R. § 1010.100(ff)(5), without substantive amendment.   *See* Financial Crimes Enforcement Network, Dep't of the Treasury, *Transfer and Reorganization of Bank Secrecy Act Regulations*, 75 FR 65806-01, 2010 WL 4168841, at 65812 (Oct. 26, 2010).

convertible virtual currency for any reason *is* a money transmitter under FinCEN's regulations, unless a limitation to or exemption from the definition applies to the person."   *Id.* (emphasis in original).[12]   To be clear, the FinCEN guidance did not *change* the law, but merely clarified the applicability of existing law and regulations to virtual currencies like bitcoin.   *See id.* at 1 (document is "interpretive guidance to clarify the applicability of the regulations implementing the Bank Secrecy Act" to virtual currencies).[13]

To the extent the defendant relies on an ignorance-of-the-law defense that he did not *know* he was required to register with FinCEN (or obtain a license in the District of Columbia), that defense fails.   As the Seventh Circuit explained in *United States v. Dimitrov*, 546 F.3d 409 (7th Cir. 2008), the 2001 Patriot Act specifically amended 18 U.S.C. § 1960 to *remove* any "scienter requirement" regarding registration or licensing:   "Under the amended § 1960, the government no longer need prove that a defendant was aware of state licensing requirements or that he knew about the federal registration requirements found at 31 U.S.C. § 5330."   546 F.3d at 413. Accordingly, courts in this District have held that a violation of § 1960 is a general intent crime that does not require the government to prove the defendant knew registration was required.   *See, e.g.*, *United States v. Keleta*, 441 F. Supp. 2d 1, 3 (D.D.C. 2006) ("[T]he Court finds that 18 U.S.C.

---

[12]  FinCEN issued further guidance in 2019 confirming, specifically, that "anonymizing services, commonly referred to as 'mixers' or 'tumblers,'" are required to register with FinCEN.   *See* Dep't of the Treasury FinCEN Guidance, *Application of FinCEN's Regulations to Certain Business Models Involving Convertible Virtual Currencies*, FIN-2019-G001 (May 9, 2019), at 19-20, available at https://www.fincen.gov/sites/default/files/2019-05/FinCEN%20Guidance%20CVC%20FINAL%20508.pdf.   As FinCEN explained, the business of mixers and tumblers "consists exclusively of providing secured money transmission," and therefore "a person . . . who provides anonymizing services by accepting value from a customer and transmitting the same or another type of value to the recipient, in a way designed to mask the identity of the transmitt*or*, is a money transmitter under FinCEN regulations." *Id.* at 20.

[13]  It is therefore inaccurate to assert, as defense counsel did during cross-examination of Agent Haynie, that the applicable law is "changing all the time."   2/11/20 Tr. at 56:4-5.   Section 1960 and the Bank Secrecy Act have been in place at all relevant times from 2014 through the present.

§ 1960(b)(1)(B) does not require that the Defendant either knew or willfully violated (or both) federal money transmitting registration requirements in order to have violated the statute.").

In any event, although it is not an element of the offense, the government obtained a covert recording of the defendant talking to undercover officers at a bitcoin conference on or about July 25, 2019, in which Harmon stated that he was working on raising money to obtain "licensing" for his bitcoin payment app, Dropbit:

> HARMON:   We have uh, uh like you can buy bitcoin through our app.   It currently goes through another company but we're working on creating our own way to sell bitcoin to start making money that way.   Right now we're not making any money.
>
> UC2:   Oh wow.
>
> UC1:   [inaudible]
>
> UC2:   So what did you need to do to make money?   What's your next steps?
>
> HARMON:   Uh, well, we're gonna try and get investments so we can get licensing.   I mean right now we make a little off that cause we have a lot of referrals.
>
> UC2:   Sure, ok.
>
> HARMON:   If we can do it ourselves, we need about, about 2 million to get the licenses so that we can sell it ourselves, so that's, that's what we're gonna do.

Ex. J.   Harmon's own words show that he was well-aware of the licensing requirements for his bitcoin payment app, and provide strong evidence that he was aware of the relevant licensing and registration requirements while he was operating HELIX in 2014 through 2017.

In sum, the government's evidence against the defendant is comprehensive and largely undisputed.

### C.  The Defendant's History and Characteristics

Two factors weigh overwhelmingly in favor of detention:  (1) Harmon's massive collection of cryptocurrency assets, which are only partially accounted for, are virtually untraceable, and can be accessed from anywhere in the world; and (2) Harmon's significant foreign ties, including financial and other ties to Belize.

First, Harmon is believed to have accumulated a massive amount of illicit proceeds in the form of bitcoin through operation of HELIX.   As noted above, the evidence introduced during the detention hearing in Ohio included the "Accounts.xlsx" spreadsheet, dated October 18, 2018, listing cryptocurrency and U.S. dollar assets totaling $56,939,610.00.   Ex. D-11 (Det. Hr'g Ex. 11); 2/11/12 Tr. at 35:10-19.   The evidence also showed that Harmon was using his mobile phone to monitor a portfolio of cryptocurrency valued at $47,740,800.   Ex. D-13 (Det. Hr'g Ex. 13); 2/11/20 Tr. at 41:10-24.   The government has recovered several cryptocurrency storage devices and seed keys and is in the process of recovering any stored bitcoin (and tracing recent transactions), but to date it has secured only a small fraction of the tens of millions of dollars in illicit cryptocurrency proceeds that Harmon is believed to control.

Agent Haynie testified that the information needed to access bitcoin can be copied in more than one place, including storage on multiple hardware devices, and storage in the form of cryptographic "seed keys"—which can be written down or even memorized.   2/11/20 Tr. at 37:13-38:8.   On cross-examination, Agent Haynie confirmed that Harmon "could also have copies of those Trezors or those hardware wallets with family, friends, places that we didn't search."   *Id.* at 65:21-23.   Agent Haynie also stated that it was likely Harmon had additional cryptocurrency storage devices that the government had not yet recovered:

> Just based on the fact that – how spread out these devices were, right?   We found one here in Akron under the desk.   We found two in Belize.   We found one in California.   All these places are in the name of Larry Harmon.   They're all leases or things that are owned by him.
>
> And so who knows the places that we weren't able to search.   Just the nature of how spread out these were and the fact that they were concealed, who knows how many other places they are.   Who knows the places that we may have missed in the places that we actually did search.

*Id.* at 66:20-67:5.   There is a substantial basis to believe that Harmon, if released, would be able to access at least some portion of his immense cryptocurrency holdings to finance his flight from prosecution.

Indeed, Harmon appears to have authored a blog in connection with his CoinNinja business in which he described methods of hiding and obfuscating bitcoin holdings.   In one post, the blog explains how to create a "secret wallet[]" within the wallet on a Trezor device, which appears invisible within the wallet software unless the user inputs an additional passphrase.   *See*, *Prevent Bitcoin Gunpoint Robberies with Secret Wallets* (Jan. 29, 2018), available at https://larry-harmon-ps8g.squarespace.com/blog/2018/1/29/prevent-bitcoin-gunpoint-robberies-with-secret-wallets, attached as Ex. K.   Another post describes hiding a recovery seed within the cavity of a disassembled electric guitar:   "So I printed my recovery words using a label-maker, rolled it up, and am now storing this extremely sensitive data in a very inconspicuous place, that only I will know, and of course now all of you fine folks."   *I found a Great Place to Hide Seed Words, How About You?* (Mar. 22, 2018), available at https://larry-harmon-ps8g.squarespace.com/blog/2018/3/21/i-found-a-great-place-to-hide-seed-words-how-about-you, attached as Ex. L.

Second, Harmon has significant foreign ties in Belize.   Agent Haynie testified that Harmon paid $2,000 per month to lease a vacation property in San Pedro, Belize, since at least 2014.   2/11/20 Tr. at 42:20-43:9.   This is the same Belize property from which Harmon was operating GRAMS and HELIX in the Google Glass photograph shown in Government Exhibit 8.   *See* Ex. D-8 (Det. H'rg Ex. 8).   When Belizean authorities searched Harmon's unit pursuant to a Mutual Legal Assistance Treaty request on February 6, 2020, they found hard drives (some of which contained movies, but are still undergoing review) and two Trezor devices.   2/11/20 Tr. at 42:18-19.   Of additional concern, while Belizean authorities were executing the search of Harmon's unit, an individual identifying himself as an "attorney" for the property and a personal acquaintance of Harmon showed up at the scene and attempted to intervene in the search.   The individual was identified as Lyndon Jones, who is the son of a former Minister of Finance for Belize.   Harmon is believed to have additional personal ties cultivated through his frequent stays in Belize and expenditures of illegal HELIX proceeds.[14]

Furthermore, Agent Haynie testified that Harmon has a record of using private jets to fly internationally.   Agents located an invoice on Harmon's phone dated April 2018, showing that he chartered a private plane from Cleveland to Jamaica.   2/11/20 Tr. at 47:18-21.   Agents also conducted surveillance of Harmon in December 2018 and witnessed Harmon boarding a charter flight.   *Id.* at 48:18-25.   Access to private jets is a significant risk factor in assessing the risk of

---

[14] Another example of Harmon's ties appears on a website that appears to have been created by Harmon's wife to raise money for his legal expenses.   According to the website, ""[w]hen Larry [Harmon] and [his wife] first moved to Belize in 2014, they made Belizean friends who were active in ensuring that all the children of San Pedro whose families could not afford Christmas had presents and the families had a Christmas dinner.   Larry and [his wife] immediately joined this effort, shopped for gifts for the children and provided funds for part of the food distribution effort."   *See* http://letlarrygo.com/ (accessed Mar. 8, 2020).

flight.   In addition, although agents seized Harmon's passport, Agent Haynie testified at the detention hearing that fraudulent identity documents are commonly sold on Darknet markets. 2/11/20 Tr. at 74:4-8.   Harmon's extensive familiarity with the Darknet would render obtaining fraudulent identity documents upon his release inconsequential.

The defendant relies (at 8) on his family support and ties to Akron, Ohio.   *But see United States v. Smith*, 160 F. Supp. 3d 280, 284 (D.D.C. 2016) (noting that defendant had "negligible to no ties to the District of Columbia community" and "his request for supervision in California presents the additional challenge of ensuring that the defendant appears before this Court as required for trial").   It is worth noting that the investigation into the HELIX money laundering conspiracy remains ongoing as to other co-conspirators and aiders and abettors.   Investigators examining a computer belonging to one of Harmon's family members, recovered during the search warrants, have located what appear to be preliminary draft designs for the HELIX logo—showing dollar signs and bitcoin symbols in a twisting design reminiscent of a double-helix—saved on the family member's computer.   According to file directory data, the draft logos were created in or about June 2014.   *See* Ex. M.   That was after Harmon launched GRAMS, but *before* he launched HELIX in or about July 2014.   This new evidence, combined with public statements by Harmon's wife and brother confirming their knowledge that Harmon was operating HELIX, raises concerns about relying on Harmon's family ties.

Furthermore, in public statements and in their letters to this court, several of Harmon's family members have associated themselves with CoinNinja, one of Harmon's overt businesses. While CoinNinja is currently associated with Harmon's "DropBit" bitcoin payment application, it was originally created to function as a bitcoin mixer closely mirroring Helix.   In responding to

one financial institution's know-your-customer inquiries related to CoinNinja's profits, Harmon stated:   "My recent deposit came from the profits of my bitcoin mixer. https://coinninja.io[.]   It charges a variable fee to mix a users bitcoins with other users' bitcoins.   It protect users privacy by getting rid of blockchain taint."   Ex. N.   However, at the detention hearing the Pretrial Services Officer stated that Harmon told her CoinNinja "is not making, really making money" and that Harmon "is not earning any income from that."   2/11/20 Tr. at 88:24-25, 89:1-5.   The conflicting evidence regarding CoinNinja's profitability raises questions about whether it has been used to launder Harmon's illicit proceeds from HELIX.   In addition, Agent Haynie testified that CoinNinja itself appears to be an unlicensed money transmitting business, operating without FinCEN registration in possible violation of 18 U.S.C. § 1960.   *See* 2/11/20 at 50:3-13.

In summary, Harmon has the means to escape and a place to escape *to*.   His enormous cryptocurrency holdings and his ties to Belize weigh heavily in favor of detention, and substantially outweigh any other considerations, including his family ties and negligible criminal history.   Combined with the other factors under 18 U.S.C. § 3142(g)—including Harmon's exposure to a lengthy term of imprisonment and significant financial penalties, as well as the government's strong evidence against him—the balance of considerations strongly favors detention of Harmon without bail pending trial.

### D.  The Magistrate Judge Adequately Considered Alternatives to Detention

The defendant incorrectly asserts (at 8-9) that Magistrate Judge Burke failed to consider alternatives to detention.   As a preliminary matter, the Bail Reform Act requires that the detention order be supported by a "clear and legally sufficient basis for the court's determination" in "written findings of fact and a written statement of the reasons for the detention or in the transcription of a

detention hearing." *United States v. Johnson*, 212 F. Supp. 3d 126, 127 (D.D.C. 2016) (quoting *United States v. Nwokoro*, 651 F.3d 108, 109 (D.C. Cir. 2011) (internal quotations omitted).    That was satisfied by Magistrate Judge Burke's assessment on the record of each of the relevant factors under 18 U.S.C. § 3142(g), including the defendant's significant criminal exposure, the very high Guidelines range, the "strong" weight of the evidence against the defendant, the defendant's "considerable" cryptocurrency assets—including assets "that have not yet been seized"—the defendant's failure to be "candid" with Pretrial Services, and the defendant's "history of using and causing others to use means to avoid law enforcement."    2/11/20 Tr. at 90:10-94:9.    Magistrate Judge Burke also credited the defendant's negligible criminal history and "strong" family ties and ties to the community, but found that these did not outweigh the other considerations in favor of detention.    *Id.* at 91:22-92:7.    There is no further obligation (and the defendant cites none) that the court is required to tick through and individually reject, on the record, every conceivable alternative release condition that the court could impose.

And Magistrate Judge Burke clearly *did* consider alternatives to detention.    As noted above, Pretrial Services for the Northern District of Ohio originally recommended pretrial release on $50,000 bond and other conditions.    On the record, Magistrate Judge Burke noted that she "saw" the Pretrial Services report and asked the Pretrial Services Officer whether she stood by the original recommendation.    2/11/20 Tr. at 77:11-78:3.    The defendant's argument that Magistrate Judge Burke failed to consider alternatives to detention is impossible to reconcile with this clear record showing that she did, in fact, consider alternatives to detention proposed by Pretrial Services—and, like the Pretrial Services Officer, ultimately concluded that any alternatives would *not* be sufficient to reasonably assure Harmon's appearance for trial.

### E.  The Defendant's Cases Are Inapposite and Unpersuasive

Finally, the defendant relies on a 15-year-old decision from this District, an unpublished order from the Northern District of Georgia (unavailable on Westlaw or via ECF), and the Bernie Madoff case.   These cherry-picked examples bear little resemblance to the facts of this case or the history and characteristics of this defendant.   *United States v. Karni*, 298 F. Supp. 2d 129 (D.D.C. 2004), concerned regulatory export control violations with a *much* lower advisory Guidelines range, and otherwise offered scant analysis of the § 3142(g) factors.   *See* U.S.S.G. § 2M5.1(a)(1) (base offense level for export control violations is 26, yielding Guideline range of 63-78 months).   The *Madoff* and *Holda* decisions are *sui generis* and, at least in the case of *Madoff*, appeared to have been decided against a complicated record in which the government initially consented to pretrial release and then sought multiple iterative modifications in bail conditions.   *See Madoff*, 586 F. Supp. at 244, 248 (noting that "until this motion was filed, the Parties had agreed that the measures in place were adequate").   These cases offer no basis for this Court to release a defendant with Harmon's substantial criminal exposure, sophistication as a Darknet money launderer, record of evading law enforcement, largely uncontested evidentiary case, and substantial cryptocurrency assets and foreign ties.

## <u>CONCLUSION</u>

For the foregoing reasons, the Magistrate Judge correctly found that there is no condition or combination of conditions that can reasonably assure the defendant's appearance for proceedings in this case.  The defendant's motion should be denied, and the defendant should continue to be detained without bail pending trial in this case.

Respectfully submitted,

TIMOTHY J. SHEA
United States Attorney
D.C. Bar No. 437437

By:    <u>/s/ *Christopher B. Brown*</u>
Christopher B. Brown, D.C. Bar No. 1008763
Assistant United States Attorney
U.S. Attorney's Office
555 4th Street, N.W.
Washington, D.C. 20530
C. Alden Pelker, Maryland Bar
S. Riane Harper, D.C. Bar No. 230233
Trial Attorneys, U.S. Department of Justice
1301 New York Ave., N.W., Suite 600
Washington DC, 20005
(202) 252-7153 (Brown)
(202) 616-5007 (Pelker)
(202) 305-2593 (Harper)
Christopher.Brown6@usdoj.gov
Catherine.Pelker@usdoj.gov
Riane.Harper@usdoj.gov

30