## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| v. | § | No. 1:19-cr-00395 |
| | § | |
| LARRY DEAN HARMON | § | |

## REPLY TO GOVERNMENT'S OPPOSITION TO DEFENDANT'S
## MOTION TO REVOKE DETENTION ORDER

TO THE HONORABLE CHIEF JUDGE BERYL HOWELL:

NOW COMES LARRY DEAN HARMON, Defendant, by and through his attorney, Charles Flood and files this reply to the Government's opposition to Defendant's Motion to Revoke Detention Order, saying more particularly as follows:

### Introduction

Defendant is presumed innocent and presumed to receive a bond, 18 U.S.C. § 3142 (a) (b) and (j). "Our system of criminal justice embraces a strong presumption against detention." *United States v. Hassanshahi*, 989 F.Supp.2d 110, 113 (D.D.C. 2013) citing *United States v. Hanson*, 613 F.Supp.2d 85, 87 (D.D.C. 2009).  See also *United States v. Gloster* 969 F.Supp 92, 96-97 (D.D.C. 1997) (quoting *United States v. Salerno*, 481 U.S. 739, 755, 107 S.Ct. 2095, 95 L.Ed.2d 697. (1987)("In our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception.").  If the court determines that a personal recognizance or unsecured appearance bond are not appropriate, then the court considers release on conditions. It is only after considering conditions of release and determining that they will not reasonably assure the defendant's appearance that the court orders detention pending trial.

While the Government is correct that the Magistrate does not have to go through the conditions of release like a checklist, there must be consideration given to what particular conditions will reasonably assure appearance. Logically speaking, since release is the default

position, there must be some analysis of why the condition of release will not suffice before reaching the conclusion to detain someone pretrial.

In the present case there is no evidence that Magistrate Burke considered alternatives to incarceration as she summarily decided that Mr. Harmon should be detained without verbalizing any consideration of alternatives to detention.  As Harmon stated in his motion, there are numerous conditions which would assure his appearance. These include GPS monitoring, signing a waiver of extradition, home detention, reporting on regular basis with pretrial, executing a surety bond, executing an agreement to forfeit property upon failing to appear.  As will be shown later, these particular conditions have ben deemed sufficient in numerous analalgous cases.  This Court should revoke the Detention Order entered by Magistrate Burke and release Mr. Harmon on conditions which will reasonably assure his appearance.  In making this determination, the Court should consider:

**Nature and Circumstances of the Charged Offense**:

Harmon is charged with financial crimes.  While the charged crimes are no doubt serious, and carry grave penalties, they are not crimes of violence and do not meet any of the factors set forth in § 3142(g)(1) (they do not involve sex trafficking of children; crimes of terrorism; a minor victim; or a controlled substance, firearm, explosive, or destructive device.).  Importantly, there is no presumption against bond.  The charges involve Mr. Harmon's alleged control of a bitcoin "mixer" which swapped one bitcoin for a different bitcoin.  As the Government has stated, this allegation against a bitcoin "mixer" is the first time in the United States that a prosecution on this theory has been attempted.  While crimes related to crypto currencies are relatively new in our jurisprudence, a look at how other Courts handled bond in similar cases is instructive.

**Similar Cases**:

*United States v. Robert Faiella and Charlie Shrem*, 39 F. Supp.3d 544 (S.D.N.Y. 2014), Faiella and Shrem were charged with operating an unlicensed money transmitting business, conspiracy to launder money and failure to file suspicious activity report related to transactions on the darknet market, "Silk Road". Faiella was granted a $250,000 secured bond, ordered to surrender his passport and abide by strict travel restrictions and strict pretrial supervision, including home detention, electronic monitoring, no computer, smart phone or internet use. Shrem was granted a $1,000,000 secured bond, travel restrictions, ordered to live with his parents, home detention and electronic monitoring. Both were alleged to have large sums of bitcoin and both defendants complied with bond.

*United States v. Anthony Murgio*, *Yuri Lebedev, Trevon Gross and Michael Murgio*, No. 1:15-CR-00769 (S.D.N.Y November 5, 2015): This case involved Coin.mx, a bitcoin exchange service[1] and all the defendants were granted bond. The charges included operating an unlicensed money transmitting business, money laundering, wire fraud, bank fraud and aggravated identity theft. The lead defendant, Anthony Murgio was arrested in the Middle District of Florida where he was granted bond then appeared before the Magistrate court in the Southern District of New York where the court placed additional conditions of release, including no employment in a money transmittal business. All defendants appeared as ordered.

*United States v. Michael Lord and Randall Lord*, 915 F.3d 1009 (W.D.L.A. 2019), the Lords (father and son) were charged with 14-count indictment related to their bitcoin business. Both defendants were granted $25,000 unsecured bond. Both defendants appeared as ordered.

---

[1] An "exchange" and a "mixer" are two distinct services as an exchange trades cryptocurrency for actual government currency.

*United States v. E-Gold, Ltd.*, et al., 550 F.Supp.2d 82 (2008).  This case was prosecuted in the District of Columbia before the Honorable Rosemary Collyer.  The E-Gold case was one of the first cryptocurrency cases ever filed.  The allegations were money laundering of cryptocurrency and operating an unlicensed money transmitting businesses. All of the defendants were granted bond, and all appeared as ordered.

These cases were similar bitcoin or cybercurrency prosecutions.  In all of these cases the defendants were granted bond and appeared as ordered.

In the present case this Court should analyze the following factors and release Mr. Harmon on bond conditions.

**Count One: Conspiracy to Launder Monetary Instruments**

The Government makes much of internet posts which they allege [without evidence] were made by Mr. Harmon.  Mr. Harmon does not concede that he made these statements.   The Government also incorrectly asserts that Harmon concedes that he was the founder or administrator of the Grams or Helix programs.  Mr. Harmon makes no such concession.  The Government believes that a photograph allegedly taken in Belize establishes that Mr. Harmon was the administrator of Helix, but as Agent Haynie testified, he doesn't know who took the photo or who the photo depicts.  See Detention Hearing Transcript at p. 69.  Additionally, the Government contends that this is somehow a "sophisticated" money laundering "designed to avoid law enforcement."  There is no evidence to support these conclusions.  The Helix program was a one-to-one swap bitcoin for bitcoin, there was no exchange with national currency.  There is also no evidence in the record to support the Government's contention that the largest customers of Helix were darknet markets.  Even assuming arguendo that the numbers provided by the Government are accurate, those numbers only support a conclusion that certain bitcoin had at some point had

"darknet markets" in its ledger (i.e. "past") and that it was then swapped for different bitcoin. There is no evidence that this swap was done by the market itself or even with the direct proceeds of illegal activity.  The Government needs to make some temporal connection between an illegal act and the "mixing" of the bitcoin.  There is nothing in the record to suggest that the bitcoin couldn't have changed hands numerous times before being sent to Helix.

The Government also contends that there is substantial evidence that Mr. Harmon conspired to commit money laundering in violation of 18 U.S.C. § 1956(h).  The Government goes to great lengths to attempt to draw a "partnership" or a conspiracy between Mr. Harmon and anyone who worked at a "darknet market" – yet there is no evidence of any communication between them at all.  The "overwhelming" evidence the Government points to is a link previously contained on the AlphaBay website which suggested that users of AlphaBay utilize a product and then posted an internet link to the Helix website.  There is no evidence this was done by Helix, with anyone at Helix's knowledge (much less knowledge that Larry Harmon had anything to do with it), or any evidence of any sort of relationship between the parties.  It is certainly safe to assume that if the Government had any evidence of communications between Helix or Grams with any "darknet market" it would have been presented to the Court.

Lastly, while the Government is correct as to their allegation regarding the elements of conspiracy to commit money laundering, they still must prove that Mr. Harmon intended to commit the crime of money laundering with knowledge that the money to be laundered was the proceeds of a specified unlawful activity.  The government must prove that Harmon possessed the requisite culpable mental state to enter an agreement to break the law.

**Counts Two and Three**: **Operating an Unlicensed Money Transmitting Business**

Harmon does need to correct one portion of his motion – due to the nature of their service Helix did not have to be licensed as a Money Services Business (MSB) or a money transmitter pursuant to Federal *or District* law. To be MSB or a money transmitter the entity must do business "wholly or in substantial part within the United States."[2]  Helix does not meet this definition and did not need to register as an MSB or a money transmitter.   Additionally, pursuant to D.C. Code § 26-1001 (10): "Money Transmission" means the "sale or issuance of payment instruments or engaging in the business of receiving money for transmission or transmitting money within the United States, or to locations abroad, by and all means, including but not limited to payment instruments, wire, facsimile, or electric transfer."  There is zero evidence that the "swap" of bitcoins occurred within the District or even within the United States.  Additionally, there is no evidence that pursuant to District law that the bitcoin swap was receiving or transmitting money.

Similarly, as the Court can no doubt tell from the multiple cites to "FinCen Guidance" there exists substantial questions as to whether a bitcoin "mixer" was or is subject to licensing requirements.[3]

While the Government may be correct in asserting that ignorance of licensing requirements is not a defense to a prosecution pursuant to 18 U.S.C. § 1960 – the Government must still prove that at the time the business was engaged in, there was a duty to obtain a license and that Harmon intentionally and knowingly operated a money transmitting business.

Similarly, while Harmon specifically addressed the second half of the Government's allegation in Count Two, the Government's proof is far from overwhelming as to the first portion

---

[2] 31 CFR § 1010.100(ff) –
[3] FIN-2013-G001 and FIN-2019-G001, FinCEN Guidance

of that Count as well.  As stated above, Helix was not required to register as a money transmitter under D.C. Code § 26-1023(c).   As to the Government's assertion that Harmon operated a money transmitting business that "otherwise involves the transportation or transmission of funds that are known to the defendant to have been derived from a criminal offense or are intended to be used to promote or support unlawful activity" – there is simply no evidence of this at all.   By the Government's own admission, Helix only saw an address coming in and an address going out. There is no evidence that anyone would have actual knowledge of the actual provenance of the bitcoin.

**History and Characteristics of the Larry Harmon**

Magistrate Burke correctly acknowledged that Harmon has very strong ties to his home in Akron, Ohio. As D.C. Circuit case law instructs, Courts "should consider personal factors related to defendant's background, including his education, assets, employment, family and other personal ties to the United States and the jurisdiction specifically." *Hassanshahi,* Id at 115.  Mr. Harmon is a thirty-six-year-old citizen of the United States and almost lifelong resident of Akron, Ohio.  He has very strong family ties including a wife, siblings, parents and grandparents in the Akron area. His father, a retired member of the United States Navy has agreed to put his own house as a condition of his son's release.  He graduated from High School in Ohio and is a College graduate. He owns multiple properties in the Akron area that he has agreed to put up as collateral.  Mr. Harmon has no real criminal history.  He was in a car in Texas in 2005 and another passenger of the vehicle was arrested for possession of a small amount of marijuana.  The District Attorney did not accept charges against Mr. Harmon.  The Government is in possession of both Mr. Harmon and his wife's United States passports.   Harmon's personal history and characteristics weigh heavily in favor of release.

**Substantial Ties to Belize:**

The Magistrate held that Harmon had "significant family or other ties outside the United States."  The Government in their response continues to focus on this incorrect finding.  Harmon leased an apartment in Belize.  When the agents arrived to search the apartment, a gentleman identified as an "attorney" identified himself as someone who was an acquaintance of Harmon and said that he represented the apartment.  From this simple and innocuous fact, the Government believes that Mr. Harmon has substantial ties to Belize.  Similarly, the Government attempts to make use of the fact that Mr. Harmon's wife indicated that they bought Belizean children Christmas presents as "substantial ties" to a foreign country.  These are simply not substantial ties to a foreign country.  Being a citizen of a foreign country is a substantial tie to a foreign country.  See *United States v. Karni*, 298 F. Supp.2d 129 (D.D.C. 2004). (Defendant Karni was an Israel citizen who at the time of his arrest had been living in South Africa for 17 years and was released on conditions.)  Having a spouse, or children, or family in a foreign country can be substantial ties to a foreign country.  See *United States v. Hanson*, 613 F. Supp.2d 85 (D.D.C. 2009).  (Defendant Hanson had a son, ex-husband, siblings and other relatives in China.  Furthermore, Mrs. Hanson owned two properties in China and retained a Chinese and American passport.  She was released on conditions).  Lastly, in *United States v. Hannashahsi, Id*, defendant was a dual Iranian and United States citizen who was granted bail by the Circuit Court.  The Hannashahsi court found it instructive that the defendant's passport was in Government custody: "[T]he D.C. Circuit has considered it relevant that his passports have been confiscated."  See *Hannashahsi*, Id. at 116 *citing United States v. Nworoko*, 651 F.3d 108 (D.D.C. 2011)(per curiam).

**Access to Finances:**

The Government speculates that Harmon has access to a "massive collection" of cryptocurrency which in only partially accounted for. Based on this speculation they believe that it is "likely" the Mr. Harmon has additional cryptocurrency devices and believe that if Mr. Harmon were released, he would be able to access at least some portion of his cryptocurrency holdings to finance his flight from prosecution. Magistrate Burke made a similarly confusing mental leap holding "it appears that he has considerable assets remaining." Detention Hearing Transcript at p. 92. As Mr. Harmon told the Pretrial Service Officer in Ohio; all of his assets have been seized by the government. Additionally, with regard to what Mr. Harmon allegedly said to the Pretrial Service in District of Columbia, Mr. Harmon indicates that he offered to explain and list all of his asset to pretrial services but that the officer said it was unnecessary. Mr. Harmon again tried to list his assets informing the officer that he had previously been accused of lying to pretrial service, and the officer again refused his request.

The Government's speculation regarding unaccounted cryptocurrency flips the Government's burden on its head. The Government has the burden of proving that no combination of conditions will reasonably assure Mr. Harmon will appear as ordered. Mr. Harmon has twice told Pretrial Service that the Government has seized all of his assets. Mr. Harmon has agreed to have no access to computers or any crypto currency of any kind. Mr. Harmon has agreed to GPS monitoring and house arrest. The notion that Mr. Harmon has any outstanding unaccounted-for assets and that he can somehow magically access these funds and flee the country without a passport is fantastical and wildly speculative.

WHEREFORE, Defendant Larry Harmon again prays that this Honorable Court revoke Magistrate Burke's order of detention and release him on conditions which will reasonably assure this Court that he will appear as directed.

Respectfully submitted,

*/s/ Charles Flood*
Charles Flood
Flood & Flood Law Office
914 Preston at Main, Suite 800
Houston, TX 77002
(713) 223-8877; Fax (713) 223-8877
charles@floodandflood.com
Texas Bar License# 00798178
Fed I.D. 22508
**COUNSEL FOR LARRY HARMON**

## CERTIFICATE OF SERVICE

I hereby certify that on March 11, 2020, I filed the foregoing document to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing which will send such notice of filing to all filing users.

*/s/ Charles Flood*
Charles Flood