UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | Criminal No. 19-cr-395 (BAH) |
| | : | |
| v. | : | |
| | : | |
| LARRY HARMON, | : | |
| | : | |
| Defendant | : | |

## GOVERNMENT'S MOTION FOR EMERGENCY STATUS HEARING ON THE DEFENDANT'S CONDITIONS OF RELEASE AND RESTRAINING ORDER TO PRESERVE CRYPTOCURRENCY ASSETS FOR FORFEITURE

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, hereby respectfully requests that the Court hold an emergency status hearing on the Defendant's compliance with his conditions of release in the above-captioned case, and to enter the attached restraining order. In support of this motion, the government states as follows:

1.      On December 3, 2019, a federal grand jury in the District of Columbia returned a sealed, three-count indictment (the "Indictment") against Larry Dean Harmon ("Harmon" or the "defendant") on charges of Conspiracy To Launder Monetary Instruments, in violation of 18 U.S.C. § 1956(h); Operating an Unlicensed Money Transmitting Business, in violation of 18 U.S.C. § 1960(a); and Money Transmission Without a License, in violation of D.C. Code § 26-1023(c). The Indictment contained a Forfeiture Allegation seeking forfeiture of "any property, real or personal, involved in" Harmon's money laundering and unlicensed money transmitting business offenses, including "any property traceable thereto." The charges arose from Harmon's

operation of a Darknet[1] bitcoin[2] money laundering and money transmission service known as "Helix." An arrest warrant was issued the same day.

2.      On February 6, 2020, federal law enforcement agents from the Internal Revenue Service-Criminal Investigation ("IRS-CI") and the Federal Bureau of Investigation ("FBI") arrested Harmon in Akron, Ohio. Contemporaneous to and following the arrest, agents in the United States and foreign law enforcement executed searches of numerous properties associated with Harmon. These searches yielded voluminous electronic evidence, as well as evidence of Harmon's significant bitcoin holdings representing the illegal proceeds generated by Harmon's operation of Helix. This evidence included multiple cryptocurrency storage devices and recovery seeds[3] concealed in various locations.

3.      Additional examination of the evidence obtained through these searches revealed that the defendant had implemented numerous security features, including layers of encryption and "hidden wallets," to protect his cryptocurrency cache. At the time of his arrest, Harmon was using his mobile phone to monitor a portfolio of cryptocurrency valued at $47,740,800.[4] The defendant's use of security features to protect his cryptocurrency and lack of cooperation with law

---

[1] The Darknet refers to a collection of hidden service websites available through a network of globally distributed relay computers called the Tor network. The use of Tor conceals the Internet Protocol (IP) addresses of the servers hosting the hidden service websites as well as the IP addresses of the sites' users. The Darknet includes hidden service websites that sell illegal goods, like guns and drugs, and illegal services, like hacking and money laundering.

[2] Bitcoin is a virtual currency that exists in electronic form and is transacted through the Internet. The Bitcoin protocol, or software, allows users to create "bitcoin addresses," roughly analogous to accounts. For security and privacy reasons, it is common for a single bitcoin user to control numerous bitcoin addresses, which are stored and controlled in a "bitcoin wallet." Each bitcoin address is controlled through the use of a unique "private key," akin to a password. Bitcoin is sometimes called a "cryptocurrency" because transactions are executed using public-private key cryptography.

[3] A seed key or seed phrase is a list of words used to encode a bitcoin wallet address. Wallet software will typically generate a seed phrase and instruct the user to write it down on paper. The same software can be used to decode the seed phrase and reconstitute the wallet.

[4] During the investigation, the government also located a spreadsheet maintained by the defendant titled "Accounts.xlsx," dated October 18, 2018, listing cryptocurrency and U.S. dollar assets totaling $56,939,610.00. ECF No. 16-4, at 12 (Det. Hr'g Ex. 11); 2/11/12 Tr. at 35:10-19.

enforcement have frustrated government efforts to secure the defendant's assets.  To date, the government has seized only a portion of the tens of millions of dollars' worth of cryptocurrency proceeds that the defendant obtained through his illegal operation of Helix.

4.    On February 11, 2020, U.S. Magistrate Judge Kathleen B. Burke in the Northern District of Ohio held a combined identity and detention hearing for Harmon.  At the conclusion of the hearing, Magistrate Judge Burke found that Harmon posed a serious risk of flight pursuant to 18 U.S.C. § 3142(f)(2)(A) and ordered that Harmon be detained without bond pending trial. *See United States v. Larry Dean Harmon*, N.D. Ohio No. 20-mj-1030, ECF No. 9-2 (Feb. 12, 2020). In announcing her decision, Magistrate Judge Burke found that Harmon's substantial cryptocurrency assets were not fully accounted for, and, while the government had seized *some* cryptocurrency storage media, Harmon appeared to have "considerable assets remaining," which "could be accessed by him through other persons who may have access to them." *Id.* at 92:17-21. She also faulted Harmon for concealing his assets from Pretrial Services, finding that he "was not candid with the Office of Pretrial Services in describing his assets." *Id.* at 93:15-16.

5.    Harmon was transported to the District of Columbia and appeared before Magistrate Judge Harvey on February 20, 2020.

6.    On March 4, 2020, defense counsel filed a Motion to Revoke the Detention Order, *see* ECF No. 15, which the government opposed.

7.    On March 13, 2020, following a contested hearing, this Court granted the defendant's motion to revoke the detention order and released the defendant.  The defendant's conditions of release included a prohibition on the use of internet-connected devices and a freeze on new financial accounts.  ECF No. 20 (Order Setting Conditions of Release), at 2.    It also

contained a clear-cut prohibition on Harmon conducting *any* cryptocurrency transactions: "NO CRYPTO-CURRENCY TRANSACTIONS TO BE CONDUCTED BY DEFENDANT." *Id.*

8.      Despite this explicit condition of release, the government has learned that Harmon has begun to secretly transfer his extensive cryptocurrency holdings, representing the illegal proceeds of his operation of Helix. Between April 19 and April 24, approximately 712.6 bitcoin, valued at more than $4.9 million, were transferred from the defendant's wallets to new bitcoin wallets, previously unknown to the government. These transactions are detailed in the attached Agent Declaration. Exhibit 1. All of these bitcoin are illegal proceeds derived from the defendant's operation of Helix.

9.      These recent bitcoin transactions could only be conducted by an individual who holds the private keys, seed keys, and/or recovery phrases for the wallets. Therefore, either Harmon or a close associate acting at his direction are moving illicit proceeds from Helix in an attempt to further conceal the proceeds from the government. The timing of the transactions is also telling: the funds were *not* moved between Harmon's February 6 arrest and his mid-March release from detention, but rather only after Harmon was released and thus able to re-access his wallets.

10.      These transactions are a direct violation of the defendant's conditions of release and illustrate precisely the sort of behavior the government was concerned with in its original detention memorandum in the Northern District of Ohio, *see United States v. Harmon*, No. 20-mj-1030 (N.D. Ohio), ECF No. 7 (Gov't Mem. in Support of Pretrial Detention), at 9-10, and in its opposition to the defense Motion to Revoke the Detention Order, *see* ECF No. 16 (Gov't Opp. to Def. Mot. To Revoke Detention Order), at 23-27.

11.     At the Ohio detention hearing, Special Agent Jeremiah Haynie testified that the information needed to access bitcoin can be copied in more than one place, including storage on multiple hardware devices, and storage in the form of cryptographic "seed keys"—which can be written down or even memorized.  2/11/20 Tr. at 37:13-38:8.  On cross-examination, Agent Haynie confirmed that Harmon "could also have copies of those Trezors or those hardware wallets with family, friends, places that we didn't search."  *Id.* at 65:21-23.  Agent Haynie also stated his belief that it was likely that Harmon had additional cryptocurrency storage devices that the government had not yet recovered:

> Just based on the fact that – how spread out these devices were, right?  We found one here in Akron under the desk.  We found two in Belize.  We found one in California.  All these places are in the name of Larry Harmon.  They're all leases or things that are owned by him.
>
> And so who knows the places that we weren't able to search.  Just the nature of how spread out these were and the fact that they were concealed, who knows how many other places they are.  Who knows the places that we may have missed in the places that we actually did search.

*Id.* at 66:20-67:5.

12.     In its opposition to the defense Motion to Revoke the Detention Order, the government noted, "Harmon's massive hoard of cryptocurrency assets, which are only partially accounted for, and are virtually untraceable and can be accessed from anywhere in the world." ECF No. 16, at 23.  The government further stated, "The government has recovered several cryptocurrency storage devices and seed keys and is in the process of recovering any stored bitcoin (and tracing recent transactions), but to date it has secured only a small fraction of the tens of millions of dollars in illicit cryptocurrency proceeds that Harmon is believed to control."  *Id.*

13.     The defense at the time dismissed the government's concern, stating: "The notion that Mr. Harmon has any outstanding unaccounted-for assets and that he can somehow magically

access these funds . . . is fantastical and wildly speculative." ECF No. 9, at 9. Yet this "fantastical and wildly speculative" cryptocurrency transfer is precisely what has now occurred, in direct violation of the defendant's conditions of release.

14. The transfers of the defendant's bitcoin further illustrate the repeated misleading statements that the defendant has made regarding the status of his assets. In his Motion to Revoke the Detention Order, the defendant claimed: "Mr. Harmon has twice told Pretrial Service that the Government has seized all of his assets. Mr. Harmon has agreed to have no access to computers or any crypto currency of any kind." ECF No. 19, at 9. At the Ohio detention hearing, defense counsel claimed that the government had seized all of the defendant's bitcoin. 2/11/20 Tr. at 84:23-25. However, the recent transfers reveal that the defendant retains control of his cryptocurrency assets, and that his repeated representations to the contrary—to Pretrial Services and to this Court—were not accurate.

15. In response to the government's concerns that the defendant's security measures and encryption thwarted efforts to effectively transfer the cryptocurrency, defense counsel represented on the record that the defendant was willing to assist the government in accessing the wallets. The government has repeatedly expressed its interest in this path to securing the assets. However, no such assistance has come to fruition.

16. Specifically, at the Ohio detention hearing, defense counsel advised the court:

DEFENSE COUNSEL: [W]e have offered to the government to unlock those devices. And we did so, saying if your concern is that he will, if released, get this money and flee, you may transfer the money into your accounts, like a regular fraud case. . . .

COUNSEL FOR GOVERNMENT: And to be clear, Your Honor, we accept that offer. We would happily accept that information. What was offered to us is if he provides you the pins, would you agree to his release. And the answer there was no. But certainly to the extent he wishes to provide the passwords and the PINs and the information that would allow us to access that bitcoin, we would happily accept that offer.

2/11/20 Tr. at 86:2-16.

17.     In an e-mail to defense counsel on April 7, the government again reiterated that it would like to "accept your offer to have Mr. Harmon provide passwords for his electronics and bitcoin storage devices."  To date, the defendant has not responded to the government's acceptance of its offer or followed through by providing passwords for the bitcoin storage devices.

## CONCLUSION

18.     As detailed in the attached Agent Declaration, the defendant has violated the conditions of his release by conducting at least eight cryptocurrency transactions involving more than $4.9 million in bitcoin assets between April 19 and April 24, 2020. Such transfers may be an attempt to conceal and place the defendant's illegal Helix proceeds beyond the reach of the government in order to prevent forfeiture in this case; they may be preparations for an anticipated flight from prosecution; or both.

19.     Accordingly, the government requests an emergency telephonic status hearing to assess the defendant's compliance with his conditions of release.

20.     In addition, the government requests that the Court enter the attached restraining order. This Court has broad authority under 21 U.S.C. § 853(e)(1)(A) to craft such a "restraining order or injunction" to preserve property subject to forfeiture in a criminal proceeding.[5]  *See United*

---

[5] Harmon's cryptocurrency proceeds are subject to forfeiture pursuant to 18 U.S.C.  § 982(a)(1).   *See* ECF No. 1, at 7 (Forfeiture Allegation).  In turn, § 982 incorporates by reference the criminal forfeiture procedures of 21 U.S.C.  § 853.  *See* 18 U.S.C.  § 982(b)(1).   The applicable provision under § 853 reads as follows:

(e)  Protective orders

    (1)  Upon application of the United States, the court may enter a restraining order or injunction, require the execution of a satisfactory performance bond, or take any other action to preserve the availability of property . . . for forfeiture under this section—

        (A)  upon the filing of an indictment or information charging a violation of this subchapter or subchapter II for which criminal forfeiture may be ordered under this section and alleging that the property with respect to which the order is sought would, in the event of conviction, be subject to forfeiture under this section

*States v. Monsanto*, 491 U.S. 600, 611-14 (1989) (upholding restraining order pursuant to § 853(e)(1)(A) and noting that the provision "cannot sensibly be construed to give district court discretion to permit the dissipation of the very property that § 853(a) requires be forfeited upon conviction"); *see, e.g.*, *United States v. Schlotzhauer*, 2008 WL 320717 (W.D. Mo. Feb. 4, 2008) (issuing restraining order to preserve assets and cash generated from sale of business involved in mail fraud, wire fraud, false statements, and aircraft parts fraud prosecution). The attached Agent Declaration establishes probable cause to believe that Harmon accumulated a significant amount of illegal cryptocurrency proceeds, which are subject to forfeiture pursuant to the Forfeiture Allegation as property involved in the operation of Helix. A post-indictment restraining order may be issued *ex parte* and without a hearing, although the defendant may request a probable cause hearing after the fact to litigate whether the restrained property is properly subject to forfeiture. *See Schlotzhauer*, 2008 WL 320717, at *8 (citing *United States v. Bissell*, 866 F.2d 1343, 1349 (11th Cir. 1989)); *cf. United States v. Bikundi*, 125 F. Supp. 3d 178 (D.D.C. 2015) (reviewing probable cause for seizure of property for forfeiture, upon defense motion).

21.    Here, the government requests entry of a restraining order directing the defendant to (1) cease any and all cryptocurrency transactions; and (2) provide the government with access to any and all cryptocurrency within the defendant's possession, custody, and control, including by disclosing seed recovery keys, access to hidden wallets, and other keys needed to transfer cryptocurrency. Such an order is necessary, as evidenced by the defendant's efforts to secretly begin transferring his cryptocurrency holdings in violation of his conditions of release. It is also undeniably reasonable, as it merely requires the defendant to do what defense counsel has made a show of offering to do voluntarily. In practice, the requested order is analogous to an order to

repatriate and deposit forfeitable property held outside the United States, which is specifically authorized under the statute. *See* 21 U.S.C. § 853(e)(4)(A).

22.    Counsel for the defendant was consulted on April 26, 2020 and stated that the defendant opposes the proposed hearing and restraining order.

WHEREFORE, in light of the above, the government requests that the Court set this matter for an emergency telephonic status hearing regarding the defendant's compliance with his conditions of release, and enter the proposed restraining order to preserve the defendant's cryptocurrency assets for forfeiture.

Respectfully submitted,

TIMOTHY J. SHEA
UNITED STATES ATTORNEY

BY:        /s/
Christopher B. Brown, D.C. Bar No. 1008763
Assistant United States Attorney
555 4th Street, N.W.
Washington, D.C. 20530
C. Alden Pelker, Maryland Bar
S. Riane Harper, D.C. Bar No. 230233
Trial Attorneys, U.S. Department of Justice
1301 New York Ave., N.W., Suite 600
Washington, D.C. 20005
(202) 252-7153 (Brown)
(202) 616-5007 (Pelker)
(202) 305-2593 (Harper)
Christopher.Brown6@usdoj.gov
Catherine.Pelker@usdoj.gov
Riane.Harper@usdoj.gov