UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>v.<br><br>LARRY DEAN HARMON,<br><br>        Defendant. | Criminal No. 2019-CR-00395 |

**MOTION FOR RELEASE OF FUNDS NEEDED TO SECURE COUNSEL OR ALTERNATIVE MOTION FOR A HEARING**

Defendant Larry Dean Harmon respectfully moves for the release of certain property, seized as substitute assets, for the exclusive purpose of securing representation by counsel of his choosing. Mr. Harmon lacks any other assets with which to retain counsel; barring the release of these assets, he will be denied his Sixth Amendment right to select counsel to defend him in this novel, complex prosecution.

Specifically, Mr. Harmon asks that the Court order the release, for the purpose of hiring counsel of 160 Bitcoin. This amounts to less than 4% of the 4,168 Bitcoin currently being held by the Government. In the alterative, Mr. Harmon asks that the Court hold an evidentiary hearing as to "whether probable cause exists to believe that the assets in dispute are traceable or otherwise sufficiently related to the crime charged in the indictment." *See Kaley v. United States*, 571 U.S. 320, 324 (2014).

This Motion is supported by the following Memorandum of Points and Authorities.

## I.   Introduction

The Government has trumpeted its indictment of Mr. Harmon as unique, a first-of-its-kind prosecution of a privacy-enhancing bitcoin "mixing" service. In its press release announcing his arrest, the Government said that the "sole purpose of Harmon's operation was to conceal criminal transactions from law enforcement on the Darknet."  Press Release, U.S. Dep't of Justice, *Ohio Resident Charged with Operating Darknet-Based Bitcoin "Mixer" which Laundered over $300 Million* (Feb. 13, 2020), https://www.justice.gov/opa/pr/ohio-resident-charged-operating-darknet-based-bitcoin-mixer-which-laundered-over-300-million.  The Indictment, similarly recited that "[t]he largest volume of funds sent to Helix came from Darknet markets . . . including AlphaBay . . . and other Darknet markets." [Doc. 1, ¶ 8]

But that isn't true.  And at the first hearing in this case the Government admitted as much.  At the Ohio detention hearing, the Government conceded that the premise of its public announcement and the gravamen of its Indictment—that most or all of Mr. Harmon's alleged business on Helix came from the Darknet Market—is false.  Instead, the Government's evidence at the Ohio hearing established only that "most of the *known* bitcoin that came into Helix came from illegal marketplaces."  [Detention Hearing Transcript at 25:11-12, *United States v. Harmon*, No. 5:20MJ1030 (N.D. Ohio Feb. 11, 2020), ECF No. 13 (the "Ohio Hearing") (emphasis added), excerpts attached as Ex. B] That "known" bitcoin, reflected on Government's Exhibit 5, totaled less than 45,000 bitcoin out of an alleged 354,468 bitcoin deposited into Helix.  [*Compare*

Ohio Hearing Ex. 5 *with* Ohio Hearing Ex. 10, attached collectively as Ex. C] In the Government's own words, only "approximately" 10-15% of the bitcoins sent through Helix are linked to Darknet Markets. Continuing in the words of the Government's witness, "[m]ost of the bitcoin came [in to Helix] from unknown customers." [Ex. B at 25:7-8 (Ohio Hearing Tr.)]

In other words, despite the claims in its press release and its Indictment, the Government has no idea where "[t]he largest volume of funds sent to Helix" came from. [*See* Indictment ¶ 8] And even assuming that all bitcoins seized in this matter can be traced to Helix, a fact still not established, the Government has conceded that 85–90% of the bitcoins seized by it are *not* linked to Darknet Markets.

Thus, these bitcoins, which the Government concedes did not come from Darknet Markets, can be seized, if at all, only as substitute assets. And where, as here and as shown below, a defendant lacks other assets sufficient to retain counsel of his choosing, the Constitution requires seized assets to be released for that purpose.

## II. Factual Background

### A. Mr. Harmon's Interest in Privacy Led Him to Create A Privacy Enhancing Service for Bitcoin -- Helix.

As the Court knows from prior hearings and motions, Larry Harmon is a thirty-six-year-old married man with deep family roots in Ohio. Prior to his arrest, he worked for himself in internet-based advertising and studied for a time at Kent State University.

He was also an early adopter of bitcoin, buying and mining coins for himself beginning in 2014. This interest in bitcoin, was driven by, among other things, Mr. Harmon's interest in privacy in an increasingly connected, data-crunched world. Many of the most prominent leaders in the growing field of virtual currencies are also fierce privacy advocates. *See, e.g.*, Jerry Brito, *The Case for Electronic Cash: Why Private Peer-to-Peer Payments are Essential to an Open Society*, Coincenter.org (Feb. 2019), https://coincenter.org/entry/the-case-for-electronic-cash (arguing, among other things, that "[c]ash . . . is a fundamental tool for individual privacy and autonomy, and it is necessary for an open society"); *cf. also* Heike Mai, *Cash empowers the individual through data protection*, Deutsche Bank Research (July 2, 2019), https://www.dbresearch.de/PROD/RPS_EN-PROD/PROD0000000000495958.pdf (explaining the importance of physical cash as a privacy protecting mechanism in an increasingly digital world).

Mr. Harmon's interest in privacy also led him to create a bitcoin privacy service called Helix. Created in 2014, Helix was a software "that let users mix their coins with other users, in order to preserve their privacy."[1] There are many reasons a bitcoin holder might use a mixer—"you might not necessarily want the world to know where you spend your money, what you earn or how much bitcoin you own."[2] For instance, "[a] dissident pseudonymous journalist may want to get paid for his articles without the regime in his country finding

---

[1]   *What are Bitcoin Mixers*, Bitcoin Magazine, https://bitcoinmagazine.com/guides/what-are-bitcoin-mixers (last visited May 19, 2020).
[2]   *Id.*

out who he is" or "[a] wealthy bitcoiner may not want to reveal his holdings as it would make him a target for kidnapping, extortion or worse."[3]

In 2017, long before he learned of the Government's investigation of him, Mr. Harmon shut Helix down.

### B. Mr. Harmon Is Indicted.

On December 3, 2019, a grand jury indicted Mr. Harmon on three counts based on his operation of Grams and Helix. Specifically, the grand jury indicted Mr. Harmon for: (1) Conspiracy to Launder Monetary Instruments, in violation of 18 U.S.C. § 1956(a)(1)(A)(i), 18 U.S.C. § 1956(a)(1)(B)(i), and 18 U.S.C. § 1956(h) ("Count One"); (2) Operating an Unlicensed Money Transmitting Business in violation of 18 U.S.C. § 1960(a) ("Count Two"); and (3) Money Transmission Without a License, in violation of § 26-1023(c) of the D.C. Code ("Count Three"). [Indictment, ¶¶ 14-20]

The Indictment contained a forfeiture allegation based on Counts One and Two. Pursuant to 18 U.S.C. § 982(a)(1), the Indictment set forth the Government's demand that Mr. Harmon "forfeit to the United States any property, real or personal, involved in [the] offense, or any property traceable" to the offense. Pursuant to 21 U.S.C. § 853(p), the Indictment also provided that Mr. Harmon shall forfeit substitute assets.[4] In furtherance of these

---

[3] *Id.*

[4] For the reasons discussed in Mr. Harmon's Motion to Dismiss Counts Two and Three, filed concurrently herewith, those Counts should be dismissed and should not be allowed to support any seizure of assets.

forfeiture allegations, the Government seized nearly everything Mr. Harmon owns: bank accounts, digital currency holdings, cars and real property.

### C. Mr. Harmon Wants to Retain Perkins Coie, LLP, a Leading Digital Currency Law Firm For His Defense, But Cannot Do So Without the Release of Some of His Seized Assets.

The Government's pre-conviction seizures in this matter have left Mr. Harmon with next to nothing. Mr. Harmon has no current employment or income.[5] As further described in lodged Exhibit A, which Mr. Harmon respectfully requests be filed under seal because of the personal financial information contained therein, Mr. Harmon lacks sufficient funds with which to retain counsel of his choosing.

Specifically, Mr. Harmon wants to retain Perkins Coie, LLP, a law firm with particular expertise in blockchain technology and digital currency, to assist in his defense of this complex, first-of-its-kind matter.[6] And without the release of assets seized as substitute assets by the Government, he will be denied his right to counsel of his choosing. *See, e.g.*, *Luis v. United States*, 136 S. Ct. 1083, 1088 (2016) (plurality).

---

[5] In the wake of the seizures, Mr. Harmon has applied for and begun receiving modest unemployment benefits.

[6] Counsel from Perkins Coie respectfully appear now to pursue motions seeking the release of assets needed to fund their participation in Mr. Harmon's defense. Mr. Charles Flood remains, and irrespective of the outcome of these motions will remain, counsel for Mr. Harmon.

**Argument**

I.  **This Court Should Release Mr. Harmon's Untainted Assets to Fund His Defense.**

   A.  **Restraint of Untainted Assets Needed to Retain Counsel of Choice Violates the Sixth Amendment.**

"[T]he pretrial restraint of legitimate, untainted assets needed to retain counsel of choice violates the Sixth Amendment." *Luis*, 136 S. Ct. at 1088; *see also United States v. Marshall*, 872 F.3d 213, 219 (4th Cir. 2017) (noting that the "Supreme Court resolved the question of whether the Government may freeze *untainted* assets (i.e., those assets not connected to the crimes charged) *pretrial* that a defendant needs to hire counsel of her choice" and "answered that query in the negative").

   B.  **Not All of the Seized Assets Are Connected to the Alleged Crimes.**

Mr. Harmon does not, and could not properly, seek the return of assets "involved in" or "traceable to" the adequately alleged offenses.[7] Rather, he seeks, and the Constitution requires, the return of untainted assets. *See, e.g.*, *Luis*, 136 S. Ct. at 1088. The crux of the Government's case, the focus of its statements in the Indictment and otherwise, is Count One, which alleges Conspiracy to Launder Monetary Instruments, the specified unlawful activity ("SUA") for which is "the felonious manufacture . . . and otherwise dealing in a

---

[7] Contemporaneously with filing this Motion, Mr. Harmon has filed a Motion to Dismiss Counts Two and Three in the Indictment. Mr. Harmon respectfully requests that this Court decide the Motion to Dismiss first. Because Mr. Harmon believes that Count Two is invalid, he makes no arguments related to the traceability of assets to that offense in the present motion.

controlled substance" on the Darknet.  [Doc. 1, ¶ 15a]  Mr. Harmon seeks only assets *other* than those allegedly connected to Darknet Markets.

> **1.   The Government Concedes that More than 80% of the Seized Bitcoins Are *Not* From Darknet Markets.  And The Government Has Never Alleged that Digital Assets *Other* Than Bitcoins Were Used on Helix.**

Unless the Government can establish that assets seized prior to conviction are traceable to the alleged offenses, those assets are available if needed to fund the defense.  As discussed above, notwithstanding prior statements to the contrary, the Government has conceded in this matter that it has traced only a fraction—roughly 13%— of the seized bitcoins to Darknet Markets.

The Government's evidence in this case is consistent with independent analyses of mixed coins confirming that, despite rumors and innuendo to the contrary, most mixed coins are *not* from the Darknet Market.  For example, Chainalysis, Inc. is a firm under contract to do bitcoin tracing for, among other agencies, the FBI, DEA, IRS, and FinCEN.  *See, e.g.*, Federal Procurement Data System, search results for "Chainalysis" at https://www.fpds.gov/ezsearch/fpdsportal?indexName=awardfull&templateName=1.5.1&s=FPDS.GOV&q=chainalysis&x=0&y=0 (last accessed May 19, 2020) (confirming, among others, purchase orders from the DEA, FBI, SEC, IRS and ICE); *see also* Danny Nelson, *Inside Chainalysis' Mutli-Million Dollar Relationship with the US Government*, YAHOO! Finance (Feb. 10, 2020), https://finance.yahoo.com/news/inside-chainalysis-multimillion-dollar-relationship-180003919.html.  In a recent webinar, "*Cryptocurrency Typologies: What You Should Know about Who's Who on the Blockchains*,"

Chainalysis demonstrated that "users of mixing services mostly leverage [mixers] for privacy reasons." Aaron Van Wirdum, *Chainalysis*: *Most Mixed Bitcoin Not Used for Illicit Purposes*, Bitcoin Magazine (Aug. 26, 2019), https://bitcoinmagazine.com/articles/chainalysis-most-mixed-bitcoin-not-used-for-illicit-purposes. In its study of mixed coins, Chainalysis, the Government's frequent expert on such things, concluded that "only 2.7 percent of [mixed] coins had been used on darknet markets." *Id.*

Only a small fraction of the bitcoin seized in this case, and of the bitcoins flowing through mixers generally, are linked to Darknet Markets. And Darknet Markets are the *only* link to the alleged SUA in this case. Thus, bitcoins *other* than those linked to Darknet Markets are "untainted" and available, if needed, for Mr. Harmon's defense.

### C. These Assets Are Necessary to Retain Mr. Harmon's Counsel of Choice.

A defendant seeking the release of funds under circumstances like these must demonstrate that, without the release, he lacks the "funds he requires to hire counsel of choice." *United States v. Emor*, 794 F. Supp. 2d 143, 149 (D.D.C. 2011). As explained above and in lodged Exhibit A, Mr. Harmon has provided the Court with disclosure of his "assets, liabilities, sources of income, or other information relevant to his ability to retain legal counsel." *See, e.g.*, *United States v. Edwards*, 856 F. Supp. 2d 42, 45 (D.D.C. 2012).

Presently, Mr. Harmon has no lawyers on his defense team with extensive knowledge of cryptocurrency; it is this expertise he seeks to add. And

for this he would like to retain Perkins Coie and, specifically, one of the founding members of the Firm's blockchain and digital currency practice.[8]

As required under the circumstances, "the seized assets, if released, would be used [exclusively] to pay" Mr. Harmon's "legal fees." *Emor*, 794 F. Supp. 2d at 149.[9]

## II. At a Minimum, Mr. Harmon is Entitled to a Hearing to Determine the Forfeitability of the Requested Assets.

To the extent the information submitted with this Motion is insufficient to release funds, Mr. Harmon respectfully requests that this Court grant him a hearing on this issue. Indeed, the Constitution guarantees defendants the "right to an adversary post-restraint, pretrial hearing for the purpose of establishing whether there was probable cause 'as to . . . the forfeitability of the specified assets' needed for a meaningful exercise of their rights to counsel." *United States v. E-Gold*, 521 F.3d 411, 419 (D.C. Cir. 2008) (quoting *United States v. Monsanto*, 924 F.2d 1186, 1195 (2d Cir. 1991)), *both abrogated on other grounds by Kaley v. United States*, 571 U.S. 320 (2014); *see also Kaley*,

---

[8] Perkins Coie, like most large law firms, typically performs work for its clients on an hourly basis. In criminal matters, that work is customarily billed against a substantial retainer, which must be supplemented if it falls below an agreed-upon level. In this case, if successful in achieving the release of sufficient funds to allow its participation, Perkins Coie has agreed to perform its work on this case at hourly rates lower than those customarily charged by its lawyers for work in the District of Columbia. Based on its experience in prior cases and its present knowledge of this case, Perkins Coie estimates that to represent Mr. Harmon in this Court through his proceedings in this Court would cost in excess of $1,500,000.

[9] In the event funds are released in excess of those ultimately used by the defense, those funds would be returned to the Court for further disposition.

571 U.S. at 324 (noting that a majority of circuits guarantee defendants the right to a hearing as to "whether probable cause exists to believe the assets in dispute are traceable or otherwise sufficiently related to the crime charged in the indictment").

Such a hearing is required where, as here, the defendant "ha[s] demonstrated the inability to retain counsel of their choice without access to the seized assets." *E-Gold*, 521 F.3d at 415. For the reasons set forth above, Mr. Harmon has demonstrated both "that (1) he lacks the funds he requires to hire counsel of choice, and, as a necessary corollary, (2) the seized assets, if released, would be used to pay his legal fees." *Emor*, 794 F. Supp. 2d at 149.

## Conclusion

For the foregoing reasons, Mr. Harmon asks that the Court order the release, for the purpose of hiring counsel of 160 Bitcoin. In the alternative, Mr. Harmon asks that the Court hold an evidentiary hearing as to "whether probable cause exists to believe that the assets in dispute are traceable or otherwise sufficiently related to the crime charged in the indictment." *See Kaley*, 571 U.S. at 324.

| | |
|---|---|
| Dated: May 20, 2020 | */s/ Charles Flood*<br>Charles Flood<br>Flood & Flood Law Office<br>914 Preston at Main, Suite 800<br>Houston, TX 77002<br>(713) 223-8877; Fax (713) 223-8877<br>charles@floodandflood.com<br>Texas Bar License# 00798178<br>Fed I.D. 22508<br><br>Jean-Jacques Cabou*<br>Alexis E. Danneman*<br>Perkins Coie<br>2901 N. Central Avenue, Suite 2000<br>Phoenix, Arizona 85012<br><br>*Pro hac vice motion forthcoming*<br><br>Attorneys for Defendant Larry Dean Harmon |

147847481.4