**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | |
| | : | |
| v. | : | **Criminal No. 19-cr-395 (BAH)** |
| | : | |
| **LARRY DEAN HARMON,** | : | |
| | : | |
| **Defendant** | : | |

**GOVERNMENT'S OPPOSITION TO DEFENDANT'S**
**MOTION TO DISMISS COUNTS TWO AND THREE**

The United States of America, by and through its attorney, the Acting United States

Attorney for the District of Columbia, respectfully files its opposition to the Defendant's Motion

To Dismiss Counts Two and Three for Failure To State an Offense, ECF No. 31.  In support

whereof, the government states as follows:

**INTRODUCTION**

On December 3, 2019, a federal grand jury in the District of Columbia returned an

indictment against the defendant, Larry Dean Harmon ("Harmon" or the "defendant"), on counts

of Conspiracy to Launder Monetary Instruments, in violation of 18 U.S.C. § 1956(h); Operating

an Unlicensed Money Transmitting Business, in violation of 18 U.S.C. § 1960(a); and Money

Transmission Without a License, in violation of D.C. Code § 26-1023(c).

The Indictment arises from Harmon's operation of a Darknet money laundering and money

transmission service known as HELIX from 2014 through 2017.[1]  As summarized in the

---

[1] The Darknet refers to a collection of hidden websites available through a network of globally distributed relay computers called the Tor network.  Unlike standard Internet websites, Tor-based websites "anonymize[] Internet activity by routing user's communications through a global network of relay computers (or proxies), thus effectively masking the internet-protocol ('IP') address of the user."  *United States v. Galarza*, 2019 WL 2028710, at *2 (D.D.C.

Indictment, Harmon began operating HELIX in or about July 2014.  For a fee, HELIX would transfer its customers' bitcoin to designated recipients in a manner designed to conceal and obfuscate the source or owner of the bitcoin.[2]  This type of service is commonly referred to as a bitcoin "mixer" or "tumbler."  In or about August 2014, Harmon explained that HELIX "uses new addresses for each transaction so there is no way LE would able [*sic*] to tell which addresses are helix addresses."  ECF No. 1 (Indictment), at 2.

As described in the Indictment, on or about November 8, 2016, a Federal Bureau of Investigation (FBI) employee acting in an undercover capacity from a location in the District of Columbia transferred 0.16 bitcoin from a bitcoin wallet hosted by the Darknet marketplace AlphaBay to HELIX.  HELIX then transferred an equivalent amount of new bitcoin, less a 2.5 percent fee, to an address provided by the FBI employee.  In total, HELIX exchanged at least approximately 354,468 bitcoins—the equivalent of approximately $311 million at the time of the transactions—on behalf of its customers, including customers in the District of Columbia.

HELIX stopped providing its services in or about December 2017.  As stated in the Indictment, at no time during the operation of HELIX did the defendant hold a money transmitting license for HELIX in the District of Columbia or register HELIX as a money transmitting business with the Financial Crimes Enforcement Network.

## **STANDARD OF REVIEW**

"[T]o be sufficient, an indictment need only inform the defendant of the precise offense of which he is accused so that he may prepare his defense and plead double jeopardy in any further

---

May 8, 2019).  The Darknet includes a number of hidden websites that sell illegal goods, like guns and drugs, and illegal services, like hacking and money laundering.

[2] Bitcoin (abbreviated "BTC") is a virtual currency that exists in electronic form and is transacted through the Internet.

prosecution for the same offense." *United States v. Verrusio*, 762 F.3d 1, 13 (D.C. Cir. 2014). "Because a court's use of its supervisory power to dismiss an indictment directly encroaches upon the fundamental role of the grand jury, dismissal is granted only in unusual circumstances." *United States v. Ballestas*, 795 F.3d 138, 148 (D.C. Cir. 2015) (internal quotations and alterations omitted). Accordingly, "a pretrial motion to dismiss an indictment 'allows a district court to review the sufficiency of the government's pleadings, but it is not a permissible vehicle for addressing the sufficiency of the government's evidence.'" *United States v. Mosquera-Murillo*, 153 F. Supp. 3d 130, 154 (D.D.C. 2015) (quoting 24 James W. Moore *et al.*, Moore's Fed. Practice § 612.02 (3d ed. 2015)). "Thus, '[w]hen considering a motion to dismiss an indictment, a court assumes the truth of [the government's] factual allegations.'" *Id.* (quoting *Ballestas*, 795 F.3d at 149).

Where a defendant is, in effect, "seeking to dismiss [a] count on the ground that it does not charge a crime against the United States," the "operative question is whether those allegations, if proven, would be sufficient to permit a jury to find that the crimes charged were committed." *United States v. Aka*, 339 F. Supp. 3d 11, 15 (D.D.C. 2018) (internal quotations and alterations omitted).

## ARGUMENT

### I.    Regulatory Framework for Money Transmitting Businesses Under Federal and D.C. Law

The federal prohibition on operating an unlicensed money transmitting business, 18 U.S.C. § 1960, was created in 1992 as part of the Annunzio-Wylie Anti-Money Laundering Act. "Title 18 U.S.C. § 1960 was enacted in order to combat the growing use of money transmitting businesses to transfer large amounts of the monetary proceeds of unlawful enterprises." *United States v. Velastegui*, 199 F.3d 590, 593 (2d Cir. 1999). Specifically, Congress found that anti-money

laundering regulation in the formal banking sector had the effect of driving drug traffickers and other criminals toward smaller, often poorly regulated nonbank financial institutions:

> In the past, drug money laundering deterrence legislation has focused on depository institutions. However, as deterrence and compliance programs by depository institutions have improved, money launderers with illicit profits have found new avenues of entry into the financial system. . . . Increasingly, money launderers are using money transmitters, check cashers, money exchanges and other nonbank financial companies for initial placement and the number of such businesses is growing rapidly in some States.

S. Rep. No. 101-460 (1990). Section 1960 was enacted to fill this gap in the regulatory framework. It strengthened federal regulation of money transmitters, and at the same time created a vehicle for federal law enforcement to enforce and complement state regulatory schemes. *See id.* ("The legislation . . . provides for an expanded federal role in a way that enhances and supplements State regulation."). "From its inception . . . § 1960 sought to prevent innovative ways of transmitting money illicitly." *United States v. Murgio*, 209 F. Supp. 3d 698, 708 (S.D.N.Y. 2016). In furtherance of this goal, § 1960 sets out three prongs of prohibited conduct: failing to comply with *federal* money transmitting business requirements, in violation of § 1960(b)(1)(B); operating without a required *state* money transmitting license, in violation of § 1960(b)(1)(A); and otherwise transmitting known criminal funds or promoting unlawful activity, in violation of § 1960(b)(1)(C).

The federal prong of § 1960, § 1960(b)(1)(B), criminalizes the failure to comply with money transmitting business requirements set forth under the Bank Secrecy Act ("BSA"). Under the BSA and its implementing regulations, a money transmitting businesses is required to register as a "money services business" ("MSB") with the Financial Crimes Enforcement Network ("FinCEN"), a division of the U.S. Department of Treasury. *See* 31 C.F.R. § 1022.380(a)(1). Registration carries with it a responsibility to comply with federal regulations designed to combat illicit money laundering. MSBs are required to establish and maintain programs designed to detect

and report suspicious activity, and to maintain certain records "where they have a high degree of usefulness in criminal, tax, or regulatory investigations or proceedings." 31 U.S.C. § 5311; *see, e.g.*, 31 U.S.C. § 5318(h)(1); 31 C.F.R. § 1022.210(a) (anti-money laundering programs); 31 U.S.C. § 5318(g)(1); 31 C.F.R. § 1022.320(a)(1) (suspicious activity reporting); 31 U.S.C. § 5313; 31 C.F.R. § 1010.311 (currency transaction reporting for transactions involving more than $10,000 in currency). When MSBs do not register, it makes it more difficult for FinCEN to identify them and ensure they are in compliance with these obligations. Unregistered MSBs thus operate in, and fuel, a black market financial system, and pose the very threats that animated the enactment of § 1960.

Compliance with these requirements is critical to law enforcement efforts to combat dangerous criminal activity, *especially* criminal activity enabled by bitcoin or other virtual currency payment mechanisms. In *United States v. Galarza*, No. 18-mj-146 (RMM) (D.D.C.), for example, law enforcement used information collected by a virtual currency exchanger pursuant to the BSA to identify a dangerous child pornography defendant, who uploaded more than 500 videos depicting child pornography to an illicit Tor-based website. *See Galarza*, 2019 WL 2028710, at *1-2. After identifying a bitcoin payment sent to the child pornography website, "[l]aw enforcement subpoenaed a virtual-currency exchange in the United States, *which is required by U.S. law to collect identifying information on its customers*," and discovered the defendant's name, phone number, email address, and other information. *Id.* at 2 (emphasis added). This know-your-customer information provided "compelling evidence that the website user who uploaded and downloaded child pornography to and from the [Child Pornography] Website is the defendant." *Id.* As Judge Collyer noted in another case, in sentencing one of the defendants in *United States v. E-Gold, Ltd., et al.*, No. 07-cr-109 (RMC) (D.D.C.): "[T]he failure to register is what leads to

5

the ability of criminals to make use of the E-Gold system for nefarious purposes . . . Because once you register you have to report things and therefore it's not as anonymous or private . . . . So on one hand it's just a regulatory compliance issue.  On the other hand it's a very serious problem." *In re Downey*, 162 A.3d 162, 170 (D.C. 2017) (opinion on attorney discipline for *E-Gold* defendant Robert Downey).

The state prong of § 1960, § 1960 (b)(1)(A), makes it a federal crime to operate without a required state license.  As relevant here, the District of Columbia Money Transmitters Act of 2000 provides a complementary mix of provisions focused on consumer protection and the safety and soundness of money transmitting businesses.  In the District of Columbia, anyone engaging in the "business of money transmission" is required to obtain a license from the Superintendent of the Office of Banking and Financial Institutions of the District of Columbia—in practice, administered through the D.C. Department of Insurance, Securities, and Banking ("DCISB").  D.C. Code § 26-1002(a); *see also* D.C. Reg. § 26-C2299.  License applicants must disclose, *inter alia*, criminal convictions and the history of any material litigation for the preceding 5-year period, a history of the applicant's operations, and (for corporations) an audited financial statement.  *Id.* § 26-1006(a)-(c).  Applicants are evaluated qualitatively to ensure that their business "will be conducted honestly, fairly, and in a manner commanding the confidence and trust of the community."  *Id.* § 26-1009(a)(1).  Licensed money transmitters are generally required to obtain a surety bond or other security device for at least $50,000, maintain a net worth of at least $100,000, and provide access to on-site examinations by the D.C. government.  *Id.* § 26-1004(a); 26-1007(a); 26-1013(a)-(b).  Under D.C. law, engaging in the business of money transmission without a license is punishable as a felony.  *Id.* § 26-1023(c).

Finally, § 1960 was amended as part of the USA PATRIOT Act of 2001, Pub. L. 107-56, 115 Stat. 272.  Among other things, the PATRIOT ACT created the third prong of the statute, § 1960(b)(1)(C), which criminalizes operation of *any* money transmitting business that "otherwise involves the transportation or transmission of funds that are known to the defendant to have been derived from a criminal offense or are intended to be used to promote or support unlawful activity."  This prong was designed to fill any remaining gaps in the regulatory scheme of § 1960, including smaller or more informal money transmitting businesses:

> [S]ection 104 expands the definition of an unlicensed money transmitting business . . . .  Thus, a person who agrees to transmit or to transport drug proceeds for a drug dealer, or funds from any source for a terrorist, knowing such funds are to be used to commit a terrorist act, would be engaged in the operation of an unlicensed money transmitting business.  It would not be necessary for the Government to show that the business was a storefront or other formal business open to walk-in trade.  To the contrary, it would be sufficient to show that the defendant offered his services as a money transmitter to another.

H.R. Rep. 107-250(l) (2001).  As relevant here, § 1960(b)(1)(C) created a separate definition of unlicensed money transmitting business independent of the federal registration and state licensure prongs.  Accordingly, the statute applies to any money transmitting business *regardless* of whether it is required to obtain a state license or federal registration.

## II.     Bitcoin Qualifies as "Money" Under the D.C. Money Transmitters Act

The defendant first argues (at 2-4) that virtual currency businesses like HELIX cannot be regulated under the D.C. Money Transmitters Act because bitcoin is not "money."  The beginning and end of the defendant's argument is that the term "money" is defined in a separate section of the D.C. Code enacting the Uniform Commercial Code.  But there is no legal justification for importing this specialized definition into the unrelated criminal and regulatory enforcement regime created by the Money Transmitters Act.  Rather, the broad statutory definition of "money transmission" *within* the Money Transmitters Act confirms that it applies broadly to electronic

payment technologies, including bitcoin.  Accordingly, Count Three and the first prong of Count Two cannot be dismissed.

### A.  Money Transmission Includes Electronic Transfers of Bitcoin

As noted above, the Money Transmitters Act generally requires anyone engaged in the "business of money transmission" to obtain a D.C. license.  D.C. Code § 26-1002(a).  The Money Transmitters Act contains a comprehensive list of statutory definitions that apply "[f]or the purposes of this chapter," in § 26-1001.  Section 26-1001 defines "money transmission" in sweeping terms:  "'Money transmission' means the sale or issuance of payment instruments or engaging in the business of receiving money for transmission or transmitting money within the United States, or to locations abroad, *by any and all means*, *including but not limited to* payment instrument, wire, facsimile, *or electronic transfer*."  *Id.* § 26-1001(10) (emphases added).

Such broad statutory language easily encompasses the transfer of virtual electronic currencies such as bitcoin.  By its explicit terms, the statute includes "electronic transfer[s]."  It also applies to transfers "by any and all means," and "including but not limited to" a non-exclusive list of payment technologies.  In *E-Gold*, Judge Collyer relied on the same statutory cues in broadly construing the BSA definition of "money transmitting business" to include transfers of virtual currency.  *See United States v. E-Gold, Ltd.*, 550 F. Supp. 2d 82, 94 (D.D.C. 2008) ("A 'transmission' of 'funds,' in its ordinary sense, is not limited to cash or currency transfers, but may include transfers by check, wire or some other means.  The statute itself even states that a transmission of 'funds' may be made '*by any means*.'") (quoting 31 U.S.C. § 5330(d)(2)).  The same logic should apply here.

This understanding of "money transmission" is consistent with the aims and purposes of the Money Transmitters Act.  The legislative drafters used technology-neutral language and catch-

all terms ("any and all means," "including but not limited to") to ensure money transmitters could not evade regulation simply by adopting new technologies. Indeed, money transmitters using bitcoin or other virtual currencies arguably raise some of the greatest risks for consumers.[3]  Given the emphasis on consumer protection in the Money Transmitters Act, it would make little sense to construe the statute so narrowly as to exclude the businesses arguably most in need of regulatory oversight.

In fact, DCISB has issued money transmitter licenses to a number of virtual currency businesses doing business in the District of Columbia, including Coinbase (MTR1163082), TZero Crypto (MTR1749137), BitPay (MTR 1496848), Circle (MTR 1201441), and CoinList (MTR1785267).  DCISB's practice of licensing virtual currency businesses is at least relevant in interpreting the scope of the Money Transmitters Act.  Further, the defendant *himself* admitted in an undercover recording that he was aware of "licensing" requirements for his bitcoin payment app, Dropbit.  *See* ECF No. 16, at 22; ECF No. 16-10 (Undercover Tr.) ("we're gonna try and get investments so we can get licensing," "we need about 2 million to get the licenses so that we can sell it ourselves").  The defendant's prior, unguarded admission likely reflects the commonsense understanding that bitcoin payments, like other forms of payments, are subject to regulation under state money transmitter laws.

To be sure, the Money Transmitters Act does not further define the word "money."  Where a statutory term is undefined, it should be given its ordinary meaning, and read "in [its] context and with a view to [its] place in the overall statutory scheme."  *Roberts v. Sea-Land Servs., Inc.*, 566 U.S. 93, 100, 101 (2012).  Here, dictionaries define "money" as a medium of exchange that can be used to purchase goods or services.  *See, e.g.*, Am. Heritage Dictionary (4th ed. 2000) ("A

---

[3] DCISB's concern about the riskiness of bitcoin and other virtual currencies is well illustrated by its 2014 consumer advisory, cited (at 3) in the defendant's motion.

medium that can be exchanged for goods and services and is used as a measure of their values on the market, including among its forms a commodity such as gold, an officially issued coin or note, or a deposit in a checking account or other readily liquefiable account."); Oxford English Dictionary (3d ed. 2002) ("Any generally accepted medium of exchange which enables a society to trade goods without the need for barter; any objects or tokens regarded as a store of value and used as a medium of exchange."). This ordinary understanding of "money" does not depend on it being formally adopted by a sovereign government.

It is clear that bitcoin fits within the ordinary definition of money—especially as used in the illicit Darknet economy. Darknet vendors and customers engaged in illegal drug trafficking cannot easily use traditional payment methods, like credit cards or personal checks, without running the risk of detection. Instead, they use bitcoin or other virtual currencies based on their perceived anonymity. In practice, bitcoin is used in this illicit economy as a virtual substitute for the U.S. dollar or other national currencies—as a medium of exchange, unit of account, and store of value. HELIX performed an essential function in making this illicit economy work, providing drug traffickers and their customers with a way to spend, exchange, and use their bitcoins without creating an electronic paper trail leading to their illegal transactions. *See generally* ECF No. 16-1 (2/11/20 Det. Hr'g Tr.), at 64:4-65:5.

Indeed, while the definition of "money" under the Money Transmitters Act may be an issue of first impression,[4] numerous federal courts have ruled on whether bitcoin counts as "money" or "funds" under related federal statutes, including the money laundering statute, 18 U.S.C. § 1956,

---

[4] This is not, however, the first prosecution applying the Money Transmitters Act to transmission of virtual currency. The defendants in the *E-Gold* case were charged with violations of D.C. Code § 26-1002, among other offenses, and two of the defendants ultimately pled guilty to only the D.C. charge. *See United States v. E-Gold, Ltd., et al.*, No. 07-cr-109 (RMC) (D.D.C.), ECF Nos. 130 (Plea Agreement of R. Jackson); 142 (Plea Agreement of B. Downey). And, as noted above, DCISB has licensed numerous virtual currency businesses under the Money Transmitters Act.

and the money transmitting business statutes in § 1960 and the BSA.   These courts have overwhelmingly held that bitcoin is "money" based on the recognition that bitcoin is used as the functional equivalent of the U.S. dollar in the Darknet economy.   For example, in a money laundering and money transmission case involving the Darknet market Silk Road, *United States v. Faiella*, 39 F. Supp. 3d 544 (2014), Judge Rakoff rejected the same argument raised by the defendant here—that bitcoin does not qualify as "money."   Relying on the definitions of "money" and "funds" contained in Merriam-Webster's dictionary, the court held that "Bitcoin clearly qualifies as 'money' or 'funds' under these plain meaning definitions," because "Bitcoin can be easily purchased in exchange for ordinary currency, acts as a denominator of value, and is used to conduct financial transactions."   *Id.* at 545.   Other courts have followed suit in a virtually unbroken line of precedent.[5]

---

[5] *See, e.g.*, *United States v. Ulbricht*, 31 F. Supp. 3d 540, 570 (S.D.N.Y. 2014) ("Bitcoins can be either used directly to pay for certain things or can act as a medium of exchange and be converted into a currency which can pay for things.  . . . Indeed, the only value for Bitcoin lies in its ability to pay for things . . . .  Sellers using Silk Road are not alleged to have given their narcotics and malicious software away for free—they are alleged to have sold them."); *United States v. Budovsky*, 2015 WL 5602853, at *13-15 (S.D.N.Y. Sept. 23, 2015) ("The *Faiella* court found that Bitcoin as a virtual currency qualified as 'funds' under the statute, since it can 'be easily purchased in exchange for ordinary currency, acts as a denominator of value, and is used to conduct financial transactions.' For these same reasons, LR qualifies as 'funds' for purposes of § 1960.") (quoting *Faiella*); *Murgio*, 209 F. Supp. 3d at 707-10 ("[T]he Court concludes that 'funds,' for the purposes of § 1960, means pecuniary resources, which are generally accepted as a medium of exchange or a means of payment.  Applying that definition here, it is clear that bitcoins are funds within the plain meaning of that term.  Bitcoins can be accepted as a payment for goods and services or bought directly from an exchange with a bank account.") (internal quotations and alterations omitted); *United States v. Mansy*, 2017 WL 9672554, at *1 (D. Me. May 11, 2017) (collecting cases and announcing that "[t]he Court . . . adopts the persuasive analysis of the majority of the district courts that have recently addressed this question"); *United States v. Stetkiw*, 2019 WL 417404, at *1-2 (E.D. Mich. Feb. 1, 2019) (collecting cases and concluding that "federal District Courts have repeatedly found that Bitcoin constitutes 'money' and 'funds' within the meaning of 18 U.S.C. § 1960"); *United States v. Ologeanu*, 2020 WL 1676802, at *10-11 (E.D. Ky. Apr. 4, 2020) (collecting cases and concluding that "the federal district courts have unanimously and univocally concluded that Bitcoin constitutes 'money' and 'funds'") (internal quotations and alterations omitted).  The sole dissenting voice is a Magistrate Judge's Report and Recommendation that was never adopted by a district court and was mooted by subsequent developments in the case. *See United States v. Petix*, 2016 WL 7017919 (W.D.N.Y. Dec. 1, 2016); *but see Mansy*, 2017 WL 9672554, at *2 (rejecting *Petix*); *Stetkiw*, 2019 WL 417404, at *1-2 (rejecting *Petix*).

In sum, the statutory text, regulatory context and historical practice, and purposes of the Money Transmitters Act all favor a broad understanding of the term "money transmission" to include virtual electronic payments using bitcoin.

### B.   The Court Should Not Import a Uniform Commercial Code Definition To Narrow the Scope of the D.C. Money Transmitters Act

The defendant does not address the statutory definition of "money transmission" within the Money Transmitters Act, the purposes of that statute, the way bitcoin is used in the Darknet economy, or the overwhelming federal case law defining bitcoin as "money" and "funds." Instead, the defendant relies solely on the fact that a separate section of the D.C. Code—namely, the District of Columbia's enactment of the Uniform Commercial Code ("UCC"), codified under Title 28— contains a separate definition of the word "money." This Court should reject the defendant's attempt to arbitrarily shoehorn the UCC definition into the Money Transmitters Act.

The definition relied on by the defendant appears in a limited, "General definitions" section of the UCC codified at D.C. Code § 28:1-201. As a general principle, "[s]tatutory definitions establish a term's meaning *in the act in which the definition appears*, or, for general interpretative statutes, a definition extends to as much legislation *as the general act designates*." 2A Norman Singer, *et al.*, Sutherland Statutory Construction § 47:7 (7th ed. 2019) (emphasis added). It does not follow, however, that a specialized definition of a common word appearing in one code section—such as the UCC definition of "money"—necessarily controls every instance in which the same word appears in an unrelated statute. Just the opposite. The statutory text of the UCC statute in question—specifically, subsections (a) and (b) of § 28:1-201—strongly implies that the UCC definitions are limited *only* to the UCC. *See* D.C. Code § 28:1-201(a) (defined terms have the meanings stated "[u]nless the context otherwise requires"); Editor's Notes to § 28:1-201 ("The reference in subsection (a) to the 'context' is intended to refer to the context in which the defined

term is used *in the Uniform Commercial Code*.") (emphasis added).  Accordingly, one influential treatise flatly states:  "The definitions contained in the UCC only apply with respect to transactions covered by the UCC.  They are not definitions of general application."  1 Lawrence's Anderson on the Uniform Commercial Code § 2-201:12 (3d ed. 2019).  There is no legal basis to import these specialized UCC definitions into unrelated statutes outside of the UCC.

By comparison, the Money Transmitters Act has a comprehensive set of its own "Definitions" at D.C. Code § 26-1001.  These definitions govern "[f]or the purposes of this chapter," that is, for purposes of the Money Transmitters Act.  *See id.*  Notably, the Money Transmitters Act is codified under Chapter 10 of Title 26 of the D.C. Code, alongside a number of chapters applying to various kinds of banks and other financial institutions.  There is no shortage of definitions within Title 26.  Most of the chapters in Title 26 have their own specialized "Definitions" section, each which governs for purposes of that specific chapter.[6]  Given such an extensive effort at creating a specialized vocabulary of statutorily defined terms, it is reasonable to conclude that the District's legislative drafters deliberately left certain terms undefined, trusting that undefined terms would be given their ordinary meaning under well-accepted principles of statutory construction.  *See Roberts*, 566 U.S. at 100-101.

The defendant makes no effort to explain *why* the UCC's definitions should be imported into the Money Transmitters Act, let alone control the rest of the D.C. Code—and even a cursory comparison of the two sections illustrates their divergent aims and purposes.  The UCC is a body of law designed to "govern[] commercial transactions," D.C. Code § 28:1-103(a)(1), and its definitions provide precise terms for the benefit of contract-drafters and sophisticated commercial

---

[6] *See, e.g.*, D.C. Code § 26-131.02 ("Definitions" for Chapter 1A, "Automated Teller Machines"); *id.* § 26-301 ("Definitions" for Chapter 3, "Check Cashers"); *id.* § 26-431.02 ("Definitions" for Chapter 4A, "Community Development by Financial Institutions"); *id.* § 26-501.01 ("Definitions" for Subchapter I of Chapter 5, "Credit Unions"); *etc.*

parties.  The Money Transmitters Act, by contrast, is a consumer protection statute, and its terms should be construed broadly to protect consumers from predatory or unnecessarily risky business practices.  As other courts have held, it makes no sense to import UCC definitions into consumer protection statutes in a way that would limit the scope of the latter.  *See, e.g.*, *Burney v. Thorn Americas, Inc.*, 944 F. Supp. 762, 768 (E.D. Wisc. 1996) ("The U.C.C. has no applicability in interpreting the [Wisconsin Consumer Act's] definition of consumer act because the statutes have different language and because the U.C.C. covers commercial transactions involving highly sophisticated commercial actors—as compared to the average consumer.  Especially when faced with a broad statute like § 421.301(9), the court should not artificially limit it by comparing it to statutes with different language and different purposes."); *see also In re Crawford*, 397 B.R. 461, 466-67 (Bankr. E.D. Wisc. 2008) (following *Burney* and finding that "[t]he divergent purposes of the purchase money security interest provisions of the UCC . . . and the Wisconsin Consumer Act . . . militate against reading these statutes together"); *cf. In re Acaya*, 369 B.R. 564, 570 (Bankr. N.D. Cal. 2007) ("The legislative history of the [Automobile Sales Finance Act] makes plain that the ASFA is a consumer protection statute that imposes disclosure requirements on dealers and is not helpful in determining what constitutes a purchase money security interest under the California UCC.").

Finally, the Rule of Lenity provides no basis for importing the UCC definition of "money" into the Money Transmitters Act.  As other courts have held, the Rule of Lenity does not justify exempting electronic currencies like bitcoin from regulation under money transmitting statutes. *See, e.g.*, *Stetkiw*, 2019 WL 417404, at *3-4; *Mansy*, 2017 WL 9672554, at *2.  And for good reason.  It is well-established that the Rule of Lenity only applies in instances of "grievous ambiguity" where courts can muster "no more than a guess as to what Congress intended." *United*

*States v. Burwell*, 690 F.3d 500, 515 (D.C. Cir. 2012) (internal quotations omitted). "The simple existence of some statutory ambiguity is not sufficient to warrant application of that rule, for most statutes are ambiguous to some degree." *Id.* (internal quotations and alterations omitted); *see also U.S. Parole Com'n v. Noble*, 693 A.2d 1084, 1103-04 (D.C. 1997) (Rule of Lenity is "a 'secondary' rule of construction" that can be considered only after finding that "a penal statute's language, structure, purpose and legislative history leave its meaning genuinely in doubt") (internal quotations omitted). The statute here, D.C. Code § 26-1001(10) defining "money transmission" under the Money Transmitters Act, is not grievously ambiguous. The Court can readily construe its meaning based on the broad statutory text of § 26-1001(10), the statutory context and purposes of the Act, DCISB's historical practice, the ordinary meaning of the word "money," and analogous federal case law all holding that "money" or "funds" includes bitcoin.

## III.   HELIX Was a Money Transmitting Business Under Federal Law

The defendant next argues (at 4-6) that HELIX was not a money transmitting business required to register with FinCEN—the second prong of Count Two—because it did not transmit bitcoin to "another person or location." Alternatively, the defendant seems to argue (at 4-5) that HELIX was not a money transmitting business because it was not a "business." Both claims fail on the facts and the law.

### A.  The Indictment Properly Alleges that HELIX Violated the Federal Money Transmission Statute

As a preliminary matter, the defendant's argument rests on a mischaracterization of the Indictment. He inaccurately claims (at 6) that the Indictment "nowhere alleges that Helix transmitted bitcoin to 'another person or location.'" Not true. In fact, the Indictment contains several obvious references to sending bitcoins to another person or location:

- "Helix enabled customers, for a fee, *to send* bitcoins *to designated recipients* in a manner which was designed to conceal and obfuscate the source or owner of the bitcoins."  ECF No. 1, at 2 (emphasis added).

- "In or about November 2016, the AlphaBay website recommended to its customers that they use a bitcoin tumbler service to 'erase any trace of [their] coins *coming from* AlphaBay.'"  *Id.* at 2-3 (emphasis added).

- "On or about November 8, 2016, a Federal Bureau of Investigation (FBI) employee acting in an undercover capacity from a location in the District of Columbia transferred 0.16 bitcoin *from an AlphaBay bitcoin wallet to Helix.  Helix then exchanged* the bitcoin for an equivalent amount of bitcoin, less a 2.5 percent fee, *which was not directly traceable to AlphaBay*."  *Id.* at 3 (emphasis added).

This Court is obligated to accept these allegations as true for purposes of a motion to dismiss. *Mosquera-Murillo*, 153 F. Supp. 3d at 154.  They plainly allege that HELIX was involved in sending ("to send") bitcoins to and from other persons ("to designated recipients") or other locations ("from AlphaBay" / "from an AlphaBay bitcoin wallet").  Thus, the Indictment properly alleges an offense against the United States.

### B.  HELIX Was a Money Transmitting Business Subject to the BSA

In any event, HELIX plainly satisfies the definition of a money transmitting business that is required to register with FinCEN under the federal prong of § 1960, subsection (b)(1)(B).  That subsection criminalizes operation of a money transmitting business that "fails to comply with the money transmitting business registration requirements under section 5330 of title 31, United States Code, *or* regulations prescribed under such section."  18 U.S.C. § 1960(b)(1)(B) (emphasis added).  The statutory term "or" creates a disjunctive test, meaning that a business can violate § 1960 if it

fails to register as required under the *statutory text* of the BSA, 31 U.S.C. § 5330; *or* if it fails to register as required under the *implementing regulations* to the BSA.  *See E-Gold*, 550 F. Supp. 2d at 95-96.

**Statutory Definition:**  The defendant does not mention the statutory text of 31 U.S.C. § 5300, let alone dispute that HELIX satisfies the definition of money transmitting business required to register under the *statute*.[7]  Specifically, § 5330(a)(1) requires all "money transmitting businesses" to register with the Secretary of the Treasury (*i.e.*, with FinCEN).  Subsections (d)(1) & (2) then define what is a "money transmitting business" within the meaning of the BSA:

> (1) Money transmitting business. —The term "money transmitting business" means any business other than the United States Postal Service which—
>
>> (A) provides check cashing, currency exchange, or money transmitting or remittance services, or issues or redeems money orders, travelers' checks, and other similar instruments or *any other person who engages as a business in the transmission of funds*, including any person who engages as a business in an *informal money transfer system* or any network of people who engage as a business in *facilitating the transfer of money domestically or internationally outside of the conventional financial institutions system*;
>
> . . .
> (2) Money transmitting service.—The term "money transmitting service" includes accepting currency or funds denominated in the currency of any country and transmitting the currency or funds, or the value of the currency or funds, by any means through a financial agency or institution, a Federal reserve bank or other facility of the Board of Governors of the Federal Reserve System, or an electronic funds transfer network.

31 U.S.C. § 5330(d)(1)-(2) (emphases added).

These definitions were clearly written to cover a broad array of financial transfers, including those that take advantage of new technologies.  Subsection (d)(1)(A) applies broadly to "any other person who engages as a business in the transmission of funds."  It specifically applies to non-traditional payment services, including "informal money transfer system[s]" and

---

[7] *See N.Y. Rehabilitation Care Mgmt., LLC v. NLRB*, 506 F.3d 1070, 1076 (D.C. Cir. 2007) (arguments raised for the first time on reply are waived "in order to prevent the 'sandbagging' of another party").

facilitating the movement of funds "outside of the conventional financial institutional system." Notably, this *statutory* definition is not limited to transmission to "another location or person"—the defendant's primary argument.  To the contrary, it provides a web of overlapping definitions that evidence Congress's intent to capture emerging technologies and business models.  *See Murgio*, 209 F. Supp. 3d at 708 (construing similar definition of "money transmitting" under § 1960 and explaining that "Congress designed the statute to keep pace with evolving threats") (internal quotations and alterations omitted).  As Judge Collyer explained in *E-Gold*, "the plain language of the statute . . . clearly provides that a 'money transmitting business' as defined in Section 5330 includes all financial institutions that fall outside of the conventional financial institutions system." 550 F. Supp. 2d at 94.  To be sure, the analysis in *E-Gold* was responsive to the particular facts and arguments raised by the defendants in that case.  But a long line of federal courts have addressed the definition of money transmitting under § 1960 and § 5330 in various respects, and found, virtually without exception, that money transmitting includes virtual currency businesses like HELIX.  *See supra*, note 5 (collecting cases).[8]

The defendant does not address § 5330 or any of the relevant case law.  But it is clear that HELIX, as described in the Indictment, meets the statutory definition of a money transmitting business, as it "enabled customers, for a fee, to send bitcoins to designated recipients in a manner which was designed to conceal and obfuscate the source or owner of the bitcoins."  ECF No. 1, ¶ 4.

**Regulatory Definition:**  Alternatively, federal regulations issued pursuant to 31 U.S.C. § 5330 require "money services businesses," or MSBs, to register with FinCEN.  31 C.F.R.

---

[8] Section 1960 contains its own definition of "money transmitting," *see* 18 U.S.C. § 1960(b)(2), which is separate from the definition of "money transmitting business" in 31 U.S.C. § 5330.  Courts, however, generally construe the two definitions as substantively the same.  *See E-Gold*, 550 F. Supp. 2d at 92 n.10.

§ 1022.380(a)(1).  MSBs are defined in 31 C.F.R. § 1010.100(ff).  In relevant part, that regulation

creates a category of MSBs called "Money transmitter[s]."  *See* 31 C.F.R. § 1010.100(ff)(5).

Money transmitters are defined as:

> (5) Money transmitter—
>
> (i) In general.
>
>> (A) A person that provides money transmission services. The term "money transmission services" means the acceptance of currency, funds, or other value that substitutes for currency from one person and the transmission of currency, funds, or other value that substitutes for currency to another location or person by any means. "Any means" includes, but is not limited to, through a financial agency or institution; a Federal Reserve Bank or other facility of one or more Federal Reserve Banks, the Board of Governors of the Federal Reserve System, or both; an electronic funds transfer network; or an informal value transfer system; or
>
>> (B) Any other person engaged in the transfer of funds.

31 C.F.R. § 1010.100(ff)(5).

Again, the defendant ignores one of the alternative bases for finding that HELIX was a

money transmitter.  Under the catch-all definition in subsection (ff)(5)(i)(B), money transmitters

include "[a]ny other person engaged in the transfer of funds."  As alleged in the Indictment, HELIX

plainly meets this definition as a business that "enabled customers, for a fee, to send bitcoins to

designated recipients."  ECF No. 1, ¶ 4.

The defendant instead focuses on the phrase in subsection (ff)(5)(i)(A) referring to

transmission of funds "to another location or person."  This phrase was explicated in a regulatory

guidance published by FinCEN in 2013 that specifically focused on the application of federal

money transmitting regulations to virtual currency businesses.  *See* Dep't of the Treasury FinCEN

Guidance, *Application of FinCEN's Regulations to Persons Administering, Exchanging, or Using*

*Virtual        Currencies*,        FIN-2013-G001        (Mar.        18,        2013),        available        at

https://www.fincen.gov/sites/default/files/shared/FIN-2013-G001.pdf (the "March 2013 Guidance"). FinCEN explained that transmission to "another location" could mean transmission from one account to another. Thus, a virtual currency exchanger, which accepts fiat currency like the U.S. dollar and credits a user's account in units of virtual currency, is engaged in transferring funds from one account (*i.e.*, location), to another. *Id.* at 4 ("This circumstance constitutes transmission *to another location*, namely from the user's account at one location (e.g., a user's real currency account at a bank) to the user's convertible virtual currency account with the administrator."). If the virtual currency exchanger also offers the ability to forward virtual currency to designated third parties, then it is also engaged in transmission to "another person"— "namely each third party to which transmissions are made at the user's direction." *Id.* at 4-5. In this way, a virtual currency exchanger generally satisfies the "location" prong of the regulation, and often satisfies the "person" prong as well.

FinCEN confirmed this understanding in a follow-on guidance published in 2019 that focused specifically on so-called mixers and tumblers, like HELIX. *See* Dep't of the Treasury FinCEN Guidance, *Application of FinCEN's Regulations to Certain Business Models Involving Convertible Virtual Currencies*, FIN-2019-G001 (May 9, 2019), at 19-20, available at https://www.fincen.gov/sites/default/files/2019-05/FinCEN%20Guidance%20CVC%20FINAL%20508.pdf (the "May 2019 Guidance").[9] The guidance used the term "anonymizing service provider" to reference services "commonly referred to as 'mixers' or 'tumblers.'" *Id.* at 19. As FinCEN explained, a mixer or tumbler is still a money transmitter because its business model is

---

[9] While this interpretive guidance was published after HELIX ceased operations, it is nonetheless relevant for the purposes of applying FinCEN's regulations to the HELIX business model. As the guidance notes: "This guidance does not establish any new regulatory expectations or requirements. Rather, it consolidates current FinCEN regulations, and related administrative rulings and guidance issued since 2011, and then applies these rules and interpretations to other common business models involving CVC [convertible virtual currency] engaging in the same underlying patterns of activity." May 2019 Guidance, at 1. That is, the guidance simply confirms the state of the regulatory environment that has been in existence since at least 2011.

fundamentally the same as a virtual currency exchanger or other money transmitter:  it "consists exclusively of providing secured money transmission," in which the mixer/tumbler "provides anonymizing services by accepting value from a customer and transmitting the same or another type of value to the recipient, in a way designed to mask the identity of the transmitter."  *Id.* at 20.

Thus, in FinCEN's view, there is no significant difference between accepting value in the form of fiat currency and transmitting it in virtual currency (as an exchanger does) and accepting value in the form of virtual currency and transmitting it in virtual currency (as a mixer/tumbler does).  Indeed, as FinCEN observed, a mixer/tumbler like HELIX creates anonymity *by* engaging in money transmitting—accepting a customer's virtual currency with one hand, and, with the other, transmitting an equivalent but unrelated amount of virtual currency to a location or person of the customer's choosing.

The May 2019 Guidance confirmed (at 13) that "FinCEN interprets the term 'another location' broadly,'" in a way that encompasses virtual currency accounts or addresses.  That is undoubtedly correct in light of the broad contextual language of the regulation.  In *E-Gold*, Judge Collyer rejected the argument that the *statutory* definition of "money transmitting" (under 18 U.S.C. § 1960 and 31 U.S.C. § 5330) was limited to transfers of cash or currency, explaining that "funds" is broader than "just currency," and "any and all means" is "not limited to cash transactions."  550 F. Supp. 2d at 88.  The same textual cues exist in the *regulatory* definition of money transmitter and counsel the same broad construction.  *See* 31 C.F.R. § 1010.100(ff)(5)(i)(A) (transmission of "currency, *funds*, or *other value that substitutes for currency*" to another location or person "*by any means*") (emphases added).

Any doubts about the scope of these regulations should be resolved in favor of broad construction.  Courts have repeatedly recognized that the definitions of money transmitter in

related statutes should be construed broadly.  *See E-Gold*, 550 F. Supp. 2d at 96 (citing statutory language as well as legislative history to confirm "the inclusiveness of the term 'money transmitting business' under Section 5330"); *United States v. $215,587.22 in United States Currency*, 306 F. Supp. 3d 213, 219 (D.D.C. 2018) (noting that "[c]ourts have broadly construed the definition of both a 'money transmitting business' and a 'financial institution'") (collecting cases); *United States v. Banki*, 685 F.3d 99, 113 (2d Cir. 2012) (noting that "section 1960 defines 'money transmitting' broadly").  The same logic and underlying purposes hold true for the regulatory definition in 31 C.F.R. § 1010.100(ff)(5).

As discussed below, HELIX satisfies the definition of money transmitter under subsection (ff)(5)(i)(A) because its business model was *centered* on receiving customer funds and transmitting them to another location or person.

### 1. The Core of HELIX's Business Model Was the Transfer of Bitcoin from One Location to Another to Remove Bitcoin "Taint"

As the Indictment makes plain, transmission to "another location or person" was the core of HELIX's business model.  HELIX directed users to transfer their "dirty" bitcoin to wallets controlled by HELIX.  HELIX in turn sent "clean" bitcoins—less at 2.5% fee—to a destination bitcoin address, or multiple addresses, specified by the HELIX user.  *See* ECF No. 1, at 2.  The funds sent to the designated recipient would not be the user's original coins, but rather a new set of coins that the defendant had pre-laundered and held ready for his customers.  This was central to the defendant's business model:  he advertised that recipients would receive new bitcoins that "have never been to the darknet before," and represent "new addresses for each transaction so there is no way [law enforcement] would able [*sic*] to tell which addresses are helix addresses."  *Id.* at 2.  HELIX's tumbling transactions thus necessitated transferring funds to new locations—specifically, to new bitcoin addresses.

A bitcoin address is the virtual currency equivalent of an account number.  It is a virtual identifier that enables users to direct fund transfers to a designated recipient, similar to a wire transfer.  And, just as a wire transfer from one bank account to another bank account is clearly money transmission within the meaning of the FinCEN regulations, there is no reason why this Court should not consider a transfer of funds from one bitcoin address to another bitcoin address to be money transmission.  All involve a transfer of funds to a new, virtual location.[10]

Indeed, transmission to a new location was the very purpose of HELIX.  The defendant repeatedly emphasized that HELIX was designed to remove any "taint" that would arise from a connection from the originating bitcoin address to the destination bitcoin address.  *See* ECF No. 1, at 2.  HELIX did so by exchanging the "dirty" coins with "clean" coins, but in function, HELIX was similar to a traditional money launderer who layers funds between multiple accounts in order to cloud the audit trail.  *See Bikundi*, 125 F. Supp. 3d at 195 ("Layering involves a financial transaction or series of financial transactions that separate unlawfully obtained proceeds from their source and, in the process, conceal the illegal nature of the proceeds and complicate an audit trail.").  That is well-illustrated by the undercover transaction described in the Indictment.  *See* ECF No. 1, at 7.  An undercover FBI employee sent bitcoin to HELIX from an "AlphaBay bitcoin wallet"—in other words, a bitcoin wallet address readily associated with the illegal Darknet market AlphaBay.  *Id.*  HELIX returned an equivalent amount, less a 2.5% fee, in bitcoin that "was not directly traceable to AlphaBay."  *Id.*  The sole purpose of this transaction was to transfer the value

---

[10] This is similar to a hawala-type transaction in which a hawaladar accepts funds, whether in cash or electronic transfer, from an individual and transfers an equivalent amount of funds to the same individual's bank account in another country.  The funds are in the control of the same account holder, but there is a clear transmission of value to a new location, in a way designed to avoid a paper trail.  Courts have confirmed that such hawala-type business models fall well within the remit of 18 U.S.C. § 1960.  *See, e.g., United States v. Elfgeeh*, 515 F.3d 100 (2d Cir. 2008) (affirming § 1960 conviction of defendant who operated hawala out of his ice cream shop).

of the bitcoin from one *location*—a bitcoin address tainted by its association with AlphaBay—to another *location*—a new bitcoin address not directly linked to AlphaBay, and thus capable of being spent or cashed out at mainstream bitcoin exchanges without triggering anti-money laundering concerns.[11]

This understanding of "another location" is consistent with the broad purposes of the BSA and its implementing regulations.  The transmission of funds to another location can facilitate criminal activity or the concealment of criminal proceeds, regardless of whether the transmission is from one traditional bank account to another; from one bank account to a bitcoin address; or— as here—from one bitcoin address to another, unrelated bitcoin address.  The animating concern of § 1960 in enforcing the BSA was to inhibit the movement of criminal funds generally.  That is well evidenced in the legislative history of § 1960, described above, and in the broad statutory language that defines "money transmitting" to include transferring funds "by any and all means." Artificially limiting the scope of the BSA or its implementing regulations to exclude transfers among online accounts or other virtual locations would render the federal money transmission regulatory regime powerless against 21st century money laundering—the exact opposite of Congress's clear intent.

### 2.  Transfer of Value to Another Private Key Constitutes Transfer to Another Location

Alternatively, even if "location" meant physical location rather different accounts, HELIX's business model would nonetheless qualify.  The physical "location" of a bitcoin address

---

[11] The defendant (at 6) faults the FBI for not sending its laundered bitcoin to a third party, but fails to address the obvious purpose of the transaction—to launder the AlphaBay-tainted bitcoins by transmitting their value to another *location*, an untainted bitcoin address.  Transmission to another location alone is sufficient to qualify a business as a money transmitter.  In practice, as alleged in the Indictment and as the government will show at trial, customers used HELIX to send funds to "designated recipients" including third parties, and thus transmitted funds to other persons as well as new locations.  *See* ECF No. 1, at 2.

is best affiliated with the location of the asset's private key.[12]  Bitcoins, like many virtual assets, exist in an online environment.  Transactions are recorded on a virtual transaction ledger, called the "blockchain," a copy of which is distributed to the thousands of bitcoin nodes across the globe. Bitcoins, in their truest sense, exist only as entries in this ledger—just as bank account balances exist as entries in the bank's ledger system.  *Control* of a bitcoin address—that is, the ability to submit a new entry on the blockchain transferring bitcoins from one address to another—is tied to the bitcoin address's private key.  The private key is equivalent to an extremely secure pin number or password and is most commonly stored as part of a bitcoin wallet.  The transfer of bitcoin from Address A to Address B involves the owner of Address A using an Internet-connected device to announce a transaction to the bitcoin network using Address A's private key.  This is the bitcoin equivalent to a bank employee initiating a wire transfer.

A user of HELIX transferred funds from his own bitcoin address, using private keys in the user's possession and control, to bitcoin addresses controlled by the defendant.  Once the transfer from the user to HELIX was complete, the funds were entirely controlled by the defendant and the private keys he held.  Control of the bitcoin therefore shifted from the location where the user's private keys were stored to the location where the defendant's private keys were stored.

### 3. HELIX Transferred Funds Between Mainstream Exchange Accounts and Darknet Markets

Finally, as noted above, the Indictment plainly states that HELIX transmitted funds to "another . . . person" by allowing users to send funds to "designated recipients."  ECF No. 1, at 2. As the evidence at trial will show, the defendant specifically advertised his service as a method for

---

[12] *See generally Severnoe Sec. Corp. v. London & Lancashire Ins. Co.*, 255 N.Y. 120, 123-24 (1931) ("The situs of intangibles is in truth a legal fiction, but there are times when justice or convenience requires that a legal situs be ascribed to them. . . . At the root of the selection is generally a common sense appraisal of the requirements of justice and convenience in particular conditions.")

transferring bitcoin between mainstream bitcoin exchanges and Darknet markets. This was because the mainstream exchanges conducted anti-money laundering due diligence and would have flagged suspicious activity directly to and from Darknet markets. For example:

- In a Reddit comment first posted on March 23, 2015, and re-posted approximately a dozen times through 2017, the defendant instructed users how to check the "taint" on their bitcoin to ensure that their transactions on a bitcoin exchange could not be linked to their Darknet market activity. The defendant provided an example in which "a user buys bitcoins on coinbase send to a tumbler and tells the tumbler to send to a market address Coinbase(wallet A) -> Tumbler (wallet B) -> Market (wallet C)." Ex. A (Reddit Comments by GramsAdmin-Excerpts).

- The defendant instructed a Reddit user: "You should send bitcoins like this coinbase->Tumber(Helix)->market. That is the fastest way and works." Ex. A.

- The defendant instructed another Reddit user how to send funds from a Coinbase account to a Darknet market through HELIX: "You would enter the market address, then you will be given an address to send the coins to. Send the coins from coinbase to the address you are given." Ex. A.

In each of the above examples, the funds would be transferred from bitcoin addresses held by mainstream bitcoin exchanges to HELIX, and then ultimately remitted to addresses controlled by Darknet marketplace administrators. These examples show that HELIX was broadly used to transfer funds between third parties—particularly from mainstream exchanges to Darknet markets, and vice versa. *See Faiella*, 39 F. Supp. 3d at 4 (characterizing defendant's transfer of bitcoin to customers' accounts on Silk Road as "transfers to a third-party agent" because the Silk Road administrators had control over the users' accounts).

### C.  HELIX Was a Business

The defendant argues (at 4-5) that HELIX was not a "business," but the Indictment clearly alleges that HELIX operated as a business.  *See United States v. Mazza-Alaluf*, 607 F. Supp. 2d 484, 489 (S.D.N.Y. 2009) ("The statute does not define the word "business," which should be afforded its ordinary meaning as an enterprise that operates for profit.").  HELIX was linked to GRAMS, the Darknet search engine also operated by the defendant, and it was generally accessible to the public via the Internet.  ECF No. 1, ¶ 3.  HELIX collected a 2.5% fee on transactions. *Id.* ¶¶ 3, 7.  The defendant advertised and promoted HELIX as a service to counter "LE" tracing and avoid "arrest[] just through bitcoin taint."  *Id.* ¶ 5.  HELIX partnered with Darknet markets including AlphaBay, which sold "a variety of illegal drugs, guns, and other illegal goods," and AlphaBay recommended HELIX to its customers and provided an embedded link to the Tor website for GRAMS-HELIX.  *Id.* ¶ 6.  HELIX operated for more than three years (July 2014 through December 2017) and transferred at least approximately 354,468 bitcoins—more than $311 million at the time of the transactions—on behalf of its customers, including its largest customers, various Darknet markets selling illegal goods and services.  *Id.* ¶ 8.

Indeed, the defendant repeatedly touted the benefits of using a professional service like HELIX to tumble coins:  "Using a tumbler to tumble your coins is like paying a mechanic to change your oil.  You can change your oil yourself and save some money but you will have to get dirty and it will take a lot of your time.  If you use a mechanic you pay more than doing it yourself, but you know it gets done right and quickly without you having to spend any of your time."  Ex. A.  For the defendant now to claim that HELIX was not a "business" strains credulity.

### IV.    The Defendant Does Not Challenge the Indictment Charging Operation of a Money Transmitting Business that Otherwise Involved Funds Derived from a Criminal Offense and Intended To Be Used To Promote Unlawful Activity

Finally, the defendant does not dispute the sufficiency of the Indictment as to the third prong of Count Two.   Under that prong, the defendant is charged with operating a money transmitting business that "[o]therwise involved the transportation and transmission of funds known to HARMON to have been derived from a criminal offense and intended to be used to promote and support unlawful activity," in violation of 18 U.S.C. § 1960(b)(1)(C).   ECF No. 1, at 6.   Far from disputing it, the defendant now openly admits that he was the administrator of HELIX, *see* ECF No. 32, at 3-4.   Abundant evidence—including evidence recited on the face of the Indictment—shows that the defendant intended HELIX to be used to launder funds involved in illegal Darknet drug trafficking.   *See* ECF No. 1, *see also* ECF No. 16 (Gov't Opp. to Def. Mot. To Revoke Detention Order & attached exhibits).   Thus, *regardless* of the Court's decision on the instant motion to dismiss, the undisputed portion of the Indictment charging violation of 18 U.S.C. § 1960(b)(1)(C) cannot be dismissed.   Accordingly, Count Two (and its associated forfeiture authorities) must stand.

### CONCLUSION

For the foregoing reasons, the Court should deny the Defendant's Motion To Dismiss Counts Two and Three for Failure To State an Offense.

Respectfully submitted,

MICHAEL R. SHERWIN
ACTING UNITED STATES ATTORNEY
New York Bar No. 4444188


BY:     */s/ Christopher B. Brown*
        Christopher B. Brown, D.C. Bar No. 1008763
        Assistant United States Attorney
        555 4th Street, N.W.
        Washington, D.C. 20530
        C. Alden Pelker, Maryland Bar
        S. Riane Harper, D.C. Bar No. 230233
        Trial Attorneys, U.S. Department of Justice
        1301 New York Ave., N.W., Suite 600
        Washington, D.C. 20005
        (202) 252-7153 (Brown)
        (202) 616-5007 (Pelker)
        (202) 305-2593 (Harper)
        Christopher.Brown6@usdoj.gov
        Catherine.Pelker@usdoj.gov
        Riane.Harper@usdoj.gov