# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| v. | : | Criminal No. 19-cr-395 (BAH) |
| | : | |
| LARRY DEAN HARMON, | : | |
| | : | |
| Defendant | : | |

## GOVERNMENT'S OPPOSITION TO DEFENDANT'S
## MOTION FOR RELEASE OF FUNDS

The United States of America, by and through its attorney, the Acting United States Attorney for the District of Columbia, respectfully files its opposition to the Defendant's Motion for Release of Funds Needed To Secure Counsel or Alternative Motion for a Hearing, ECF No. 32. In support whereof, the government states as follows:

## BACKGROUND

As explained in the accompanying Opposition to the Defendant's Motion To Dismiss Counts Two and Three, the defendant Larry Dean Harmon ("Harmon" or the "defendant") was indicted on December 3, 2019, on counts of Conspiracy to Launder Monetary Instruments, in violation of 18 U.S.C. § 1956(h); Operating an Unlicensed Money Transmitting Business, in violation of 18 U.S.C. § 1960(a); and Money Transmission Without a License, in violation of D.C. Code § 26-1023(c).

On February 6, 2020, federal law enforcement agents from the Internal Revenue Service-Criminal Investigation ("IRS-CI") and the Federal Bureau of Investigation ("FBI") arrested Harmon and executed three search warrants for Harmon's residence and office properties in the Akron, Ohio area (Harmon leased office space on the second and third floors of a commercial office building in downtown Akron). On the same date, authorities in Belize executed a search of

Harmon's vacation property in Belize pursuant to a Mutual Legal Assistance Treaty ("MLAT") request. On or about February 6, 2020, agents also executed seizure warrants for a number of properties, including a BlockFi Bitcoin Interest Savings Account under Harmon's name. On February 10, 2020, based in part on information discovered through the Ohio search warrants, federal agents executed another search warrant for an apartment Harmon rented in San Mateo, California.

As relevant here, agents recovered a number a cryptocurrency storage devices, including (1) one Trezor seized from Harmon's office space in Akron, Ohio, which was found taped to the underside of a desk using double-sided tape; (2) two Trezors seized from Harmon's vacation property in Belize; and (3) one Ledger Nano seized from Harmon's apartment in San Mateo, California. Agents also found recovery seed words in Harmon's office space.[1]

Subsequently, during the course of this litigation, the Court issued a Restraining Order pursuant to 21 U.S.C. § 853(e)(1)(A) requiring that Harmon provide the government with access to any cryptocurrency within his possession, custody, or control, for safekeeping by the U.S. Marshals Service during the pendency of this proceeding. *See* ECF No. 26 (Apr. 27, 2020 Order), as modified by ECF No. 28 (Apr. 28, 2020 Order). In response to the Court's Restraining Order, Harmon provided credentials that allowed the government to seize certain additional bitcoin wallets.

In total, the government has seized the following bitcoin assets (collectively, the "Seized Bitcoin"), all of which are currently in the custody of the U.S. Marshals Service:

---

[1] A seed key or seed phrase is a list of words used to encode a bitcoin wallet's private keys. Wallet software will typically generate a seed phrase and instruct the user to write it down on paper. The same software can be used to decode the seed phrase and reconstitute the wallet.

- 330.25648625 BTC (after required fees) from Harmon's BlockFi Bitcoin Interest Savings Account;

- 0.18803781 BTC (after required fees) from wallets reconstituted using a set of seed words recovered during the search warrants ("Seed Words A");

- 0.0000414 BTC (after required fees) from wallets reconstituted using a set of seed words recovered during the search warrants ("Seed Words B");

- 0.00234138 BTC (after required fees) from wallets reconstituted a set of seed words recovered during the search warrants ("Seed Words C"); and

- 4,168.9815353 BTC (after required fees) from wallets accessed in part using credentials provided by Harmon in response to the Court's Restraining Order.

The defendant is now moving for the return of 160 BTC for purposes of attorney's fees. *See* ECF No. 32.

## **LEGAL FRAMEWORK**

The Supreme Court has long held that a criminal defendant has no right to property that is subject to forfeiture, even if he needs that property to pay attorney's fees. In *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617 (1989), the Court held that there is no right under the Sixth Amendment to use forfeitable assets to pay for a defendant's counsel of choice: "It is our view that there is a strong governmental interest in obtaining full recovery of all forfeitable assets, an interest that overrides any Sixth Amendment interest in permitting criminals to use assets adjudged forfeitable to pay for their defense." *Id.* at 631. As the Court explained:

> A robbery suspect, for example, has no Sixth Amendment right to use funds he has stolen from a bank to retain an attorney to defend him if he is apprehended. The money, though in his possession, is not rightfully his; the Government does not violate the Sixth Amendment if it seizes the robbery proceeds and refuses to permit the defendant to use them to pay for his defense.

3

*Id.* at 626. In *United States v. Monsanto*, 491 U.S. 600 (1989), the Court held that the government can properly seize and restrain property for forfeiture before trial as long as there is probable cause to believe the assets are subject to forfeiture. *Id.* at 615-16.[2]

At the same time, courts have recognized that a criminal defendant has a *qualified* right to a pretrial probable cause hearing to dispute the government's showing of probable cause, if the defendant needs funds to retain his counsel of choice. *See, e.g.*, *United States v. Monsanto*, 924 F.2d 1186, 1192-98 (2d Cir. 1991) (en banc) ("*Monsanto II*"); *and United States v. E-Gold*, 521 F.3d 411, 419 (D.C. Cir. 2008), *both abrogated in part by Kaley v. United States*, 571 U.S. 320 (2014). These hearings are sometimes called "*Monsanto* hearings." In *Kaley v. United States*, the Court explained that probable cause to believe property is subject to forfeiture reflects two findings: "(1) that the defendant has committed an offense permitting forfeiture, and (2) that the property at issue has the requisite connection to that crime." 571 U.S. at 323-24. *Kaley* held that a defendant in an indicted case was not entitled to a pretrial hearing to challenge the grand jury's finding of probable cause on the first question, whether the defendant committed the charged offense. *Id.* at 322; *see also id.* at 331 ("The grand jury's determination is conclusive."). But *Kaley* left open the option for a pretrial hearing limited to the second question, whether the property is traceable to the offense, and courts have continued to hold *Monsanto* hearings on the traceability of seized property. *See id.* at 324 & n.3; *see also, e.g.*, *United States v. Bikundi*, 125 F. Supp. 3d 178 (D.D.C. 2015) (conducting pretrial review of whether property is traceable to offense).

---

[2] More recently, the Court held in *Luis v. United States*, 136 S. Ct. 1083 (2016), that the government cannot restrain "untainted" substitute property if the defendant asserts a valid Sixth Amendment need for the property to pay for his counsel of choice. Luis did not overrule *Caplin & Drysdale* or *Monsanto*. *See id.* at 1089-92. Rather, *Luis* carved out an exception for property seized solely as "substitute" assets, as opposed to property that is directly subject to forfeiture because it represents criminal proceeds, facilitating property, or other property tied to the offense. *See Luis*, 136 S. Ct. at 1089-90. Here, *Luis* is not relevant because the government is not seeking to restrain the Seized Bitcoin as "substitute assets," but as property "involved in" the defendant's money laundering and unlicensed money transmitting offenses.

The right to a pretrial hearing, however, is not absolute. The defendant bears a threshold burden of establishing financial need. As Judge Friedman summarized in *United States v. Emor*, 794 F. Supp. 2d 143 (D.D.C. 2011), "[e]very court that has addressed the issue has found that a defendant's merely conclusory allegation that he lacks the funds to retain counsel of choice is insufficient to trigger the need for a Monsanto hearing; in order to obtain a hearing the defendant must present some evidence that he will be deprived of counsel of choice if he cannot access the seized assets." *Id.* at 149 (collecting cases); *see also, e.g.*, *E-Gold*, 521 F.3d at 417, 421 (defendant has right to hearing where "need is clearly established," and where "access to assets is necessary for an effective exercise of the Sixth Amendment right to counsel"); *United States v. Jones*, 160 F.3d 641, 647 (10th Cir. 1998) (defendant "bears the burden of persuasion" of "demonstrat[ing] to the court's satisfaction that she has no assets, other than those restrained, with which to retain private counsel and provide for herself and her family"). The defendant's right to a pretrial hearing is legally contingent on satisfying this threshold burden: "If a defendant fails to persuade the court on this point, then the private interest of the *Mathews* calculus drops out of the picture, tipping the balance of interests against a post-restraint hearing." *Jones*, 160 F.3d at 647 (referring to Due Process balancing test in *Mathews v. Eldridge*, 424 U.S. 319 (1976)).

Thus, a *Monsanto* proceeding involves two steps: first, the defendant bears the burden of establishing financial need; and second, the defendant can litigate whether there is probable cause to support the requisite connection between the property and the crime.[3] At a *Monsanto* hearing:

---

[3] The government assumes that it bears the burden of establishing probable cause as to the connection between the property and the crime, but courts are not in agreement. *Compare United States v. Bonventre*, 720 F.3d 126, 131 (2d Cir. 2013) (government bears "relatively modest burden"); *with Jones*, 274 F.3d at 805 (defendant has "opportunity . . . to prove by a preponderance of the evidence that the government seized untainted assets without probable cause"). In *E-Gold*, the D.C. Circuit did not directly address the question, but suggested that the defendant would bear the burden of making a "successful showing" at a hearing. 521 F.3d at 418.

- The legal standard is probable cause. *Monsanto*, 491 U.S. at 615-16. As *Kaley* emphasized, probable cause requires only a "fair probability." 571 U.S. at 338. It is "not a high bar," and serves "only a gateway function." *Id.* at 338-39. "That is why a grand jury's finding of probable cause to think that a person committed a crime can be made reliably without an adversary hearing; it is and has always been thought sufficient to hear only the prosecutor's side." *Id.* at 338 (internal quotations and alterations omitted). "Circumstantial evidence and inferences therefrom are good grounds for a finding of probable cause in a forfeiture proceeding." *United States v. Brock*, 747 F.2d 761, 763 (D.C. Cir. 1984) (per curiam).

- The Federal Rules of Evidence do not apply, and hearsay may be relied on to establish probable cause. *See United States v. Walsh*, 712 F.3d 119, 124-25 (2d Cir. 2013); *Monsanto II*, 924 F.32d at 1198.

- Courts accept submission of an affidavit to establish probable cause prior to the *Monsanto* hearing. *See United States v. Dupree*, 2011 WL 3235637, at *3, 6 n.2 (E.D.N.Y. July 27, 2011) (permitting government to satisfy its burden at a *Monsanto* hearing by submitting a pre-hearing affidavit); *United States v. Clarkson Auto Electric, Inc.*, 2012 WL 345911, at *1, 3 (W.D.N.Y. Feb. 1, 2012) (same), *aff'd*, *United States v. LaVilla*, 553 F. App'x 45 (2d Cir. 2014); *United States v. Contents of Accounts*, 2010 WL 2556849, at *11 (W.D. Ky. June 8, 2010) (submission of agent's affidavit met the government's initial burden at the *Monsanto* hearing); *cf. United States v. $40,000*, 763 F. Supp. 1423, 1428 (S.D. Ohio 1991) (information provided in affidavit, which was hearsay, supported finding of probable cause for forfeiture). Courts typically require that the affiant be made available for cross-examination. *See Dupree*, 2011 WL 3235637, *7 (cross-examination provided the

defendant with the opportunity to challenge government's establishment of probable cause via affidavit); *Clarkson Auto*, 2012 WL 345911, *2, 4 (defendant was given opportunity to cross-examine the government's affiant). In cases where the government's affidavit made a clear showing, courts have found probable cause existed prior to the *Monsanto* hearing. *See Dupree*, 2011 WL 3235637, *6 (affidavit established probable cause as to the forfeitability of the funds); *Contents of Accounts*, 2010 WL 2556849, *11 (submission of agent's affidavit met the government's initial burden at the *Monsanto* hearing to establish probable cause). In these cases the *Monsanto* hearing was limited to cross-examination of the affiant or the presentation of evidence by the defendant. *See Dupree*, 2011 WL 3235637, *6-7 (given that court found affidavit established probable cause, *Monsanto* hearing was limited to cross-examination and presentation of evidence or testimony by defendant); *Contents of Accounts*, 2010 WL 2556849, *11 (defendant was required to call and question witnesses, or offer other relevant testimony or evidence to attack the facts supporting the initial finding of probable cause).

## ARGUMENT

**I.     The Defendant Has Not Carried His Burden of Establishing Financial Need**

First, the defendant has not carried his burden of establishing financial need to retain his counsel of choice. *See Jones*, 160 F.3d at 647. The declaration submitted in support of his motion (by the defendant's wife, not the defendant himself) claims the defendant "has no other income or assets from which to pay for Perkins Coie to represent him." ECF No. 32-1 (M. Harmon Decl.). But evidence indicates that the defendant does have access to other assets—namely, the approximately 712.6 BTC that he secretly transferred from HELIX-derived bitcoin wallets in April

2020, and has not provided to the government in response to the Court's April 27, 2020 Restraining Order, as modified on April 29, 2020, *see* ECF Nos. 26, 28.

As summarized in the government's Motion for Emergency Status Hearing on the Defendant's Conditions of Release and Restraining Order To Preserve Cryptocurrency Assets for Forfeiture, ECF No. 23; Special Agent Matthew Price's declaration in support of that motion, ECF No. 23-1; and additional evidence summarized below, the government believes the defendant himself secretly transferred approximately 712.6 BTC after being released on bond. Those funds have not been recovered.

- During the course of this investigation, IRS-CI identified 16 Bitcoin wallets containing approximately 4,877 BTC, which it traced to HELIX prior to the defendant's arrest on February 6, 2020, based on subpoena returns, email search warrants, and searches of Harmon's properties in Ohio, California, and Belize. ECF No. 23-1, at 1-2.

- Pursuant to search warrants and an MLAT request executed on the date of the defendant's arrest, February 6, 2020, IRS-CI seized, *inter alia*, three Trezor cryptocurrency storage devices. *Id.* at 3. The Trezor devices had security features enabled, including layers of encryption, "hidden wallets" stored within the device, and the "passphrase" feature, which allows a user to create unlimited hidden wallets within each Trezor device, each protected by its own passphrase in addition to seed recovery keys. *Id.*; *see also* ECF No. 16, at 23 (discussing defendant's blog postings on secret wallets and recovery seeds).

- On February 11, 2020, during the defendant's initial detention hearing in the Northern District of Ohio, defense counsel confirmed that the defendant had the ability to "unlock" the seized Trezor devices. ECF No. 16-1 (2/11/20 Det. Hr'g Tr.), at 86 ("We have, just for the Court's edification, we have offered to the government to unlock those devices.").

- On March 13, 2020, the defendant was released on bond. Among the conditions of release imposed by the Court were restrictions on using Internet-connected devices or conducting any cryptocurrency transactions. ECF No. 20, at 2.

- On March 20, 2020 and March 26, 2020, shortly after he was released on bond, the defendant logged onto his Dropbox cloud storage account from Internet Protocol (IP) address 65.31.4.127. This IP address corresponds to a "linked computer" the defendant associated with his Dropbox account on February 3, 2020, shortly before he was arrested on February 6, 2020. *See* Ex. A (Dropbox, Inc. subscriber records for Larry Harmon), at 2-3. Among other things, Dropbox cloud storage can be used to store passwords, recovery seeds, and other credentials.

- Beginning on or about April 19, 2020 and continuing through April 24, 2020, IRS-CI observed transactions liquidating 8 of the 16 HELIX-derived bitcoin wallets described above, totaling approximately 712.6 BTC (worth approximately $4.9 million at the time). ECF No. 23-1, at 3. Each of the *eight* wallet addresses would have required its own private key to execute the transaction, making it impossible to believe an unrelated third party could have orchestrated these transactions. *See* ECF No. 25, at 2.

- On April 26, 2020, the government sent an email to defense counsel alerting him to the transfers and asking for the defendant's position on an emergency restraining order and a telephonic status hearing. The government filed its motion the following day, on April 27, 2020. ECF No. 23.

- On April 27, 2020, the defendant again logged into his Dropbox account, from the same IP address as before. *See* Ex. A, at 2.

- On April 29, 2020, following the emergency status hearing in this case and issuance of the Court's restraining order, the defendant through counsel conveyed an encrypted PDF to the government, containing cryptocurrency access credentials. Using the credentials provided by the defendant, in combination with other information obtained in the course of the investigation, IRS-CI was able to access three hidden wallets stored on the Trezor device that was seized from the defendant's office space on the premises of 57/59 Market Street, 2nd Floor, Akron, Ohio. The government successfully seized approximately 4,168.9815353 BTC from these hidden wallets. *See* ECF No. 38, at 1. This seized bitcoin was then transferred to the custody of the U.S. Marshals Service. *Id.*
- However, the defendant did not provide credentials to recover the missing 712.6 BTC that was secretly transferred between April 19, 2020 and April 24, 2020. ECF No. 38, at 3.
- IRS-CI was also able to view transaction history for the hidden wallets found on the defendant's Trezor device. The transaction history showed that the secret transfers between April 19, 2020 and April 24, 2020 had been made out of the *same* three hidden wallets on the Trezor device that were later accessed by IRS-CI in part by using the defendant's credentials. ECF No. 38, at 3-5.

The evidence and the damning timing of these transactions confirm that the defendant himself secretly transferred the missing 712.6 BTC, and he has refused to provide it to the government under the terms of the Court's Restraining Order.

To be sure, the government's position is that *all* of the defendant's cryptocurrency assets are subject to forfeiture as property "involved in" his money laundering conspiracy and unlicensed money transmitting offenses, and should be secured by the U.S. Marshals Service for safekeeping during the pendency of this case. But the defendant cannot claim (vicariously) that he "has no

other income or assets" when he, in fact, has access to millions of dollars in cryptocurrency assets. And the existence of undisclosed cryptocurrency assets raises questions about what *other* assets, including non-cryptocurrency assets, the defendant has at his disposal but is unwilling to disclose.

Unless the defendant addresses these questions, he cannot carry his threshold burden, and he has no right to a probable cause hearing.[4] *See, e.g.*, *Emor*, 794 F. Supp. 2d at 150 (defendant "misunderstands the nature of the *threshold* requirement; there is no hearing until the defendant has *first* made the requisite showing, which he has not") (emphasis in original). The Court need not consider his motion any further.

## II. The Seized Bitcoin Is Property "Involved In" Harmon's Operation of an Unlicensed Money Transmitting Business

The defendant has declined to challenge the forfeitability of the Seized Bitcoin under Count Two of the Indictment. *See* ECF No. 32, at 7 n.7 (defendant "makes no arguments related to the traceability of assets to that offense in the present motion").[5] The defendant apparently concedes that, if the Court denies the defendant's motion to dismiss Count Two, *see* ECF No. 31, then the Seized Bitcoin is subject to forfeiture pursuant to the broad forfeiture authority associated with that count—specifically, forfeiture of "any" property "involved in" a violation of 18 U.S.C. § 1960. *See* ECF No. 1, at 7; 18 U.S.C. § 982(a)(1).

Courts have repeatedly affirmed the broad forfeiture authority under § 982(a)(1). Operation of an unlicensed money transmitting business in violation of § 1960 is considered a

---

[4] The defendant has a Fifth Amendment right not to put himself on the record under penalty of perjury, but the Supreme Court has held that, "while the assertion of the Fifth Amendment privilege against compulsory self-incrimination may be a valid ground upon which a witness . . . declines to answer questions, it has never been thought to be in itself a substitute for evidence that would assist in meeting a burden of production." *United States v. Rylander*, 460 U.S. 752, 758 (1983).

[5] At the May 29, 2020 status hearing, defense counsel orally reiterated that the defendant was not challenging forfeiture under Count Two. The defendant cannot belatedly raise a new challenge in his reply brief. *See N.Y. Rehabilitation Care Mgmt., LLC v. NLRB*, 506 F.3d 1070, 1076 (D.C. Cir. 2007) (arguments raised for the first time on reply are waived "in order to prevent the 'sandbagging' of another party").

"continuing offense." *United States v. Elfgeeh*, 2004 WL 3767299, at *9 (E.D.N.Y. Apr. 13, 2004). Because the offense encompasses the entire operation of the illegal business, forfeiture of any property "involved in" the offense is similarly broad—including any property involved in the business as a whole, regardless of its purpose or whether it was involved in specific transactions. *See, e.g.*, *United States v. Elfgeeh*, 515 F.3d 100, 122, 138-39 (2d Cir. 2008) ("all assets that passed through" account belonging to unlicensed hawala were subject to forfeiture); *United States v. 50.44 Bitcoins*, 2016 WL 3049166, at *2 (D. Md. May 31, 2016) (bitcoins seized from married couple that operated unlicensed Darknet virtual currency exchange were subject to forfeiture "[b]ecause the business operated by [the defendants] . . . was not registered to transmit money as required by state and federal law"); *United States v. $829,442.42 in U.S. Currency*, 2013 WL 2446486, at *8-9 (D. Conn. June 5, 2013) (bank accounts belonging to unlicensed money transmitting business were subject to forfeiture in their entirety); *United States v. $715,031.27*, 587 F. Supp. 2d 1275, 1276-78 (N.D. Ga. 2008) ("entire" bank accounts belonging to unlicensed money transmitting business were subject to forfeiture).

Here, the defendant openly admits (at 3-4) that he was the administrator of HELIX, and he does not dispute that the Seized Bitcoin traces back to HELIX. Based on the sweeping terms of § 982(a)(1), any bitcoin the defendant accumulated through HELIX—from his 2.5% commission fees or otherwise—would be property "involved in" operation of the illegal business and subject to forfeiture. This Court should therefore deny the instant motion based on Count Two alone.

### III. The Seized Bitcoin Is Property "Involved In" Harmon's Money Laundering Conspiracy

Even if Count Two were dismissed, the Seized Bitcoin is still subject to forfeiture under Count One. That count charges the defendant with engaging in a money laundering conspiracy from at least 2014 through 2017 to promote and to launder the proceeds of drug trafficking

12

offenses, in violation of 18 U.S.C. § 1956(h). ECF No. 1, at 4-5. All property "involved in" this ongoing conspiracy is subject to forfeiture pursuant to 18 U.S.C. § 982(a)(1). *Id.* at 7.

### A. Section 982(a)(1) Requires Forfeiture of All Property "Involved In" the Entire Money Laundering Conspiracy

In general, "[m]oney laundering forfeiture pursuant to § 982(a)(1) applies to a larger class of property than proceeds forfeiture." *United States v. Coffman*, 859 F. Supp. 2d 871, 875 (E.D. Ky. 2012). Property involved in a money laundering offense includes "the money or other property being laundered (the corpus), any commissions or fees paid to the launderer, and any property used to facilitate the laundering offense." *United States v. Puche*, 350 F.3d 1137, 1153 (11th Cir. 2003) (internal citation omitted).

Moreover, the defendant is charged in this case with money laundering *conspiracy* under 18 U.S.C. § 1956(h). Money laundering conspiracy is also a "continuing offense." *See United States v. Robertson*, 67 F. App'x 257, 269 (6th Cir. May 9, 2003) (unpublished) (rejecting argument that § 1956(h) indictment must allege "specific, discrete financial transactions," because it is "continuing offense"); *United States v. McGoff*, 831 F.2d 1071, 1078 (D.C. Cir. 1987) ("The classic example of a continuing offense is conspiracy."). Thus, the scope of forfeiture under § 982(a)(1) for money laundering conspiracy is similar to the broad scope of forfeiture under the same statute, § 982(a)(1), for operation of an unlicensed money transmitting business: it applies to all property "involved in" the *conspiracy*, not specific transactions.

Courts have consistently construed § 982(a)(1) in this way, applying the forfeiture statute to all of a conspiracy's transactions or assets, rather than parsing through individual transactions—especially in cases where, as here, the conspiracy operated in the form of an ongoing business. *See, e.g.*, *United States v. Baker*, 227 F.3d 955, 969-70 ("Specifically, . . . *all* of the funds from Baker's prostitution business over the years—both the proceeds from credit card and ATM

transactions and other proceeds—were illegal, and as a result Baker laundered all of them. All of these funds were thus 'involved in' the money laundering conspiracy, not just the specific credit card transactions the government proved were for prostitution services and not just the specific monies the government proved were laundered."); *United States v. Garza-Gonzalez*, 512 F. App'x 60, 67 (2d Cir. Feb. 21, 2013) (unpublished) ("Datta used his perfume business to conceal the fact that he was laundering the proceeds of drug transactions, and the district court did not err in viewing the business's cash receipts during the period in question as 'property . . . involved in' Datta's conspiracy to violate § 1956. Those cash receipts, including the $7 million in drug money, totaled $29,505,265."); *United States v. Coffman*, 859 F. Supp. 2d 871, 879 (E.D. Ky. 2012) ("[T]he conspiracy to commit money laundering conviction . . . is not based on or limited to specific transactions, but encompasses the whole of Coffman's scheme and his attempts and plans to conceal and disguise the nature, location, source, ownership and control of the proceeds of the fraud."); *United States v. Swank Corp.*, 797 F. Supp. 497, 502 (E.D. Va. 1992) ("The ability to forfeit a business entity which is used to facilitate the offense of money laundering is well established."). These courts have declined to limit forfeiture to a subset of transactions within the conspiracy. As the Seventh Circuit explained in *Baker*, even funds that were not part of the predicate specified unlawful activity can still be "involved in" the money laundering conspiracy in a number of ways, including by being used to "bankroll" the ongoing conspiracy. *See* 227 F.3d at 969 ("[T]he funds that were not from credit card and ATM transactions facilitated the conspiracy by helping to further the prostitution business . . . In short, these funds helped 'bankroll' the conspiracy.").

**B. The Seized Bitcoin Represents the Defendant's Commission Fee Income from the HELIX Money Laundering Conspiracy**

Here, *all* of the Seized Bitcoin represents property "involved in" the ongoing HELIX conspiracy from 2014 through 2017. First, all funds involved in HELIX should be considered part of the long-running HELIX drug trafficking conspiracy.[6] HELIX was a business created for the explicit purpose of allowing Darknet customers evade law enforcement by laundering their bitcoins—as evidenced by HELIX's partnership and coordination with AlphaBay, the defendant's extensive customer support efforts directed at Darknet drug customers, and the defendant's own statements (under the moniker GramsAdmin) confirming that "the Darknet is 90% drugs and illegal items for sale" and that HELIX was designed to allow users to buy and sell drugs without risking arrest through "bitcoin taint." ECF No. 1, at 2-3; ECF No. 16, at 9 & ECF No. 16-3. As discussed in further detail below, all of the largest *depositors* into HELIX were confirmed Darknet markets, and additional evidence shows that a significant share of both incoming *and outgoing* funds were involved in Darknet drug trafficking.

Second, the Seized Bitcoin represents commissions paid to the defendant for his operation of HELIX—and thus falls within the heartland of property "involved in" the money laundering conspiracy. *See Puche*, 350 F.3d at 1153 (forfeiture includes "commissions or fees paid to the launderer"). As alleged in the Indictment, HELIX laundered at least 354,468 bitcoins while charging a 2.5% fee, which would have generated approximately 8,861 bitcoins in illegal proceeds. *See* ECF No. 1, at 3. The attached Agent Declaration explains how IRS-CI investigators identified HELIX's use of exchange accounts at the bitcoin exchanger HitBTC to conduct bitcoin laundering transactions, and that the defendant retained a 2.5% fee for each transaction. Agent Decl. at 2, 7.

---

[6] For purposes of the defendant's motion, the grand jury's Indictment is "conclusive" and the defendant cannot challenge the scope, timing, or nature of the money laundering conspiracy as alleged in Count One. *See Kaley*, 571 U.S. at 331.

IRS-CI traced the transaction fees retained by the defendant to 16 bitcoin wallet addresses identified in the April 27, 2020 Price Declaration as "Harmon Wallets" 1 through 16. *Id.*; *see also* ECF No. 23-1. This tracing was confirmed when agents found records of 13 of the 16 previously identified "Harmon Wallets" on the Trezor device seized from the defendant's office, ECF No. 38, and when the defendant turned over credentials pursuant to the Court's Restraining Order to access 5 of the 16 "Harmon Wallets," Agent Decl. at 7.

It is important to note that the Seized Bitcoin represents the direct proceeds of the defendant's money laundering conspiracy—his 2.5% commission fee income. This is not a situation in which the government is seeking to forfeit, for example, the corpus of property involved in a money laundering transaction that may have been comingled with clean or "untainted" funds. In such cases, courts appropriately question whether the comingling was part of the laundering scheme or merely incidental. *See, e.g.*, *Bikundi*, 125 F. Supp. 3d at 194-95. Here, by contrast, the Seized Bitcoin in this case represent the "commissions or fees paid to the launderer" and clearly fall within the scope of property subject to forfeiture under § 982(a)(1). *Puche*, 350 F.3d at 1153.

### C. Forfeiture of Property "Involved In" the HELIX Money Laundering Conspiracy Is Not Limited by the Government's Conservative Calculation that HELIX Laundered at Least $21 Million in Deposits Directly from Darknet Markets

The defendant's only argument is the inaccurate claim that most of the bitcoin traced to HELIX was "not linked to Darknet Markets." ECF No. 32, at 3; *see also id.* at 8-9. This argument fails to address the broad scope of 18 U.S.C. § 982(a)(1), which requires the Court to forfeit all property "involved in" the entire HELIX money laundering conspiracy. It also misstates the government's actual claims regarding certain *deposits* into HELIX from Darknet markets. As explained below, HELIX laundered a far larger volume of drug proceeds than the relatively conservative $21 million figure would suggest. HELIX, moreover, was thoroughly permeated by

16

illegality as a Darknet business designed and operated for the purpose of facilitating drug money laundering.

The defendant focuses on the detention hearing exhibit and Special Agent Haynie's testimony showing that the 10 largest depositors into HELIX—accounting for at least 43,319.68 BTC in deposits, or more than $21 million at the time of the transactions—were all Darknet markets that trafficked in drugs and other illegal items. *See* ECF No. 16-4, at 6 (Det. Hr'g Ex. 5). But that is a conservative estimate and captures only a portion of the drug proceeds that were actually laundered through HELIX.

First, the 43,319.68 BTC figure represents only bitcoin deposited *directly* from Darknet markets to bitcoin. It does not capture funds that were transferred indirectly from Darknet markets, including funds sent through intermediary addresses (*i.e.*, more than one "hop") before being laundered through HELIX. *See* Agent Decl. at 5. Indeed, as the attached Agent Declaration documents, the defendant routinely instructed his customers to engage in multi-step transactions through HELIX. *See id.* at 5-6.

Second, the 43,319.68 BTC figure is limited to funds deposited *into* HELIX from Darknet markets. *See* ECF No. 16-4, at 6 ("Top 10 Depositors . . ."); 2/11/20 Tr., at 25:19-21 (chart shows bitcoin "traced *from* illegal marketplaces that were *deposited* into the Helix mixer") (emphases added). These deposits are likely from Darknet vendors. As Agent Haynie testified, vendors selling illegal drugs on Darknet markets earn proceeds in the form of bitcoin, but face a challenge in converting their illicit bitcoin proceeds into U.S. dollars through ordinary virtual currency exchanges: "[I]f they went directly from AlphaBay to an exchange, a company that exchanges bitcoin for U.S. dollars," the exchange "would see that the money is coming from AlphaBay," and might close the account and/or file a suspicious activity report. 2/11/20 Tr., at 64:21-65:2. To

17

avoid this risk, Darknet vendors could launder their illegal profits through HELIX "to kind of erase AlphaBay from their history, and then they can go through the exchange and cash out." *Id.* at 65:3-5. The 43,319.68 BTC traced *from* Darknet markets *to* HELIX captures only one side—the vendor side—of the equation.

The figure does not include additional drug money laundering accomplished on the buyer side, primarily by individuals attempting to send bitcoin from mainstream exchanges or other Clearnet sources to Darknet markets. As Agent Haynie testified, HELIX could be used not only by Darknet vendors, but also by buyers. 2/11/20 Tr. at 65:6-9. Indeed, a sampling of the defendant's Reddit posts shows that he specifically advertised HELIX as a method for transferring bitcoin *from* mainstream exchanges *to* Darknet markets. This was to avoid due diligence by the exchanges which would have flagged suspicious customer expenditures made directly to Darknet markets. *See* Agent Decl. at 3, 5-6. The defendant specifically marketed HELIX as a way for Darknet drug purchasers to avoid being arrested by having their purchases traced back to them:

- "No one has ever been arrested just through bitcoin taint, but it is possible and do you want to be the first? If you get a controlled delivery and you deny ordering the package the bitcoin taint will be the evidence they need to prove you ordered it. It is better to be safe than sorry no matter which tumbler or tumbling method you use." ECF No. 16-5.

None of these transactions—which were specifically tied to Darknet markets and intended to promote and launder Darknet drug trafficking—are included in the 43,319.68 BTC traced from Darknet markets to HELIX.[7]

---

[7] The same fallacy underlies the defendant's reliance (at 8-9) on a 2019 Chainalysis webinar (which is, in itself, of questionable relevance to the defendant's operation of HELIX on the Darknet from 2014 through 2017). The Chainalysis study referenced in the webinar captured only funds sent *from* Darknet markets (or other sources) *to* mixers. The same study also found that more than 26% of deposits into mixers came from "other mixers"—hardly an indication of legitimate activity. And it found that 40% of deposits into mixers came from exchanges, which is consistent with the evidence cited above that HELIX was used by exchange customers to tumble their coins in order to conduct Darknet drug purchases.

Indeed, the HELIX business model was designed to facilitate Darknet drug trafficking. HELIX operated in the shadows on the Darknet. HELIX was a companion service to GRAMS, the defendant's Darknet search engine project. ECF No. 1, at 2. The defendant characterized the Darknet as "90% drugs and illegal items for sale," and explained that he created GRAMS for the *purpose* of making "blackmarket sites" more accessible to buyers. *See* ECF No. 16-3 ("I created grams because 90% of the darknet was behind blackmarket sites which required a login to view. This made it unsearchable by normal search engines. . . . I wanted to make it easier for users to use the darknet."). HELIX partnered with the Darknet market AlphaBay, which directed its users to an embedded link to the Tor website for HELIX. ECF No. 1, at 3. The defendant communicated with administrators of other Darknet markets, including Cloud 9 market and Evolution market, about plans to integrate HELIX into the withdrawal systems for those Darknet markets as well. *See* Agent Decl. at 4. In sum, HELIX was created, advertised, and used as a tool to facilitate Darknet drug trafficking.

Finally, it is worth emphasizing that 43,319.68 BTC—more than $21 million at contemporary prices—is *by itself* a monumental volume of drug laundering transactions. Almost any business that laundered more than $21 million in drug proceeds over the course of three years would be considered a major money laundering organization. And, as the evidence above shows, HELIX actually engaged in Darknet drug money laundering on a far larger scale than the government's conservative calculation might suggest. It is appropriate under the broad forfeiture authority of § 982(a)(1) to seize and forfeit all of the defendant's illicit bitcoin proceeds from this massive money laundering conspiracy.

## **CONCLUSION**

For the foregoing reasons, the Court should deny the Defendant's Motion for Release of Funds Needed To Secure Counsel or Alternative Motion for a Hearing.

        Respectfully submitted,

        MICHAEL R. SHERWIN
        ACTING UNITED STATES ATTORNEY
        New York Bar No. 4444188

BY:    */s/ Christopher B. Brown*
        Christopher B. Brown, D.C. Bar No. 1008763
        Assistant United States Attorney
        555 4th Street, N.W.
        Washington, D.C. 20530
        C. Alden Pelker, Maryland Bar
        S. Riane Harper, D.C. Bar No. 230233
        Trial Attorneys, U.S. Department of Justice
        1301 New York Ave., N.W., Suite 600
        Washington, D.C. 20005
        (202) 252-7153 (Brown)
        (202) 616-5007 (Pelker)
        (202) 305-2593 (Harper)
        Christopher.Brown6@usdoj.gov
        Catherine.Pelker@usdoj.gov
        Riane.Harper@usdoj.gov