UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                 Plaintiff,<br><br>v.<br><br>LARRY DEAN HARMON,<br><br>                 Defendant. | Criminal No. 2019-CR-00395 |

## DEFENDANT'S REPLY IN SUPPORT OF
## MOTION FOR RELEASE OF FUNDS

Mr. Harmon's Motion for Release of Funds (Doc. 32) (the "Motion") showed why due process entitles Mr. Harmon to receive a post-seizure evidentiary hearing to challenge the forfeitability of his assets because he "ha[s] demonstrated the inability to retain counsel of" his "choice without access to the seized assets." *United States v. E-Gold, Ltd.*, 521 F.3d 411, 415 (D.C. Cir. 2008), *abrogated by Kaley v. United States*, 571 U.S. 320, 134 S. Ct. 1090, 188 L. Ed. 2d 46 (2014).

In filings since then aimed at opposing the Motion, the Government has argued both that Mr. Harmon has the assets with which to hire undersigned counsel and that, even if he does not, Mr. Harmon still has no right to use the assets seized from him for this limited purpose. *See generally* Doc. 40 (Government's Opposition to Motion), Doc. 44 (Government's Supplemental Opposition to Motion). But none of the Government's filings are sufficient to change the fact that Mr. Harmon does not have any assets with which to hire counsel of his choosing; nor have the Government's filings altered the fact that the seized bitcoin, if released, would be used to pay for counsel. Thus, Mr. Harmon is entitled to a hearing at which, in order to prevent Mr. Harmon from using them to retain counsel, the Government must demonstrate that "probable cause exists to believe that the assets in

dispute are traceable or otherwise sufficiently related to the crime charged in the indictment." *Kaley*, 571 U.S. at 324.

And because the Government is unlikely to meet that burden as to *all* of the seized assets, Mr. Harmon should, following the hearing, be entitled to the release of assets he respectfully seeks.

## I.      Mr. Harmon has Met His Burden to Show that He Is Entitled to a Hearing.

Mr. Harmon has shown that "(1) he lacks the funds he requires to hire counsel of choice, and, as a necessary corollary, (2) the seized assets, if released, would be used to pay his legal fees." *United States v. Emor*, 794 F. Supp. 2d 143, 149 (D.D.C. 2011); *see also E-Gold, Ltd.*, 521 F.3d at 415. The Government does not, and cannot, dispute that this two-part showing is all that is required to entitle Mr. Harmon to a hearing.

### A.      The Declaration of His Wife Establishes That He has No Assets With Which to Retain Counsel, Which is Unsurprising in Light of the Government's Investigation and Seizures.

In this case, Mr. Harmon's wife submitted a detailed declaration, outlining that Mr. Harmon is unemployed and has no other income or assets to pay Perkins Coie.[1] [*See generally* Doc. 32 Ex. A] Of course that is unsurprising where, as here, the Government has accused a defendant of a significant financial crime and has endeavored to seize as much of his property as it can.

### B.      Mr. Harmon Had Nothing to Do With the Missing Bitcoin and Has Assisted the Government in Trying to Recover it and Identify Who is Responsible.

The only real issue the Government takes (at 7–8) with Mr. Harmon's showing on this point is that "defendant does have access to other assets—namely, the approximately

---

[1]      The Government seems to suggest that this affidavit is insufficient because it does not come from Mr. Harmon himself. But the Government cites no authority, and indeed none exists, for the proposition that a Defendant seeking the release of assets is required to prove his financial circumstances exclusively through his own statements.

712.6 BTC that he secretly transferred from HELIX-derived bitcoin wallets in April 2020." But this claim is neither factually true nor legally persuasive.

While the Government's theory of the missing bitcoin continues to evolve, Mr. Harmon's has always been the same: he had nothing to do with it. Weeks ago, the Government's first theory regarding these missing bitcoins was to insist that Larry Harmon "himself secretly transferred approximately 712.6 BTC after being released on bond." Doc. 40 at 8. Since learning of these bitcoin transfers, Larry Harmon has consistently denied being involved in them and has consistently remained terrified of being wrongly accused of having made them. Now, despite mounting evidence to corroborate Defendant's unwavering denials of involvement, the Government continues to insist that, even if its initial theory that Defendant himself took the bitcoin was wrong, Defendant must have been involved. But Mr. Harmon had nothing to do with these bitcoin transfers, and they are no reason to deny him access to the funds he needs to retain counsel.

Far from being involved, Mr. Harmon learned of the transfers from the Government and has attempted, with counsel, to assist the Government in understanding what happened. As the Supplemental Opposition states, "[o]n May 13, 2020 defense counsel first communicated" to the Government that "INDIVIDUAL A alone was responsible for the transfers." Doc. 45 at 3. Of course, Defendant did not hide from the Government his beliefs about who Individual A was. Rather Defendant was, we believe, the first person to identify the responsible person as *his brother*, Gary Harmon. Then, following Mr. Harmon's explanation that he had nothing to do with these transfers and his identification of his own brother as the likely perpetrator, the Government got "an unsolicited tip from a third party, who was in communication with both the defendant and INDIVIDUAL A, to the effect that INDIVIDUAL A transferred the 712.6 BTC without the defendant's knowledge or permission." Doc. 45 at 3. In other words, an unsolicited tip from a third-party Government source now corroborates what Defendant has maintained all along—he had no part in the movement of the 712.6 BTC.

The details of this tip, disclosed to counsel by the Government but as yet unshared with the Court, further corroborate that Defendant had nothing to do with the BTC transfers. After hearing from the Defense on May 13, 2020 that INDIVIDUAL A alone was responsible for the transfers, the Government spoke on May 18, 2020 with a source who "believes Larry Harmon's brother, Gary Harmon is responsible for moving…bitcoin that belonged to Larry." Ex. A (May 18, 2020 Memorandum of Conversation).  In other words, Defendant was so terrified of the consequences and so certain of who was responsible, that he named his own brother as the likely responsible party. That information was then corroborated by an independent source.

Past its speculations, the Government's Supplemental Opposition justifies its unwillingness to believe the Defendant was uninvolved by saying, among other things, that "defendant received [certain email] messages" and that Defendant "accessed his Dropbox cloud storage account on March 20, 2020 [and] March 26, 2020." (Doc. 45 at 2-3). But these allegations similarly fail to stand for the proposition that Defendant was involved. That Defendant *received* an automatic reply email from Trezor shows that someone accessed the Trezor wallet. But that we already knew because the bitcoins moved. It does nothing to show, and indeed could not show, that someone was Mr. Harmon. As to the Dropbox logins, those are similarly innocuous and do not prove that Defendant was involved with any of the transfers of missing bitcoin.[2]

### C.   Even if he had been Involved With the Bitcoin Transfers, He Could Not Use Transferred Bitcoin to Retain Counsel.

Furthermore, even if he *did* have access to it, he couldn't use it to pay for counsel; certainly undersigned counsel would not accept it. *See Caplin & Drysdale, Chartered v. United States,* 491 U.S. 617, 626 (1989) (noting among other things that no lawyer has a

---

[2]     Defendant has continually offered to assist the Government in investigating who is responsible for these transfers.  Defendant has named his brother as the likely perpetrator and he has offered his mother as a corroborating witness.  Further Defendant has offered to proffer with the Government on this topic.

right to accept the proceeds of crime as payment for services); *see also* D.C. Bar R. Prof. Cond. 8.4 (enumerating prohibited professional misconduct including that which "seriously interferes with the administration of justice").

II.   **The Government Does Not Contest that at Least Some of The Seized Bitcoin is Unrelated to Narcotics Activity, the SUA Allegedly at the Heart of the Government's Conspiracy Theory.**

Nowhere in the many pages of responses, supplements, declarations and other materials filed by the Government does it demonstrate that every bitcoin that went through HELIX is linked to a narcotics transaction. And nowhere in its papers does the Government defend the veracity of the recital in the indictment that "[t]he largest volume of funds sent to Helix came from Darknet markets . . . including AlphaBay . . . and other Darknet markets." (Doc. 1 at ¶8) Instead the Government acknowledges that its efforts to determine what seized assets actually came from drug transactions, quantified at roughly $21 million, amount only to a "conservative estimate." (*See* Doc. 40 at 17). And the Government for the first time explains that its $21 million "figure does not include additional drug money laundering accomplished on the buyer side." (*Id.* at 17-18). Of course, that new "buy[] side" explanation in no way supports the grand jury finding about funds sent "to HELIX."

Still, though, the Government insists it can prevent Mr. Harmon from accessing the seized assets to pay for counsel simply because that property was "involved in" the alleged HELIX Money Laundering Conspiracy. (Doc. 40 at 12-13). But, as explained in Part III below, to the extent the Government argues that being "involved in" the alleged conspiracy means something less than being the traceable proceeds or instrumentalities of the conspiracy, that argument stretches the principle of "taint" beyond its constitutional breaking point.

III.   **Pretrial Restraint of Assets Not Traced to The Alleged Narcotics Activity is Unconstitutional.**

To be clear, as he conceded from the outset, to the extent the Government can trace seized bitcoin to narcotics-related transactions, Defendant cannot ask for its release to pay

for his defense.  Defendant has asked only for the release of assets the Government has not traced to any such transactions.

A. **Luis Establishes a Constitutional Rule that, Where Needed to Pay for Counsel, Assets Can be Restrained Pretrial Only Where Traced to the Charged Offense.**

As the Supreme Court explained in Luis "untainted" property "differs from a robber's loot, a drug seller's cocaine, a burglar's tools, or other property associated with the planning, implementing, or concealing of a crime." *Luis v. United States*, 136 S. Ct. 1083, 1090, 194 L. Ed. 2d 256 (2016). Rejecting the Government's argument that property could be restrained even where it could not be traced to the charged offense, the Supreme Court's plurality explained that "[t]o permit the Government to freeze Luis' untainted assets would unleash a principle of constitutional law that would have no obvious stopping place." *Id* at 1094. Further explaining its rationale that the Government must trace assets to the charged crimes in order to place them beyond the reach of a defendant, like Mr. Harmon, who seeks to use them to hire counsel, the Court noted that tracing assets was a familiar judicial task and that "[c]ourts use tracing rules in cases involving fraud, pension rights, bankruptcy, trusts, etc." *Id.* at 1095. The property Mr. Harmon seeks to use to pay for counsel is here, as in *Luis* "is not loot, contraband, or otherwise 'tainted' [by the alleged narcotics activity]." *See id.* at 1090. The Government has not traced it to the offense alleged in Count One and it should, therefore, be available to pay for counsel.

B. **The Government Has Not Traced All Seized Assets to the Narcotics Offense Charged in Count One, Which it Must do To Restrain Them.**

The Government disagrees, insisting that the "broad scope" and "sweeping terms" of 18 U.S.C. § 982(a)(1) permit it to restrain all the seized assets because, says the Government, they were "involved in" the charged crime even if the Government has not traced them to any drug-related transactions. (*See* Doc. 40 at 12-13) The Government's position seems to reduce to the argument that if some drug-related bitcoin flowed through HELIX, it can restrain *all* the HELIX-linked bitcoin it has found as "involved in" the

unlawful narcotics activity. (*See* Doc. 40 at 13-14) In its own words, the Government argues that "Section 982(a)(1) requires forfeiture of all property 'involved in' the entire money laundering conspiracy."  Doc 40 at 13 (title case capitalizations altered).

But neither *Luis* nor any case undersigned counsel have found since, stands for the proposition that the Government can restrain, pretrial and when needed to hire counsel, assets it has not traced to the charged unlawful activity. To the contrary *Luis* made plain that the "constitutional line between a criminal defendant's tainted funds and innocent funds needed to pay for counsel should prove workable" because of the experience of courts in applying "tracing rules." *Luis,* 136 S. Ct. at 1086.

Which rules apply to the tracing of immutable, nonfungible digital assets appears to be a question of first impression, though one to which the answer should be straightforward given the nature of the assets in question. The court in *Luis* correctly noted that "money is fungible . . . [b]ut the law has tracing rules that help courts implement the kind of distinction we require in this case." *Luis*, 136 S. Ct. at 1095; *see also United States v. $56,471,329.88 in Proceeds From the Sale of a Bond Belonging to Airbus SE,* No. 20-CV-408, 2020 WL 2896661, at *2 (D.D.C. June 3, 2020) (applying tracing rules to fungible and commingled bank deposits).

Digital assets like bitcoin, though, are not fungible. Rather, "every bitcoin has a history that anybody can view in the block chain." ARVIND NARAYANAN, ET AL, BITCOIN AND CRYPTOCURRENCY TECHNOLOGIES 219 (2016). Most importantly here, a "coin's history traces all the way back to one or more coinbase transactions in which coins were originally minted." *Id*.  Thus where, as here, the Government's burden is to trace the assets it seeks to restrain and where, as here, those assets are nonfungible digital assets, it must do what it has so far not done—actually trace that which it seeks to restrain to actually unlawful transactions.

Finally, though in a similar vein, the Government's insistence (at 15) that it can prior to conviction, restrain all the seized digital assets because of statutory language permitting

forfeiture of "any commissions or fees paid to the launderer" also goes too far to the extent the Government seeks to apply it to transactions *other* than those involving narcotics proceeds. "When a business has both lawful and unlawful aspects, only the income attributable to the unlawful activities is forfeitable." *United States v. Hodge*, 558 F. 3d 630, 635 (7th Cir. 2009). Here too, if the Government can no doubt restrain assets traced to unlawful narcotics transactions.  But the Government has not, and likely cannot, do that as to all seized assets.

IV.   **In All Events, The Government Has Not Demonstrated That *All* The Seized Digital Assets Were "Involved In" Narcotics-Related Money Laundering Conspiracy.**

As a final matter, even assuming that the Constitution permits the pretrial restraint of assets merely "involved in" money laundering, the Government has not demonstrated that *all* the assets seized here satisfy even that amorphous concept. Though the Government nowhere tells us what it thinks "involved in" means where, as here, the property in question is not fungible, like money, but rather is immutable, unique digital currency, as discussed above. Broadly speaking, "courts have consistently interpreted the phrase involved in in § 982(a)(1) broadly to include the money or property being laundered as well as property used to commit or to facilitate the money laundering offense or the underlying unlawful activity." *United States v. Miller,* 295 F. Supp. 3d 690, 697 (E.D. Va.), *aff'd,* 911 F.3d 229 (4th Cir. 2018) (internal quotation omitted). But the Government has not shown that seized bitcoins *not* traceable to narcotics-related transactions are "involved" in the narcotics-related conspiracy alleged here.

V.   **Conclusion**

The issue before the Court at the moment is not whether the Government can ultimately forfeit all the assets it has seized.  Rather, the issue is narrower: whether the Government can constitutionally restrain all the assets it has seized where some such assets are needed to pay for counsel.

The Supreme Court has made clear that assets can be restrained, even if needed to pay for counsel, where they are traced to the charged crimes.  But the Government has not done that work here.  Thus, Mr. Harmon respectfully requests that the Motion be granted and sufficient funds be released to fund his defense.

Dated:  July 1, 2020

By: */s/ Jean-Jacques Cabou*

Jean-Jacques Cabou*
Alexis E. Danneman*
Perkins Coie LLP
2901 N. Central Avenue, Suite 2000
Phoenix, Arizona 85012

Charles Flood
Flood & Flood
914 Preston at Main
Suite 800
Houston, Texas 77002

*admitted pro hac vice*

Attorneys for Defendant Larry Dean Harmon

## CERTIFICATE OF SERVICE

I hereby certify that on July 1, 2020, I filed the foregoing document to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing which will send such notice of filing to all filing users.

*/s/ Indy Fitzgerald*

148501793.2