## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Criminal Action No. 19-395 (BAH) |
| LARRY DEAN HARMON, | Chief Judge Beryl A. Howell |
| Defendant. | |

## <u>MEMORANDUM OPINION</u>

Defendant, Larry Dean Harmon, is charged in three counts related to his alleged operation of Helix, an underground tumbler for bitcoin, a form of virtual currency. *See* Indictment (Dec. 3, 2019) at ¶¶ 3, 8–9, ECF No. 1. As described in the indictment, Helix "enabled customers, for a fee, to send bitcoins to designated recipients in a manner which was designed to conceal and obfuscate the source or owner of the bitcoins." *Id.* ¶ 4. This service, which was located on the Darknet — a collection of hidden websites accessible only to anonymized users — was allegedly "advertised . . . as a way to" mask drug, gun, or other illegal "transactions from law enforcement." *Id.* ¶ 5. Between 2014 and 2017, Helix was used to "exchange[] . . . approximately 354,468 bitcoins — the equivalent of approximately $311 million in U.S. dollars." *Id.* ¶ 8. On December 3, 2019, a federal grand jury in the District of Columbia indicted defendant for conspiracy to launder monetary instruments, in violation of 18 U.S.C. § 1956(h), *id.* ¶¶ 14–16 (Count One); operating an unlicensed money transmitting business, in violation of 18 U.S.C. § 1960(a), *id.* ¶¶ 17–18 (Count Two); and engaging, without a license, in the business of money transmission, as defined in D.C. Code § 26-1001(10), in violation of the District of Columbia's Money Transmitters Act (MTA), D.C. Code § 26-1023(c), *id.* ¶¶ 19–20

(Count Three).  Defendant has now moved to dismiss, for failure to state an offense, *see* FED. R. CRIM. P. 12(b)(3)(B)(v), both Counts Two and Three, *see* Def.'s Mot. to Dismiss, ECF No. 31; Def.'s Mem. Supp. Mot. to Dismiss ("Def.'s Mem."), ECF No. 31.  The motion to dismiss raises two novel questions:  Is bitcoin "money" for purposes of the District of Columbia's MTA?  Was Helix, which operated as a bitcoin tumbler, an "unlicensed money transmitting business" under 18 U.S.C. § 1960(b)(1)(B)?  After examination of the relevant statutes, case law, and other sources, the Court concludes that bitcoin is money under the MTA and that Helix, as described in the indictment, was an "unlicensed money transmitting business" under applicable federal law.  Accordingly, defendant's motion to dismiss Counts Two and Three is denied.

## I.   BACKGROUND

The facts and charges in the indictment are summarized below, after a brief review of the operation of bitcoin and the Darknet.

### A.   Technical Primer on Bitcoin and the Darknet

Brief primers on bitcoin and the Darknet are helpful to understand the charged activity that is the focus of defendant's pending motion to dismiss.

#### 1.   *Bitcoin*

"Bitcoin is a decentralized form of electronic or digital currency that exists only on the [i]nternet."  *United States v. Lord*, 915 F.3d 1009, 1013 n.1 (5th Cir. 2019); *see also United States v. Brown*, 857 F.3d 334, 337 (6th Cir. 2017) (defining bitcoin as "a virtual, sovereign-free currency"); *United States v. Costanzo*, 956 F.3d 1088, 1091 (9th Cir. 2020) ("Bitcoin is an alternative currency that can be transferred electronically anywhere in the world with no bank and no government forms."); *United States v. Gratkowski*, No. 19-50492, 2020 WL 3530575, at *1 (5th Cir. June 30, 2020) ("Bitcoin is a type of virtual currency.").  The term bitcoin refers to both a system and a unit.  As a system, Bitcoin is a peer-to-peer network enabling proof and

transfer of ownership — of units, or tokens, also called bitcoin — without involving a third-party such as a bank.  *See* Eric D. Chason, *How Bitcoin Functions As Property Law*, 49 SETON HALL L. REV. 129, 139 (2018) ("[T]he Bitcoin system comprises both a protocol for transferring ownership and a set of records of all transactions."); THE LAW OF BITCOIN 30 (Stuart Hoegner ed., 2015).[1]  Conventionally, the Bitcoin network and its protocols are referred to with a capital B, while the units transmitted on the network are referred to with a lowercase b.

Transferring or otherwise using a bitcoin requires an address, a public encryption key, and a private encryption key.  "Units of [b]itcoin are stored by reference to" the "address[]."  Shawn S. Amuial, Josias N. Dewey & Jeffery R. Seul, The Blockchain: A Guide for Legal & Business Professionals § 1:3 (2016).  The address, "similar to a bank account number, . . . is a long string of letters and numbers."  *Gratkowski*, 2020 WL 3530575, at *1; *see also* Chason, *supra*, at 141 (analogizing the address to a user name).  Every address is associated with a public key.  *See* Chason, *supra*, at 141.  Every public key is derived from a private key.  Importantly, private keys are secret, like passwords.  *See id.* at 143 ("Private keys create public addresses, but public addresses do not reveal the associated private keys.").

To transfer bitcoin from one address to another, the sender transmits a message — called a transaction — on the Bitcoin public network, and that transaction is eventually recorded on a blockchain, a public ledger that records every bitcoin transaction.  *See Gratkowski*, 2020 WL 3530575, at *1; THE LAW OF BITCOIN, *supra*, at 31.[2]  The transaction must contain: (1) the

---

[1]     Peer-to-peer "mean[s] that the computer servers, commonly called 'nodes,' that actively run" the Bitcoin network's "open-source software are linked together."  Henry S. Zaytoun, Comment, *Cyber Pickpockets: Blockchain, Cryptocurrency, and the Law of Theft*, 97 N.C. L. REV. 395, 403 (2019).
[2]     Blockchain is a type of digital ledger.  *See* Brittany Manchisi, *What is Blockchain Technology?*, BLOCKCHAIN PLUSE: IBM BLOCKCHAIN BLOG (July 31, 2018), https://www.ibm.com/blogs/blockchain/2018/07/what-is-blockchain-technology/; *Bitcoin 101: What is Bitcoin?*, COINDESK (Jul. 6, 2020), http://coindesk.com/learn/bitcoin-101/what-is-bitcoin (calling the Bitcoin network "distributed ledger that maintains the balances of all token trading").

amount of bitcoin to be transferred; (2) the address to which the bitcoin will be sent; (3) the address from which the bitcoin is being sent; and (4) the public key associated with the sender and the sending address.  *See* The Blockchain: A Guide for Legal & Business Professionals § 1:3; *see also* Chason, *supra*, at 147–48.  With these elements in place, the sender must sign the transaction using a digital signature generated using the sender's private key.  *Id.*; *see also* THE LAW OF BITCOIN, *supra*, at 31.  Once signed, the transaction is broadcast to the Bitcoin network.

The network then verifies the transaction by confirming that (1) the public key is associated with the address of the sender and (2) the digital signature was produced for this transaction using the sender's private key.  *See* Chason, *supra*, at 150; THE LAW OF BITCOIN, *supra*, at 31.  After the transaction is verified, the bitcoin being sent becomes associated with the recipient address and its attendant private and public keys.  *See* The Blockchain: A Guide for Legal & Business Professionals § 1:3.  The transaction is also recorded on the blockchain.  *Id.* The recording process is a complex one that involves nodes on the network "bundl[ing] up transactions into blocks of aggregated transactions and append[ing] each block to the prior block."  *Id.*  The result of this process is that every node in the network "ha[s] a current, immutable history of all transactions ever logged on the blockchain."  *Id.*; *see also Bitcoin 101: What is Bitcoin?*, COINDESK (Jul. 6, 2020), http://coindesk.com/learn/bitcoin-101/what-is-bitcoin ("The network records each transaction onto these ledgers and then propagates them to all of the other ledgers on the network").

The Bitcoin blockchain records "only the sender's address, the receiver's address, and the amount of Bitcoin transferred."  *Gratkowski*, 2020 WL 3530575, at *1.  "The owners of the addresses are anonymous on the Bitcoin blockchain, but it is possible to discover the owner of a Bitcoin address by analyzing the blockchain."  *Id.*  Analyzing the blockchain does not, however,

allow for discovery of the private keys associated with those addresses.  The Blockchain: A

Guide for Legal & Business Professionals § 1:8 (discussing anonymity and the blockchain).

Ownership of bitcoin is thus based on a user's possession or knowledge of the private key

associated with a public key and address.  *See id.* § 1:3; THE LAW OF BITCOIN, *supra*, at 31.

Many users therefore store their private keys securely in a digital wallet, which "can take the

form of software or hardware;" the physical, hardware devices are more secure because they

"benefit from the added protection of not being connected to any network."  The Blockchain: A

Guide for Legal & Business Professionals § 1:9.

### 2.     *The Darknet*

The Darknet is a collection of hidden websites "accessible only through anonymization

software that obscures users' internet protocol addresses" by "filter[ing] their traffic through" a

network of relay computers called the Tor network.  *United States v. Le*, 902 F.3d 104, 107 (2d

Cir. 2018); *see also United States v. Galarza*, No. 18-mj-146 (RMM), 2019 WL 2028710, at *2

(D.D.C. May 8, 2019) (Howell, C.J.) (explaining that Tor-based websites "anonymize[]

[i]nternet activity by routing user's communications through a global network of relay computers

(or proxies), thus effectively masking the internet-protocol ('IP') address of the user" (internal

quotation marks omitted)).  According to the indictment, "[t]he Darknet includes a number of

hidden websites that sell illegal goods, like guns and drugs, and services, like hacking and money

laundering."  Indictment ¶ 2.

### B.     The Indictment

The following facts are taken from the indictment, and are assumed to be true, as is

required at the motion to dismiss stage.  *See United States v. Park*, 938 F.3d 354, 358 (D.C. Cir.

2019).

Defendant began "own[ing] and operat[ing] a Darknet search engine called Grams" around April 2014.  Indictment ¶ 2.  As this description suggests, Grams allowed users to search the Darknet.  Only a few months later, by July 2014, defendant had begun "own[ing] and operat[ing]" Helix.  *Id.* ¶ 3.  Helix was openly affiliated with Grams, "and the two services were sometimes referred to collectively as Grams-Helix."  *Id.*

As already stated, customers used Helix "to send bitcoins to designated recipients in a manner which was designed to conceal and obfuscate the source or owner of the bitcoins."  *Id.* "This type of service is commonly referred to as a bitcoin 'mixer' or 'tumbler.'"  *Id.*  These services are so-called because they "work by literally mixing up a user's payment with lots of other payments from other users."  Usha R. Rodrigues, *Law and the Blockchain*, 104 Iowa L. Rev. 679, 712 n.224 (2019).

In online posts, defendant portrayed Helix as a service for stripping bitcoin of any link to illegal Darknet transactions.  Just before launching Helix, defendant wrote "that Helix was designed to be a 'bitcoin tumbler' that 'cleans' bitcoins by providing customers with new bitcoins 'which have never been to the darknet before.'"  Indictment ¶ 5.  Around March 2015, defendant allegedly posted: "No one has ever been arrested just through bitcoin taint, but it is possible and do you want to be the first? . . . Most markets use 'Hot Wallets,' they put all their fees in these wallets.  [Law enforcement] just needs to check the taints on these wallets to find all the addresses a market uses."  *Id.*

Starting "at least in or about November 2016, Helix partnered" with a Darknet market called AlphaBay.  *Id.* ¶ 6.  AlphaBay, which "was seized by law enforcement" in 2017 was a marketplace located on the Darknet where customers could "purchase a variety of illegal drugs, guns, and other illegal goods."  *Id.*  In the fall of 2016, AlphaBay's website "recommended to its

customers that they use a bitcoin tumbler service to 'erase any trace of [their] coins coming from AlphaBay,' and provided an embedded link to the Tor website for Grams-Helix." *Id.* An undercover FBI employee, in November 2016, "transferred 0.16 bitcoin from an AlphaBay bitcoin wallet to Helix. Helix then exchanged the bitcoin for an equivalent amount of bitcoin, less a 2.5 percent fee, which was not directly traceable to AlphaBay." *Id.* ¶ 7.

Defendant "shut down" both Grams and Helix in 2017. *Id.* ¶ 9. Before then, between 2014 and 2017, "[i]n total, Helix exchanged at least approximately 354,468 bitcoins — the equivalent of approximately $311 million in U.S. dollars at the time of the transactions." *Id.* ¶ 8. According to the indictment, "[t]he largest volume of funds sent to Helix came from Darknet markets selling illegal goods and services, including AlphaBay, Agora Market, Nucleus, and Dream Market, and other Darknet markets." *Id.*

Helix's customers included people in the District, *id.*, but "Helix was not licensed" as a money transmitter "by the District of Columbia," *id.* ¶ 13. Nor was Helix "registered with" the federal Financial Crimes Enforcement Network (FinCEN), which is part of the U.S. Department of Treasury. *Id.* ¶ 11.

Based on these factual allegations, a federal grand jury indicted defendant in December 2019, but the indictment remained under seal until after the defendant was arrested in February 2020. *See* Entry (Feb. 6, 2020); Order Granting Motion to Unseal, ECF No. 5. He is charged in three counts.[3] Count One, which is not at issue in defendant's pending motion to dismiss, charges that, from about July 2014 until about December 2017, defendant conspired with others, including the administrator of AlphaBay, to conduct financial transactions — namely, "the sending and receiving of bitcoin" — that he knew involved the proceeds of illegal drug activity,

---

[3]        The indictment also includes a forfeiture allegation. *See* Indictment at 7–8.

Indictment ¶ 15(a) (citing 18 U.S.C. § 1956(a)(1)(A)(i)), and that he knew were designed to "conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of [the] unlawful activity," *id.* at ¶ 15(b) (citing 18 U.S.C. § 1956(a)(1)(B)(i)).  The "goal" of this conspiracy was for defendant and his co-conspirators "to unlawfully enrich themselves by operating a bitcoin money laundering service which would conceal and promote illegal Darknet drug sales and other illegal activity."  *Id.* ¶ 16.

Count Two charges that defendant, in running Helix, "knowingly conducted, controlled, managed, supervised, directed, and owned an unlicensed money transmitting business," in violation of 18 U.S.C. § 1960(a).  *Id.* ¶ 18.  Section 1960(b)(1) defines an "unlicensed money transmitting business" as "a money transmitting business which affects interstate or foreign commerce in any manner or degree and" is illegal one of the following three ways:

> (A)  is operated without an appropriate money transmitting license in a State where such operation is punishable as a misdemeanor or a felony under State law, whether or not the defendant knew that the operation was required to be licensed or that the operation was so punishable;
> (B)  fails to comply with the money transmitting business registration requirements under section 5330 of title 31, United States Code, or regulations prescribed under such section; or
> (C)  otherwise involves the transportation or transmission of funds that are known to the defendant to have been derived from a criminal offense or are intended to be used to promote or support unlawful activity.

18 U.S.C. § 1960(b)(1).  Subparagraph (B) references section 5330, which is part of the Bank Secrecy Act ("BSA"), 31 U.S.C. § 5311 *et seq.*, and requires all "money transmitting businesses" to register with FinCEN.  31 U.S.C. § 5330(a)(1).  According to Count Two, defendant violated § 1960(a) by (a) operating Helix without the appropriate money transmitting license in the District, where failure to obtain the proper license is a felony, *see* D.C. Code § 26-1023(c); (b) failing to comply with 31 U.S.C. § 5330 and its regulations; and (c) involving Helix in the

8

transmission of funds known to defendant "to have been derived from a criminal offense and intended to be used to promote and support unlawful activity," Indictment ¶ 18 (a)–(c).

Finally, Count Three charges that defendant failed to obtain a money transmitter license in the District, while, through the operation of Helix, he was engaged in the business of money transmission, as that term is defined by the MTA. *Id.* ¶¶ 19–20 (citing D.C. Code § 26-1001(10)).[4]  The District's MTA defines money transmission as "engaging in the business of receiving money for transmission or transmitting money within the United States, or to locations abroad, by any and all means, including but not limited to payment instrument, wire, facsimile, or electronic transfer."  D.C. Code § 26-1001(10).  Operation of a money transmission business without a license violates D.C. Code § 26-1023(c), which provides that "[a]ny person who engages in the business of money transmission without a license as provided herein shall be guilty of a felony and, on conviction thereof, shall be fined not more than $25,000, or imprisoned for not more than 5 years, or both."

Defendant has now moved to dismiss Counts Two and Three of the indictment, which motion, following a motion hearing on July 15, 2020, is ripe for resolution.[5]

---

[4]     Federal courts do not have jurisdiction over local or state crimes, except in the District of Columbia.  This "troublesome anomaly among federal jurisdictional statutes" is a vestige of the time when the District lacked a separate state court system.  *United States v. Garnett*, 653 F.2d 558, 561 (D.C. Cir. 1981); *see also id.* (noting that the anomaly persists because it "eliminat[es] the procedural difficulties of trying a single defendant for related federal and D.C. Code offenses in two courts" (internal quotation marks omitted)).  Specifically, D.C. Code § 11-502(3) grants this Court jurisdiction over "[a]ny offense under any law applicable exclusively to the District of Columbia which offense is joined in the same information or indictment with any Federal offense."  Thus, when a D.C. Code offense and a federal offense are properly joined under Rule 8 of the Federal Rules of Criminal Procedure, *United States v. Koritko*, 870 F.2d 738, 739 (D.C. Cir. 1989), this Court exercises something like "pendent jurisdiction" over the D.C. Code offense, *United States v. Kember*, 685 F.2d 451, 454 (D.C. Cir. 1982).  In this case, defendant was charged with two federal offenses and one D.C. Code offense "based on the same act or transaction," FED. R. CRIM. P. 8(a), so this Court properly exercises jurisdiction over the D.C. Code offense charged in Count Three.

[5]     Defendant has also moved for release of funds needed to secure counsel or for a hearing.  He seeks the release of 160 bitcoins seized by the government or, in the alternative, a hearing to determine whether probable cause exists to believe that the requested bitcoins are subject to forfeiture.  *See* Def.'s Mot. for Release of Funds Needed to Secure Counsel or Alternative Mot. for a Hr'g ("Mot. for Release"), ECF No. 32.  That motion challenges the traceability of the seized bitcoins to the offense alleged in Count One but "makes no arguments related to the traceability of assets to" Count Two.  *See id.* at 7 n.7.  At the hearing on this motion, held on July 21, 2020,

defendant conceded that, if Count Two survives this motion to dismiss, the motion for release of funds "should be denied." Rough Release Hr'g Tr. (July 21, 2020) at 5:1–2. In light of that concession, the pending request for release of funds is denied.

Concession aside, the request would still be denied. Following the parties' stipulation that defendant lacks enough funds to retain counsel of his choice, *see* Joint Stip. Regarding Mots. Hr'g and Evidentiary Hr'g, ECF No. 54, an evidentiary hearing was held on the links between the seized bitcoin and the conduct charged in Count One, *see United States v. Emor*, 794 F. Supp. 2d 143, 149 (D.D.C. 2011) (requiring "some evidence that [defendant] will be deprived of counsel of his choice if he cannot access the seized assets" before granting such a hearing); *see also* Gov't's Opp'n to Def.'s Mot. for Release of Funds ("Gov't's Release Opp'n") at 5 n.3 (stating that the government assumes that the burden of establishing probable cause connecting the property and the crime rests with the government, although "courts are not in agreement"). The government has shown that Helix partnered with a Darknet market, AlphaBay; and encrypted e-mail communications "found on Harmon's devices also reveal[] that he actively coordinated with well-known Darknet figures to promote Helix" beyond AlphaBay, "to the Darknet market community." *See* Decl. of Special Agent Matthew Price ("Price Decl.") ¶ 6–7, ECF No. 40-1 (citing Price Decl., Attachments 4 & 6). Indeed, at least 43,319.68 of the 354,468 bitcoins received by Helix were sent "*directly* from a known Darknet market wallet," *id.* ¶ 8, likely by Darknet vendors, *see* Gov't's Release Opp'n at 17–18 (describing testimony from defendant's initial bond hearing establishing this). Internet posts advertising Helix attributed to defendant suggest that Helix also received bitcoins transferred indirectly from Darknet markets and that Helix sent bitcoins to Darknet market wallets on behalf of customers. *See* Price Decl. ¶ 9. These extensive links between Helix and Darknet markets show a high likelihood that all funds involved in Helix were "involved in" the alleged drug-trafficking conspiracy. *See* Indictment ¶¶ 14–16 (Count One); *see also* 18 U.S.C. § 982(a)(1) (making "any property" "involved in" the Count One conspiracy and "any property traceable to such property" subject to forfeiture). As the government's agent testified, the "vast majority" — about 85% to 90% — of Darknet markets' offerings are illicit drugs. Rough Release Hr'g Tr. at 40:2–10 (testifying agent citing his "experience from personal review of Darknet markets and of working investigations on Darknet markets"). Posts attributed to defendant contain statements that he agreed with this characterization of the Darknet and of Helix's business, recognizing that "the Darknet is 90% drugs and illegal items for sale" and acknowledging that he designed Helix so that users could buy and sell drugs without risking arrest through "bitcoin taint." *See* Indictment ¶ 5; Ex. C, Gov't's Opp'n to Def.'s Mot. to Revoke Detention, ECF No. 16-3. Evidence also establishes that the seized bitcoin probably represents defendant's direct proceeds from Helix: his 2.5% commission on each transaction. *See* Price Decl. ¶¶ 12–15 (explaining how a portion of the seized bitcoins were traced to "residual bitcoin left from . . . customer transaction[s]"). "[C]ommissions or fees paid to the launderer" are forfeitable. *United States v. Puche*, 350 F.3d 1137, 1153 (11th Cir. 2003) ("'Property' under [18 U.S.C. § 982(a)(1)] includes 'the money or other property being laundered (the corpus), any commissions or fees paid to the launderer, and any property used to facilitate the laundering offense.'" (quoting *United States v. Bornfield*, 145 F.3d 1123, 1135 (10th Cir. 1998)).

Defendant maintains that only those commissions or fees shown to be from narcotics transactions are forfeitable. *See* Def.'s Reply in Supp. Mot. for Release of Funds at 7–8, ECF No. 50; *see id.* at 8 (citing *United States v. Hodge*, 558 F.3d 630, 635 (7th Cir. 2009), for notion that "[w]hen a business has both lawful and unlawful aspects, only the income attributable to the unlawful activities is forfeitable"). Yet property need not be directly derived from the predicate unlawful activity to be forfeitable, as the statute covers any property "involved in" the ongoing conspiracy. *See* 18 U.S.C. § 982(a)(1); *see also, e.g., United States v. Baker*, 227 F.3d 955, 968 (7th Cir. 2000) ("Money does not need to be derived from the crime to be forfeited. It can be forfeited if it is involved in the crime." (internal quotation marks omitted)); *cf. United States v. Braxtonbrown–Smith*, 278 F.3d 1348, 1351–55 (D.C. Cir. 2002) (arriving at the same interpretation of "involved" in a parallel context). Where, as here, the conspiracy takes the form of a business, all funds flowing through the business that "bankroll" or otherwise facilitate the alleged conspiracy are "involved in" it. *See Baker*, 227 F.3d at 969–70. Thus, any untainted funds used as "seed" money to start Helix or to run Grams, Helix's companion service, were used to further Helix's core business, which was cleaning bitcoins used in Darknet drug purchases. *See* Rough Release Hr'g Tr. at 46:3–49:5 (testifying agent establishing that early users paid to use Grams and that those fees were in part used to "expand Grams into Helix"). Finally, to the extent some of Helix's business came from transactions unrelated to drug activity, the fees from those transactions remain forfeitable because the evidence suggests that "the business as a whole was overwhelmingly devoted to" transactions from Darknet markets, which, in turn, overwhelmingly deal in drugs. *Hodge*, 558 F.3d at 635.

## II.      LEGAL STANDARD

"[A] court's use of its supervisory power to dismiss an indictment directly encroaches upon the fundamental role of the grand jury," so "dismissal is granted only in unusual circumstances." *United States v. Ballestas*, 795 F.3d 138, 148 (D.C. Cir. 2015) (internal quotations and alterations omitted).  Under Federal Rule of Criminal Procedure 12(b)(1), "[a] party" may "raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits." FED. R. CRIM. P. 12(b)(1).  That includes "a defect in the indictment" requiring dismissal, such as "failure to state an offense." *Id.* 12(b)(3)(B)(v). Pertinent here, "[c]laims that a statute named in an indictment does not proscribe the alleged conduct are generally treated as claims that the indictment 'fails to state an offense.'" *United States v. Hite*, 950 F. Supp. 2d 23, 25–26 (D.D.C. 2013) (quoting *United States v. Teh*, 535 F.3d 511, 515 (6th Cir. 2008)); *see also, e.g.*, *United States v. Aka*, 339 F. Supp. 3d 11, 15 (D.D.C. 2018); *cf. Al Bahlul v. United States*, 767 F.3d 1, 10 n.6 (D.C. Cir. 2014) (stating, in a case involving military commission, that "[f]ailure to state an offense is simply another way of saying there is a defect in the indictment").  The government "cannot cure a defective indictment" through "a bill of particulars" or at "oral argument." *United States v. Conlon*, 628 F.2d 150, 156 (D.C. Cir. 1980).

An indictment's primary purpose is "to inform the defendant of the nature of the accusation against him." *Russell v. United States*, 369 U.S. 749, 767 (2001).  To that end, "an indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." *Hamling v. United States*, 418 U.S. 87, 117 (1974); *see also United States v. Verrusio*, 762 F.3d 1, 13 (D.C. Cir. 2014) ("[T]o be sufficient, an indictment need only inform the defendant of the precise offense

of which he is accused so that he may prepare his defense and plead double jeopardy in any further prosecution for the same offense.").  As long as the indictment contains "a plain, concise, and definite written statement of the essential facts constituting the offense charged," FED. R. CRIM. P. 7(c)(1), sufficiency "is not a question of whether [the indictment] could have been more definite and certain," *United States v. Debrow*, 346 U.S. 374, 378 (1953).  Rather, "[t]he test for sufficiency is whether it is fair to require the accused to defend himself on the basis of the charge as stated in the indictment."  *Conlon*, 628 F.2d at 155.

When considering a motion to dismiss for failure to state an offense, "the court is bound by the language of the indictment."  *United States v. Hitt*, 249 F.3d 1010, 1015 (D.C. Cir. 2001).  "Adherence to the language of the indictment is essential because the Fifth Amendment requires that criminal prosecutions be limited to the unique allegations of the indictments returned by the grand jury."  *Id.* at 1016 (citing *Russell v. United States*, 369 U.S. 749, 768–71 (1962); and then citing *Stirone v. United States*, 361 U.S. 212, 216 (1960); and then citing *United States v. Lawton*, 995 F.2d 290, 292–93 (D.C. Cir. 1993)).  Accordingly, "at this stage of the case, the allegations of the indictment must be taken as true."  *Boyce Motor Lines v. United States*, 342 U.S. 337, 343 n.16 (1952).

## III.  DISCUSSION

Defendant's motion to dismiss raises two arguments of first impression: that "bitcoin is not money" under the MTA, *see* Def.'s Mem. at 2 (capitalization altered), and that Helix, as a bitcoin tumbler, "was not a 'money transmitting business' under 18 U.S.C. § 1960," *id.* at 4.  The first argument is primarily an attack on Count Three and the second argument targets Count Two.

Taking the first question first:  the MTA never defines "money."  When a statute does not supply a definition, a court generally gives a statutory term its ordinary meaning.  The term

"money," as detailed below, commonly means a medium of exchange, method of payment, or store of value. Bitcoin is these things. Indeed, defendant never disputes that bitcoin is money as that term is ordinarily used, and he concedes that bitcoin is a form of currency, *see* Def.'s Mem. at 1–2, that bitcoins qualify as funds, *see* Def.'s Reply Supp. Mot. to Dismiss ("Def.'s Reply"), at 7, ECF No. 49, and that bitcoin is a medium of exchange, *see* Rough Hr'g Tr. (July 15, 2020) ("Rough MTD H'rg Tr.") at 10:22–23. Yet, instead of applying the ordinary definition of money, seeing no definition in the MTA, defendant would import the District's adoption of the Uniform Commercial Code's (UCC) definition of money: "a medium of exchange currently authorized or adopted by a domestic or foreign government." *See* Def.'s Mem. at 1 (quoting D.C. Code § 28:1-201(b)(24)). Conventional tools of statutory interpretation — text, structure, history, and purpose — point away from defendant's view and toward the conclusion that the MTA adopts the ordinary definition of money, which encompasses bitcoin. Given that bitcoin qualifies as money under the MTA, Helix was in the business of money transmission for purposes of the MTA. As a result, defendant's motion to dismiss will be denied as to Count Three.

The second question relates to Count Two, which charges that defendant violated § 1960 in three ways: (1) by failing to comply with the District's money transmitter requirements, *see* 18 U.S.C. § 1960(b)(1)(A); (2) by "fail[ing] to comply with the money transmitting business registration requirements under" 31 U.S.C. § 5330 of the BSA, or "regulations prescribed under such section," *see id.* § 1960(b)(1)(B); and (3) by otherwise transmitting illegal funds, *see id.* § 1960(b)(1)(C); *see also* Indictment ¶ 18. Defendant challenges the first and second parts of Count Two but not the third, and his challenge to the first part is identical to his attack on Count Three, and fails for the same reasons. Defendant argues that the second part of Count Two fails

to state an offense because an "unlicensed money transmitting business" under 18 U.S.C.

§ 1960(b)(1)(B) must transmit funds from one person or location to another person or location

but "the Indictment fails to allege that Helix did anything other than provide bitcoin back to the

user from whom it was sent." Def.'s Reply at 2. Helix's business, though, was receiving bitcoin

to send to another location or person in order to mask the original source of the bitcoin. Under

the relevant authorities, that qualifies as money transmission. Count Two will not be dismissed.

### A.   Bitcoin Is Money under the District's Money Transmitters Act

Count Three charges a violation of D.C. Code § 26-1023(c), which criminalizes engaging

in money transmission in the District without a license. Indictment ¶ 19–20 (citing D.C. Code

§ 26-1023(c)). The MTA, which contains § 26-1023(c) and the District's licensing requirements

for money transmitting businesses, defines money transmission as "engaging in the business of

receiving money for transmission or transmitting money within the United States, or to locations

abroad, by any and all means, including but not limited to payment instrument, wire, facsimile,

or electronic transfer." D.C. Code § 26-1001(10). The MTA does not, however, define money.

*See generally id.* § 26-1001 ("Definitions").

### 1.   The Ordinary Meaning of Money Covers Bitcoin and the MTA Adopts That Ordinary Meaning

Where a statute does not define a term, courts "look first to the word's ordinary

meaning." *Mohamad v. Palestinian Auth.*, 566 U.S. 449, 454 (2012); *see also, e.g.*, *FCC v.

AT&T Inc.*, 562 U.S. 397, 403 (2011) ("When a statute does not define a term, we typically give

the phrase its ordinary meaning" (internal quotation marks omitted)); *Hood v. United States*, 28

A.3d 553, 559 (D.C. 2011) ("When the terms of a statute are undefined and not recognized terms

of art, we presumptively accord them their ordinary meaning in common usage, taking into

account the context in which they are employed . . . ."). Money, in common parlance, is a

medium of exchange — that is, a token that can be traded for goods or services.  *See Money*, AM. HERITAGE DICTIONARY (4th ed. 2000) ("A medium that can be exchanged for goods and services and is used as a measure of their values on the market, including among its forms a commodity such as gold, an officially issued coin or note, or a deposit in a checking account or other readily liquefiable account."); *Money*, OXFORD ENGLISH DICTIONARY (3d ed. 2002) ("Any generally accepted medium of exchange which enables a society to trade goods without the need for barter; any objects or tokens regarded as a store of value and used as a medium of exchange."); *Money*, MERRIAM-WEBSTER ONLINE, https://www.merriam-webster.com/dictionary/money ("[S]omething generally accepted as a medium of exchange, a measure of value, or a means of payment.").  Money is also often "regarded as a store of value."  *Money*, OXFORD ENGLISH DICTIONARY (3d ed. 2002).[6]

Bitcoin is just that — a medium of exchange, method of payment, and store of value. *See, e.g.*, Robert C. Hockett & Saule T. Omarova, *The Finance Franchise*, 102 CORNELL L. REV. 1143, 1208 (2017) (defining "bitcoins, electronic tokens or bits of data, as a means of payment and exchange similar to regular currencies"); Internal Revenue Service, *IRS Virtual Currency Guidance Notice 2014-21*, 2014-16 I.R.B. 938 (2014) [hereinafter IRS Virtual Currency Guidance] ("Virtual currency is a digital representation of value that functions as a medium of exchange, a unit of account, and/or a store of value.").  Bitcoin can be used to pay for goods or

---

[6]      Black's Law Dictionary includes similar definitions of money, although the first definition of money given there is the UCC definition favored by defendant.  *See Money*, BLACK'S LAW DICTIONARY (11th ed. 2019) ("1. The medium of exchange authorized or adopted by a government as part of its currency; esp., domestic currency <coins and currency are money>. UCC § 1-201(24). 2. Assets that can be easily converted to cash <demand deposits are money>. 3. Capital that is invested or traded as a commodity <the money market> 4. (pl.) Funds; sums of money <investment moneys>.").  Given that money is an "ordinary English word[] and should be given [its] ordinary meaning[]," the dictionaries cited in the text are more relevant than BLACK'S "which would only be relevant if [the legislature] intended that" money "be given [a] special meaning[] as [a] legal 'term[] of art.'"  *United States v. Faiella*, 39 F. Supp. 3d 544, 545 n.2 (S.D.N.Y. 2014).  For the reasons discussed in this Part, the D.C. Council intended for money to take its ordinary meaning in the MTA.

services.  As of 2015, "[o]ver one hundred thousand firms, including major companies such as

Microsoft, Dell Computer, Dish Network, Time Inc., and Overstock.com, accept Bitcoin-

denominated transactions."  Kevin Werbach & Nicolas Cornell, *Contracts Ex Machina*, 67 DUKE

L.J. 313, 324 (2017) (citing *State of Bitcoin 2015: Ecosystem Grows Despite Price Decline*,

COINDESK (Jan. 7, 2015), http://www.coindesk.com/state-bitcoin-2015-ecosystem-grows-

despite-price-decline); *see also* Lael Brainard, Governor, Bd. of Governors of the Fed. Reserve

Sys., *Cryptocurrencies, Digital Currencies, and Distributed Ledger Technologies: What Are We

Learning?* (May 15, 2018), https://www.federalreserve.gov/newsevents/speech/

brainard20180515a.htm [hereinafter, Brainard, *Cryptocurrencies*] ("[A] typical cryptocurrency

may be used in payments."); Stephanie Lo & J. Christina Wong, *Bitcoin as Money?*, Federal

Reserve Bank of Boston: Current Policy Perspectives, no. 14-4 (2014) at 4 ("[T]he acceptance of

bitcoin has spread to more mainstream vendors."); Jeffrey E. Glass, *What Is a Digital Currency*,

57 IDEA 455, 458–59 (2017) ("[A]" variety of businesses have decided to accept Bitcoin as

payment for goods and services" and "us[e] Bitcoin for transactions that could be performed in

some other currency.").  Bitcoin can also be exchanged for conventional currency.  *See* IRS

Virtual Currency Guidance ("Bitcoin can be digitally traded between users and can be purchased

for, or exchanged into, U.S. dollars, Euros, and other real or virtual currencies"); Kevin V. Tu &

Michael W. Meredith*, Rethinking Virtual Currency Regulation in the Bitcoin* Age, 90 WASH. L.

REV. 271, 310 (2015) ("[Bitcoin] can also be exchanged for conventional currencies, such as the

U.S. dollar, Euro, Yen, and Yuan.") (quoting *SEC v. Shavers*, No. 4:13-cv-00416, 2013 WL

4028182, at *2 (E.D. Tex., Aug. 6, 2013)); Trevor I. Kiviat, Note, *Beyond Bitcoin: Issues in

Regulating Blockchain Transactions*, 65 DUKE L. J. 569, 583–84 (2015) (explaining bitcoin

exchange rate against U.S. dollar).  In addition, bitcoin is viewed by many as holding value, even

though that "value has been known to fluctuate."  Brainard, *Cryptocurrencies*; *see also, e.g.*,

Andrew Keane Woods, *Against Data Exceptionalism*, 68 STAN. L. REV. 729, 733 n.16 (2016)

(explaining that "the data that creates the code gives [Bitcoin] value among other Bitcoin

traders").[7]

Other federal courts have similarly concluded that bitcoin qualifies as money under these

ordinary definitions.  *See Faiella*, 39 F. Supp. 3d at 545 (holding that bitcoin is "money" because

it "can be easily purchased in exchange for ordinary currency, acts as a denominator of value,

and is used to conduct financial transactions."); *Shavers*, 2013 WL 4028182, at *2 ("It is clear

that Bitcoin can be used as money.  It can be used to purchase goods or services, and . . . used to

pay for individual living expenses. . . . [I]t can also be exchanged for conventional currencies,

such as the U.S. dollar, Euro, Yen, and Yuan."); *United States v. Ulbricht*, 31 F. Supp. 3d 540,

570 (S.D.N.Y. 2014) (defining "money" as "an object used to buy things" and concluding that

"the only value for Bitcoin lies in its ability to pay for things" because "[b]itcoins can be either

used directly to pay for certain things or can act as a medium of exchange and be converted into

a currency which can pay for things"); *United States v. Murgio*, 209 F. Supp. 3d 698, 707

(S.D.N.Y. 2016) (stating that "bitcoins clearly qualif[y] as money or funds . . . because they can

be easily purchased in exchange for ordinary currency, act[] as a denominator of value, and [are]

used to conduct financial transactions" (first alteration in original) (internal quotation marks

omitted)); *United States v. Mansy*, No. 2:15-cr-198, 2017 WL 9672554, at *1 (D. Me. May 11,

2017) (same); *United States v. Stetkiw*, No. 18-cr-20579, 2019 WL 417404, at *2 (E.D. Mich.

---

[7]    Some economists have questioned bitcoin's effectiveness or efficiency as a medium of exchange, a method of payment, and a store of value.  *See, e.g.*, Bennet T. McCallum, *The Bitcoin Revolution*, 35 CATO J. 347, 349 (2015) (noting that bitcoin is not "generally acceptable" and that "there are very few . . . basic payments" that most participants in the U.S. population can make with bitcoin).  The instant concern, however, is whether bitcoin possesses the attributes of money not *"how well* . . . bitcoin [has] served *the function* of 'money.'"  Lo & Wong, *supra*, at 3 (emphasis added).

Feb. 1, 2019) (same); *United States v. Ologeanu*, No. 5:18-cr-81, 2020 WL 1676802, at *11 (E.D. Ky. Apr. 4, 2020) ("[T]he federal district courts have unanimously and univocally concluded that Bitcoin constitutes money." (internal quotation marks omitted)).  *But see United States v. Petix*, No. 15-cr-227A, 2016 WL 7017919, at *5 (W.D.N.Y. Dec. 1, 2016) (concluding, in a magistrate judge report and recommendation never adopted by the district court, that the ordinary meaning of money contemplates a connection to a sovereign).

Faced with this overwhelming authority, defendant, unsurprisingly, concedes that bitcoin is a medium of exchange, *see* Rough MTD Hr'g Tr. at 10:22–23, that bitcoin qualifies as funds, *see* Def.'s Reply at 7, and that bitcoin is a form of currency, *see* Def.'s Mem. at 1–2.  Indeed, defendant's own cited authorities repeatedly describe bitcoin as a "currency," *United States v. Ulbricht*, 858 F.3d 71, 83 n.3 (2d Cir. 2017), "a virtual, sovereign-free currency," *Brown*, 857 F.3d at 337, and "an alternative currency," *Costanzo*, 956 F.3d at 1091.  *See* Def.'s Mem. at 1–2. Defendant's quibble, then, is not with the conclusion that bitcoin is money, as that term is ordinarily defined, but with the conclusion that the ordinary definition of money governs.

Defendant maintains that the ordinary meaning of money is supplanted here by a specialized definition of money located in Title 28 of the D.C. Code, which is where the District codified the UCC.  *See* D.C. Code § 28:1-101(a) ("This subtitle may be cited as the 'Uniform Commercial Code.'"); *Heller v. Buchbinder*, 399 A.2d 850, 852 n.2 (D.C. 1979) ("Title 28 of the D.C. Code is popularly known and cited as the Uniform Commercial Code Secured Transactions.").[8]  The MTA, meanwhile, is housed in Title 26, covering regulation of banks and

---

[8]     A single-by-analogy citation in defendant's memorandum in support of his motion to dismiss suggests that he may view the UCC definition of money and the ordinary definition as equivalent.  *See* Def.'s Mot. at 3 ("That 'money' within the meaning of the D.C. Code is limited to that which is authorized or adopted by a government could not be more plain. *Cf. Wis. Cent. Ltd. v. United States*, 138 S. Ct. 2067, 2070-71 (2018) (declining to expand definition of 'money remuneration' to include stocks).").  Defendant's reasoning, to the extent discernable, is flawed. *Wisconsin Central*, which interpreted the phrase "money remuneration" in the Railroad Retirement Tax Act of 1937, looked to the "ordinary meaning" of "money" "at the time Congress enacted the statute," *i.e.*, in 1937.  138 S. Ct. at

other financial institutions.  Defendant's reading is thus premised on a presumption of consistent usage — the idea that a term generally means the same thing within, or sometimes even across, different subject-matter statutes.  *See, e.g.*, *Fadero v. United States*, 59 A.3d 1239, 1250 (D.C. 2013) ("Where a particular term is used in different sections of the same statute, we assume that the term will have a 'consistent definition unless otherwise indicated or obvious from the face of the statute.'" (quoting *Carey v. Crane Serv. Co.*, 457 A.2d 1102, 1108 (D.C. 1983)); *K.L. v. Rhode Island Bd. of Educ.*, 907 F.3d 639, 646 (1st Cir. 2018) (internal quotation marks omitted) (referencing the "'whole code' canon," "under which courts construe terms across different" acts or titles of a legal code "consistently").  Yet this precept usually applies where the statute at issue contains a definition, not whenever a relevant term is defined somewhere in the governing code. *See, e.g.*, *United States v. E-Gold, Ltd.*, 550 F. Supp. 2d 82, 92 (D.D.C. 2008) ("[I]f a word is defined to mean something particular 'in this section,' then it will be given that definition only in that section and will be given . . . its ordinary meaning in the rest of the statute." (quoting Linda D. Jellum & David Charles Hricik, MODERN STATUTORY INTERPRETATION: PROBLEMS, THEORIES, AND LAWYERING STRATEGIES 137 (2006)); 2A Sutherland STATUTES & STATUTORY CONSTRUCTION § 47:7 (7th ed. 2007) ("Statutory definitions establish a term's meaning in the act in which the definition appears, or, for general interpretative statutes, a definition extends to as much legislation as the general act designates.").  Even in cases where the statute at issue supplies a definition, "like other canons of construction," the presumption of consistent usage is "'no more than [a] rul[e] of thumb'" and can be overcome by context.  *Sebelius v. Auburn Reg'l*

2070 (internal quotation marks omitted).  Back then, according to the *Wisconsin Central* majority, "'money' was ordinarily understood to mean currency 'issued by [a] recognized authority as a medium of exchange.'"  *Id.* at 2070–71 (quoting WEBSTER'S NEW INT'L DICTIONARY 1583 (2d ed. 1942)).  The MTA, however, was enacted in 2000. Under *Wisconsin Central*'s original-meaning approach to statutory interpretation, then, definitions of money from 1937 are irrelevant here.  In any event, as the *Wisconsin Central* dissent noted, "the formal 'medium of exchange' definition is not the only dictionary definition of 'money,' now or then."  *Id.* at 2076 (Breyer, J., dissenting).

*Med. Ctr.*, 568 U.S. 145, 156 (2013) (alteration in original) (quoting *Connecticut Nat. Bank v. Germain*, 503 U.S. 249, 253 (1992)); *see also Util. Air Regulatory Grp. v. EPA*, 573 U.S. 302, 320 (2014) ("[T]he presumption of consistent usage readily yields to context, and a statutory term — even one defined in the statute — may take on distinct characters from association with distinct statutory objects calling for different implementation strategies." (internal quotation marks omitted)).

Clues in the MTA indicate that the D.C. Council intended for money to be given its ordinary meaning, not a specialized one. To start, the breadth of the MTA's definition of money transmission suggests that the goal is to regulate not just traditional transfers of fiat currency but all kinds of transfers of funds. That definition covers "receiving money for transmission" or "transmitting money" "by any and all means, including but not limited to payment instrument, wire, facsimile, or electronic transfer." D.C. Code § 26-1001(10). *United States v. E-Gold, Ltd.* relied on similar textual breadth to conclude that the BSA's definition of "money transmitting business" covers virtual currency transmission. 550 F. Supp. 2d at 94 ("A 'transmission' of 'funds,' in its ordinary sense, is not limited to cash or currency transfers, but may include transfers by check, wire or some other means. The statute itself even states that a transmission of 'funds' may be made 'by any means.'") (quoting 31 U.S.C. § 5330(d)(2)).

In addition, the MTA does not define money but does define fifteen other terms "[f]or the purposes of this chapter," including ones like "remit" that have ready common meanings. D.C. Code § 26-1001. Other chapters in Title 26 also include sections giving specialized meanings to terms (but never money), in those chapters. *See, e.g.*, D.C. Code § 26-301 (defining terms "for purposes of" the chapter on check cashers); *id.* § 26-631 (defining terms "for purposes of" the chapter on international banking). That the D.C. Council chose to give some banking and

financial terms specialized definitions but left money undefined signals that the D.C. Council did not intend for money to have a specialized definition for purposes of the MTA.  Put differently, if the D.C. Council had wanted to give money a specialized definition for purposes of the MTA, such a specialized definition could have been provided or cross-referenced.

Defendant resists this inference, insisting instead that, where a statute leaves a term undefined, courts should assume that the legislative body intended to define that term as it is defined elsewhere in the legal code.  This version of the presumption of consistent usage, sometimes called the whole code canon or rule, *see, e.g.*, *K.L.*, 907 F.3d at 646 (referencing the "whole code canon"); Nina A. Mendelson, *Change, Creation, and Unpredictability in Statutory Interpretation: Interpretive Canon Use in the Roberts Court's First Decade*, 117 MICH. L. REV. 71, 91 (2018) (identifying the "whole code rule" as "[i]dentical terms are presumed to have consistent meaning throughout the U.S. Code; different words are presumed to have different meanings" (citing Antonin Scalia & Bryan A. Garner, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 172 (2012)), has very limited application in practice.

Before addressing practice, though, the first problem with defendant's whole code argument is that the definition of money he favors — the one from the UCC that turns on sovereign backing — is not the only definition of money in the D.C. Code.  Title 15 of the D.C. Code's Chapter on Uniform Foreign-Money Claims defines "money" more broadly than the definition provided in UCC's title 28, as follows: "for the purposes of th[at] chapter," as "a medium of exchange for the payment of obligations or a store of value authorized or adopted by a government or by an intergovernmental agreement."  D.C. Code § 15-901(7).  Defendant offers no reason to favor importing in the MTA the UCC definition over the one in Title 15.  The mere

existence of multiple definitions of money in the D.C. Code undermines defendant's unexplained assumption that the Title 28 definition must control across the whole code.

The second problem with defendant's whole code argument is that the whole code rule has recently been applied by the Supreme Court and the D.C. Court of Appeals only where the statutory provisions were enacted very close in time.  *See* Mendelson, *supra*, at 119 (concluding this about the Supreme Court based on a comprehensive empirical survey of Supreme Court cases since 2006).[9]  In *Fadero v. United States*, the D.C. Court of Appeals explained that "[w]here a particular term is used in different sections of the same statute, we assume that the term will have a 'consistent definition,'" and extended "that . . . same interpretive principle" to cases where "two amendments to similar statutes . . . were enacted by the Council in the same bill containing (at the time) the only two appearances of the" relevant "phrase."  59 A.3d at 1250–51 (footnotes omitted) (quoting *Carey*, 457 A.2d at 1108); *see also Mohamad*, 566 U.S. at 455 (relying on definition of "person" in a statute enacted by the "very same Congress" as the statute at issue).  By contrast, in *Gomez-Perez v. Potter*, for example, the Supreme Court rejected the whole code rule because the "two relevant provisions were not considered or enacted together."  553 U.S. 474, 486 (2008).  Following these cases, the whole code rule — and thus the definition of money found in the UCC's Title 28 of the D.C. Code — is unhelpful here:  The MTA was enacted by the D.C. Council in 2000.  The UCC, including its definition of money, was adopted for D.C. by Congress a decade before home rule, in 1963.  *See* 77 Stat. 632, Pub. L. 88-243, § 1 (1963).

---

[9]     The Supreme Court has used statutory definitions enacted in different legislative sessions to confirm interpretations already supported by other evidence.  *See Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 448 n.3 (2006) (confirming definition of "contract" in Federal Arbitration Act, from 1947, with reference to a definition in the Sherman Antitrust Act, from 1890).  Those applications are inapposite because defendant here offers no other evidence for his interpretation.

Features of the UCC other than its date of enactment confirm that the UCC's definition of money should not supersede that term's ordinary meaning for purposes of the MTA. The text of the UCC's general definitions section, which contains defendant's favored definition of money, states that the "words or phrases defined in this section," apply "[u]nless the context otherwise requires," D.C. Code. § 28:1-201(a), and the editor's notes explain that "[t]he reference . . . to the 'context' is intended to refer to the context in which the defined term is used in the Uniform Commercial Code," Editor's Notes to § 28:1-201. A leading treatise reads this language as a rule that the UCC's definitions "only apply with respect to transactions covered by the UCC." Lawrence's Anderson on the Uniform Commercial Code § 1-103:81 [Rev] (3d. ed. 2019 Update).[10] At the very least, the text of the UCC urges attention to "context" before applying UCC definitions, a caution that should especially apply outside that law. D.C. Code. § 28:1-201(a).

Differences in the purposes and objects of the UCC and MTA counsel against applying the UCC definition in the MTA context. Contrast the two laws: The UCC generally governs commercial transactions between private parties. Among the law's stated "purposes" are "[t]o simplify, clarify, and modernize the law governing commercial transactions" and "[t]o make uniform the law among the various jurisdictions." D.C. Code § 28-103. Meanwhile, the MTA establishes a regulatory and licensing scheme for money transmitters, and its purposes, discussed

---

[10] The treatise adds that courts may still "mak[e] reference to the UCC definition when a non-UCC statute, which lacks a definition, and the UCC are *in pari materia*." *Id.* "Statutory provisions *in pari materia* relate to the same subject matter or have the same purpose or object." *Holt v. United States*, 565 A.2d 970, 975 (D.C. 1989); *see also, e.g.*, *Sivaraman v. Guizzetti & Assocs., Ltd.*, No. 18-CV-1201, 2020 WL 3088865, at *7 (D.C. June 11, 2020) (discussing the similar "doctrine of *in pari materia*" — that "laws dealing with the same subject . . . should if possible be interpreted harmoniously" (alteration in original) (internal quotation marks omitted); *Smith v. City of Jackson, Miss.*, 544 U.S. 228, 233 (2005) ("[W]hen Congress uses the same language in two statutes having similar purposes, particularly when one is enacted shortly after the other, it is appropriate to presume that Congress intended that text to have the same meaning in both statutes."). As discussed, *infra* in text, the differing purposes and objects of the UCC and MTA mean that the statutes are not *in pari materia*.

23

further below, are consumer protection and ensuring the stability of money transmitting

businesses.  *See infra* Part II.A.3.  Consistent with these purposes, the UCC contains no criminal

penalties, while the MTA does.  The UCC thus aims to lay down uniform rules for private

parties' commercial transactions, while the MTA uses licensing requirements and other tools —

including criminal penalties — to regulate a type of business.  *Cf.* Sarah Jane Hughes & Stephen

T. Middlebrook, *Advancing A Framework for Regulating Cryptocurrency Payments*

*Intermediaries*, 32 YALE J. ON REG. 495, 502 (2015) (describing the UCC as a form of regulation

that "serve[s] private-law purposes by, for example, establishing default rules among

counterparties to certain kinds of transactions" and contrasting this with forms of regulation "for

primarily public-law purposes such as collecting taxes or deterring money laundering" or for

"market-enhancing" purposes).  The laws thus have different purposes and objects, even if they,

in part, touch on and regulate a similar subject matter — money.  *Cf. Burney v. Thorn Americas,*

*Inc.,* 944 F. Supp. 762, 768 (E.D. Wisc. 1996) ("The U.C.C. has no applicability in interpreting

the [Wisconsin Consumer Act's] definition of consumer act because the statutes have different

language and because the U.C.C. covers commercial transactions involving highly sophisticated

commercial actors—as compared to the average consumer. Especially when faced with a broad

statute like § 421.301(9), the court should not artificially limit it by comparing it to statutes with

different language and different purposes."); *cf. Morris v. Osmose Wood Preserving*, 667 A.2d

624, 635 (Md. 1995) (concluding that importing the UCC definition of "consumer goods" into

the Maryland Consumer Protection Act would "not be entirely workable" because under the

UCC definition, "a merchant could never commit an unfair or deceptive trade practice in the

offer for sale of consumer goods.").  *But see Fish v. Home Depot USA, Inc*., 455 F. App'x 575,

583 (6th Cir. 2012) ("Thus, considering Michigan's Compiled Laws as a whole, the word

conspicuous should be given the same meaning under the [Michigan Consumer Protection Act] as it has under Michigan's Uniform Commercial Code.").

Tellingly, defendant does not attempt to argue that previous courts have applied the UCC's definition of money to clarify substantive criminal law.[11]  When other courts have referred to the UCC's definition of money in non-UCC cases, they have done so in commercial settings: bankruptcy suits, *e.g.*, *In re Tusa-Expo Holdings, Inc.*, 811 F.3d 786, 796 n.24 (5th Cir. 2016); *In re Hokulani Square, Inc.*, 460 B.R. 763, 770 (B.A.P. 9th Cir. 2011); *In re Hill*, No. 1:14-BK-15544-SDR, 2015 WL 5575499, at *3 n.2 (Bankr. E.D. Tenn. Sept. 18, 2015); *In re Radical Bunny, LLC*, 459 B.R. 434, 439 n.4 (Bankr. D. Ariz. 2011); breaches of contract, *e.g.*, *Orlowski v. Bates*, 146 F. Supp. 3d 908, 924 n.4 (W.D. Tenn. 2015); and tax delinquency, *e.g.*, *Cuyahoga Cty. Treasurer v. Samara*, No. 9977, 2014 WL 3029617, at *3 (Ohio Ct. App. July 3, 2014) (using the UCC meaning to evaluate the validity of financial instruments).  Just once, a Texas appeals court relied on the UCC "money" definition to construe a state money laundering statute, and was later admonished by the reviewing court.  *See Ex parte Ellis*, 279 S.W.3d 1, 25 (Tex. App. 2008), *aff'd*, 309 S.W.3d 71, 82 (Tex. Crim. App. 2010) (holding that the lower court should not have considered an as-applied challenge at the pre-trial stage at all).  This Court joins others, then, in declining to use the UCC to define the reach of state criminal law.

---

[11]      Indeed, in arguing that "courts look to UCC definitions in other contexts, despite the Government's insistence to the contrary," Def.'s Reply at 3, the defendant cites only to *Algemene Bank Nederland v. Soysen Tarim Urunleri Dis Ticaret Ve Sanayi, A.S.*, which did not involve the definition of money and which merely applied the principles discussed in the previous paragraph, allowing that "analogies to the []UCC may be drawn" in adjacent contexts.  748 F. Supp. 177, 181 (S.D.N.Y. 1990).  *Algemene Bank Nederland* does not help the defendant.

> ### 2.     The MTA's History Supports Construction Encompassing Transmission of Bitcoin

Defendant argues that both past practice and the legislative history of the MTA support his reading. He misreads both. Consequently, neither changes the conclusion already reached: that the MTA adopts the ordinary definition of money, which encompasses bitcoin.

> #### a)              Past Practice under the MTA

In support of his narrower construction of the MTA, defendant asserts that the District has, in practice, left bitcoin unregulated. He cites to a webpage about virtual currency published in 2014 by the District's Department of Insurance, Currency, and Banking (DISB), which is charged with enforcing the MTA. *See* D.C. Code § 26-1002(a); *see also* D.C. Reg. § 26-C2299. This webpage states: "Until this form of currency is regulated, D.C. residents should be aware of the increased risks." *See* Def.'s Mem. at 3 (quoting D.C. Dep't of Insurance, Securities, and Banking, *What you Should Know About Bitcoin and Other Virtual Currencies* (July 11, 2014), https://disb.dc.gov/sites/default/files/dc/sites/disb/page_content/attachments/DISBConsumerGuideVirtualCurrency%202018.pdf).[12] Based on this isolated quotation, defendant concludes that "for now, and in 2017," the sending and receiving of bitcoin "is and was unregulated." Def.'s Reply at 3. This DISB webpage cannot bear the weight defendant places on it. The page's purpose is to alert consumers that virtual currency poses risks that traditional currency does not. Given that audience and purpose, DISB's statement that bitcoin is not yet "regulated" is neither an official interpretation of the law nor, as it turns out, a precise description of past practice.

In reality, past practice cuts against defendant's reading of the MTA. Five virtual currency companies have obtained money transmitter licenses from DISB. The granting of these

---

[12]         For the webpage version of this PDF, see *What you Should Know About Bitcoin and Other Virtual Currencies*, D.C. DEP'T OF INSURANCE, SECURITIES, AND BANKING, https://disb.dc.gov/page/what-you-should-know-about-bitcoin-and-other-virtual-currencies.

licenses — to BitPay (MTR 1496848), Circle (MTR 1201441), Coinbase (MTR1163082), CoinList (MTR1785267), TZero Crypto (MTR1749137) — belies the contention that the District does not consider bitcoin a form of money that can be regulated under D.C. law.  *See* NATIONWIDE MULTISTATE LICENSING SYSTEM: CONSUMER ACCESS, https://www.nmlsconsumeraccess.org/ (containing listings of these registrations).[13]  In addition, that virtual currency companies have sought licenses in the District signals awareness among those companies that the District's MTA reaches virtual currency.  That Coinbase and Circle both obtained licenses in 2015 further evinces that companies have been so aware over the period that Helix was operating.  *See id*.

In addition, as the government notes, this is not the first prosecution applying the MTA to virtual currency.  In *E-Gold*, defendants who operated a business that exchanged traditional currency for bitcoin were charged with violations of the MTA, among other offenses.  Two defendants pled guilty to the D.C. charge alone.  *See United States v. E-Gold, Ltd.*, No. 07-cr-109, ECF Nos. 130 (Plea Agreement of R. Jackson); 142 (Plea Agreement of B. Downey).

An isolated statement on a webpage geared toward consumers cannot overcome this evidence that, in practice, virtual currency businesses have been regulated under the MTA.

### b)      *Legislative History of the MTA*

Relying on definitions of "money transmission" in two other states, defendant suggests that, if the District wanted virtual currency businesses to register as money transmitters, the D.C.

---

[13]      These businesses offer a variety of bitcoin-related services, including exchanging bitcoin and government-backed currencies, *see Leading U.S. Cryptocurrency Marketplace Steps Up Efforts to Expand Business*, CNBC.COM (Apr. 9, 2019), https://www.cnbc.com/2018/04/09/leading-us-cryptocurrency-marketplace-coinbase-steps-up-efforts-to-expand-business.html; hosting wallets, *see Crypto App*, TZERO, https://www.tzero.com/crypto-app (offering "an easy and secure crypto wallet and exchange service"); and even facilitating tax payments in bitcoin, *see The Implications of Accepting Cryptocurrency for Tax Payments*, AM. ENTER. INST. (July 3, 2019), https://www.aei.org/technology-and-innovation/innovation/the-implications-of-accepting-cryptocurrency-for-tax-payments/.

Council would "do what other states have done: amend" the MTA "to include not just 'money' but also 'monetary value' within its reach." Def.'s Mem. at 4; *see id.* at 3 n. 1 (citing N.C. Gen. Stat. § 53-208.42(13) (including within anti-money laundering statute's definition of "money transmission" not only "money" but also "monetary value"); S.C. Code § 35-11-105(9) (same)). Tracing the legislative history of the MTA, however, shows this assumption to be misguided.

The MTA, introduced in 1999 and enacted in 2000 in the District, "was adapted from a Model Legislative outline . . . prepared by the Money Transmitter Regulatory Association" in the early 1990s.  Charlene Drew Jarvis, Chair, Committee on Economic Development, *Bill 13-367: "Money Transmitters Act of 1999"*, D.C. COUNCIL at 3 (Jan. 20, 2000), https://lims.dccouncil.us/downloads/LIMS/7828/Committee_Report/B13-0367-COMMITTEEREPORT.pdf. [hereinafter, MTA Committee Report].  By contrast, the definitions of money transmission including the phrase "monetary value" cited by defendant come from an entirely different model law: the Uniform Money Services Act (UMSA).  *See Money Services Act*, UNIFORM LAW COMMISSION, https://www.uniformlaws.org/committees/community-home?communitykey=cf8b649a-114c-4bc9-8937-c4ee17148a1b&tab=groupdetails (listing North and South Carolina as states that have enacted this act); *see also* Nat'l Conf. of Commissioners on Uniform State Laws, Uniform Money Services Act at 15–16 (Last Revised or Amended in 2004) [hereinafter, UMSA (2004 draft)] (including those transmitting "monetary value" in the definition of money transmission and defining "monetary value" as "a medium of exchange, whether or not redeemable in money.").  That Uniform law, first drafted in 1998, drew on the earlier Model Legislative outline but also on other sources.  *See id.* at 30, 31, 35 (relying on this outline); *see also Committee Archive – Money Services Act*, UNIFORM LAW COMMISSION, https://www.uniformlaws.org/committees/community-

home/librarydocuments/viewdocument?DocumentKey=e5c71a1e-9208-4012-94d5-2b8ba166e134 (containing a draft from 1998). Defendant is correct that the UMSA included the term "monetary value" in its definition of money transmission to ensure that businesses sending and receiving emerging forms of e-payment would be regulated as money transmitters. *See* UMSA (2004 draft) at 19–21. The D.C. Council's choice not to enact the UMSA's language, which was in its early stages of development in 1999 when the MTA was introduced, does not, however, evince an intent by the D.C. Council to do the opposite — that is, to exclude businesses sending and receiving emerging forms of e-payment from regulation as money transmitters. Rather, the District's decision to adopt the Model Legislative outline rather than the UMSA could have been an accident of timing or even a considered decision to enact a simpler regime — one that does not adopt a specialized definition of either money or monetary value.

Indeed, defendant treads on dangerous ground in inferring anything about the scope of one state's law based on the omission of language included in another state's law. Such negative inferences about legislative intent are disfavored in evaluating acts of a single legislature, and they must be even less reliable across legislative bodies. *See Lindh v. Murphy*, 521 U.S. 320, 330 (1997) (recognizing that "negative implications raised by disparate provisions are strongest when the portions of a statute treated differently had already been joined together and were being considered simultaneously when the language raising the implication was inserted").

Cross-state inferences might be particularly unreliable in areas like this one where state laws and regulations lack uniformity. *See* THE VIRTUAL CURRENCY REGULATORY REVIEW (Michael S. Sackheim and Nathan A. Howell, eds., 2d ed. 2019) (noting the "existing patchwork of money service and money transmitter licensure laws, and other, sometimes ambiguous or duplicative, existing regulatory regimes that could be applied to [virtual currency business']

29

activities among the various states."). Some states have enacted the UMSA. *See Money Services Act*, Uniform Law Commission, https://www.uniformlaws.org/committees/community-home?communitykey=cf8b649a-114c-4bc9-8937-c4ee17148a1b&tab=groupdetails (displaying these states). Some states have unique language in their money transmitter laws identifying virtual currency transmitters as regulated businesses. *See*, *e.g.*, Ala. Code § 8-7A-2(8) (defining "monetary value" as "[a] medium of exchange, including virtual or fiat currencies, whether or not redeemable in money"). Still others like, Colorado, explicitly include certain virtual currency businesses through regulatory guidance. *See* Colo. Dep't of Regulatory Agencies, Div. of Banking, 'Interim Regulatory Guidance Cryptocurrency and the Colorado Money Transmitters Act' (Sept. 20, 2018) (including virtual currency exchangers that exchange cryptocurrency for fiat currency). New York even has a virtual currency–specific licensing regime. *See* N.Y. Comp. Codes R. & Regs. tit. 23, § 200.3 (requiring what is colloquially called a "BitLicense" for virtual currency business activities). At first glance, these examples might seem to support defendant's inference that the District's silence on the inclusion of virtual currency is evidence of intent not to regulate virtual currency. These examples, however, are washed out by others. As defendant points out, several states have explicitly exempted virtual currency from money transmission laws by regulation or statute. *See* Def.'s Not. of Supp. Authority ("Def.'s Not.") at 2, ECF No. 57; *see also e.g.*, Wyo. Stat. Ann. § 40-22-104(a) ("This act shall not apply to: (vi) Buying, selling, issuing, or taking custody of payment instruments or stored value in the form of virtual currency or receiving virtual currency for transmission to a location within or outside the United States by any means."); N.H. Rev. Stat. Ann. § 399-G:3(VI-a) ("The provisions of this chapter shall not apply to: (vi-a) Persons who engage in the business of selling or issuing payment instruments or stored value solely in the form of

convertible virtual currency or receive convertible virtual currency for transmission to another

location."); Penn. Dep't of Banking, *Money Transmitter Act Guidance for Virtual Currency*

*Businesses* (Jan. 23, 2019) (noting that the Pennsylvania "MTA defines 'money' as 'currency or

legal tender or any other product that is generally recognized as a medium of exchange' and

concluding that "[v]irtual currency, including Bitcoin, is not considered 'money' under the

MTA").  In this patchwork landscape, a state legislature's failure to specify that virtual currency

is money cannot be, and has not been, interpreted as a choice not to regulate virtual currency.

*See* THE VIRTUAL CURRENCY REGULATORY REVIEW, *supra*, at 354 ("At present, not every state

has taken a position, either through legislation or the actions of a regulator, regarding the

application of MTL statutes to virtual currencies.  Most notably, [California] has indicated that it

is reserving judgement regarding the potential application of the California [money transmitters]

statute to many virtual currency activities and the necessity of obtaining a licen[s]e.").  This is

particularly true for the District, which in practice, has evidenced the choice of licensing under

the MTA virtual currency businesses.  *See supra* Part III.A.(2)(a).

### 3.    The Rule of Lenity Does Not Apply

Finally, defendant invokes the principle that any "ambiguity concerning the ambit of

criminal statutes should be resolved in favor of lenity."  Def.'s Mem. at 4 (quoting *Skilling v.*

*United States*, 561 U.S. 358, 410 (2010)).  That rule is triggered only when "a reasonable doubt

persists about a statute's intended scope even *after* resort to 'the language and structure,

legislative history, and motivating policies' of the statute."  *Moskal v. United States*, 498 U.S.

103, 108 (1990) (emphasis in original) (quoting *Bifulco v. United States*, 447 U.S. 381, 387

(1980)); *see also U.S. Parole Comm'n v. Noble*, 693 A.2d 1084, 1103–04 (D.C. 1997)

(explaining that the rule of lenity is "a 'secondary' rule of construction" that can be considered

only after finding that "a penal statute's language, structure, purpose and legislative history leave

its meaning genuinely in doubt" (internal quotations omitted)).  The MTA's language, structure, and legislative history all point to the conclusion that the MTA's definition of "money" encompasses bitcoin.

Available evidence about the MTA's purposes provides further confirmation that the D.C. Council intended that the law reach a broad range of non-bank transmission services.  The D.C. Council repealed a 1978 law that "applie[d] only to issuers of money orders" in favor of the MTA, which was billed as "a comprehensive licensing and regulatory system to oversee the non-bank money transmission industry."  MTA Committee Report at 7, 10.  In requesting that the MTA be enacted, the District's mayor expressed concern about the recent proliferation of novel and varied forms of non-bank money transmission services and observed that the MTA would "provide safety and soundness protection for the many District of Columbia residents who use" such services.  Letter from Anthony A. Williams, Mayor, D.C., to Linda W. Cropp, Chairman, Council of the D.C. (Sept. 1, 1999), *reprinted in B13-0367 Introduction* 1, https://lims.dccouncil.us/downloads/LIMS/7828/Introduction/B13-0367-Introduction.pdf (discussing examples, including "foreign currency denominated checks; the issuance of travelers checks; and the domestic and foreign transfer of funds by wire and payment orders").  This evidence of concern with ensuring the safety and soundness of new and non-traditional non-bank money transmitters is consistent with the conclusion that the MTA regulates transmitters of bitcoin.

The text, structure, history, and purpose of the MTA show that the MTA adopts the ordinary definition of money, which encompasses bitcoin.  Defendant's arguments do not render the MTA ambiguous enough to trigger the rule of lenity.  *United States v. Burwell*, 690 F.3d 500,

515 (D.C. Cir. 2012) (declining to apply the rule of lenity where a defendant's arguments did not make the statute "grievously ambiguous").

*    *    *

In sum, because bitcoin qualifies as money under the MTA, defendant's motion to dismiss Count Three is denied.

### B.  Helix Was an "Unlicensed Money Transmitting Business" under 18 U.S.C. § 1960(b)(1)(B)

Defendant next argues that Count Two fails to state an offense.  Recall that Count Two tracks the subparagraphs of § 1960(b)(1), charging that defendant violated § 1960 in three ways: (1) by failing to comply with the District's money transmitter requirements, *see* 18 U.S.C. § 1960(b)(1)(A); (2) by "fail[ing] to comply with the money transmitting business registration requirements under" 31 U.S.C. § 5330 of the BSA, or "regulations prescribed under such section," *see id.* § 1960(b)(1)(B); and (3) by otherwise transmitting illegal funds, *see id.* § 1960(b)(1)(C); *see also* Indictment ¶ 18.  Defendant challenges the first and second parts of Count Two but not the third.  *See* Gov't's Opp'n to Def.'s Mot. to Dismiss ("Gov't's Opp'n"), at 28, ECF No. 39 (noting this and arguing that this "undisputed portion of the Indictment charging violation of 18 U.S.C. § 1960(b)(1)(C) cannot be dismissed").  He insists that, if his challenges succeed, Count Two cannot stand on the third part alone.  *See* Def.'s Reply at 4–5.  The basis for defendant's argument is that Count Two uses the conjunctive "and" to join the three parts, stating that defendant failed to comply with the District's MTA *and* failed to comply with the BSA's registration requirements *and* otherwise transmitted illegal funds.  *See* Indictment ¶ 18.  Defendant reasons that, given Count Two's use of "and," if the indictment fails to state an offense as to any one of Count Two's three portions, then all three parts of Count Two must fall. *See* Def.'s Reply at 4–5.

Defendant's argument turns the notice requirements for indictments on their head. Where, as here, Congress has provided alternative means of committing a crime, *see* 18 U.S.C. § 1960(b)(1) (separating these aspects of the definition of "unlicensed money laundering business" with an "or"), "[t]he correct method of pleading alternative means of committing" that crime "is to allege the means in the conjunctive," *United States v. Lemire*, 720 F.2d 1327, 1345 (D.C. Cir. 1983); *see also, e.g.*, *United States v. Bader*, 698 F.2d 553, 555 (1st Cir. 1983) ("The complaint does not use the statute's disjunctive 'or,' for the simple reason that, when a statute is phrased in the disjunctive, it is well-established that a criminal complaint based on that statute must be phrased in the conjunctive.").  In this context, "[t]he use of 'and' merely notifies the defendant that the government will try to prove each of the connected offenses."  1 Fed. Prac. & Proc.: Criminal 2d § 125 (4th ed.).  Indeed, "[t]o charge the offense in the disjunctive (as it appears in the strict language of the statute)," when the government intends to prove each of the connected offenses "would make the indictment bad for uncertainty."  *Joyce v. United States*, 454 F.2d 971, 976 (D.C. Cir. 1971).  At trial, though, "the government need prove only one of the conjunctively connected offenses to warrant conviction."  *Bader*, 698 F.2d at 555; *see also United States v. Coughlin*, 610 F.3d 89, 106–07 (D.C. Cir. 2010) ("[A]s the Supreme Court has repeatedly held, the government is entitled to prove criminal acts in the disjunctive, notwithstanding that the indictment charges them in the conjunctive." (citing *Griffin v. United States*, 502 U.S. 46, 56–60 (1991); then citing *United States v. Miller*, 471 U.S. 130, 136 (1985); and then citing *Turner v. United States*, 396 U.S. 398, 420 (1970)); *see also Turner*, 396 U.S. at 420–21 ("[W]hen a jury returns a guilty verdict on an indictment charging several acts in the conjunctive . . . the verdict stands if the evidence is sufficient with respect to any one of the acts charged.").

In short, although Count Two alleges the three means of violating § 1960(b)(1) in the conjunctive to give defendant full notice of the offenses charged, those three parts of Count Two need not rise and fall together, either in the indictment or at trial.  The government is therefore correct that, "*regardless* of the Court's decision on the instant motion to dismiss," and because "the undisputed portion of the Indictment charging violation of 18 U.S.C. § 1960(b)(1)(C) cannot be dismissed, . . . . Count Two (and its associated forfeiture authorities)" may "stand" on the third part of Count Two.  Gov't Opp'n at 28 (emphasis in original).

Nevertheless, for clarity as to what the government may seek to prove in this case, defendant's challenges to the first and second parts of Count Two are considered, and rejected.  Defendant's challenge to the first, state law–related portion of the charge is identical to his attack on Count Three and is unsuccessful for the reasons already articulated.  *See supra* Part II.A.  As to the second part of Count Two, defendant argues that Helix, as described in the Indictment, was not an "unlicensed money transmitting business" under 18 U.S.C. § 1960(b)(1)(B) "because the Indictment fails to allege that Helix did anything other than provide bitcoin back to the user from whom it was sent."  Def.'s Reply at 2.  For the reasons below, Helix, as described in the indictment, satisfies the definition of "unlicensed money transmitting business" at § 1960(b)(1)(B) because Helix's core business was receiving customers' bitcoin and transmitting that bitcoin to another location or person.

### 1.    *Relevant Meaning of "Unlicensed Money Transmitting Business"*

Section 1960 defines the terms "unlicensed money transmitting business," 18 U.S.C. § 1960(b)(1), and "money transmitting," *id*. § 1960(b)(2), but does not define "money transmitting business," *see, e.g.*, *United States v. Bah*, No. 06-cr-0243 (LAK), 2007 WL 1032260, at *1 (S.D.N.Y. Mar. 30, 2007) (noting that § 1960 has "somewhat peculiar terms"). The term "unlicensed money transmitting business" is defined in § 1960(b)(1), in the three ways

already discussed: (1) operation without complying with state law money transmitting

requirements, *id.* § 1960(b)(1)(A); (2) "fail[ure] to comply with the money transmitting business

registration requirements under" 31 U.S.C. § 5330 of the BSA, or "regulations prescribed under

such section," *see id.* § 1960(b)(1)(B); or (3) otherwise transmitting or transporting illegal funds,

*see id.* § 1960(b)(1)(C).  "[M]oney transmitting," meanwhile, is broadly defined at § 1960(b)(2)

as "includ[ing] transferring funds on behalf of the public by any and all means including but not

limited to transfers within this country or to locations abroad by wire, check, draft, facsimile, or

courier."  *Id.* § 1960(b)(2).

In interpreting the second prong of § 1960(b)(1)'s definition of "unlicensed money

transmitting business," courts have held that "there is virtually no substantive difference, nor did

Congress intend there to be a substantive difference, between the terms 'money transmitting' in

Section 1960 and 'money transmitting business' in Section 5330."  *E-Gold*, 550 F. Supp. 3d at

92 n.10; *cf. United States v. Budovsky*, No. 13-cr-368 (DLC), 2015 WL 5602853, at *8

(S.D.N.Y. Sept. 23, 2015) ("Against this backdrop, an indictment need only allege a violation of

§ 5330's implementing regulations to sufficiently allege a violation of 18 U.S.C.

§ 1960(b)(1)(B).").  Thus, for purposes of resolving defendant's second argument, the parties

focus on the definition of "money transmitting business" in the BSA, along with the definition of

"money transmitter" in the BSA's regulations.  *See* Def.'s Mem. at 5 (citing regulations

promulgated under the BSA to define the term); Def.'s Reply at 5–8 (discussing that regulation,

FinCEN guidance about the BSA, and § 5330); Gov't's Opp'n at 16–19 (arguing that Helix falls

under § 1960(b)(1)(B) because it was a "money transmitting business" as that term is defined in § 5330 and its regulations).[14]

Section 5330 of the BSA requires "[a]ny person who owns or controls a money transmitting business" to register the business and to comply with other requirements. 31 U.S.C. § 5530(a)(1). That provision defines "money transmitting business" as any business that:

> provides check cashing, currency exchange, or money transmitting or remittance services, or issues or redeems money orders, travelers' checks, and other similar instruments or any other person who engages as a business in the transmission of funds, including any person who engages as a business in an informal money transfer system or any network of people who engage as a business in facilitating the transfer of money domestically or internationally outside of the conventional financial institutions system.

31 U.S.C. § 5530(d)(1).[15]

Regulations promulgated under § 5330 require "money services businesses" (MSBs) to register with FinCEN. 31 C.F.R. § 1022.380(a)(1). Those regulations identify a category of MSBs called "[m]oney transmitter[s]," and defines money transmitter as follows:

> (5) Money transmitter—
> (i) In general.
>> (A) A person that provides money transmission services. The term *"money transmission services" means the acceptance* of currency, funds, or other value that substitutes for currency *from one person and the transmission of currency, funds, or other value* that substitutes for currency *to another location or person by any means.* "Any means" includes, but is not limited to, through a financial agency or institution; a Federal Reserve Bank or other facility of one or more Federal Reserve Banks, the Board of Governors of the Federal Reserve

---

[14] The parties suggest that the state law definitions of "money transmitting business" govern for purposes of § 960(b)(1)(A). The parties do not take explicit positions on what definition of "money transmitting business" governs the final prong of the definition of "unlicensed money transmitting business."

[15] Defendant concedes that bitcoin amounts to "funds," at least under 31 U.S.C. § 5330. *See* Def.'s Reply at 7 ("Mr. Harmon's argument does not depend on the argument that bitcoins are not "funds" under § 5330. We agree that argument is foreclosed, and we have never made it.").

> System, or both; an electronic funds transfer
> network; or an informal value transfer system; or
> (B) Any other person engaged in the transfer of
> funds.

31 C.F.R. § 1010.100(ff)(5)(1)(A) (emphasis added).

Interpreting these definitions of "money transmitting," 18 U.S.C. § 1960(b)(2), "money transmitting business," 31 U.S.C. § 5330(d)(1), and "money transmitter," 31 C.F.R. § 1010.100(ff)(5), courts in other criminal cases have held that § 1960(b)(1)(B) reaches unlicensed operations reaping a commission from exchanging traditional for digital currency, *see Stetkiw*, 2019 WL 417404, at *2; *Murgio*, 209 F. Supp. 3d at 710–11; *E-Gold*, 550 F. Supp. 2d at 94. Courts have also held that § 1960(b)(1)(B) reaches an unlicensed Darknet market that "received cash deposits from . . . customers and then, after exchanging them for Bitcoins, transferred those funds to the customers' accounts" hosted by the market, *Faiella*, 39 F. Supp. 3d at 546 (describing Silk Road), and an online "bank" and "payment processor" that hosted accounts holding virtual currency and processed transactions in virtual currency, *see Budovsky*, 2015 WL 5602853, at *1 (describing Liberty Reserve).

Defendant argues, relying on the text of the regulation defining "money transmitter[s]," that § 1960 "require[s] a money transmitting business to involve the transmission of money to a *third party or location*." Def.'s Mem. at 5 (emphasis in original). The government maintains that the statutory definition in § 5330 "is not limited to transmission to 'another location or person,'" Gov't's Opp'n at 18, and that Helix satisfied the statutory definition because it "engage[d] as a business in the transmission of funds" and "facilitate[ed] the transfer of money domestically or internationally outside of the conventional financial institutions system," *id.* at 17 (quoting 31 U.S.C. § 5330). Transmit and transfer, the verbs in the statutory phrases the government emphasizes, both mean to convey to another person or place. *See Transfer*, OXFORD

38

ENGLISH DICTIONARY (3d ed. 2002) ("The act of transferring or fact of being transferred;

conveyance or removal from one place, person, etc. to another; transference; transmission.");

*Transmit*, OXFORD ENGLISH DICTIONARY (3d ed. 2002) ("To cause (a thing) to pass, go, or be

conveyed to another person, place, or thing; to send across an intervening space; to convey,

transfer."); *Transmit*, MERRIAM-WEBSTER ONLINE, https://www.merriam-

webster.com/dictionary/transmit ("[T]o send or convey from one person or place to another.");

*Transfer*, MERRIAM-WEBSTER ONLINE, https://www.merriam-webster.com/dictionary/transfer

("[T]o convey from one person, place, or situation to another.").  Thus, both the statutory and

regulatory language of § 5330 seemingly require a money transmitting business to move funds

from one person or place to another.  *See* Bank Secrecy Act Regulations; Definitions and Other

Regulations Relating to Money Services Businesses, 76 Fed. Reg. 43585, 43592 (July 21, 2011)

(observing that although the phrase "to another location or person" "is not in the statutory

definition of money transmitting service, it is implicit in the statutory definition's use of the word

'transmitting'").

> In any event, the parties agree that if the indictment properly alleges that Helix qualified

as a "money transmitter" under the BSA's regulations, then the indictment states a violation of

§ 1960(b)(1)(B).[16]  As described in the indictment, Helix did qualify as a "money transmitter."

---

[16]    To be clear, the government concedes that alleging that Helix qualified as a "money transmitter" as defined
in the BSA's regulations is sufficient to state a violation of § 1960(b)(1)(B).  *See* Gov't's Opp'n at 16–19.  The
government does not suggest that proving a violation of those regulations is necessary, maintaining, as already
explained, that a violation of § 1960(b)(1)(B) also occurs where an entity "fails to register as required under the
*statutory text* of the BSA, 31 U.S.C. § 5330."  Gov't's Opp'n at 17 (emphasis in original).  The Second Circuit has
suggested that a conviction under § 1960(b)(1)(B) survives a sufficiency challenge even where the government does
not prove at trial that the business qualified as a "money transmitting business" under the BSA or a "money
transmitter" under the regulations, as long the relevant business was engaged in "money transmitting" under
§ 1960's separate definition of that term.  *United States v. Mazza-Alaluf*, 621 F.3d 205, 209 (2d Cir. 2010).  Again,
though, the consensus, which includes courts in the Second Circuit, is that alleging a violation of § 5330's
regulations is sufficient to allege a violation of § 1960(b)(1)(B).  *See Budovsky*, 2015 WL 5602853, at *8; *Murgio*,
209 F. Supp. 3d at 714.

###### 2.    *Helix, as Described in the Indictment, Moved Money from One Person or Place to Another*

The indictment alleges that "Helix enabled customers, for a fee, to send bitcoins to designated recipients in a manner which was designed to conceal and obfuscate the source or owner of the bitcoins."  Indictment ¶ 4.  For example, the indictment continues, in November 2016, an FBI employee "transferred 0.16 bitcoin from an AlphaBay wallet to Helix.  Helix then exchanged the bitcoin for an equivalent amount of bitcoin, less a 2.5 percent fee, which was not directly traceable to AlphaBay."  *Id.* ¶ 7.  All told, the indictment alleges, between 2014 and 2017, "Helix exchanged at least approximately 354,468 bitcoins — the equivalent of approximately $311 million in U.S. dollars at the time of the transactions — on behalf of its customers," with "[t]he largest volume of funds . . . c[o]m[ing] from Darknet markets selling illegal goods and services, including AlphaBay, Agora Market, Nucleus, and Dream Market, and other Darknet markets."  *Id.* ¶ 8.  These allegations, combined with the language of Count Two "set[ting] forth the offense in the words of the statute itself," properly allege a violation of § 1960(b)(1)(B).  *Hamling*, 418 U.S. at 117.

Helix, according to the indictment, mixed or tumbled bitcoins by transferring bitcoins from one person or location to another.  A Helix customer, like the FBI employee, would send bitcoin to addresses controlled by Helix.  Helix would then remit cleaned bitcoin — that is, bitcoin that "have never been to the darknet before," Indictment ¶ 5 — to an address or addresses designated by the customer.  These transactions might also occur in the reverse — from a clean address to a Darknet address.  Either way, one end of a Helix transaction, the indictment says, was often associated with a Darknet market, as in the FBI employee's transaction, which sent bitcoin "from an AlphaBay wallet."  *Id.* ¶ 7.  The other end, however, would typically be so associated.  Considering that Helix's alleged function, as advertised, was to clean bitcoin of links

40

to such Darknet sites, common sense dictates that the typical customer did not use Helix to send bitcoin between Darknet markets.  Instead, fairly read, the indictment indicates that the Helix usually sent bitcoin between an address associated with a Darknet market and a clean address, such as one associated with a mainstream exchange.

Transactions like these represent movement of bitcoin between two parties or locations. The FBI employee's transaction illustrates:  The "administrator of AlphaBay," referenced in the indictment, *id.* ¶ 15, had some control over "AlphaBay wallet[s]," *id.* ¶ 7; *see also* Rough Release Hr'g Tr. at 39:1–2 (testifying agent describing market wallets as "the custodial wallets of those markets"); *Faiella*, 39 F. Supp. 3d at 544 (explaining that the administrator of Silk Road, another Darknet market, had some control over funds in the market users' accounts). Thus, put in terms of transmission between parties, the transaction sent bitcoin from a "custodial wallet of" AlphaBay, *see* Release Hr'g Tr. at 39:2, to an account hosted by a mainstream exchange, or from AlphaBay to the FBI employee, if he designated an end-point address wholly controlled by him.  Put in terms of transmission between locations, the transaction sent bitcoin from an address — the one associated with AlphaBay — to another address — one not associated with AlphaBay.

Defendant mounts two counterarguments to this reading of the indictment, but neither succeeds.  First, defendant resists the conclusion that the indictment alleges transmission between parties.  He dismisses the allegation that Helix "enabled" customers to send bitcoins to any "designated recipients," *id.* ¶ 4, because "[w]hat Helix enabled is not the same as what it did," Def.'s Reply at 6.  He reads the indictment to allege that the "FBI agent sent bitcoin to himself," *id.*, as if using "a billbreak machine, in which a user inserts, for instance, a $100 bill and in return gets back" bills in different denominations, *id.* at 7.

Fairly read, though, the indictment alleges both that Helix enabled transmission of — and that it did transmit — bitcoin between parties. As already illustrated, the FBI employee's transaction started at an address controlled by or associated with a Darknet market and ended at a clean address controlled by a mainstream exchange or by the FBI employee. In such a transaction, and in its reverse — where bitcoin flows through Helix from a customer or mainstream exchange to a Darknet market — the customer is not necessarily sending bitcoin to himself. As noted, a customer's account on a Darknet market is typically controlled in part by the market's administrator, "similar to an E-Bay account." Rough Release Hr'g Tr. at 39:4–5. Consequently, other courts, as early as 2014, have held that transmission between a customer and that customer's account on a Darknet market constitutes transmission from a customer to a "third-party agent" — that is, the market. *Faiella*, 39 F. Supp. 3d at 544. A transaction like the FBI employee's that moved funds in the other direction — from the customer's account hosted by the Darknet market to another account not controlled by that market — would similarly qualify as transmission between parties.

Moreover, here, the indictment alleges that Helix received bitcoin to be transmitted to customers' "designated recipients." Indictment ¶ 4. This allegation fairly encompasses, for example, transactions taking the form of a customer sending bitcoin from a mainstream exchange through Helix to an address controlled by a Darknet market, with the aim of masking any links between the customer's mainstream exchange account and a Darknet purchase. *See* Gov't's Opp'n at 25–27 (stating that "evidence at trial will show" that Helix was used to do this); *cf.* Rough Release Hr'g Tr. at 50:9–51:22 (defendant's counsel questioning government agent using a hypothetical transaction in which counsel purchases shoes on a Darknet market by transmitting bitcoin from Coinbase through Helix to the Darknet market). To see once again why this

42

qualifies as transmission between parties, compare such a transaction to a common type of transaction by a virtual currency exchanger:  An "exchanger accepts currency or its equivalent from a user and privately credits the" user's virtual currency account hosted by the exchanger. Dep't of the Treasury FinCEN Guidance, *Application of FinCEN's Regulations to Persons Administering, Exchanging, or Using Virtual Currencies*, FIN-2013-G001 at 4 (Mar. 18, 2013) [hereinafter, 2013 FinCEN Guidance], https://www.fincen.gov/resources/statutes-regulations/guidance/application-fincens-regulations-persons-administering.  The exchanger then "transmits that internally credited value to third parties" when the user so requests.  *Id.*  The 2013 FinCEN Guidance concluded that this activity "constitutes transmission to another person, namely each third party to which transmissions are made at the user's discretion."  *Id.* at 4–5.  Thus, reading the indictment fairly, and in light of the legal interpretations available while defendant was operating Helix, the indictment alleges that Helix was in the business of transmitting funds from one person to another — i.e., the customer and a designated recipient . *Cf. Hamling*, 418 U.S. at 418 (rejecting defendants' challenge to sufficiency of indictment's factual allegations describing obscene material because "[t]he definition of obscenity . . .  is not a question of fact, but one of law").

Defendant's claim that the indictment needs more "proof," or that it must "point to" more transactions or to more details about the example transaction therefore either misreads the indictment or misconstrues the standard to which indictments are held.  *See* Def.'s Reply at 6. As already explained, "[t]o be sufficient under the Constitution, an indictment 'need only inform the defendant of the precise offense of which he is accused so that he may prepare his defense and plead double jeopardy in any further prosecution for the same offense.'"  *United States v. Williamson*, 903 F.3d 124, 130 (D.C. Cir. 2018) (quoting *Verrusio*, 762 F.3d at 13); *see also*

FED. R. CRIM. P. 7(c) (mandating merely an indictment give "a plain, concise, and definite written statement of the essential facts constituting the offense charged").  To satisfy those requirements, "[i]t is generally sufficient that an indictment set forth the offense in the words of the statute itself . . . accompanied with such a statement of the facts and circumstances as will inform the accused of the specific offen[s]e, coming under the general description, with which he is charged."  *Hamling*, 418 U.S. at 117 (internal quotation marks omitted).  This is not the rare case where some fact at "the very core of criminality" under the statute has been omitted.  *See Russell*, 369 U.S. at 764 (holding that indictments alleging a type of obstruction of Congress must identify the subject matter under congressional inquiry, as subject matter is "central to every prosecution under the statute").  The indictment meets the bar by repeating the statutory language, along with identifying the dates of Helix's operation, generally describing Helix's function, specifically stating how bitcoin flowed from Darknet markets through Helix, and alleging that most of Helix's transactions involved those markets.  *See Murgio*, 209 F. Supp. 3d at 711 (holding that indictment under § 1960 need not specify particular transactions of bitcoin exchanger to be sufficient); *see also United States v. Richard*, 775 F.3d 287, 292 (5th Cir. 2014) (holding indictment for bribery sufficient even though it did not include which transaction was the subject of a bribe or the name of the person involved in the bribe because it "track[ed] the language" of the statute); *United States v. Stringer*, 730 F.3d 120, 124 (2d Cir. 2013) (indictment for fraud sufficient when it generally described the means, although it did not name the names of those defrauded); *United States v. Resendiz-Ponce*, 549 U.S. 102, 107 (2007) (holding that an indictment for attempted illegal reentry "need not specifically allege a particular overt act or any other 'component par[t]' of the offense" (quoting *Hamling*, 418 U.S. at 119) (alteration in original)).  If defendant wants to further defend against the charge by challenging the sufficiency

of the government's evidence that Helix transmitted bitcoin between people, he has the notice he needs to do so.

Second, defendant insists that the indictment fails to state an offense on the theory that Helix transferred bitcoin from one location to another. Indeed, he maintains that "where bitcoin is involved," such a theory will always fail "because all bitcoin transfers take place in the same 'location' — the Bitcoin blockchain." Def.'s Reply at 8.[17] He stressed this argument after the motions hearing in supplemental briefing, insisting that "[w]hen a bitcoin transaction happens, nothing moves anywhere." Def.'s Supp. Mem. Re: Op. of Bitcoin Protocol at 3, ECF No. 55; *id*. at 2 ("[W]hen a user creates a transaction, nothing is sent anywhere."); *id*. at 3 ("Whether explained in legal or technical terms, bitcoin transactions do not involve the transfer of funds from one location to another."). Defendant's view of bitcoin transactions rests on an overly narrow understanding of "location." FinCEN has long considered transfers of funds from one unique account to another for the benefit of the same person, when the two accounts are subject to control or hosted by separate entities, to amount to a change of the funds' location. *See* Dep't of the Treasury FinCEN Guidance, *Application of FinCEN's Regulations to Certain Business Models Involving Convertible Virtual Currencies*, FIN-2019-G001 at 13–14 (May 9, 2019) [hereinafter, 2019 FinCEN Guidance] https://www.fincen.gov/sites/default/files/2019-05/FinCEN%20Guidance%20CVC%20FINAL%20508.pdf (stating that "FinCEN interprets the term 'another location' broadly" to include "transmission from [a] person's account at one

---

[17]    To be clear, defendant never disputes that bitcoin can be transferred from person to person in the way just discussed. To the contrary, in pressing his view about location and the blockchain, including in his last supplemental filing, defendant embraces descriptions of Bitcoin that emphasize that bitcoin can move between two parties — such as AlphaBay and an FBI employee. *See, e.g.*, Def.'s Not. at 2 ("[T]he right to a particular unit of digital currency is transferred from party to party by the use of unique cryptographic keys." (quoting Ex. A, Def.'s Not., Dep't of the Treasury Office of the Comptroller of the Currency, *Authority of a National Bank to Provide Cryptocurrency Custody Services for Customers*, Interpretive Letter 1170 at 5 (July 22, 2020)).

location (e.g., a user's real currency account at a bank) to the person's CVC account with the

exchanger"). Such a transfer of funds can occur on the Bitcoin blockchain.

      To see further how, compare a Helix transaction to one by a traditional money transmitter

like Western Union, which undoubtedly qualifies as a money transmission business under the

BSA and as a money transmitter under the BSA's regulations. These days, traditional money

transmitters offer services allowing customers to move money easily between bank accounts.

Such a service transmits funds from one location (bank account 1) to another (bank account 2),

not by effecting a physical move, but as altering the records in the bank's ledger system. In other

words, in effectuating a transfer between two bank accounts, a money transmitter does not

transport objects from one physical place to another but enters into a computer network a series

of numeric or alphanumeric identifiers, such as account numbers and routing numbers. This

information is sent between or within banks through secure communication networks. When the

transfer is complete, movement of funds from one account to another is reflected in changes to

the ledger or ledgers of the bank or banks involved. Transferring funds from one bitcoin address

to another is as much a transmission between locations. Bitcoins are virtual — they exist only as

entries in the Bitcoin network's ledger, the blockchain. Moving bitcoins from one address to

another requires announcing to a computer network, in a standardized format, alphanumeric

identifiers like the originating and terminating addresses and the public key. When the transfer is

complete, all that has changed is what address the bitcoin is associated with, and this change is

reflected as an entry on the blockchain summarizing the transaction. To complete the picture,

then, when Helix accepted bitcoins from the address where they were stored (*e.g.,* a mainstream

exchanger) and transmitted those bitcoins to a designated address or addresses on a Darknet

marketplace, for the benefit of the same person, that was transmission to a new location on the

blockchain hosted by a different entity, just as a traditional money transmitter's acceptance of funds from one bank account to send to another bank account is transmission to a new location. *Compare, e.g.*, *How to send and receive cryptocurrency*, COINBASE, https://help.coinbase.com/en/coinbase/trading-and-funding/cryptocurrency-trading-pairs/how-to-send-and-receive-cryptocurrency.html, *with*, *e.g.*, *What Information Do I Need To Send Money: Transfer to a Bank Account*, WESTERN UNION, https://wucare.westernunion.com/s/article/What-do-I-need-to-send-money?language=en_US#bankacc.

Defendant claims, vaguely, that this analogy is "inapt" because Bitcoin is decentralized — that is, its peer-to-peer network allows transfers without the need for intermediaries like banks or Western Union. Def.'s Reply at 7. True enough, but defendant never explains why this feature means that the Bitcoin blockchain is a single location rather than a record of all the locations — that is, the unique addresses — at which bitcoins are stored.[18] In any event, although the Bitcoin network can operate entirely peer-to-peer, it does not in practice, as the allegations in this indictment demonstrate. On the Bitcoin network, businesses like tumblers or exchangers facilitate transactions between people and hosts that would be difficult for individual users to do on their own.

This understanding of the Bitcoin network, and of the nature of the blockchain, is reflected in FinCEN guidance dating back to 2013 interpreting the relevant regulations. The 2013 FinCEN Guidance explained that transmission between accounts still qualifies as transfer between locations when one of the accounts is a virtual currency address. As FinCEN explained,

---

[18]    Indeed, blocks and transactions on the blockchain share a salient attribute of physical locations: just as physical locations have unique geographic coordinates, blocks appended to the "blockchain (including all of the transactions that were bundled up into that block) are subject to a specific mathematical algorithm that results in a unique 'hash.'" The Blockchain: A Guide for Legal & Business Professionals § 1:2. Defendant recognized as much at the hearing on the motion for release of funds, stating that "each bitcoin is unique" because "there is a unique value for every transaction" of bitcoin "that is confirmed by the network." Rough Release Hr'g Tr. at 10:4–10. "[E]very bitcoin stays unique," he added, so "you can trace it through its history." *Id.* at 10:16–17.

one form of virtual currency exchanger "accepts real currency or its equivalent from a user . . . and transmits the value of that real currency to fund the user's . . . virtual currency account" hosted by the exchange.  2013 FinCEN Guidance at 4.  Over a decade ago, *E-Gold* held that exchangers doing this qualify as money transmitting businesses under § 1960(b)(1)(B) because they "transfer funds on behalf of the public."  550 F. Supp. 2d at 97.  In the 2013 Guidance, FinCEN further explained this conclusion: "This circumstance," FinCEN wrote, "constitutes transmission to another location, namely from the user's account at one location (e.g., a user's real currency account at a bank) to the user's convertible virtual currency account with the administrator" of the exchange.  2013 FinCEN Guidance at 4.  A 2019 FinCEN Guidance reiterated that "transmission to another location occurs when an exchanger selling [virtual currency] accepts real currency or its equivalent from a person and transmits the [virtual currency] equivalent of the real currency to the person's [virtual currency] account with the exchanger."  2019 FinCEN Guidance at 13–14.[19]  Just like a virtual currency exchanger, Helix received bitcoin from one location — for example, an account associated with a wallet hosted by AlphaBay — cleaned that bitcoin, and transmitted the cleaned bitcoin to a new location — for example, an account associated with a mainstream bitcoin exchange.

The 2019 Guidance went on to embrace this very comparison, concluding that certain "anonymizing services providers" like "mixers" or "tumblers" qualify as money transmitters for the same reasons.  *Id.* at 19.  "[A] person that" possesses "anonymity-enhanced" bitcoin and "uses [that] anonymity-enhanced" bitcoin "to pay for goods or services on his or her own behalf

---

[19]     Although the 2019 Guidance was published after Helix shut down, the Guidance is nonetheless helpful in interpreting FinCEN's regulatory language and indeed, more generally, the meaning of terms like transmission and transfer in § 5330 of the BSA.  As the Guidance notes, it "does not establish any new regulatory expectations or requirements" but instead "consolidates current FinCEN interpretations to other common business models involving [convertible virtual currency] engaging in the same underlying patterns of activity."  2019 Guidance at 1.

would not be a money transmitter under the BSA," FinCEN stated. *Id.* at 21. "[T]he person will fall under the definition of money transmitter," however, if he "uses" the anonymized bitcoin in his possession "to accept and transmit value from one person to another person or location." *Id.* That is just what Helix did. Notably, the anonymizers FinCEN considered dealt only in virtual currencies, so, by accepting that an anonymizer could transmit value to another "location," FinCEN's analysis implicitly rejects defendant's position that the Bitcoin blockchain is a single location such that transfer between addresses on the blockchain is not transmission between locations. FinCEN's position is persuasive.

In sum, Helix, as described in the indictment, satisfies the definition of "unlicensed money transmitting business" at § 1960(b)(1)(B) because Helix's core business was receiving bitcoin and transmitting that bitcoin to another location or person. As a result, defendant's remaining challenge to Count Two is unsuccessful, and Count Two will not be dismissed.

## IV.  CONCLUSION

For the reasons given, the defendant's motion to dismiss Counts Two and Three of the indictment is denied. In addition, his motion for release of 160 bitcoins seized by the government is denied.

An appropriate Order accompanies this Memorandum Opinion.

Date: July 24, 2020

_____
BERYL A. HOWELL
Chief Judge