```
                  UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF COLUMBIA
    *  *  *  *  *  *  *  *  *  *  *  *  *  *
UNITED STATES OF AMERICA,          )  Criminal Action
                                   )  No. 19-395
vs.                                )
                                   )
LARRY DEAN HARMON,                 )  July 15, 2020
                                   )  10:03 a.m.
               Defendant.          )  Washington, D.C.
    *  *  *  *  *  *  *  *  *  *  *  *  *  *
```

**TRANSCRIPT OF VIDEOCONFERENCE PROCEEDING**
**BEFORE THE HONORABLE BERYL A. HOWELL,**
**UNITED STATES DISTRICT COURT CHIEF JUDGE**
**(All parties appear videoteleconference)**

**APPEARANCES**:

```
FOR THE GOVERNMENT: C. ALDEN PELKER
                    CHRISTOPHER B. BROWN
                    S. RIANE HARPER
                    U.S. Attorney's Office
                    For the District of Columbia
                    555 Fourth Street, NW
                    Washington, DC 20530
                    (202) 252-7153
                    Email: Christopher.brown6@usdoj.gov


FOR THE DEFENDANT:  JEAN-JACQUES CABOU
                    Perkins Coie LLP
                    2901 N. Central Avenue
                    Phoenix, AZ 85012
                    602-351-8000
                    Email: Jcabou@perkinscoie.com

                    CHARLES FLOOD
                    914 Preston
                    Suite 800
                    Houston, TX 77002
                    713-223-8877
                    Email: Charles@floodandflood.com

ALSO PRESENT:       SHAY HOLMAN, Pretrial Services

Court Reporter:     Elizabeth SaintLoth, RPR, FCRR
                    Official Court Reporter
```

```
         Proceedings reported by machine shorthand, transcript
              produced by computer-aided transcription.
```

1                         **P R O C E E D I N G S**

2                  THE DEPUTY:  Matter before the Court, Criminal

3       Case No. 19-395, United States of America versus Larry Dean

4       Harmon.

5                  Is Mr. Harmon present?

6                  Is Mr. Harmon present?

7                  THE DEFENDANT:  Yeah.  I am here.

8                  THE DEPUTY:  Okay.  Thank you.

9                  Counsel, please state your names for the record,

10      starting with the Government.

11                 MR. BROWN:  Good morning, Your Honor.

12                 AUSA Christopher Brown.

13                 THE COURT:  Good morning, Mr. Brown.

14                 MS. PELKER:  Good morning, Your Honor.

15                 This is Alden Pelker from DOJ.

16                 THE COURT:  Yes.  Good morning, Ms. Pelker.

17                 MS. HARPER:  Good morning, Your Honor.

18                 This is Ryan Harper also from DOJ.

19                 THE COURT:  Yes.  Good morning, Ms. Harper.

20                 And for the defendant?

21                 MR. CABOU:  Good morning, Your Honor.

22                 Jay Cabou on behalf of Mr. Harmon; and I have

23      asked Mr. Flood to call in as he is able.

24                 THE COURT:  All right.  Thank you, Mr. Cabou.

25                 MS. HOLMAN:  Shay Holman, Pretrial Services, Your

1    Honor.

2              THE COURT:  Yes.  Good morning.

3              All right.  So the motions hearing today on the

4    defendant's motion to dismiss Counts II and III -- since we

5    need to have a hearing, I guess, on the defendant's motion

6    on release of funds -- I have scheduled that hearing for

7    next week, July 21.

8              Is that date still good for the parties?

9              MR. BROWN:  Yes, Your Honor.  It still works for

10   the Government.

11             THE COURT:  Mr. Cabou.

12             MR. CABOU:  Your Honor, that is fine with the

13   defense as well.  We're planning to circle up with the

14   Government later today to talk about some logistics, but

15   that date is fine.

16             THE COURT:  Okay.  And this is all going to be

17   done by video conference.  So how many witnesses are going

18   to be called by each side, if any?

19             Mr. Brown, are you planning on calling any

20   witnesses?

21             MR. BROWN:  Your Honor, we are planning on making

22   the Government agent available for cross-examination.  And

23   it is possible that we will call a civilian witness who is

24   identified as "Individual A" in the Government's pleadings.

25             THE COURT:  Okay.  What about the defense?  It's

1     your motion.  You are going to go first.

2              What witnesses are you going to call?

3              MR. CABOU:  Your Honor, we are planning to confer

4     with the Government as to whether they intend to challenge

5     the sufficiency of Mrs. Harmon's affidavit regarding the

6     fact that the Harmons are without funds to hire counsel.

7              THE COURT:  So you are putting Miss Harmon on the

8     stand basically to testify; is that what you are going to

9     do?

10             MR. CABOU:  To the extent that the Government is

11    unwilling to accept her affidavit, we would plan to do that

12    Your Honor, yes.

13             THE COURT:  Well, is the Government willing to

14    accept the sufficiency of Miss Harmon's affidavit; or do you

15    want to cross-examine her?

16             MR. BROWN:  Yes.  Your Honor, I think we would

17    want to cross-examine her as of this -- based on our

18    pleadings, we challenge the sufficiency of the defendant's

19    showing as to financial need.  And so if the defense --

20    that's a defense burden that they have to meet.  And if they

21    believe that Miss Harmon is sufficient to meet that burden

22    then, yes, we would like to cross-examine her.

23             THE COURT:  All right.  So we'll start with

24    Miss Harmon.  I am presuming Miss Harmon is not

25    "Individual A"; so this Individual A would be another

1    person.  So we'll start with Miss Harmon.

2              Any other witnesses that are going to be called by

3    the defense in support of its motion for release of funds?

4              Is the defense going to call Individual A?

5              MR. CABOU:  Your Honor, we haven't had a chance to

6    discuss that and weren't aware the Government was planning

7    to do that.  I -- frankly, we have not made a decision on

8    that yet, Your Honor.

9              THE COURT:  Well, the defense certainly knows who

10   Individual A is; is that correct?

11             MR. CABOU:  I believe that we do.

12             MR. BROWN:  Yes.  And, Your Honor, we actually

13   sent the defense an email on Friday explaining that we were

14   at least considering, although we hadn't decided for sure,

15   that we were going to issue a subpoena for that person's

16   testimony; so the defense has had warning on that.

17             THE COURT:  Okay.  Could you speak up, Mr. Brown?

18             I couldn't hear the last part of what you said.

19             MR. BROWN:  Excuse me, Your Honor.

20             The defense has had warning because we sent them

21   an email on Friday indicating our intent to call that person

22   possibly, although we hadn't decided for sure.

23             THE COURT:  All right.  And to make sure that the

24   evidentiary hearing by videotape moves smoothly, have you

25   all discussed the exchange of documents that are clearly

1   numbered so that everybody knows if there's documents being

2   presented to one side or the other what those documents are?

3           MR. BROWN:  Yes, Your Honor.

4           Pursuant to our earlier joint report on the

5   evidentiary hearing, we had agreed to exchange numbered

6   exhibits between the parties and with the Court three

7   business days in advance; so that would be by tomorrow, Your

8   Honor.  So we will plan to do that and will do that with

9   Ms. Gumiel.

10          THE COURT:  Okay.  Good.

11          Now, I know in the motions the defendant wanted --

12  if I recall correctly, the defendant wanted -- before we

13  turn to the release of funds motion -- wanted resolution of

14  the motion to dismiss Counts II and III of the Indictment

15  which is the topic of our motions hearing today.  I am

16  probably not going to have that resolved by then, so I just

17  want to tell you, timingwise, that's going to be your

18  situation.

19          Do you all appreciate that?

20          MR. CABOU:  We understand that, Your Honor.

21          THE COURT:  All right.  I just wanted to make

22  sure.

23          Okay.  So now let's turn to the defendant's motion

24  to dismiss Counts II and III of the Indictment for failure

25  to state an offense.

1          So does the defense have anything to add to the

2     fairly substantial papers in the case?

3          MR. CABOU:  Your Honor, we'd be happy to, of

4     course, answer any questions the Court has but in terms

5     of -- otherwise, we would like to highlight a couple of

6     points if Your Honor has time for us today.

7          THE COURT:  Go forward.  Proceed.

8          MR. CABOU:  So, Your Honor, to summarize,

9     Mr. Harmon is charged in a three-count indictment, and we

10    have moved to dismiss two of them for several reasons.

11         The D.C. money transmission counts have been, I

12    think, fairly briefed.  I don't intend to spend a

13    significant amount of time on that; but I'd like to say that

14    it's a matter of statutory construction.  The only

15    definition of money in the D.C. Code is one that excludes

16    Bitcoin; and we believe that defeats Count III and defeats

17    Count II as pled.

18         THE COURT:  Okay.  So let me just stop you right

19    there because, as I understand your papers, you concede that

20    Bitcoin is a form of currency; is that right?

21         MR. CABOU:  Almost, Your Honor.

22         We concede that Bitcoin is funds within the

23    meaning of the relevant statutes.

24         THE COURT:  Okay.  You concede -- well, I just say

25    that because, in your motion to dismiss, you cite three

1    cases -- Ulbricht, Brown, Constanzo, all defining Bitcoin as

2    currency, virtual decentralized currency, virtual

3    sovereignty currency, and alternative currency.

4           So with your citation to all of those cases

5    calling Bitcoin currency, I thought that, in addition to

6    conceding that Bitcoin was funds under some definition --

7    certainly under the BSA, you also concede it was currency.

8           Am I correct on that?

9           Or, if not, why did you cite Ulbricht, Brown, and

10   Constanzo?

11          MR. CABOU:  Well, Your Honor, I think the question

12   of "currency" is one that's not implicated by D.C. law.

13   D.C. law speaks in terms of whether or not something is

14   issued by --

15          THE COURT:  Why did you cite those cases if you

16   are not conceding that Bitcoin is a form of currency?

17          MR. CABOU:  Your Honor, we cited those cases for

18   other purposes, including the fact that the federal courts

19   have reached conclusions about whether or not Bitcoin falls

20   within the federal definitions; but we don't believe those

21   cases speak to the issue of whether Bitcoin is money under

22   the D.C. money transmission law.

23          THE COURT:  Yes.  And you also said -- you said a

24   couple of times in your briefing that the definition that

25   should be used for how D.C. Code -- the D.C. Code defines

1    "money" is the definition of money under the UCC adoption by

2    D.C. in the D.C. Code.  So it's really, sort of, the D.C.'s

3    UC version of the UC definition of money.

4              And I think you said orally today -- you said it a

5    couple of times in your papers that that's the only

6    definition of money in the D.C. Code; so that's the

7    definition of money that should apply across the entire code

8    even in separate titles of the code.

9              Do I understand that part of your argument

10   correctly?

11             MR. CABOU:  You do, Your Honor.

12             We also noted that that definition is not

13   exclusive to the UCC, and that other jurisdictions that have

14   seen fit to legislate more specifically have adopted that

15   specific definition within their money transmission statute

16   for D.C. --

17             THE COURT:  Okay.

18             MR. CABOU:  Not to do that --

19             THE COURT:  Okay.  So let's just say if the D.C.

20   Code did not have a definition of money in the UCC section,

21   would you agree that in order to understand the use of the

22   term "money" that I would just turn to the ordinary

23   dictionary definition of money?

24             MR. CABOU:  I agree that that would be one source

25   to which you would turn to help resolve the ambiguity there,

1    yes.

2              THE COURT:  Okay.  So part of your reason that I

3    should use the UCC definition of money, as adopted in the

4    D.C. Code in Section 28-1-201, is because that's the only

5    definition of money in the D.C. Code.  That's part of your

6    argument, right?

7              MR. CABOU:  It is, Your Honor.

8              Legislatures are pursuant to the well-known

9    cannon, pursuant to the legislative background of the

10   statutes they have already passed and have knowledge of

11   those statutes and having already defined money.  We don't

12   believe --

13             THE COURT:  But doesn't -- but when I look at the

14   D.C. Code, I do see another definition of money in the D.C.

15   Code in Title 15, Chapter 9, which defines "money" under the

16   Uniform Foreign-Money Claims Act.  Under that definition of

17   money, it means:  A medium of exchange for the payment of

18   obligations -- a very broad definition -- or a store of

19   value authorized or adopted by a government or by an

20   intergovernmental agreement.

21             So why should I use -- why should I import the

22   definition of money under the UCC rather than the definition

23   of money under the Uniform Foreign-Money Claims Act in

24   Title 15?

25             I have got two definitions of money in the D.C.

 1    Code; so why pick one, not the other?

 2              MR. CABOU:  Well, Your Honor, we would say first

 3    of all that -- in terms of what is swept up within the ambit

 4    of the penal law that is then grafted on top of that, we

 5    would state that a narrower definition is appropriate to the

 6    extent that there is a question that puts the defendant on

 7    notice it is prohibited.  In terms of the --

 8              THE COURT:  So you would agree -- you would agree

 9    that the Title 15 D.C. Code definition of money would

10    include Bitcoin?

11              MR. CABOU:  I agree that Bitcoin is a medium of

12    exchange.  I do not -- I, of course, dispute that Title 15

13    should apply here; but I agree with Your Honor's premise

14    that Bitcoin is a meaning of exchange.

15              THE COURT:  And the only reason you think that I

16    should pick the UCC definition over the other D.C. Code

17    definition of money that would cover Bitcoin in Title 15 is

18    rule of lenity, that's your only reason -- other than eeny,

19    meeny, miny, mo?

20              MR. CABOU:  Your Honor, certainly not eeny, meeny,

21    miny, mo.  And yes as to the rule of lenity, to the extent

22    that is a principle that I believe applies here and that

23    would give Mr. Harmon, sort of, the benefit of any doubt

24    with regards to what is or isn't a money transmission.

25              THE COURT:  Okay.  Well, let me just tell you, I

1    found it very peculiar in your briefing that every single

2    time you cited to the definition of "money" that you are

3    asking this Court to import into -- from one title of the

4    D.C. Code into other title of the D.C. Code you miscited the

5    definition.

6          You cite it as D.C. Code Section 28:1-201; you

7    cite it as D.C. Code Section 28:1-201(24).  You never, in

8    your briefing, give the correct cite for the definition of

9    money, which is D.C. Code Section 28:1-201(b)(24).

10         You never pay any attention to the fact that the

11   UCC definition section, as adopted in the D.C. Code, has two

12   paragraphs in the definition in "A" and, then, in "B"; and

13   the "B" gives the definition.

14         Do you want to comment now on the significance of

15   the two subsections in the definition section of the UCC

16   part of the D.C. Code?

17         MR. CABOU:  Your Honor, I certainly apologize to

18   the extent that we did not properly explain that; that was

19   an oversight and an error.

20         I am not sure that I have a comment at this moment

21   about "A" and "B."  I am sorry that I don't have more to say

22   about that at this time; but definitely if Your Honor would

23   like to hear about that further we'd be happy to submit

24   something in writing on that.

25         THE COURT:  No.  It's very straightforward in the

1    UCC and how D.C. has adopted the UCC definitions.  It

2    purposely separated the definitions into subsections A and B

3    to make it clear that all definitions in the uniform

4    commercial code do not apply if the context otherwise

5    requires; so it emphasized, you could say, that the

6    definitions in the UCC are very contextual.

7            So I did find your argument on this -- I don't

8    know whether it was intended to be clever or just sophistry

9    with the misciting of the definition ignoring of the

10   importance of the two subsections, A and B, in the UCC

11   definition section and the repeated reference to the UCC

12   definition being the only definition of money in the D.C.

13   Code when it's not the case at all.  So I will just say that

14   this is a case of first impression, you know, in this court

15   and in this Circuit and a more careful briefing would have

16   been appreciated.

17           So one of the things that defendants suggest

18   relying most on Second Circuit case law is that he hadn't

19   been given fair warning that using, deploying, or offering

20   the service as Helix did as Bitcoin's tumbler and providing

21   customers with new Bitcoins was a money transmitting

22   business.

23           One of the things that you argue in this -- on

24   this point is that since one part, I guess, of the

25   defendant's Helix business was that it cleaned Bitcoin,

1  returned it to the same person; there was no transfer to a

2  new person or a new location so there was no money

3  transmission service that occurred.

4       Do I understand that part of your argument

5  correctly?

6       MR. CABOU:  Yes, Your Honor.

7       THE COURT:  And part of your reliance is on this

8  FinCEN guidance from 2013 that says:  Transmission occurs

9  with Bitcoin when it's transmitted to another location or

10  person.

11       And since Bitcoin is sitting on computers all

12  around the world, you would agree that location, in terms of

13  a physical location, doesn't really work well in translation

14  for Bitcoin.  Would you agree?

15       MR. CABOU:  Your Honor, I agree that as with other

16  advances in digital technology, of course, we have sort of

17  reached for physical world examples.  This one is a tough

18  one, just like a file cabinet was sort of a bad example for

19  search warrant law, that it's hard to place this innovation

20  of a decentralized ledger, a big spreadsheet, that's shared

21  by all different computers.  It is not squarely within the

22  definition of "location," that's for sure.

23       THE COURT:  Well, certainly not physical location.

24       But the blockchain itself -- each block on the

25  blockchain is a unique -- has a unique combination of public

1    address and private key.  And every time the Helix program

2    was used to clean Bitcoin it had to create a new block on

3    the blockchain with a new unique hash value.  So it was

4    unique, and it had a unique location on the blockchain;

5    wouldn't you say?

6              So why can't in the virtual world this new

7    block -- unique block on the blockchain, with a unique

8    combination of public address, private key hash value -- why

9    can't that be a location in this context?

10             MR. CABOU:  So, Your Honor, if I may, I just want

11   to sort of clear up some of the lexicon for us.

12             A block within the confines of blockchain -- it's

13   fine if we want to speak more colloquially.  But a block

14   would be many transactions that are mined together by

15   network miners; it's not necessarily the same as an entry on

16   a ledger which is, I think, what we're talking about here.

17             When a transaction is completed, that involves

18   essentially -- if you think of it as a big, Microsoft Excel

19   spreadsheet -- moving the value in cell A1 to the value in

20   cell B4 -- that's the transaction, as I understand it.

21             I am confident the Government will correct me if I

22   have misstated this and will provide testimony on this fact

23   if Your Honor would like.

24             But to the extent that -- so if we're talking

25   about simply making a new entry on a spreadsheet, I don't

1    agree that that is a different location within the meaning

2    of the money transmission law.  The transmission -- even the

3    transmission cases that the government cited, the Hawala

4    cases and others, all involve a different place -- a

5    different physical place in the world to which money was

6    being transmitted.  And here --

7           THE COURT:  So is it your argument that in the

8    Bitcoin context location is irrelevant and that you have to

9    have transfer from one person to another person for there --

10   to meet the definition of a money transmitting business?

11          MR. CABOU:  Your Honor, I would say that it's not

12   irrelevant.  It's plainly -- as the Government points out,

13   and we agree, the prong of the statute -- that prong cannot

14   be satisfied in any transaction with the same person.  The

15   ledger itself is the same place.  Those --

16          THE COURT:  And doesn't the Indictment talk about

17   using how Helix was used to send Bitcoin from one person to

18   another recipient after it had been cleaned?  And so I would

19   have to assume the allegations in the Indictment to be

20   correct for purposes of the motion to dismiss, so why -- why

21   doesn't that satisfy the transfer from one person to another

22   person?

23          MR. CABOU:  So, Your Honor, the Indictment speaks

24   of two things.  It speaks of one specific transaction -- the

25   only transaction that's actually pled is the FBI recover

1    transaction; and that went from the FBI agent back to

2    himself, so that's not it.

3            The second thing the Indictment speaks of, in

4    paragraph 4, is that Helix enabled customers for a fee to

5    send Bitcoin to designated recipients.  It doesn't say that

6    they were different people; it doesn't mean a single

7    transaction that went to someone else, and that's the key

8    here.  If they -- this relates also to our other pending

9    motion; but if the Government wants to plead that, of course

10   it can.

11           But the Government has not pled that Helix -- that

12   there was a transaction that went to any other person other

13   than this FBI agent, and that isn't a different person than

14   the person who originated the transaction.

15           And mostly -- I would say that paragraph 4 is

16   opaque as to what is actually being pled but they don't

17   plead it was a different person.  In fact, the whole theory

18   is that people were using this as a tumbling or

19   privacy-enhancing service themselves.

20           The theory isn't that -- at least not as I read

21   the Indictment -- the face of the Indictment speaks for

22   itself, and we agree with that -- that people go and they

23   get their own money back, much like as we mentioned in our

24   reply brief, sort of like a bill breaker machine, where you

25   would be taking your own -- that which you already have, and

18

1    give it back to yourself in a different form; that's the

2    exemplar transaction that they did with the UC.

3                THE COURT:  All right.  Is there anything further

4    you would like to add?

5                MR. CABOU:  Not at this time, Your Honor.

6                Thank you.

7                THE COURT:  Mr. Brown, or Ms. Pelker or

8    Ms. Harper.

9                MR. BROWN:  Yes, Your Honor.

10               THE COURT:  What would you like to add to your

11   papers?

12               MR. BROWN:  Your Honor, we believe that we have

13   briefed this extensively.  We are happy to answer any

14   specific questions, but there is nothing in particular we

15   need to add.

16               THE COURT:  All right.  Well, one of the arguments

17   that the defendant makes is that the Government is claiming

18   for the first time in this case that failure to register

19   with FinCEN alone would be one of the alternative bases

20   providing that Helix was a money transmitter.

21               Is the Government making that argument?

22               MR. BROWN:  Let me back up a little bit.

23               The Indictment pleads three ways in which the

24   defendant violated 18 U.S.C. Section 1960, one of those ways

25   is in violation of 1960 (b)(1)(B).  And the way that you

1    violate (b)(1)(B) is to fail to comply with the money

2    transmission business registration requirements under

3    Section 5330 of Title 21 -- in other words, under the

4    statute or under regulations prescribed under such statute,

5    so the FinCEN implementing regulations.  The Indictment

6    clearly pleads both of those bases under that federal prong.

7             And I am a little confused by the defendant's

8    argument because the entire basis of the federal prong to

9    begin with is that Helix was not registered with FinCEN as

10   an MSB although it was required to do so.  So I am not even

11   sure what the defendant's argument there is because that's

12   (b), the cornerstone of that charge.

13            THE COURT:  Okay.  So the defendants say that --

14   the defendant says that the Indictment never says that Helix

15   was used to send Bitcoin from one person to a different

16   person, and that the provision or the paragraph in the

17   Indictment that talks about senders of Bitcoin to Helix for

18   it to be sent to a designated recipient isn't sufficient and

19   doesn't mean that that designated recipient was another

20   person.

21            So is there a provision in the Indictment that

22   makes it clear that Helix was -- if location is irrelevant

23   in the Bitcoin environment, given the nature of the beast,

24   so to speak, that -- is there a provision in the Indictment

25   that talks about Bitcoin being transferred from a sender to

1    Helix and then to a third party?

2            MR. BROWN:  Yes, Your Honor.  And it comes out in

3    this way.  So the Indictment, as you mentioned, says this is

4    how Helix works.  Helix enables a sender to send Bitcoin to

5    a designated recipient.

6            In paragraph 8, we go on -- we state:  In fact,

7    Helix engaged in transactions on behalf of its customers to

8    the tune of more than $311 million.  So reading those two

9    paragraphs fairly together, I think you do get the idea that

10   Helix was, in fact, used by customers to send Bitcoin to

11   designated recipients.  It's a bit like having an Indictment

12   that says -- paragraph 1:  This is how a carburetor works;

13   paragraph 2:  A car with this carburetor traveled, you know,

14   100 miles or 311 miles.  It is a fair inference?

15           And the Indictment should be read fairly and not,

16   sort of, technicalistically (sic).  It should be read

17   fairly.  It's a fair inference, I think, that the car that

18   traveled 311 miles using this carburetor used it in the way

19   that we have explained the carburetor works.  So I think --

20           THE COURT:  So, in the Government's view, you do

21   have enough in the Indictment to say that Helix was used to

22   take Bitcoin from Person A and tumble it around, clean it

23   up, and then send it to Person B if -- if the definition --

24   as a definitional matter, for a money transmitting business,

25   it needs to have a transfer from one person to a different

1    person?

2              MR. BROWN:  Yes, Your Honor.  I think that --

3              THE COURT:  Okay.  So let's go to location.

4              The defendant appears to argue, if I'm

5    understanding this correctly, that the fact that every block

6    on the blockchain and every transaction with Bitcoin that

7    creates a new block or -- with a unique hashtag and unique

8    public key and unique private key -- all the confluence of

9    that is a unique part of the ledger or blockchain -- in the

10   defendant's view, that doesn't give you a new location.

11             What's the Government's view on that; do you

12   agree?

13             MR. BROWN:  No, Your Honor.

14             And I think the easiest way to think about

15   location is -- what the defense is arguing for is a very

16   narrow location, essentially GPS coordinates on a map.

17             But if you think about ordinary bank accounts, if

18   I am sending money to myself from a Bank of America account

19   to a Citibank account, what's relevant in terms of the

20   location of those accounts, in terms of the instructions I

21   give to the money transmitter, is not the GPS coordinates at

22   Citibank or Bank of America, it's my account number; it's

23   the bank name; it's the routing number; those are the

24   relevant location information that allows me to send money

25   from one place to another place, and it's exactly the same

```
1    on the blockchain.
2            And if you want to get technical about the
3    blockchain, every time Helix executed a transaction by
4    transferring funds -- by receiving funds from a customer and
5    then by sending funds to the designated address given by a
6    customer through Helix -- in order to execute those
7    transactions, Helix had to write those transactions onto the
8    blockchain, so the Court's understanding is --
9            THE COURT:  Mr. Brown, you just frozen.
10           I'm sorry.  Could you repeat what you just said
11   because you froze?  I didn't hear what you had to say.
12           MR. BROWN:  I apologize, Your Honor.
13           The Court's understanding is correct, every
14   transaction executed by Helix required writing a new piece
15   onto the blockchain, a new entry into the blockchain; and to
16   say that that's not a separate location, it's a separate
17   location within the blockchain, just as you would say where
18   are you in a file?  Where are you?  What cell are you in in
19   an Excel spreadsheet?  What account number should I send
20   this to at Bank of America?  Those are all -- so a smaller
21   iteration of location within the blockchain.  The defendant
22   concedes the blockchain itself is a location; that's in the
23   reply brief.
24           What they're arguing is -- they're saying the
25   blockchain is a location of individual blocks within the
```

1    blockchain location, and that doesn't make any sense, Your

2    Honor.

3            THE COURT:  Okay.  So let me just pursue that a

4    little bit because this is in some ways the intellectual

5    conundrum.

6            If everybody -- if you have a totally legitimate

7    transaction in Bitcoin -- not on the Darknet, not for drugs

8    or guns or anything like that -- you use Bitcoin to buy a

9    service, that's not a money transmitting business because

10   you are actually getting something different in value?

11           Let me just ask.  Why isn't anybody who does a

12   transaction with Bitcoin -- what makes any transaction in

13   Bitcoin -- let me start over.

14           What is the limit to the money transmitting

15   business when you're dealing with Bitcoin if every time you

16   exchange Bitcoin you are transferring to a new location or

17   to a new person, why isn't -- why aren't you a money

18   transmitter?  And what makes you not a money transmitter

19   required to register with any transaction on Bitcoin?  And

20   whatever that limit is, what makes the Helix different?

21           MR. BROWN:  Your Honor, that's an excellent

22   question.

23           The answer is in order to be a money transmitting

24   business you have to be a business.  So you have to be doing

25   this on behalf of the public as a business, and that's

1    written into the definition of 1960 --

2              THE COURT:  Well, 1960 is a weird statute, right,

3    because it defines unlicensed money transmitting business.

4    It defines money transmitting.  It has no definition of

5    money transmitting business.  For that definition, I think

6    each prong turns to a different source; is that right?

7              MR. BROWN:  Your Honor is correct.

8              Your Honor is correct, and let me amend my

9    statement.

10             There is -- so the word "business" is in 1960, so

11   money transmitting is defined.  But money transmitting

12   itself is not a crime; it's operating in money transmitting

13   business without a license if you are required to be

14   licensed.  So the definition of "business" is fleshed out in

15   plenty of case law; we cite it in our brief at the end of

16   our opposition on this section on business.  And,

17   essentially, it is this idea that you have to open yourself

18   to the public and do this as a business.

19             So the difference between Helix -- so I could

20   go -- if I own Bitcoin I could purchase something myself, in

21   which case I am just somebody transacting in money or funds

22   that I own or I could use a third party service; I could use

23   coin base; I could use Helix.  I could use any of these

24   other money transmitting businesses.  And these businesses

25   execute my transactions for a fee on behalf of me, and

1    that's the difference between a business and somebody who

2    simply owns and transacts in Bitcoin.

3         Take Bitcoin out of the picture here, it's the

4    difference between me owning cash and spending it myself or

5    me owning cash and going to Western Union or going to PayPal

6    or going to my bank or credit card company and using that

7    third-party intermediary to execute that transaction; that

8    is a clear dividing line and it's well fleshed out in the

9    case law defining businesses.

10        THE COURT:  Okay.  Anything further, Mr. Brown?

11        MR. BROWN:  No, Your Honor.

12        THE COURT:  Any response from Mr. Cabou?

13        MR. CABOU:  Your Honor, just briefly on the

14   analogy to a bank and to Western Union, those are both

15   places where, if you are transmitting money, it's to someone

16   else.  The basics of Western Union are well-known, and they

17   aren't about sending money -- giving money at the window and

18   then getting different money back at the same window.  You

19   have to either go somewhere else you might be traveling or

20   to send it to someone else.

21        In terms of the bank, because Bitcoin is

22   decentralized and because everyone shares the same ledger on

23   which those transactions are recorded -- and I think AUSA

24   Brown accurately characterized that as being recorded and

25   being written onto the blockchain, that also, again, is

1    different from a bank which doesn't share a ledger which has

2    to send it from Bank of America to Chase; that's a different

3    bank, a different institution, a different place.

4            Other than that, Your Honor, we would leave it

5    there and submit it on the papers and argument.

6            THE COURT:  Okay.  I will see you all again for

7    the hearing on Tuesday.  And I should be getting --

8            MR. CABOU:  Thank you, Your Honor.

9            THE COURT:  -- documents you plan on using as

10   exhibits -- I should anticipate getting those tomorrow,

11   Mr. Brown, is that what you all said?

12           MR. BROWN:  Yes, Your Honor.

13           Three business days in advance, so that would be

14   Thursday, tomorrow.

15           THE COURT:  All right.  Anything further today

16   from the Government?

17           MR. BROWN:  No, Your Honor.

18           THE COURT:  And Mr. Harmon.

19           MR. CABOU:  No, Your Honor.

20           THE COURT:  Thank you.  You are all excused.

21           (Whereupon, the proceeding concludes, 10:45 a.m.)

22

23

24

25

## CERTIFICATE

I, ELIZABETH SAINT-LOTH, RPR, FCRR, do hereby certify that the foregoing constitutes a true and accurate transcript of my stenographic notes, and is a full, true, and complete transcript of the proceedings to the best of my ability.

PLEASE NOTE:  This hearing was held telephonically in compliance with the COVID-19 pandemic stay-at-home orders and is therefore subject to the limitations associated with the use of technology, including but not limited to telephone signal interference, static, signal interruptions, and other restrictions and limitations associated with remote court reporting via telephone, speakerphone, and/or videoconferencing.

This certificate shall be considered null and void if the transcript is disassembled in any manner by any party without authorization of the signatory below.

Dated this 2nd day of October, 2020.

/s/ Elizabeth Saint-Loth, RPR, FCRR
Official Court Reporter