**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | |
| | : | |
| **v.** | : | **Criminal No. 19-cr-395 (BAH)** |
| | : | |
| **LARRY DEAN HARMON,** | : | |
| | : | |
| **Defendant** | : | |

**GOVERNMENT'S SUPPLEMENTAL MEMORANDUM**
**IN OPPOSITION TO THE DEFENDANT'S MOTION TO RECONSIDER**

The United States of America, by and through its attorney, the Acting United States Attorney for the District of Columbia, respectfully submits the following Supplemental Memorandum in Opposition to the defendant's Motion To Reconsider, ECF No. 63, pursuant to the Court's October 23, 2020 Minute Order. This response supplements the Government's Opposition to Motion To Reconsider, ECF No. 64, and its Notice of Supplemental Authority, ECF No. 62, which are incorporated herein by reference.

**INTRODUCTION**

On May 20, 2020, the defendant filed a motion to dismiss Counts Two and Three of the Indictment, arguing, *inter alia*, that the defendant did not violate D.C. Code § 26-1023(c) because bitcoin is not "money" within the meaning of the District of Columbia Money Transmitters Act of 2000 (the "MTA"), *see* ECF No. 39, at 2-4. The government filed its opposition on June 3, 2020. Oral argument on the motion to dismiss was held on July 15, 2020. This Court issued its Memorandum Opinion on July 24, 2020, construing the statutory term "money" as used in the definition of "money transmission" under D.C. Code § 26-1001(10), and holding that "bitcoin qualifies as money under the MTA." ECF No. 59, at 33.

Unbeknownst to the prosecution team in this case, on July 2, 2020, the defendants in an unrelated case in this District that was resolved in 2008, *United States v. E-Gold Ltd.*, No. 07-cr-109 (ABJ), filed a post-conviction Petition for Writ of Error Coram Nobis.  Because post-conviction litigation is handled by a separate division of the U.S. Attorney's Office, Special Proceedings, the prosecution team in this case only became aware of the *E-Gold* petition at the end of August as a result of internal communications within the office.  Specifically, in August 2020, the assigned Assistant United States Attorney for the *E-Gold* petition made an inquiry with another colleague in Special Proceedings, who referred him to two Assistant United States Attorneys in the Criminal Division, one of whom (now no longer employed by the U.S. Attorney's Office) then forwarded the inquiry on August 26, 2020 to the undersigned Assistant United States Attorney.  The *E-Gold* petition dealt primarily with unrelated issues—specifically, the defendants' claim that the government violated its *Brady* obligations by allegedly failing to disclose a favorable legal opinion prepared by the Florida Office of Financial Regulation.  In passing, the petition also referenced the discovery of a non-public opinion letter prepared in 2015 by the District of Columbia Department of Insurance, Securities and Banking ("DISB"), which post-dated the convictions in the *E-Gold* case.

The *E-Gold* defendants attached an exhibit to their petition that appears to show correspondence sent by DISB to an unaffiliated company, CMO, Inc. dba COEPTIS ("COEPTIS").  *See* ECF No. 62-1.  From the face of the document, it appears to include (1) a no-action letter dated June 23, 2016 from DISB to COEPTIS, informing the company that COEPTIS "does not require a money transmitter license" under the MTA; (2) a copy of a January 26, 2015 legal memorandum prepared by DISB on the "Regulatory Treatment of the Sale or Exchange of Decentralized Virtual Currency under the Federal Bank Secrecy Act and the District of Columbia

Money Transmitters Act of 2000" (the "Opinion Letter"); and (3) a copy of an internal June 2, 2016 e-mail from the Licensing Manager of DISB to the agency's Assistant General Counsel, opining that COEPTIS "does not require a money transmitter license" under the MTA, "based on the legal guidance provided in the attached memorandum." *See id.* The *E-Gold* petition did not explain how or when the *E-Gold* defendants discovered the COEPTIS correspondence. To date, the government is also unaware of how the non-public COEPTIS correspondence came to the attention of the *E-Gold* defendants.

Once the prosecution team in this case evaluated the *E-Gold* petition and realized the significance of the DISB Opinion Letter and COEPTIS correspondence, it promptly consulted internally and held informal discussions with DISB on September 3, 2020. The following week, on September 9, 2020, the government made a disclosure to the defense and filed its Notice of Supplemental Authority regarding the DISB Opinion Letter, ECF No. 62.

On September 30, 2020, the defendant filed a 2-page motion for reconsideration, arguing that the Court should reconsider its ruling construing the meaning of the term "money" under the MTA and dismiss Count Three and the state-law prong of Count Two. The government responded the following day. On October 23, 2020, a hearing was held on the motion for reconsideration.

Following the October 23, 2020 hearing, based on comments from the Court, the prosecution team contacted DISB again on October 26, 2020 and inquired as to DISB supplementing the record for this case. DISB wishes to be helpful to this Court, but, at this time, it is not in a position to submit a public declaration on behalf of the agency in this proceeding.

**ARGUMENT**

**I.      The Court Must Construe the MTA in the First Instance and Should Consider DISB's 2015 Opinion Letter Irrelevant**

It is a bedrock principle that courts, and not executive branch agencies, construe the law in criminal prosecutions.  Indeed, the Supreme Court has recently confirmed—not once, but twice—that prior interpretations of criminal statutes by executive branch agencies are not entitled to any deference.  First, in *Abramski v. United States*, 573 U.S. 169 (2014), the defendant was prosecuted for being a straw purchaser of a firearm under 18 U.S.C. § 922(a)(6).  *Id.* at 171.  Among other things, the defendant relied on historical (and subsequently reversed) "circulars" issued by the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") that purported to limit the circumstances under which a straw purchaser's misrepresentations were considered material under the law.  *Id.* at 191; *see also Abramski*, No. 12-1493 (Sup. Ct.), Petitioner's Br. at 7-8.  The Court rejected that argument outright, explaining that "[t]he critical point is that *criminal laws are for courts, not the Government, to construe*."  573 U.S. at 191 (emphasis added).  The same principle applies whether the agency interpretation counts in the defendant's favor—as in *Abramski*—or against him.  In either case, the Court confirmed that it is the "obligation" of courts construe the statute in the first instance and "correct" any error in the executive agency's analysis:

> We think ATF's old position no more relevant than its current one—which is to say, *not relevant at all*.  Whether the Government interprets a criminal statute too broadly (as it sometimes does) or too narrowly (as the ATF used to in construing § 922(a)(6)), a court has an obligation to correct its error.

*Id.* (emphasis added).

The decision in *Abramski* relied in turn on *United States v. Apel*, 571 U.S. 359 (2014), decided earlier the same year.  In *Apel*, the defendant was charged with trespassing on a military installation in violation of 18 U.S.C. § 1382.  *Id.* at 361.  As in *Abramski*, the defendant relied on prior interpretations of the criminal statute by executive branch agencies—namely, opinions from

the Air Force Judge Advocate General, and guidance in the United States Attorneys' Manual, both of which had adopted a narrow view of the circumstances under which § 1382 could be prosecuted. *Id.* at 1151.   But the Court declined to grant any deference to these executive agency determinations:   "Their views may reflect overly cautious legal advice based on division in the lower courts. Or they may reflect legal error. Either way, *we have never held that the Government's reading of a criminal statute is entitled to any deference*."   *Id.* (emphasis added); *see also, e.g.*, *Crandon v. United States*, 494 U.S. 152, 177 (1990) (Scalia, J., concurring in the judgment) ("The Justice Department, of course, has a very specific responsibility to determine for itself what this statute means, in order to decide when to prosecute; but we have never thought that the interpretation of those charged with prosecuting criminal statutes is entitled to deference.").   Thus, under both *Abramski* and *Apel*, the DISB Opinion Letter should be considered "not relevant at all" and not "entitled to any deference."

### a. *Chevron* Deference Does Not Apply to DISB's Opinion Letter or Its Decision as to COEPTIS

Notwithstanding the broad language of *Abramski* and *Apel*, which should end the inquiry, the D.C. Circuit has suggested there is an exception to the general rule of *Abramski* and *Apel* if, under appropriate circumstances, agency interpretation of a criminal statute satisfies the conditions for *Chevron* deference.[1]   *See Guedes v. Bureau of Alcohol, Tobacco, Firearms and Explosives*, 920 F.3d 1, 24 (D.C. Cir. 2019) (rejecting argument that there is any "general rule against applying *Chevron* to agency interpretations of statutes that have criminal-law implications").   As the Circuit explained, *Chevron* itself presented one example of a case where an agency's interpretation of a

---

[1] Under the "familiar two-step framework" of the *Chevron* doctrine, "[a]t Step One, the court asks if the statute unambiguously forecloses the agency's interpretation; if it does not, then at Step Two we defer to the administering agency's interpretation as long as it reflects a permissible construction of the statute."   *Friends of Blackwater v. Salazar*, 691 F.3d 428, 432 (D.C. Cir. 2012) (internal citations and quotations omitted).

regulatory statute—there, the EPA's interpretation of the Clean Air Act—raised potential criminal liability issues, because violations of the Clean Air Act could be prosecuted criminally. *See id.* (citing *Chevron U.S.A., Inc. v. NRDC, Inc.*, 467 U.S. 837, 840 (1984); 42 U.S.C. § 7413(c)(1)). Similarly, the SEC's interpretation of securities laws "regularly receives *Chevron* treatment" even though securities laws can be enforced through criminal prosecution. *Id.* The Circuit distinguished the agency interpretations at issue in *Abramski* and *Apel* because, in those cases, the agency opinions were issued "outside the context of a *Chevron*-eligible interpretation—that is, outside the context of an agency 'speak[ing] with the force of law.'" *Id.* at 25. (quoting *United States v. Mead Corp.*, 533 U.S. 218, 229 (2001)).

But even assuming *arguendo* such a *Chevron* exception to *Abramski* and *Apel* exists in general, it does not avail defendant here because the *Chevron* framework does not apply to DISB's non-public opinion letter. This inquiry, sometimes referred to as *Chevron* "step zero," is "the threshold requirement that an agency interpretation be of the sort that warrants *Chevron* analysis in the first instance." *Martin v. Social Security Administration, Comm'r*, 903 F.3d 1154, 1160 (11th Cir. 2018). To answer, courts look to the Supreme Court's guidance in *United States v. Mead Corp.*, 533 U.S. 218 (2001), and its progeny. These authorities uniformly weigh against according any deference to the DISB Opinion Letter or its no-action correspondence to COEPTIS.

As the Supreme Court explained in *Mead*, the *Chevron* doctrine rests on the assumption that Congress has delegated authority to an administrative agency to "speak with the force of law when it addresses ambiguity in the statute or fills a space in the enacted law." 533 U.S. at 229. Not every agency action, however, constitutes such an exercise of delegated authority: there must be either "express congressional authorization[] to engage in the process of rulemaking or adjudication that produces regulations or rulings for which deference is claimed" (as in formal,

notice-and-comment rulemaking), or else "circumstances pointing to implicit congressional delegation." *Id.* at 229, 238. In *Mead*, the Court looked to the formality of the agency action and whether it was intended to bind third parties. Thus, a one-off tariff classification letter issued by the U.S. Customs Service did *not* merit *Chevron* deference because it was "far removed . . . from notice-and-comment process," "stop[ped] short of third parties," and was "conclusive only as between [the agency] and the [party] to whom it was issued." *Id.* at 227-234. The Court elaborated on the *Mead* standard in *Barnhart v. Walton*, 535 U.S. 212 (2002), explaining that the applicability of *Chevron* also depends on "the interstitial nature of the legal question, the related expertise of the Agency, the importance of the question to administration of the statute, the complexity of that administration, and the careful consideration the Agency has given the question over a long period of time." *Id.* at 221.

Agency opinion letters rarely warrant *Chevron* deference. In *Christensen v. Harris County*, 529 U.S. 576 (2000), the Supreme Court considered whether a county government could rely on an opinion letter it obtained from the Department of Labor on its treatment of compensatory time under the Fair Labor Standards Act. *Id.* at 580-81. The Court categorically rejected the idea that courts should defer to the such an informal document: "Here . . . we confront an interpretation contained in an opinion letter, not one arrived at after, for example, a formal adjudication or notice-and-comment rulemaking. Interpretations such as those in opinion letters—like interpretations contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law—do not warrant *Chevron*-style deference." *Id.* at 587.[2]

---

[2] The D.C. Circuit has distinguished *Christensen*, but only in cases where an agency's advisory opinion carried additional indicia of formality and authority to commit the agency to a public position. *See, e.g.*, *In re Sealed Case*, 223 F.3d 775, 779-80 (D.C. Cir. 2000) (FEC's "probable cause determination" subject to *Chevron* where it was made under "detailed statutory framework for civil enforcement" that was "analogous to a formal adjudication," pursuant to "statutorily mandated adversarial process," and decision was made "made by the Commission itself, not

Indeed, it is apparent that the DISB Opinion Letter does not represent an example of an agency "speak[ing] with the force of law" such that its conclusions merit *Chevron* deference. *Mead*, 533 U.S. at 229.  First, the Opinion Letter and DISB's decision as to COEPTIS were non-public—and deliberately so.  Unlike many agencies, DISB has not published advisory opinions or guidance documents on the money transmitter licensing requirements of the MTA.  By transmitting its decision and legal justification privately, DISB could not have intended to guide third parties, let alone bind them.  It is also significant that DISB did not purport to bind *itself*, either explicitly or implicitly.  Neither the Opinion Letter nor the COEPTIS correspondence discussed how DISB had handled similar inquiries regarding the MTA.  That is strong evidence that DISB did not consult prior agency precedents—and, by implication, did not intend its COEPTIS decision to constitute a precedent for itself in future agency determinations.  Just the opposite:  the agency carefully cabined its decision as a one-off, fact-specific determination based on the representations provided by COEPTIS.  *See* ECF No. 62-1, at 1-2 (decision "[b]ased on" factual representations by COEPTIS, and any change in facts would require "further review and analysis" by DISB).  Such a non-public, non-precedential agency action can hardly be deemed worthy of *Chevron* deference.  *See Mead*, 533 U.S. at 233 (no deference where classification ruling "stops short of third parties" and was binding "only as between itself and the importer to whom it was issued"); *Barnhart*, 535 U.S. at 221 (deference depends on "the careful consideration the Agency has given the question over a long period of time").  Indeed, there is no evidence in the

the staff"); *FEC v. NRA*, 254 F.3d 173, 185-86 (D.C. Cir. 2001) (FEC "advisory opinion" subject to *Chevron* where it was made under "detailed framework for issuing advisory opinions," pursuant to "statutorily granted responsibility to interpret the Act," and was made with "binding legal effect on the Commission" and was intended to "create a 'safe harbor' for parties who rely on advisory opinions").  None of these additional factors are present in the non-public, informal, staff-level DISB Opinion Letter.

record that DISB currently considers the 2015 Opinion Letter to be the binding articulation of its legal views regarding the MTA's registration requirements.

Second, there is no evidence that the DISB Opinion Letter or its response to COEPTIS were the product of any formal, statutorily mandated process. *See FEC*, 254 F.3d at 185 (finding *Chevron* appropriate based in part on "detailed framework for issuing advisory opinions" set forth in statute); *N.Y. State Bar Ass'n v. FTC*, 276 F. Supp. 2d 110, 138 (D.D.C. 2003) (denying *Chevron* deference to FTC opinion letter that "was not the result of any notice-and-comment rulemaking or a formal adjudication," explaining that "absence of a deliberative process is significant"). The Opinion Letter appears to be an ad hoc, informal memorandum occasioned by "an increasing number of inquiries" by companies engaged in virtual currency business as of January 2015. *See* ECF No. 62-1, at 3. It was not formally adopted by DISB's Commissioner or otherwise announced as the official policy of the agency. And DISB's specific decision with respect to COEPTIS was memorialized *in an e-mail*, not a formal adjudication or rulemaking document. *See id.* at 8.

Finally, the statutory question at issue in the DISB Opinion Letter—the meaning of the term "money" under the MTA—does not implicate any particular technical expertise of the agency. *See Barnhart*, 535 U.S. at 221 (deference depends on "the related expertise of the Agency" on the issue before it). It is not, for example, a scientific or medical term that would benefit from the specialized expertise that an administrative agency can bring to bear. And, while DISB undoubtedly has expertise in the field of financial regulation, there is no evidence on the face of the Opinion Letter that DISB applied its subject matter expertise to the question of statutory interpretation before it. To the contrary, the Opinion Letter relied exclusively on *legal* authorities—Black's Law Dictionary and, to a lesser extent, IRS regulations—in construing the statute. As Judge Bates reasoned in a similar context, "the relevant legal question presents a fairly

conventional statutory interpretation issue, of the sort that courts have equal—if not greater—institutional competence in resolving." *Innovator Enterprises, Inc. v. Jones*, 28 F. Supp. 3d 14, 22 (D.D.C. 2014).

In short, the non-public, informal, staff-level Opinion Letter and DISB's one-off correspondence to COEPTIS do not merit deference under *Chevron* and should not be blindly applied to negate the Court's legal analysis in its July 24, 2020 Memorandum Opinion.

### b. The DISB Opinion Letter's Analysis Is Not Persuasive and Does Not Merit *Skidmore* Deference

To be sure, agency interpretations that do not merit *Chevron* deference may still be subject to respect under *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944). As the D.C. Circuit has explained, *Skidmore* deference simply means that courts should consider administrative agency interpretations as persuasive authority: "an agency action that is not entitled to *Chevron* deference is entitled to respect only to the extent it has the power to persuade." *Fox v. Clinton*, 684 F.3d 67, 76 (D.C. Cir. 2012) (internal quotations omitted).

The DISB Opinion Letter is not persuasive. First, it relies on a weak affirmative basis for its legal conclusion. The opinion rests almost exclusively on a definition of "money" from Black's Law Dictionary, which limits "money" to forms of exchange that are "authorized or adopted by a government." ECF No. 62-1, at 6. The exact same argument, however, had already been considered and rejected at the time the Opinion Letter was drafted in *United States v. Faiella*, 39 F. Supp. 3d 544, 545 n.2 (S.D.N.Y. 2014) (rejecting reliance on Black's definitions of "money" and "funds" to exclude bitcoin because the definitions "would only be relevant if Congress intended that these terms be given special meanings as legal 'terms of art'—something not remotely suggested in [18 U.S.C.] Section 1960"). This Court likewise considered the same Black's Law Dictionary definition in its July 24, 2020 Memorandum Opinion—and came to the

same conclusion, echoing *Faiella*, that "money is an 'ordinary English word[] and should be given [its] ordinary meaning,'" because "the D.C. Council intended for money to take its ordinary meaning in the MTA."  ECF No. 59, at 15 n.6 (quoting *Faiella*, 39 F. Supp. 3d at 545 n.2).  The Court should not find the Opinion Letter's reasoning persuasive after having *already* considered and rejected the exact same argument.[3]

The Opinion Letter also draws a dubious distinction between "two party" and "three party" virtual currency business models.  That distinction appears to be a misapplication of FinCEN's March 2013 Guidance, which discussed whether a virtual currency business might be classified as a "dealer in foreign exchange" or a "money transmitter" under FinCEN regulations.  *See* ECF No. 62-1, at 5-6.  The difference between those two classifications is immaterial for purposes of federal registration under FinCEN's regulations:  foreign exchange dealers and money transmitters are *both* considered to be "money services businesses" ("MSBs") and are required to be registered with FinCEN.  *See* 31 C.F.R. § 1010.100(ff) (defining "Money services business" to include subparts (ff)(1) through (ff)(7)); *id.* § 1010.100(ff)(1) ("Dealer in foreign exchange"); *id.* § 1010.100(ff)(5) ("Money transmitter"); *see also* 31 C.F.R. § 1022.380(a)(1) (requiring "money services business[es]" to register with FinCEN).  The Opinion Letter seized on this technical distinction—which has no bearing on the question of federal registration—and turned it into the single dispositive factor for deciding whether a license is required under D.C. law.  This is especially anomalous in light of DISB's recitation that it considered FinCEN guidance "most

---

[3] DISB also relied on an Internal Revenue Service notice that virtual currency should be treated "as property and not like currency."  ECF No. 62-1, at 6.  That is unpersuasive on its face:  there is no authority to support the assumption that IRS determinations *for tax purposes* should preempt or displace other regulatory regimes.  Just the opposite:  within the federal system, it is uncontroversial that IRS can treat virtual currency as an asset for tax purposes, while at the same time, FinCEN can treat virtual currency as money or funds for purposes of the Bank Secrecy Act.  There are other examples of items—like stocks or gold—that may be considered assets for tax purposes, while entities trading in them are subject to securities or commodities regulations.

instructive on how the District should regulate transactions involving virtual currencies," ECF No. 62-1, at 5, because it creates a rule that is the diametric *opposite* of FinCEN's rule:  if a virtual currency business qualifies as a "money transmitter" under federal regulations, then it is considered a "two party" business model that does *not* need a license under D.C. law.

The Opinion Letter's distinction between "two party" and "three party" business models also makes little sense as a matter of sound financial regulation.  The distinction depends on whether the business itself engages in "exchange" of virtual currency for national currency.  *See* ECF No. 62-1, at 1 (opining that COEPTIS did not need license because the company itself would operate "closed" system for sending only virtual currency, while "exchange" transactions involving national currency would be conducted by "independent financial institutions").  But the MTA regulates money *transmitters*, not just currency exchangers.  Indeed, it is arguably the *sending* of virtual currency from one location or person to another that most directly implicates the legislative purpose of the MTA as a consumer protection statute—to ensure that, once a consumer entrusts a business with his funds for transmission, the business will reliably and securely transmit those funds to their intended destination.  The artificial distinction between "two party" and "three party" business models further creates a loophole for money transmitters sending virtual currencies to "innovate out" of regulation altogether.  Under the Opinion Letter's analysis, a company like PayPal could exempt itself from regulation under the MTA by announcing that it will no longer transmit U.S. dollars but instead transmit proprietary electronic currency, as long as a separate financial institution handles the exchange of dollars for the new PayPal currency.  That would contravene the legislative intent behind the broad, catch-all language used in the MTA's definition of "money transmission."  *See* D.C. Code § 26-1001(10) ("Money Transmission"

includes transmission "by any and all means," "including but not limited to" various forms of payment including "electronic transfer").

Second, and equally important, is what is *missing* from the Opinion Letter—namely, any consideration of the substantial contrary authority that was available at the time the letter was drafted. *See Mead*, 533 U.S. at 228 ("'The weight [accorded to an administrative] judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements . . . .'") (quoting *Skidmore*, 323 U.S. at 140) (alteration in original).

Critically, the Opinion Letter did not consider the *sole public precedent* at the time regarding application of the MTA to virtual currency businesses:  the 2007 prosecution of E-Gold, Ltd. and its principals for operating a virtual currency transmitting business in the District of Columbia without a license as required under D.C. Code § 26-1002, among other offenses. *See United States v. E-Gold, Ltd., et al.*, No. 07-cr-109 (RMC) (D.D.C. indictment returned Apr. 24, 2007).  While *E-Gold* did not result in any written rulings on the D.C. Code offense, the case was well-publicized and resulted in published decisions at both the trial and appellate level. *See, e.g.*, *United States v. E-Gold, Ltd.*, 521 F.3d 411 (D.C. Cir. 2008); *United States v. E-Gold, Ltd.*, 550 F. Supp. 2d 82 (D.D.C. 2008); *United States v. E-Gold, Ltd.*, 2007 WL 2103602 (D.D.C. July 20, 2007).  DISB's failure to acknowledge the only precedent on this issue is a significant omission— especially when it comes to DISB's specific correspondence with COEPTIS.  There are obvious similarities between E-Gold and COEPTIS:  E-Gold issued a "digital currency known as 'e-gold'" backed by gold bullion and other precious metals, *see E-Gold*, 550 F. Supp. 2d at 85, while COEPTIS issued a virtual currency that was "100% reserved by physical gold," ECF No. 62-1, at 1.  To be sure, there may be many reasons to distinguish between E-Gold and COEPTIS, including

pertinent differences in their business models[4] or evolution of DISB's legal understanding of the MTA between 2007 and 2015-2016.  But a persuasive analysis would have acknowledged the *E-Gold* precedent and explained why it did not compel the conclusion that COEPTIS, like E-Gold, was required to be licensed in the District of Columbia.  The failure to offer any explanation undermines the persuasive force of the Opinion Letter.

Nor did the Opinion Letter consider any other legal authorities in its analysis of the MTA—including ordinary dictionary definitions of the word "money;" how virtual currencies like bitcoin function as a medium of exchange, method of payment, and store of value for transactions online (especially on the Darknet); or the statutory structure and legislative purposes of the MTA, including whether adoption of an overly restrictive view of the term "money" could undermine DISB's consumer protection mission.  Indeed, at the time the Opinion Letter was drafted, Judge Collyer had already held that the definition of "money transmitting business" under the Bank Secrecy Act includes businesses engaged in the transmission of virtual currencies.  *See E-Gold*, 550 F. Supp. 2d at 94-97.  And courts in New York had already held that bitcoin qualifies as "money" or "funds" under 18 U.S.C. § 1960, the Bank Secrecy Act, and 18 U.S.C. § 1956.  *See Faiella*, 39 F. Supp. 3d at 545-47; *United States v. Ulbricht*, 31 F. Supp. 3d 540, 569-70 (S.D.N.Y. 2014).  None of these precedents were considered—despite the fact that DISB purported to rely on federal law as "most instructive" authority in construing the provisions of the MTA.[5]  *See* ECF

---

[4] As this Office has explained in its response to the *E-Gold* defendants' coram nobis petition, E-Gold operated a "three party business model" that was distinguishable from COEPTIS and would have required licensure even under the reasoning of the DISB Opinion Letter.  *See United States v. E-Gold Ltd.*, No. 07-cr-109 (ABJ), ECF No. 214, at 20-22.

[5] In evaluating the persuasiveness of the DISB Opinion Letter's analysis, it is also significant that *subsequent* federal authority has followed the early lead of *E-Gold*, *Faiella*, and *Ulbricht* in broadly construing the terms "money" and "funds" under federal money transmitting and money laundering statutes—and disagreed with the restrictive view articulated in the DISB Opinion Letter.  *See* ECF No. 59, at 17-18 (collecting cases).

62-1, at 5.   Again, the failure to address existing legal authority counts against the persuasiveness of the Opinion Letter.

Finally, the Opinion Letter omitted any discussion of prior *agency* precedents, including its issuance of money transmitting licenses to a number of business involved in the virtual currency sector, such as Coinbase and Circle.  The failure to account for agency precedents weighs against *Skidmore* deference.  *See N.Y. State Bar Ass'n*, 276 F. Supp. 2d at 116 (weight accorded to agency interpretation depends on, *inter alia*, "'consistency with earlier and later pronouncements'") (quoting *Mead*, 533 U.S. at 228).  Again, there may be valid reasons to distinguish between companies that have received money transmitting licenses and at least one company (COEPTIS) that was deemed not to require a license—as the Court noted during oral argument.  But any persuasive analysis would have acknowledged the existence of other agency precedents and explained the apparent inconsistency in the agency's record.

To be sure, the Opinion Letter may cast these licensing decisions in a different light, and change the weight the Court gives them in its overall analysis.  In fairness, these examples are ambiguous:  under the *public* record, the Court can only speculate about why DISB has issued licenses to several virtual currency businesses but, in 2016, told COEPTIS that it did not require a license.  Nevertheless, out of 20 pages of legal analysis on the meaning of the statutory term "money" in the MTA, the Court mentioned these public agency precedents only in passing, in a single paragraph, and did not accord them with any deferential weight.  *See* ECF No. 59, at 26-27.

In summary, the DISB Opinion Letter's weak rationale, minimal analysis, and failure to consider relevant legal authorities and precedents render its analysis unpersuasive and undeserving of *Skidmore* deference.  This Court, by contrast, engaged in a much more thorough and far-reaching analysis of the MTA's statutory text, based on the ordinary meaning of the term "money,"

the functional use of bitcoin as a "medium of exchange, method of payment, and store of value," analogous federal case law, the interplay between the MTA and other provisions of the D.C. Code, the "purposes and objects" of the MTA, as well as the historical public practice of DISB and the legislative history of the MTA.  Even without weighing prior agency precedents in favor of the Court's decision, the extensive legal analysis contained in the July 24, 2020 Memorandum Opinion still compels the conclusion that bitcoin counts as "money" within the meaning of the MTA.  There is no basis for this Court to reconsider its well-reasoned and thorough opinion.

## II.   The Court Should Exercise Caution in Relying on Dated, Non-Public Opinion Letter To Strip DISB of Jurisdiction To Regulate Virtual Currency Money Transmitters

This Court should exercise caution in relying on the accidental discovery of a five-year-old, non-public DISB Opinion Letter to issue a new ruling that would effectively strip DISB of its jurisdiction to regulate a significant share of virtual currency money transmitters.  As noted above, DISB has made a deliberate decision *not* to publish opinion letters or other guidance documents on the licensing requirements for virtual currency businesses under the MTA.  While *Chevron* recognizes the role of administrative agencies in speaking authoritatively on matters within their regulatory purview, an important corollary is that agencies can also choose proceed incrementally—as here—by means of one-off, non-public regulatory actions.  Such an approach avoids committing the agency to a formalized position, and allows the agency to respond nimbly to new developments in the law, technology, or regulatory landscape.  That is especially appropriate for regulating in a dynamic and fast-changing field like virtual currencies.  This Court should not lightly disrupt the careful approach reflected in DISB's actions in this field.

Yet that is exactly what would happen if this Court were to jettison its July 24, 2020 ruling on the meaning of "money" within the MTA and hold, as a matter of law, that the non-public 2015 Opinion Letter represents the authoritative construction of the statute.  That would be particularly

anomalous where DISB has made the decision *not* to announce its own construction of the statute in a formalized, binding manner.  It would also be inappropriate under the circumstances here, where the 2015 Opinion Letter emerged in this case as a matter of pure accident—not as a result of any intentional effort by DISB to weigh in on the legal questions before this Court.  The Court should not force the hand of DISB into committing to a public legal position, nor should it misconstrue an informal opinion letter in a way that would impair the agency's ability to regulate significant portions of the virtual currency economy.

### III.    The Court Appropriately Construed the MTA in this Case

To the extent this Court is concerned about ruling on a matter of D.C. law, it is entirely appropriate for this Court to exercise its statutory authority to do so.  As the Court has explained, the U.S. District Court for the District of Columbia is statutorily authorized to exercise jurisdiction over D.C. Code offenses—which necessarily implies the power to issue rulings on questions of D.C. law that are properly before the Court.  *See* ECF No. 59, at 9 n.4 (explaining federal court jurisdiction over D.C. Code offenses that are joined with federal offenses).  Even in general, it is not unusual for federal courts to opine on questions of state law.  For instance, the federal prohibition on unlicensed money transmitting businesses, 18 U.S.C. § 1960, incorporates state-law offenses into the federal criminal statute.[6]  *See* 18 U.S.C. § 1960(b)(1)(A).  Section 1960 was explicitly intended to provide federal authorities—including federal courts—with a role in enforcing *state* money transmitting laws.  *See* S. Rep. No. 101-460 (1990) ("The legislation does not preempt State laws.  Instead, it provides for an expanded Federal role in a way that enhances and supplements State regulation.").  Thus, federal courts routinely issue rulings on whether defendants, including those operating informal or non-traditional business models, fall within the

---

[6] The definition of "State" under § 1960 includes the District of Columbia.  18 U.S.C. § 1960(b)(3).

purview of relevant state money transmitting regulations.  *See, e.g.*, *United States v. Mazza-Alaluf*, 607 F. Supp. 2d 484, 490-93 (S.D.N.Y. 2009) (findings of fact and conclusions of law following bench trial, finding that defendant, who operated informal payment service offering trade-based transfers and *casas de cambio* currency exchange services, had violated the state money transmitting laws of Illinois, Michigan, and New York).  This Court's decision construing the statutory term "money" under the MTA is consistent with the well-established practice of federal courts opining on matters of state law.[7]

To be sure, this Court's unique position in the District of Columbia allows it to rule *directly* on the D.C. Code offense alleged in Count Three of the Indictment, in addition to the D.C. Code offense as incorporated into the state-law prong of Count Two.  But, in this case, that is a distinction without a difference:  all parties agree that the defendant's challenge to Count Three is identical to his challenge to the state-law prong of Count Two, and that both parts of the Indictment will rise or fall together.  *See* ECF No. 59, at 35.

The government also notes that the U.S. Attorney's Office for the District of Columbia is the sole prosecuting authority for most felony violations of D.C. law, *see* D.C. Code § 23-101(c), including violations of the D.C. Code offense charged in this case, D.C. Code § 26-1023(c).  Thus, prosecutorial decisions regarding this statute are made by the same authority, the U.S. Attorney's Office, whether brought in D.C. Superior Court or federal District Court.[8]

---

[7] Indeed, federal courts routinely rule on questions of state law in federal prosecutions.  For example, the state-law prong of 18 U.S.C. § 1960 was "modeled on 18 U.S.C. § 1955 . . . which makes it a federal crime to operate a gambling business in violation of state law."  S. Rep. No. 101-460.  State law also supplies predicate offenses for RICO violations, *see* 18 U.S.C. § 1961(1)(A), and money laundering offenses, *see* 18 U.S.C. § 1956(c)(7)(A).

[8] The MTA can be enforced civilly as well as through criminal penalties.  *See* D.C. Code § 26-1021 (Civil penalties); *id.* § 26-1023 (Criminal penalties).  Civil enforcement proceedings may involve administrative hearings conducted by an agency hearing officer, and the District of Columbia Office of the Attorney General ("OAG") can litigate to recover civil penalties.  *See* D.C. Code § 1022 (Enforcement); *id.* § 26-1021(b); *see generally* D.C. Dep't of Insurance, Securities and Banking, *Administrative Hearing Process*, available at https://disb.dc.gov/node/343372.  OAG replaced the former Corporation Counsel for the District of Columbia.  *See* Gov't of the District of Columbia,

IV.     **The Court's Statutory Construction of the MTA Is Not Impermissibly Retroactive**

Discovery of the heretofore non-public 2015 Opinion Letter does not render this Court's July 24, 2020 ruling impermissibly retroactive.  As a general rule, "'[a] judicial construction of a statute is an authoritative statement of what the statute meant *before* as well as after the decision of the case giving rise to that construction.'"  *United States v. McKie*, 73 F.3d 1149, 1153 (D.C. Cir. 1996) (quoting *Rivers v. Roadway Express, Inc.*, 511 U.S. 298 (1994)) (emphasis in original); *see also Harper v. Va. Dep't of Taxation*, 500 U.S. 86, 97 (1993) ("When this Court applies a rule of federal law to the parties before it, that rule is the controlling interpretation of federal law and must be given full retroactive effect in all cases still open on direct review and as to all events, regardless of whether such events predate or postdate our announcement of the rule.").  Indeed, most judicial decisions could be characterized as "retroactive" in the sense that they govern conduct committed by a defendant before the court's decision was issued.  But this kind of retroactivity has never been understood to raise concerns.  Thus, for example, the D.C. Circuit has explained that there is "[n]o question of retroactivity" in a case where the D.C. Court of Appeals ruled on an issue of first impression regarding parole violations, and its decision was "consistent with the statutory language," relevant canons of construction, and "other court decisions to have interpreted the statute."  *McKee v. U.S. Parole Comm'n*, 214 F. App'x 1, 1-2 (D.C. Cir. Dec. 8, 2006) (unpublished).  The same principle applies here.  This Court addressed several issues of first impression in its July 24, 2020 Memorandum Opinion, but its decision does not raise retroactivity concerns because the decision was thoroughly grounded in the statutory text, canons of construction, and the relevant case law.

---

Mayor's Order 2004-92, *Re-Designation of the Office of the Corporation Counsel as the Office of the Attorney General* (May 26, 2004).

The only exception to this general rule lies under the doctrine of *Bouie v. City of Columbia*, 378 U.S. 354 (1964). In *Bouie*, the Court stated that "an *unforeseeable* judicial enlargement of a criminal statute, applied retroactively, operates precisely like an ex post facto law" that would be forbidden by the Constitution. *Id.* at 353 (emphasis added). While the Ex Post Facto Clause applies to legislation, not judicial interpretation, the Court held that the Due Process Clause prevents courts from expanding the scope of criminal liability through acts of "unforeseeable" and "indefensible" statutory construction: "If a judicial construction of a criminal statute is *unexpected* and *indefensible by reference to the law which had been expressed prior to the conduct in issue*, it must not be given retroactive effect." *Id.* at 354 (internal quotations omitted; emphases added).

This is a high standard. The Tenth Circuit recently considered a much closer case and still rejected a challenge under *Bouie* in *United States v. Muskett*, 970 F.3d 1233 (10th Cir. 2020). There, the Tenth Circuit rejected a Due Process challenge where intervening case law had, to the defendant's detriment, broadened the definition of a "crime of violence" for purposes of 18 U.S.C. § 922(c). *See id.* at 1242-43. The Tenth Circuit rejected the Due Process challenge on three grounds: (1) the relevant statutory term ("physical force") was not so "definite and precise" that a more expansive interpretation would be unexpected and indefensible; (2) related developments in the case law "provided notice" that the Tenth Circuit's earlier interpretation "rested on shaky foundations," and (3) the "existence of a circuit split on the scope of a criminal statute" was "sufficient to supply defendants with fair notice that the broader construction might ultimately be adopted." *Id.* at 1243-47. Thus, even in the case of a circuit split where at least some extant authority favored the defendant, an intervening decision broadening the scope of criminal liability did not offend Due Process under *Bouie*.

Compare *Muskett* to the circumstances here, where there was no circuit split or countervailing authority on the meaning of the term "money" within the MTA.  To the contrary, the Court's ruling was well-grounded in the plain text of the statute and amply supported by the "overwhelming authority" of analogous federal case law, *see* ECF No. 59, at 18.  It was consistent with the only *public* precedent involving application of the MTA to virtual currency businesses, the *E-Gold* prosecution.  Thus, all of the authorities that were *publicly* available provided notice to the defendant that HELIX was subject to money transmitting regulations under federal and state law.   And the non-public DISB Opinion Letter does not render this Court's decision "indefensible," not least because it was not publicly known—and thus cannot be considered as part of the "law which *had been expressed* prior to the conduct in issue" (emphasis added).  Accordingly, the Court's July 24, 2020 opinion does not come close to the sort of "unexpected" and "indefensible" judicial construction that would raise Due Process concerns under *Bouie*.

## V.  The DISB Opinion Letter Does Not Raise Any Other Due Process Defenses

The only possible defense suggested by the discovery of the non-public DISB Opinion Letter is entrapment by estoppel.  But this defense does not apply on the merits and, in any event, is an affirmative defense that should not affect this Court's ruling on the statutory construction of the term "money" under the MTA or the sufficiency of the Indictment.

"Entrapment-by-estoppel is an affirmative defense that provides a narrow exception to the general rule that ignorance of the law is no defense."  *United States v. Funches*, 135 F.3d 1405, 1407 (11th Cir. 1998).  As the First Circuit has explained, "[e]ntrapment by estoppel has been held to apply when an official assures a defendant that certain conduct is legal, and the defendant reasonably relies on that advice and continues or initiates the conduct."  *United States v. Smith*, 940 F.2d 710, 714 (1st Cir. 1991).  But entrapment by estoppel is a defense that "rests upon

principles of fairness, not defendant's mental state," and thus applies only "under certain, relatively narrow circumstances." *Id.* Specifically, "[w]hether the prosecution of a defendant violates his due process rights depends not solely upon whether he was incorrectly informed or misled by a government official, but upon the totality of the circumstances surrounding the prosecution." *Id.*

Entrapment by estoppel does not apply in this case because it requires *actual* reliance. *See United States v. Khanu*, 664 F. Supp. 2d 35, 41 (D.D.C. 2009) ("The entrapment by estoppel defense applies where the defendant establishes by a preponderance of the evidence that (1) a government official (2) told the defendant that certain criminal conduct was legal, (3) *the defendant actually relied on the government official's statements*, (4) and the defendant's reliance was in good faith and reasonable in light of the identity of the government official, the point of law represented, and the substance of the official's statement.") (emphasis added; internal quotations omitted); *see also, e.g.*, *United States v. Campbell*, 64 F.3d 962, 1995 WL 555618, at *1 (D.C. Cir. Aug. 24, 1995) (unpublished) (defendant could not claim entrapment by estoppel based on statements in newspaper articles that "were published after [the defendant's] arrest and therefore could not have influenced him"). Here, there was no actual reliance. The defendant does not claim to have communicated with DISB when he began operating HELIX in July 2014. Nor does he claim to have *ever* been aware of the non-public DISB Opinion Letter (which was drafted in January 2015, six months *after* HELIX went online) until the letter was disclosed by the government in this case. Thus, as a matter of black-letter law, entrapment by estoppel does not apply in this case without actual reliance.

Further, even if the defendant did have a valid affirmative defense of entrapment by estoppel, it would not affect this Court's interpretation of the statutory term "money" under the MTA or its ruling as to the sufficiency of the Indictment. As the Court has held, "an indictment is

sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense."   ECF No. 59, at 11 (internal quotations omitted).   Affirmative defenses are irrelevant to this analysis, and courts routinely ignore affirmative defenses in ruling on a motion to dismiss.  *See, e.g.*, *United States v. Alvarez*, 2009 WL 3459219, at *2 (S.D.N.Y. Oct. 27, 2009) ("If the Defendant's argument ultimately proves to have any merit, it will have to be made as an affirmative defense to the charge, not as a challenge to the sufficiency of the Indictment itself."); *United States v. Wilson*, 2015 WL 13731898, at *6 n.2 (D. Neb. Dec. 7, 2015) (Magistrate Judge's Finding, Recommendation, and Orders), *report and recommendation adopted*, 2016 WL 215272 (D. Neb. Jan. 19, 2016) ("A motion to dismiss challenges the sufficiency of the indictment itself.  The indictment must include the elements of the crime asserted by the government.  It does not and need not address whether the defendant could assert and prove any affirmative defenses, including entrapment by estoppel.").  Nor should an entrapment by estoppel defense—which is based on the defendant's actual reliance on an incorrect view of the law—affect how this Court views the correct construction of a statutory term.

Were this Court to recognize a new Due Process defense to dismiss the D.C. Code offenses from the Indictment, it would be creating an anomalous rule.  Such a defense would apply earlier in the proceeding than entrapment by estoppel (on a motion to dismiss rather than at trial); and it would set a lower threshold (without requiring actual reliance or inquiring into the overall fairness of the prosecution).  In short, the Due Process Clause provides no basis in this case to dismiss counts from the Indictment.

**VI.    The Court Should Not Require Legal Opinion Testimony from DISB on a Motion To Dismiss the Indictment**

Finally, the Indictment sufficiently alleges violation of D.C. Code § 26-1023(c).  As the plain text of the statute makes clear, § 1960 creates a general-intent offense, which does not require proof that the defendant *knew* he was required to be licensed under state law or registered with FinCEN.  *See* 18 U.S.C. § 1960(b)(1)(A) (state-law prong applies "whether or not the defendant knew that the operation was required to be licensed"); *United States v. Dimitrov*, 546 F.3d 409, 413 (7th Cir. 2008) ("Under the amended § 1960, the government no longer need prove that a defendant was aware of state licensing requirements or that he knew about the federal registration requirements found at 31 U.S.C. § 5330.").  Accordingly, it is sufficient to allege in the Indictment (and prove at trial) that HELIX met the factual elements of an entity engaged in the "business of money transmission" under D.C. Code § 26-1023(c), that it was unlicensed (which is undisputed), and that the defendant "kn[e]w the facts that make his conduct illegal," *Dimitrov*, 546 F.3d at 414; *cf. United States v. O'Brien*, 131 F.3d 1428, 1430 (10th Cir. 1997) ("Section 1955 is not a specific intent statute.  To be convicted under this provision, therefore, a defendant need not know that the gambling business involved five or more people, remained in operation for thirty days, or was violative of state law.  The statute requires only a general criminal intent, which is satisfied whenever the defendant *knowingly does an act made unlawful by the statute*.") (emphasis added; internal citations omitted).  To survive a motion to dismiss, there is no requirement that the

government proffer a legal opinion from a state regulator that the defendant was required to be licensed in that state.[9]

While it is premature to decide the admissibility of specific evidence on a motion for reconsideration of a motion to dismiss the Indictment, the government has doubts about the ultimate admissibility of legal opinion testimony from DISB on the question of whether HELIX was required to obtain a license under the MTA.  It is well-established that pure legal opinions are inadmissible because it is the role of the Court, not witnesses, to instruct the jury on the law.  *See Christiansen v. Nat'l Sav. & Tr. Co.*, 683 F.2d 520, 529 (D.C. Cir. 1982) ("The existence of fiduciary duties in the context of this case is a legal conclusion.  The duty to issue such conclusions devolve on the courts and lay legal conclusions are inadmissible in evidence."); *Berckeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195, 217 (3d Cir. 2006) ("In utilizing that discretion, however, the District Court must ensure that an expert does not testify as to the governing law of the case.  Although Federal Rule of Evidence 704 permits an expert witness to give expert testimony that 'embraces an ultimate issue to be decided by the trier of fact,' an expert witness is prohibited from rendering a legal opinion.  Such testimony is prohibited because it would usurp the District Court's pivotal role in explaining the law to the jury.").[10]  Here, the Court will instruct the jury on the

---

[9] Indeed, there is no requirement that the government proffer *any* evidence at this stage.  "[A] pretrial motion to dismiss an indictment 'allows a district court to review the sufficiency of the government's pleadings, but it is not a permissible vehicle for addressing the sufficiency of the government's evidence.'"  *United States v. Mosquera-Murillo*, 153 F. Supp. 3d 130, 154 (D.D.C. 2015) (quoting 24 James W. Moore *et al.*, Moore's Fed. Practice § 612.02 (3d ed. 2015)).

[10] It is undoubtedly true that some testimony may touch upon both legal and factual elements.  A regulator from DISB might testify *generally* about the requirements of the MTA and how DISB evaluates licensing applications or administers its regulatory oversight.  But there is a distinction between such testimony, which would be based on the witness's factual knowledge and expertise, and speculative testimony opining that, as a matter of law, the MTA required the defendant to obtain a state money transmitter license.  *See, e.g.*, *United States v. Lewis*, 240 F.3d 866, 869–70 (10th Cir. 2001) (in prosecution for operating commercial elk hunting venture in violation of the Lacey Act, state hunting regulator "was only permitted to testify as to the general requirements of the Oklahoma law regarding commercial area hunting licenses, not whether the specific conduct of [the defendant] violated those requirements").

meaning of the MTA—including whether, as a matter of statutory construction, the term "money" includes virtual currencies like bitcoin—and the jury will decide whether the factual elements of the offense have been met.  To hold otherwise would risk turning this into a trial on the meaning of the statute rather than the facts of the defendant's conduct.[11]

Finally, the government notes that another legal question under Count Two is whether HELIX failed to comply with the federal money transmitting business registration requirements under the Bank Secrecy Act or FinCEN's implementing regulations.  FinCEN recently announced a civil enforcement action against the defendant for operating HELIX in violation of various provisions of the Bank Secrecy Act and its implementing regulations, including "fail[ing] to register as a money services business."  *In the Matter of Larry Dean Harmon d/b/a Helix*, No. 2020-2 (Fin. Crimes Enforcement Network Oct. 19, 2020) (Assessment of Civil Money Penalty), available at https://www.fincen.gov/sites/default/files/enforcement_action/2020-10-19/HarmonHelix%20Assessment%20and%20SoF_508_101920.pdf.   However the Court ultimately decides to address such legal opinion testimony, it should treat prospective testimony from DISB consistently with such testimony from FinCEN.

## CONCLUSION

For the foregoing reasons, the defendant's Motion To Reconsider should be denied.

---

[11] That risk is especially acute here, where the defendant has admitted to the factual conduct underlying the offense—that he owned and operated a bitcoin mixer/tumbler called HELIX—and only disputes whether D.C. or federal law regulates his conduct.  Based on statements by defense counsel to the press, it is evident that the defendant expects to litigate the legal meaning of the relevant statutes at trial.  *See* Mengqi Sun, *U.S. Treasury's FinCEN Issues $60 Million Penalty Against Operator of Bitcoin 'Mixers'* , Wall St. Journal (Oct. 19, 2020), available at https://www.wsj.com/articles/u-s-treasurys-fincen-issues-60-million-penalty-against-operator-of-bitcoin-mixers-11603144315 ("Mr. Flood said, however, that the FinCEN action was similar to a portion of the DOJ criminal case, in that it 'rests on an incorrect determination that a bitcoin tumbler was a 'money transmitter' pursuant to Federal law during the time period underlying the indictment,' he wrote in an email.  'We look forward to explaining all of this to a D.C. jury in the criminal trial.'")

Respectfully submitted,
MICHAEL SHERWIN
ACTING UNITED STATES ATTORNEY
New York Bar No. 4444188


BY:      */s/ Christopher B. Brown*
         Christopher B. Brown, D.C. Bar No. 1008763
         Assistant United States Attorney
         555 4th Street, N.W.
         Washington, D.C. 20530
         C. Alden Pelker, Maryland Bar
         S. Riane Harper, D.C. Bar No. 230233
         Trial Attorneys, U.S. Department of Justice
         1301 New York Ave., N.W., Suite 600
         Washington, D.C. 20005
         (202) 252-7153 (Brown)
         (202) 616-5007 (Pelker)
         (202) 305-2593 (Harper)
         Christopher.Brown6@usdoj.gov
         Catherine.Pelker@usdoj.gov
         Riane.Harper@usdoj.gov