UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

```
 * * * * * * * * * * * * * * *
UNITED STATES OF AMERICA,        )  Criminal Action
                                 )  No. 19-395
vs.                              )
                                 )
LARRY DEAN HARMON,               )  October 23, 2020
                                 )  10:34 a.m.
             Defendant.          )  Washington, D.C.
                                 )
 * * * * * * * * * * * * * * *
```

**TRANSCRIPT OF PROCEEDING**
**BEFORE THE HONORABLE BERYL A. HOWELL,**
**UNITED STATES DISTRICT COURT CHIEF JUDGE**
**(All parties appearing via videoteleconference)**


**APPEARANCES:**

FOR THE GOVERNMENT: C. ALDEN PELKER
                    CHRISTOPHER B. BROWN
                    S. RIANE HARPER
                    U.S. Attorney's Office
                    For the District of Columbia
                    555 Fourth Street, NW
                    Washington, DC 20530
                    (202) 252-7153
                    Email: christopher.brown6@usdoj.gov


FOR THE DEFENDANT:  CHARLES FLOOD
                    914 Preston, Suite 800
                    Houston, TX 77002
                    713-223-8877
                    Email: charles@floodandflood.com


Court Reporter:     Elizabeth SaintLoth, RPR, FCRR
                    Official Court Reporter


Proceedings reported by machine shorthand, transcript
produced by computer-aided transcription.

1                        **P R O C E E D I N G S**

2              THE COURT:  Matter before the Court, Criminal Case

3      No. 19-395, United States of America versus Larry Dean

4      Harmon.

5              Counsel, please state your names for the record,

6      starting with the Government.

7              MR. BROWN:  Good morning, Chief Judge.

8      This is AUSA Christopher Brown.

9              THE COURT:  Good morning, Mr. Brown.

10             MS. PELKER:  Good morning, Your Honor.

11     Alden Pelker for the United States.

12             THE COURT:  Good morning.

13             PROBATION OFFICER:  Good morning, Your Honor.

14     Andre Sidbury, for Pretrial Services.

15             THE COURT:  Okay.  Good morning.

16             MS. HARPER:  Good morning, Your Honor.

17             Riane Harper for the United States.

18             THE COURT:  Good morning.

19             And for the defense.

20             MR. FLOOD:  Charles Flood for Mr. Harmon, Your

21     Honor.

22             THE COURT:  Mr. Flood, I can barely hear you.  I

23     am not sure whether that's your system or ours, but there we

24     go.

25             MR. FLOOD:  I don't know.

 1                 THE COURT:  And is Mr. Harmon on?

 2                 MR. FLOOD:  Mr. Harmon is on, Your Honor.

 3                 THE DEFENDANT:  Yeah, I am here.

 4                 THE COURT:  There you are.  All right.

 5            Mr. Harmon, do you agree, after consultation with

 6       counsel, to proceed with this motion hearing via video

 7       conference?

 8                 THE DEFENDANT:  Yes.

 9                 THE COURT:  Okay.  So I called you all here today

10       to discuss Mr. Harmon's motion for reconsideration of the

11       Court's decision to dismiss part of Count 2 and Count 3,

12       which are predicated on a violation of local D.C. Code law

13       based on the supplemental filing that the Government made,

14       with information from the local agency DISB that's

15       responsible for licensing of money transmitters in D.C. --

16       and, of course, part of Count 2 and Count 3 alleges

17       violations of that statute.

18            And I have to say the briefing on all sides has

19       been minimal, to say the least; certainly compared to the

20       briefing that's going on in *E-Gold*, the defendant's petition

21       for coram nobis relief in that case.  But I did find the

22       briefing in *E-Gold* interesting to help flesh out the issues.

23            Let me just start with Mr. Flood, since it is your

24       motion for reconsideration which I was expecting as soon as

25       we got the supplemental notice from the Government.

1          If your motion for reconsideration is granted and

2     the motion to dismiss is granted, Mr. Harmon will simply be

3     left facing Count 1 for conspiracy to launder monetary

4     instruments under 18 U.S.C. Section 1956(h) and also the

5     parts of the charge in Count 2 that allege operation of an

6     unlicensed money transmitting business in violation of

7     18 U.S.C. 1960(a), so it's typical for failing to comply

8     with the money transmitting business registration

9     requirements with FinCEN and for the transmission of funds

10    known by Mr. Harmon to be derived from a criminal offense or

11    intended to be used to promote or support unlawful activity.

12          So we would be left with those two federal

13    offenses purely.  We're all on the same page on that, right?

14          MR. FLOOD:  That's correct, Your Honor.

15          THE COURT:  Okay.

16          So let's turn to the DISB letter which -- and I am

17    going to look first at the June 23rd, 2016, DISB letter that

18    concluded, in an explanation to this company COEPTIS -- I am

19    not sure exactly how to pronounce it; but in this letter to

20    COEPTIS, by my reading, the DISB letter says that COEPTIS

21    need not obtain a license under the D.C. MTA, Money

22    Transmitting Act, because COEPTIS:

23          One, uses privately issued currency that is

24    100 percent preserved by physical gold; it operates, two, on

25    a closed centralized settlement part -- platform; three, it

1   uses that platform only to make internet payments; and

2   four -- and this is also critical -- it does not provide for

3   any conversion of exchange transactions using national

4   currency.  So, as a consequence, DISB concluded it didn't

5   require a money transmitter license.

6          So could you first -- one of the things you didn't

7   do in your briefing, so maybe you will do it for me

8   orally -- if you can walk me through why Helix fits the

9   description in the June 23, 2016, DISB letter because I

10  called -- distilled from that letter a number of factors

11  that DISB considered pertinent -- or attributes of the

12  COEPTIS operation.  And I just don't see it as a perfect fit

13  to Helix, but I want to give you the opportunity to walk me

14  through that.

15          MR. FLOOD:  Well, thank you, Your Honor.

16          Can you hear me okay, Judge?

17          THE COURT:  Yes.

18          MR. FLOOD:  Thank you.

19          I think the kicker here -- the key element there,

20  Your Honor, is the inclusion of "national currency."

21          When you look at this June 23rd letter in light of

22  their letter on January 16th, 2015 -- when you look at that,

23  that is the important declaration.  As they say in January

24  2015, the department has decided not to treat virtual

25  currency as money for the purposes of transmission.  So I

1    think the COEPTIS decision by them is based largely on that,

2    in that -- if there is not going to be involvement of actual

3    national currency, then it's not going to be money

4    transmission under the MTA.

5              THE COURT:  So your view -- your interpretation of

6    the COEPTIS letter of June 2016 is that -- though it

7    detailed these attributes of COEPTIS, the only one that is

8    really critical is the fact that it did not provide for

9    conversion of exchange transactions using national currency?

10             MR. FLOOD:  Well, if you look at page 2 of that,

11   Your Honor, they say, Because the transactions as described

12   do not involve the transmission of money.  And so I think

13   that is their key takeaway -- or at least that's my key

14   takeaway from this, is that national currency is not

15   involved in the COEPTIS transaction; and there is not -- by

16   way of analogy, there is not national currency involved in

17   the Helix transaction either, Your Honor.

18             THE COURT:  And your view is that there is no

19   national currency involved in the Helix transactions

20   because, as a tumbler, it was exchanging some Bitcoin for

21   other Bitcoin, not in exchange for national currency?

22             Am I understanding you correctly, Mr. Flood?

23             MR. FLOOD:  I'm sorry, Your Honor.

24             Can you repeat that?  I had an internet glitch

25   over here.

1          THE COURT:  So because Helix operated as a tumbler

2     that simply exchanged some Bitcoin for other Bitcoin without

3     exchanging national currency, in your view, it falls under

4     this COEPTIS letter in the January 2015 letter from DISB?

5          MR. FLOOD:  That's correct, Your Honor.

6          THE COURT:  Well, one of the things that both the

7     January 2015 DISB letter memo and the June 2016 letter to

8     COEPTIS say is -- there is a focus on two-party versus

9     three-party businesses -- business model.  How does that fit

10    in here with respect to Helix which was operating with three

11    parties intricately involved, not just two?  So how does

12    that get into the mix here?

13         MR. FLOOD:  I think the bottom line there is, Your

14    Honor, both of those two-party and three-party exchanges

15    that they discuss in the January letter -- the first one,

16    the two-party, is a sale of virtual currency -- that is

17    someone selling virtual currency for national currency.

18         The three-party -- it just uses an intermediary to

19    effectively do the same thing, and it involves national

20    currency.

21         And so I don't think that Helix fits into either

22    of those because Helix doesn't involve national currency and

23    isn't money transmission under these -- both the January

24    2015 and the June 2016 DISB conclusions.

25         THE COURT:  Okay.  So the 2015 memo does indicate,

1    at page 2, that DISB was making a case-by-case determination

2    based on the description of the business model presented.

3            So it seems to suggest that DISB needed to be

4    advised of the specifics of the business model before you

5    could extrapolate its guidance to any particular

6    cryptocurrency or virtual currency operation.

7            So based on that, is it fair to apply DISB's

8    articulations in informal advice letters to any business

9    model that DISB hasn't had an opportunity to precisely

10   evaluate on a case-by-case basis, which is essentially what

11   you are asking the Court to do?

12           MR. FLOOD:  The answer I believe is yes, Your

13   Honor; it is fair.  They make a fairly determinative

14   statement.  The department has decided not to treat virtual

15   currency as money; that's, frankly, directly contrary to the

16   Court's ruling that virtual currency is money under the D.C.

17   Code.

18           THE COURT:  Absolutely.  I totally agree with you.

19   It is absolutely, directly, a clear statement contrary to

20   the ruling that I made.

21           Let me ask you, have you, on behalf of Mr. Harmon,

22   asked DISB for an advisory opinion about Helix's operation

23   in 2014 through 2017 about, one, whether DISB would have

24   required a license during that period of time or, two, even

25   today would it require Helix to obtain a license?

1          Mr. Flood, you froze.  Did you hear my question?

2          MR. FLOOD:  I'm sorry, Your Honor.  I did.

3          Your Honor, I did file a FOIA request with DISB

4     asking for other determinations similar to COEPTIS and other

5     fact patterns under which they said someone did not need a

6     license.

7          THE COURT:  Okay.  But that's not precisely saying

8     just, you know, what do you think -- you know, I feel as if

9     I am in never-never land here with both sides; I will be

10    totally frank with both you, Mr. Flood, and with the

11    Government.

12         It is the peculiarity of the jurisdiction of this

13    Court because of a federal statute that the U.S. Attorney's

14    Office here can bring before federal court, when attached to

15    an indictment with federal charges, state law charges.

16         Normally, that's easy; there are clear statutes

17    without interpretive issues.  This is different.

18         This is, in some ways, a regulatory code violation

19    with serious criminal repercussions; and I have no

20    information from DISB, the enforcement agency for the

21    District of Columbia, about whether Helix would or would not

22    have been viewed as an operation requiring a license.

23    That's why I just asked the simple question, have you asked

24    DISB that question on behalf of Mr. Harmon?  And --

25         MR. FLOOD:  I will, Your Honor.

1          THE COURT:  And, on the other hand, it's the

2     Government's burden to prove beyond a reasonable doubt that

3     that statute was violated.  So, in some ways, I can see

4     maybe your position -- it's not my burden to show that DISB

5     would have licensed them.  Why isn't the Government doing

6     that?  And that's a question I am going to ask the

7     Government next.

8          But I did want to know whether I should be -- I

9     shouldn't be ruling anymore on this statute; I should be

10    waiting for you to get your answer from DISB.  Would it have

11    licensed Helix between 2014 and 2017 or would it even

12    license Helix now?  But you have not made that request, I

13    take it; is that correct, Mr. Flood?

14          MR. FLOOD:  No, Your Honor.

15          THE COURT:  Mr. Flood?

16          MR. FLOOD:  I have not, Your Honor.

17          THE COURT:  Do you think that that is something

18    that you would want to do after consultation with your

19    client?  You couldn't be put in a worse position than you

20    are now I wouldn't think.

21          Mr. Flood?

22          MR. FLOOD:  I'm sorry.  We stepped on each other a

23    little bit.

24          I can certainly seek an advisory opinion from

25    them, Your Honor.

1          THE COURT:  Okay.  Well, let me just put it to you

2    this way, I would not have been surprised.  And, in fact, I

3    would have welcomed -- if I were going to have an

4    evidentiary hearing today, to get some facts from DISB, like

5    a witness from DISB saying, this is what we would do with

6    what we know about Helix; that might be helpful.  But it may

7    be something that we're just going to have to wait for trial

8    on if these charges last that long.

9          But there is clearly nothing stopping Mr. Harmon

10   from asking DISB for its view of whether or not Helix would

11   have required a license in the period of 2014 to 2017.

12         MR. FLOOD:  No, there is not, Your Honor.

13         But, again, I think their January 15th -- the

14   January 2015 letter is unambiguous, Your Honor; that Helix

15   would not have required a license because virtual currency

16   is not money.

17         THE COURT:  All right.  I think you have a very

18   strong point there, but I have got a one-page -- I have got

19   a one-page opposition from the Government here, so perhaps

20   the Government agrees with you at this point.

21         So let me turn -- is there anything else?  Any

22   other points you think I should be aware of, Mr. Flood,

23   before I turn to the Government?

24         MR. FLOOD:  No, Your Honor.

25         If you want to go into a full Chevron-type

1    analysis we can do that, Your Honor; but I'd love to hear

2    the Government's position on that, Your Honor.

3           THE COURT:  But why should I do a Chevron analysis

4    in the middle of a criminal case where it is a factual

5    matter that the Government bears the burden of proving that

6    Mr. Harmon was required to obtain a license from DISB before

7    operating Helix?  That's not a -- it's not a statutory

8    interpretation issue, is it?

9           I don't understand both the parties talking about

10   a Chevron deference; this is not an APA case.  This is a

11   criminal case.  As a factual matter, it is the Government's

12   burden to prove that.

13          I have decided that, in my denial of your motion

14   to dismiss, that money, as used in the MTA, can encompass

15   virtual currency.  In some ways that's a separate question

16   from whether DISB would have licensed Helix in the period

17   between 2014 and 2017.

18          So let me turn to the Government.

19          Mr. Brown or --

20          MR. BROWN:  Yes, Your Honor.

21          THE COURT:  How are you going to prove that at

22   trial?

23          MR. BROWN:  Your Honor --

24          THE COURT:  What's your plan?

25          MR. BROWN:  First of all, the question presented

```
1    is that construction of a determined statute --
2            THE COURT:  No, no, no.  Mr. Brown, answer my
3    question.
4            How are you planning to prove that Mr. -- at
5    trial, which we have scheduled, that Mr. Harmon operated
6    Helix without a license required by DISB?
7            How are you going to prove that because you
8    certainly are not just going to be able to rely on the
9    Court's motion to dismiss?
10           MR. BROWN:  Your Honor, the Court will instruct
11   the jury on legal issues, on the meaning of the law.
12           We will prove the elements factually that Helix
13   was a money transmitting business within the meaning of both
14   the Bank Secrecy Act and under the MTA --
15           THE COURT:  So do I take it that Mr. Brown --
16   Mr. Brown -- I take it that you are going to be relying on
17   the Court's instructions?
18           So is it your view that almost, like right now,
19   based on the Court's instructions, like the jury is not
20   going to have much to decide?  I am just going to instruct
21   them on Count 3, for example?  They have no wiggle room, no
22   facts?
23           MR. BROWN:  The factual -- the jury will decide
24   upon the facts.  The Court will instruct the jury on the
25   law.
```

1          It is not an element that we have to prove a

2     counterfactual; that is, if Mr. Harmon had called DISB in

3     2014 and explained his business model they would or would

4     not have granted the license.  The fact is that he did not

5     have a license.  The statute criminality is operating a

6     money transmitting business without a license; that is a

7     fact, he was not licensed.

8          Now, I think what the Court is getting at is, does

9     Mr. Harmon have an affirmative defense and, sort of, relying

10    on some law -- I think the only real affirmative defense

11    here is something called entrapment by estoppel or estoppel

12    by entrapment; but that requires actual reliance.  It

13    requires Mr. Harmon to have been aware --

14          THE COURT:  Mr. Brown, I am going to interrupt you

15    for a second.

16          Are you saying that if Mr. Harmon had, in fact,

17    tried without success -- because DISB said he didn't need

18    one to get a license from DISB -- and DISB said, We are not

19    licensing you, we don't think you need a license under the

20    D.C. version of the MTA -- that the federal government could

21    then come back and prosecute him for failing to have a

22    license even if DISB -- based on this Court -- and I am not

23    a regulator, I am a mere judge interpreting what I see in

24    front of me, I am not a licensing authority -- that you can

25    basically render moot whatever the local regulatory agency

1    decides and how it's going to enforce the local statute by

2    prosecuting a violation of the regulatory statute in federal

3    court because you can?

4            MR. BROWN:  Your Honor, to address that, there are

5    two points; number one, at this time, when Mr. Harmon began

6    operating with Helix, there was one public precedent -- a

7    public precedent on the application of the District of

8    Columbia MTA to virtual currency benefit; that was the

9    *E-Gold* case.  So the only public precedent at the time

10   affirmed the ability of the Government to hold virtual

11   currency businesses liable under the MTA; that was the

12   public precedent.

13           Now what you are raising seems to be more of a

14   substantive defense.  The question in the Court's ruling was

15   a construction of the statute and the sufficiency of the

16   indictment, neither of which is affected by substantive

17   defense that the defendant could raise at trial.

18           We would be happy -- potentially, we could bring

19   somebody in from DISB to explain that if Mr. Harmon had come

20   in and said, I want to run a dark net money laundering

21   service using Bitcoin, do I need a license?  You know,

22   that's -- first of all, Your Honor, that is unthinkable.  He

23   did not do that.  That is a counterfactual that we cannot

24   assess --

25           THE COURT:  Okay.  Let me go back -- let me go

1   back.

2          Mr. Brown, I am going to interrupt you because

3   there were five different examples that I relied on in my

4   motion to dismiss predicated on some of the arguments that

5   the Government made about DISB actually licensing companies

6   dealing in virtual currency during the time period that

7   Helix operated and thereafter which helped bolster the

8   interpretation that the Court provided for the D.C. MTA.

9          And as I have now gone back and looked at this

10  puzzle -- puzzle of the June 2016 and the January 2015 DISB

11  materials you have presented, I see that one example was

12  Circle licensed in 2015 by DISB where a Circle account could

13  be funded in U.S. dollars, via Visa and MasterCard, in bank

14  accounts, so real currency was involved.

15         CoinBase, licensed by DISB in 2015 also, was

16  billed as a Bitcoin exchange which most people acknowledge

17  was trading Bitcoin using fiat currencies.  BitPay -- the

18  third example, licensed in 2018 by DISB -- allowed payment

19  through the BitPay service of cash or foreign currencies; so

20  that also met the definition that DISB was using that it had

21  to involve fiat currencies.

22         tZERO Crypto, which was licensed by DISB in June

23  2019, was also described as a cryptocurrency exchange that

24  allowed customers to exchange cryptocurrencies for assets

25  such as U.S. dollars or other conventional fiat currency.

1          So then we're up to the fifth example, CoinList

2     Markets, licensed by DISB in 2019, which may -- it's not

3     particularly clear to me whether CoinList also allows and

4     facilitates the exchange of cryptocurrencies or virtual

5     currencies for fiat currencies; but these examples that I

6     relied on that as -- are all ones that fit within DISB's

7     interpretation of its MTA.

8          So does the Government -- the Government just

9     mentioned, I think -- Mr. Brown, you just mentioned

10     something called Eagle (sic)?  Did I hear you correctly?

11          MR. BROWN:  Yes, Your Honor.  *E-Gold*.

12          THE COURT:  Oh, *E-Gold*.  So the *E-Gold*, okay.

13          MR. BROWN:  Which, Your Honor -- looking at the

14     letter for persuasiveness and consistency, one of the

15     deficits in the letter is its failure to contend with, among

16     other things, the only on-point precedent in the public

17     record that anybody doing a Westlaw search for MTA and

18     virtual currency would have found; in a letter they

19     addressed it all --

20          Your Honor, I do think we do have --

21          THE COURT:  Okay.  Mr. Brown, let me ask you a

22     couple of things here.

23          First, has DISB's -- is DISB's interpretation of

24     the local statute it is tasked with enforcing the same today

25     as it was in January 2015?  Do you know the answer to that

 1    question?

 2              MR. BROWN:  Your Honor, I have an informal answer.

 3    And the informal answer is no; DISB's interpretation is not

 4    the same today.

 5              THE COURT:  And how has it changed?  And when did

 6    it changed?

 7              MR. BROWN:  Your Honor, based on our very brief

 8    communication with DISB -- first of all, DISB takes the

 9    position that these letters are one-off private letters, not

10    intended for precedential value.

11              Over time, DISB has changed its approach to

12    writing these letters to, you know, not giving applicants a

13    definitive yes or no answer.  They're just saying they can't

14    rely on the regulator.

15              Frankly, Your Honor, DISB is watching the

16    elevation of case law in this area, and I don't think that

17    they would come up with the same analysis based on what they

18    know now that they did back then.

19              Your Honor, we do have to decide --

20              THE COURT:  So, Mr. Brown, are you conceding --

21    Mr. Brown, are you conceding that had Mr. Harmon, in 2014

22    when Helix was launched, applied to DISB for a license --

23    are you conceding that DISB would have said pursuant to its

24    January 2015 letter "no license required"?

25              MR. BROWN:  Number one, no.

```
 1              We're not conceding that because DISB makes clear
 2      even in this letter here that is nonpublic that every letter
 3      is based on the specific facts of that case.  They were not
 4      considering the facts of Mr. Harmon's business --
 5              THE COURT:  And why -- okay.  So have you,
 6      Mr. Brown, asked DISB that question?
 7              MR. BROWN:  No, because it's irrelevant.
 8              THE COURT:  And you think it is irrelevant because
 9      by virtue --
10              MR. BROWN:  It's unsubstantiated --
11              THE COURT:  -- of the special jurisdictional --
12              Excuse me, Mr. Brown.  Do not talk over me.
13              You think it is irrelevant that DISB would have
14      said "no license required" to Mr. Harmon if he had applied
15      for one in 2014, 2015, 2016, and 2017 because you have
16      obtained from this Court an interpretation of the language
17      of the MTA that says you -- MTA, through my interpretation,
18      could be construed to require a license for the Helix
19      business; is that right?
20              MR. BROWN:  Your Honor, if you would let me
21      complete my answer, it is irrelevant because Mr. Harmon did
22      not do this.  There is no reliance defense.  There is no
23      substantive defense he can raise based on this.
24              Number two, this is a question of statutory
25      interpretation.  And this Court, in order to resolve this
```

1     motion to dismiss, needs to decide who says what "money"

2     means in that statute; is it an executive branch agency, or

3     is it this Court?

4          And we believe that, number one, there is no

5     factual relevance to this because he did not do it; and,

6     number two, that if this request before it were as it was in

7     this case, the Court would interpret that term consistent

8     with all these other courts, consistent with the *E-Gold*

9     precedent on this statute, consistent with an ordinary

10    dictionary definition.  It would have interpreted this to

11    say that if he weren't able to construe Bitcoin as if it

12    were money for purposes of the MTA --

13         THE COURT:  Okay.  So let me ask you this,

14    Mr. Brown, because, as I see how this plays out, it appears

15    to me that we have got a burden-shifting problem here,

16    right?

17         Because right now, in the coram nobis petition

18    pending before my colleague Judge Amy Berman-Jackson, the

19    burden is on the petitioner to establish that they're

20    entitled to relief under coram nobis; so, in some ways, the

21    burden is a little complicated there.

22         I have a much more straightforward situation here

23    where I have the Government charging a defendant with a

24    violation of a local licensing law.

25         And what you are saying, if I understand the

1    Government correctly, is that because this Court has

2    interpreted that statute to be able to cover the conduct at

3    issue the indictment charge stands, leaving it to Mr. Harmon

4    at trial to bring forward DISB witnesses and DISB paperwork

5    to say:  No, we would not have licensed this business; we

6    would have said, Thank you for your request for a license,

7    but you don't need one; and then leave it up to the jury to

8    decide whether Mr. Harmon violated the statute and leave it

9    up to Mr. Harmon -- leave it up to the jury to decide

10   whether they want to convict Mr. Harmon of not obtaining a

11   license he would have been denied had he requested it.

12           To me, that is a burden a defendant shouldn't

13   have.  It seems to me that the burden of proof to establish

14   to the jury beyond a reasonable doubt is the defendant

15   violated this local law requiring a license to operate this

16   business which implicitly, implicitly encompasses -- it's

17   got to be predicated on the view that had he applied for the

18   license he would have been either denied the license for

19   various reasons but not because his business didn't qualify

20   and didn't need to be licensed.

21           So aren't you, by saying this is a matter of

22   reliance or an affirmative defense, basically shifting the

23   burden of proof for showing a violation of this D.C. Code

24   26-1023(c) to the defendant?

25               MR. BROWN:  No, Your Honor.  And let me explain

1    why.  Well, first of all --

2              THE COURT:  Okay.  You can explain why, but I am

3    going to want briefing on this.

4              MR. BROWN:  Yes, Your Honor.

5              THE COURT:  And a one-page opposition given the

6    puzzle created by these documents is, to say the least,

7    insufficient.

8              MR. BROWN:  Understood, Your Honor.

9              And we are entitled to respond to the arguments

10   raised by the defense; and, frankly, they did not raise any

11   of these arguments either.

12             But just let me address Your Honor's questions --

13             THE COURT:  I do expect, Mr. Brown, from the

14   Government whether or not the defense has raised an

15   argument -- a lot of these arguments are raised in the

16   *E-Gold* briefing, so it's not as if the Government should be

17   surprised by these questions.

18             But, anyway, proceed.

19             MR. BROWN:  Your Honor, to address the question

20   earlier about how we would prove this at trial, I think --

21   the easiest way to answer that is to draw an analogy to the

22   1960 FinCEN litigation --

23             THE COURT:  You have to speak more slowly,

24   Mr. Brown, and a lot more clearly because I am having

25   difficulty understanding you; and I am confident my court

1    reporter is as well.

2              MR. BROWN:  Yes, Your Honor.

3              Let me draw an analogy to the 1960 case predicated

4    on violations of the FinCEN registration requirements.

5              The case law on the FinCEN prong is clear, that

6    the Government does not need to prove that the defendant

7    knew or didn't know whether he was required to be licensed.

8              What the Government was required to prove is the

9    factual element that shows the defendant operated a business

10   that fits the legal definition of a money services business

11   and the factual element that the defendant, in fact, was not

12   licensed.  The same proof at trial would prove the

13   defendant's guilt under Count 3 and under the state law

14   prong of the 1960 counts as there are factual elements that

15   show that Helix, as a factual matter, fit the definition of

16   a money transmitting business that is required to be

17   licensed under D.C. law and the undisputed fact that Helix,

18   in fact, was not licensed.  There is no enhanced mens rea

19   requirement; there is no willfulness requirement.  Any

20   defense that Mr. Harmon raises on this point will be in the

21   nature of an affirmative defense.

22             THE COURT:  But, Mr. Brown, why isn't the factual

23   issue at stake in Count 3 and regarding violations of the

24   D.C. Code 26-1023 whether the company required a license to

25   operate?  Why isn't that the factual matter?

```
 1            MR. BROWN:  Well, yes.  And the factual --
 2            THE COURT:  And so how is the Government planning
 3    on proving that?  And how is it that you have proceeded to
 4    this point, on a motion for reconsideration, without
 5    providing a declaration, a witness -- any information from
 6    DISB about how it would have viewed Helix during the period
 7    of 2014 to 2017?  Why can't you get that now?
 8            Are you afraid that DISB is going to say, Well,
 9    under our January 2015 legal opinion from a general
10    counsel's office, Helix would not have been licensed and we
11    would have told Helix, Mr. Harmon, you need no license to
12    operate that business, so go away?
13            And if that's the case, how can that be a
14    violation of the licensing requirement under 26-1023 if no
15    license was required?
16            MR. BROWN:  Your Honor, the question of whether a
17    license was required is a legal question; it depends on the
18    law applied to facts.
19            THE COURT:  And so what you are saying, Mr. Brown,
20    is that the federal court can reinterpret local law and
21    where you have this jurisdictional anomaly here in the
22    District of Columbia, the U.S. Attorney's Office here, no
23    matter what the local regulatory agency or the local
24    government says about how it's going to enforce and
25    interpret its local law, a federal court, the Feds can step
```

1   in and enforce it however they'd like?  Is that the

2   Government's position here?

3                   MR. BROWN:  Your Honor --

4                   THE COURT:  Yes or no?

5                   MR. BROWN:  Your Honor, yes; because it depends on

6   if this Court is deferring to an agency interpretation of a

7   statute or does this Court determine the construction of

8   that statute on --

9                   THE COURT:  Okay.  Mr. Brown.  Mr. Brown.

10  Mr. Brown, you have a team -- Mr. Brown, I'm interrupting

11  you.  I apologize in advance, but I really am interested in

12  this issue.

13                  You have a team of lawyers over there at the U.S.

14  Attorney's Office.  Have you found other cases where the

15  federal government's interpretation of a local regulatory

16  matter has prevailed in an enforcement proceeding at the

17  federal level notwithstanding that the local authorities

18  would not enforce their local regulation in that manner?

19  Have you found a case analogous like this?

20                  MR. BROWN:  Your Honor, the answer to that is no;

21  but that raises two issues of deference.

22                  Does the federal system defer to the D.C. system?

23  And does the Court defer to an administrative agency?

24                  We do need to address whether this letter warrants

25  deference under any doctrine of the law.

1          THE COURT:  Well, I think it would be helpful to

2     know from DISB how DISB treats it, whether DISB followed

3     that letter in all of its applications that it reviewed for

4     virtual currency as virtual currency was emerging as a hot

5     new area in 2014, '15, '16, '17, and so on, when it changed

6     its mind, and why -- that would all be very instructive

7     because -- don't you think, Mr. Brown?

8          MR. BROWN:  Yes, Your Honor, it would be

9     instructive.

10          But the question is does this Court then defer to

11     DISB's interpretation or does the Court make up its own mind

12     about the meaning of the statute?

13          THE COURT:  And who enforces the D.C. Code -- D.C.

14     Code violations, is it the attorney -- under 26-1023, would

15     that fall under Karl Racine's authority or would that fall

16     under the U.S. Attorney's Office authority?  Whose authority

17     is that; is it Karl Racine's?

18          MR. BROWN:  Your Honor, offhand, I don't know.

19          But I would imagine -- to the extent there is

20     criminal enforcement, that would be the U.S. Attorney's

21     Office whether in superior court or district court.  To the

22     extent it's civil enforcement, I would imagine that would be

23     the Office of the Attorney General for the District of

24     Columbia.

25          THE COURT:  Okay.  Well, in your supplemental

1    briefing, I want you to address that issue and also address

2    how often has it been prosecuted.  I mean, it has a pretty

3    substantial criminal penalty up to five years.  Is my

4    recollection correct on that?

5             MR. BROWN:  Yes, Your Honor.

6             THE COURT:  And so I would like to know if there

7    have been other -- other than *E-Gold* where -- I don't think

8    that there is that much attention paid to what DISB was

9    doing and in any -- I mean, you know, that was -- I think

10   those pleas in *E-Gold* occurred in 2008; so it was all prior

11   to this articulation by DISB of how DISB would interpret and

12   enforce the licensing statute.

13            But I'd be interested to know whether this has

14   been enforced, who enforces it, and how DISB would have

15   viewed the Helix platform as falling outside the licensing

16   scheme, as it appears it might very well have fallen outside

17   of the licensing scheme pursuant to the January 2015 and

18   June 2016 letters from DISB, or whether on a case-by-case

19   basis it would have looked at this and seen some attributes

20   that I -- we may not be aware of.

21            Why didn't the Government ask DISB:  DISB, would

22   you have required a license had you been confronted with an

23   application from Helix?

24            MR. BROWN:  Your Honor, can I answer that?

25            THE COURT:  Yes.

1          MR. BROWN:  Good point.

2          Number one, the only public precedent that we were

3     aware of at the time was the *E-Gold* prosecution which is on

4     all fours with this; and number two -- number two, it's just

5     unknowable to go back in time.

6          We did our legal research.  We found comfort in

7     the idea that money is, indeed, Bitcoin; we think that is

8     amply supported under all of the legal authorities, and so

9     we were comfortable going forward on this before knowing

10    about the DISB letter.  And we're still comfortable now

11    because we think that courts determine what the law is, not

12    administrative agencies.

13         And maybe there is some distinction that you can

14    draw between the collective business that we now know about

15    and Mr. Harmon's Helix business.  But even if there weren't,

16    how does that affect Bitcoin's construction of the statute?

17    How does that affect the deficiency of the indictment?  I am

18    not sure.  I guess if we see what the jury believes down the

19    road if we don't have DISB being able to testify --

20         THE COURT:  Well, let me just say, Mr. Brown, to

21    interrupt you here -- I mean, if you -- I mean, if Mr. Flood

22    decides that at trial he wants to put on DISB witnesses; he

23    wants to put on this DISB 2016 letter, the January 2015

24    letter from DISB -- he wants to introduce all of that, maybe

25    he will even get a letter from DISB now saying in 2014

1    through 2017 we would not have licensed Helix -- if he puts

2    all of that evidence on or he seeks admission of all of that

3    evidence, what is the Government's position?  Are you going

4    to say it's irrelevant --

5              MR. BROWN:  Your Honor, it is irrelevant

6    because --

7              THE COURT:  -- he doesn't get to put that evidence

8    on because I've already interpreted the statute?

9              MR. BROWN:  -- it is a nonpublic letter in

10   Mr. Harmon's case.

11             THE COURT:  So you would object to the jury seeing

12   this correspondence from DISB as irrelevant; is that what

13   the Government's position would be?

14             MR. BROWN:  Your Honor, obviously it's premature.

15   But I would ask the defense to articulate their evidence if

16   that's their claim of defense in this case.

17             THE COURT:  All right.  Well --

18             MR. BROWN:  Because, Your Honor, he didn't know

19   about it.  This was a secret, nonpublic letter that didn't

20   come to light until 2020 --

21             THE COURT:  And let me ask you, Mr. Brown --

22             MR. BROWN:  -- and the facts on which the jury

23   will decide, yes, is something the Government is struggling

24   with.

25             THE COURT:  Okay.  Mr. Brown, how is it that the

1    *E-Gold* defendants got this letter, if you know?  How did

2    this --

3                MR. BROWN:  Your Honor --

4                THE COURT:  I know this letter was surfaced by the

5    defendants in the *E-Gold* -- in connection with their coram

6    nobis petition.  But since you have been alerted to it --

7    well, do you know how they got it?  Was it just through a

8    FOIA request?

9                MR. BROWN:  Your Honor, that is the history.

10               When we spoke to DISB, they asked us how did the

11   *E-Gold* defendants get a copy of this letter.

12               THE COURT:  So there is no question about its

13   authenticity?

14               MR. BROWN:  No.

15               THE COURT:  All right.

16               MR. BROWN:  As I mentioned earlier, these are --

17               THE COURT:  Well, I am going to want, Mr. Brown --

18   Mr. Brown, in your supplemental, I am going to want a very

19   clear declaration from DISB about how many applications they

20   got like this COEPTIS one, how many general counsel letters

21   they got.

22               I mean, Mr. Flood is over there waiting for a

23   response to a FOIA request.  I think it's your burden.

24   You've got to prove that he was required to get a license

25   under D.C. Code Section 26-1023, and he didn't.

1          So I want an explanation from DISB -- if you say

2     that you have heard informally that they have changed their

3     mind -- if their mind changed in 2019, that's outside the

4     time frame --

5              MR. BROWN:  Your Honor --

6              THE COURT:  -- that's outside the time frame.

7              MR. BROWN:  -- it's a subject of retroactivity.

8          Interpretations of criminal statutes are

9     considered -- it's an interpretation of the statute that was

10     in effect the entire time.  So if the Court, several years

11     later, says that this is what the definition of "money"

12     means, that's what the definition of money means for the

13     entire lifetime of the statute.

14          There may be a reliance defense and due process

15     issues with prosecuting somebody who knew about these

16     different interpretations and relied on them prior to this

17     Court's ruling; but it's no defense to say that, you know,

18     this statute means X today, but there were some questions

19     three, four, or five years ago.  If the prosecution is

20     today, the statute is the statute; and the current

21     prevailing interpretation is the interpretation of that

22     statute for all time.

23              THE COURT:  Well, I think the Government's

24     position that the federal government can step in to enforce

25     a state regulatory statute even if the state interprets and

1     applies its regulation more narrowly than the federal

2     government does is a difficult premise on which to base a

3     federal prosecution.  But given the one-page opposition that

4     I received from the Government in this case, Mr. Brown, I

5     will give you an opportunity to supplement your briefing.

6              How much time do you need?

7              MR. BROWN:  Your Honor, setting aside

8     consultations with DISB, we could provide legal briefing

9     early next week.  I have reached out to DISB; I can't say

10    how long it would take to provide the Court with a

11    declaration as requested.

12             THE COURT:  Well, do I take it from that,

13    Mr. Brown, that you don't feel that you need to or want to

14    file any supplemental briefing because I certainly don't

15    want to -- I could decide this tomorrow then.

16             MR. BROWN:  Your Honor, we do want --

17             THE COURT:  And if you don't feel that you want or

18    need to provide supplemental briefing after my questions

19    here today, you don't need to take the opportunity.

20             MR. BROWN:  Your Honor, I hope I am clear on this

21    point, we would welcome and we do want to get this in

22    writing in front of you.  I am just saying I cannot speak

23    for DISB in this hearing today.

24             I will be happy to set a deadline next week --

25    let's say Wednesday of next week, to have supplemental

1    briefing.  And we will try, in earnest, to provide what the

2    Court has requested from DISB by that date.  If not, we will

3    inform the Court.

4            THE COURT:  All right.  Next Wednesday.

5            Mr. Flood, if once you see the Government's

6    opposition or you submit an application to DISB to find out

7    what their view would have been between 2014 and 2017 about

8    Helix and whether they would have said no licensing required

9    and DISB lets you know how long it will take them to respond

10   to that, given their June 2016 letter to COEPTIS and their

11   January 2015 general counsel letter -- it seems like that

12   can be a pretty simple response to give; you wouldn't take

13   too much time.  But you can let me know, after you get the

14   Government's opposition next Wednesday, whether you also

15   would like an opportunity to submit additional materials --

16           MR. FLOOD:  Thank you.

17           THE COURT:  -- on this portion of whether or not

18   this Court should dismiss part of Count 2 and Count 3

19   because, as a factual matter, no license was required no

20   matter how this Court may have interpreted the statute.

21           Does that sound amenable to you, Mr. Flood?

22           MR. FLOOD:  Yes, Your Honor.

23           May I be heard for one moment, Your Honor?

24           THE COURT:  Yes.

25           MR. FLOOD:  I am just curious if the question

1    isn't more narrow than that.

2         The allegation in the indictment is that on

3    November 8, 2016, an agent made a transfer from an AlphaBay

4    wallet through Helix; and that is the only alleged --

5    engaging in money transmission alleged to have occurred in

6    Washington, D.C. -- or in D.C.  Sorry, Your Honor.

7         So I think the question isn't whether in 2014

8    through 2017 Helix would have been required to have a

9    license by DISB.  The question, in my mind, is whether that

10   act -- which is the sole act which is alleged to have

11   occurred in D.C. -- whether that act was, one, engaging in

12   the business of money transmitting and, two, would have

13   required a license.  Is that fair, Your Honor?

14        THE COURT:  I think that that's a strategy that

15   you can take and the way that you can frame it; but I am not

16   going to give you legal advice, Mr. Flood.

17        MR. FLOOD:  No.  In terms of the battlefield -- to

18   me, that's the battlefield.  But if the battlefield is

19   broader than that, I mean, that's fine; I will wait for the

20   Government's response, Your Honor.

21        THE COURT:  All right.

22        Okay.  Anything further today?

23        MR. FLOOD:  No.  Nothing from the defense, Your

24   Honor.

25        THE COURT:  And from the Government?

1          MR. BROWN:  No, Your Honor.

2          THE COURT:  All right.  And whatever decision I

3     make here on this motion for reconsideration may be

4     instructive also to Judge Amy Berman-Jackson as she is

5     considering the coram nobis petition.

6          All right.  You are all excused.

7          MR. BROWN:  Thank you, Your Honor.

8          (Whereupon, the proceeding concludes, 11:33 a.m.)

9                         *  *  *  *  *

10                       **CERTIFICATE**

11

12          I, ELIZABETH SAINT-LOTH, RPR, FCRR, do hereby
      certify that the foregoing constitutes a true and accurate
13     transcript of my stenographic notes, and is a full, true,
      and complete transcript of the proceedings to the best of my
14     ability.

15          PLEASE NOTE:  This hearing was held telephonically
      in compliance with the COVID-19 pandemic stay-safer-at-home
16     orders and is therefore subject to the limitations
      associated with the use of technology, including but not
17     limited to telephone signal interference, static, signal
      interruptions, and other restrictions and limitations
18     associated with remote court reporting via telephone,
      speakerphone, and/or videoconferencing capabilities.

19          This certificate shall be considered null and void
      if the transcript is disassembled in any manner by any party
20     without authorization of the signatory below.

21
      Dated this 30th day of October, 2020.
22

23     /s/ Elizabeth Saint-Loth, RPR, FCRR
      Official Court Reporter
24

25