# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | |
| | **:** | |
| **v.** | **:** | **Criminal No. 19-cr-395 (BAH)** |
| | **:** | |
| **LARRY HARMON,** | **:** | |
| | **:** | |
| **Defendant.** | **:** | |

### GOVERNMENT'S NOTICE AND MOTION TO ADMIT EVIDENCE AS INTRINSIC EVIDENCE OR, IN THE ALTERNATIVE, AS OTHER CRIMES EVIDENCE PURSUANT TO FEDERAL RULE OF EVIDENCE 404(B)

The United States of America, by and through its counsel, the United States Attorney for the District of Columbia, hereby provides notice of its intent to introduce evidence described herein as intrinsic evidence relevant to the charges in the Indictment, and moves *in limine* for a ruling on the admissibility of such evidence as intrinsic evidence.  In the alternative, the Government also hereby provides notice of its intent to introduce evidence pursuant to Fed. R. Evid. 404(b).  The Government makes this disclosure out of an abundance of caution so that the Government will have complied with the notice requirement of Rule 404(b) in the event the Court were to determine that such evidence is not intrinsic and is, in fact, covered by Rule 404(b).  Even if such evidence is found to be covered by Rule 404(b), the evidence disclosed in this notice would still be admissible under that Rule as it would be offered to show Defendant Larry Harmon's motive, intent, preparation, plan, knowledge, and lack of mistake or accident in the scheme to launder darknet narcotics proceeds and operate an unlicensed money transmitting business through his Bitcoin mixing service, Helix. *See* Fed. R. Evid. 404(b)(2).

Although the Government is providing certain descriptions and specific examples of such evidence in this notice, this filing is intended to satisfy the Government's obligation under Rule

404(b) to provide notice of the "general nature" of the crimes, wrongs, or other acts evidence that the Government intends to admit at trial, and is not an exclusive list of the specific pieces of evidence that the Government may admit in support of these areas of activity. Fed. R. Evid. 404(b)(2)(A). The defendant should also be on notice that all evidence produced to the defendant, as well as all statements disclosed during discovery, may be offered in the trial of this case, as intrinsic evidence or under Rule 404(b).  Further, because the Government continues to investigate additional allegations of wrongdoing and the review of the evidence is ongoing, the Government reserves the right to supplement and amend this notice as pre-trial investigatory developments dictate.

In support of its motion, the United States relies on the following points and authorities, and such other points and authorities as may be cited at a hearing on this motion.

## FACTUAL BACKGROUND

On December 3, 2019, a federal grand jury in the District of Columbia returned an indictment against the defendant, Larry Dean Harmon ("Harmon" or the "defendant"), on counts of Conspiracy to Launder Monetary Instruments, in violation of 18 U.S.C. § 1956(h) (2018); Operating an Unlicensed Money Transmitting Business, in violation of 18 U.S.C. § 1960(a) (2018); and Money Transmission Without a License, in violation of D.C. CODE § 26-1023(c) (2020).  The indictment arises from the defendant's operation of a darknet money laundering and money transmission service known as Helix from 2014 through 2017.  The case is scheduled for trial in April 2021.

## EVIDENCE OF OTHER CRIMES, WRONGS, OR ACTS

Through this motion, the Government provides notice of its intent to admit evidence pertaining to two broad categories of information: Category A – Operation of Grams, Related

Darknet Narcotics Distribution Conspiracies, and Additional Illicit Funds Laundered Through Helix; and Category B – Other Financial Crimes, including Additional Money Laundering Activity, Bank Fraud, Tax Fraud, and Unlicensed Money Transmission.  Each category is discussed in turn below.

A. Category A: Operation of Grams, Related Darknet Narcotics Distribution Conspiracies, and Additional Illicit Funds Laundered Through Helix

The defendant operated Helix as a money laundering service integrated with his broader darknet site, Grams, which operated from in or about April 2014 through December 2017. Grams allowed users to search across multiple darknet markets for products listed by various vendors, particularly narcotics vendors.  The defendant had to visit the various marketplaces and write code and application programming interfaces (APIs) customized to each in order to enable this search platform.  As the Government will show through witness testimony, statements of the defendant and uncharged co-conspirators, and additional electronic evidence retrieved from online service providers and the defendant's own electronic devices, the illicit nature of these marketplaces was immediately apparent to visitors.  The sites prominently displayed the narcotics being distributed, which serve as the underlying specified unlawful activity for the money laundering conspiracy with which the defendant is charged.  Furthermore, the operation of Grams' search engine often necessitated discussions with the administrators of the darknet marketplaces, who are among the defendant's uncharged co-conspirators.

As one example, in 2014, the defendant engaged in a conversation with a member of the administrative team Evolution, a prominent darknet market at the time that advertised narcotics for sale on its homepage.  The defendant explained his challenges getting the API working to allow Grams users to search Evolution's listings.  In the discussion, the defendant stated his

desire for Grams and "evo" (a common shorthand for Evolution) to "work together more," suggesting, "if grams pushed evo by integrat[ing] certain features and evo pushed grams as the bext [sic] place for reviews and tumbling we would both shoot to the top."  The reference to "reviews" pertains to the Grams search results, while "tumbling" is a reference to the Helix service, as further illustrated by the Defendant's subsequent comment that such a symbiotic arrangement "worked well for agora and bitcoinfog," referring to Agora, another popular darknet marketplace, and BitcoinFog, another bitcoin mixing service.  Shortly after this conversation, the defendant added functionality to Helix to make it specifically compatible with Evolution, and the Evolution team member sent a message to the defendant indicating that he would post on two popular message boards that it was "safe" and "a great method" to use Helix in conjunction with Evolution.

The defendant ran several other services tied to Grams.  Grams "InfoDesk" allowed users to search for a specific vendor across multiple marketplaces.  Grams "Flow" allowed users to navigate to various darknet markets without needing to memorize or look up the site's .onion address.  The defendant also ran a service through Grams called TorAds, through which he allowed vendors and others to purchase advertising placement on Grams.  A related service, GramsWords, functioned similarly to Google AdWords, allowing vendors to pay to have their advertisements or listings prominently displayed when Grams users searched for certain terms.  For example, a cocaine vendor could pay to ensure that a Grams user searching for "cocaine" would see that vendor's listings displayed at the top of the search results.  The advertising vendors dealt primarily in illegal narcotics, and the evidence related to InfoDesk, Flow, TorAds, GramsWords, and related services shows that the defendant was aware of the nature of these advertisements and the materials on the marketplaces.  The government thus intends to admit

evidence related to all of the Grams services, including the defendant's own statements, conversations between the defendant and the vendors, conversations between the defendant and others involved in helping the defendant design the Grams site.

Grams allowed users to search the full array of illicit goods and services available on darknet marketplaces. While this activity centered predominantly on narcotics trafficking, the darknet marketplaces searchable by Grams also sold stolen credit card information, fraudulent identity documents, hacking tools, counterfeit currency, illegal firearms, and other drug paraphernalia. The defendant's communications and electronic evidence recovered from his computer and online accounts reveal that the defendant was aware of the nature of the activities occurring on the darknet marketplaces. This evidence is particularly relevant given that the defendant has signaled his intent to argue in his defense that darknet markets sold items other than drugs. *See* ECF No. 16-1 (2/11/20 Det. Hr'g Tr.), at 61. Even if no such argument is made, the full nature of the activity occurring on the darknet markets is probative of the full extent of the defendant's conspiracy with other darknet actors. Similarly, the Government intends to admit evidence regarding the full scope of Helix's illicit user base, which included not just users, vendors, and administrators from darknet drug markets but also users from at least one darknet child exploitation site and from sites specializing in the sale of hacking tools and stolen financial information. This is similarly relevant to rebut a defense argument that Helix was a privacy service used by law-abiding individuals mindful of security, rather than by criminals seeking to launder their funds.

The government also intends to admit evidence regarding the defendant's involvement in the operation of the darknet marketplace "Mr. Nice Guy." Mr. Nice Guy was one of the earliest marketplaces searchable on Grams, and it was one of the first marketplaces to post an

advertisement on Grams.  Electronic evidence recovered from the defendant's devices include files that would have only been held by individuals involved in the operation of Mr. Nice Guy.

   B.  <u>Category B: Other Financial Crimes, including Additional Money Laundering Activity, Bank Fraud, Tax Fraud, and Unlicensed Money Transmission</u>

Between 2014 and his arrest in 2020, the defendant, along with several unindicted co-conspirators and other third parties, engaged in a sophisticated series of money laundering and fraud sub-schemes to conceal the proceeds he earned from operating Grams/Helix.  The defendant's primary source of income for the period of time covered by the indictment was the illicit proceeds earned from the operation of Helix.  In order to spend these proceeds, originally obtained in the form of bitcoin, the defendant needed to further launder and legitimize them. This required a multifaceted scheme by the defendant, described further below, that involved making fraudulent misrepresentations to financial institutions, forging documents and submitting false documentation, and operating additional unlicensed money transmitting businesses to convert his bitcoin proceeds.  The defendant also submitted false tax returns to conceal his proceeds from Helix and show legitimate income where none existed.  The Government ultimately identified the defendant as the operator of Helix by tracing proceeds from Helix to the defendant, through the various money laundering and fraud schemes described below.  The Government intends to admit evidence of these schemes through the defendant's bank account records, witness testimony, evidence recovered from physical and electronic search warrants, and additional business records, which in total serve to prove that the defendant was the operator of Grams/Helix, establish the nexus between the crime and the property that the government seeks to forfeit, and display the lengths the defendant went to conceal the proceeds from his operation of Grams/Helix.

The defendant converted a portion of his Helix proceeds by operating his own small-scale virtual currency exchange business, offering exchanges through advertisements on LocalBitcoins, a popular peer-to-peer exchange platform, and through face-to-face transactions for cash.  The defendant was not licensed for this activity.  On numerous occasions, the defendant enlisted third parties to assist in his bitcoin sales.  The defendant would arrange bitcoin sales through LocalBitcoins and then send other individuals as straw sellers to meet the buyers face-to-face and sell the bitcoin in exchange for cash.  The defendant provided specific instructions regarding how to transfer the cash as part of his money laundering scheme.  The straw sellers would then provide the fiat proceeds to the defendant, either by giving the cash to the defendant in person, mailing cash to the defendant, sending the defendant funds via a financial transfer platform such as MoneyGram, or providing cash to a third party who would hold the cash at the defendant's direction.

The defendant used his purported web development company, Harmon Web Innovations (HWI), as a front company to disguise the fiat currency proceeds resulting from the sale of bitcoin he obtained through the operation of Grams/Helix.  The defendant advertised HWI publicly as a web development company involved in computer programming and web design work.  In reality, the defendant used HWI as a front to conceal the fiat currency proceeds of bitcoin generated from Helix.  The Government has determined that over 90% of the deposits into the defendant's HWI business bank accounts were sourced from the sale of bitcoin, which the defendant obtained from his operation of Grams/Helix.  The defendant then transferred funds from the HWI accounts to fund his Coin Ninja business, described further below; pay himself a salary; and purchase assets, including real estate and cars.

The defendant provided false invoices to at least one financial institution portraying his repeated transactions with a bitcoin dealer as related to computer programming services, in order to legitimize the income.  The defendant also included false information on his personal and business tax returns to legitimize the ill-gotten gains earned from the operation of Helix.

After Helix closed in 2017, the defendant launched a new business, "Coin Ninja," in order to continue to launder his proceeds from Helix.  Coin Ninja initially offered a bitcoin mixing service which purported to operate similarly to Helix but functioned on the clearnet and was not specifically tied to darknet markets.  The frequently asked questions section of the Coin Ninja website, CoinNinja.io, described how the mixer worked and closely matched the process used by Helix.  Coin Ninja never attracted a significant user base, and the defendant's initial efforts to use the Coin Ninja brand to legitimize his Helix income was unsuccessful.  At least two bitcoin exchanges flagged the defendant's transactions as suspicious during the exchanges' Know Your Customer (KYC) due diligence process.  These exchanges questioned the defendant's source of bitcoin.  In response, the defendant indicated that the proceeds – which were in fact sourced from Helix – were earned through the defendant's operation of CoinNinja.  After the defendant provided a description of CoinNinja as a mixing service, both exchanges closed the defendant's accounts.

Shortly thereafter, Harmon appeared to pivot Coin Ninja's business model and publicly focus instead on the development of DropBit, a mobile application which purported to simplify the transfer of bitcoin from one person to another.  The DropBit app was accessible through CoinNinja.com, rather than the CoinNinja.io that was used by the mixing service.  By the time of the defendant's arrest, Coin Ninja had multiple full-time employees who were working in earnest to build and grow the DropBit platform.  However, Coin Ninja still was not profitable; instead,

the defendant continued to use Coin Ninja as a front to launder proceeds from the Grams/Helix activity.

In October 2020, the Financial Crimes Enforcement Network (FinCEN) issued an Assessment of Civil Monetary Penalty against the defendant for his operation of Helix as well as of Coin Ninja.  *In the Matter of Larry Dean Harmon d/b/a Helix*, No. 2020-2 (Fin. Crimes Enforcement Network Oct. 19, 2020) (Assessment of Civil Money Penalty).  In the Assessment, FinCEN determined that Coin Ninja was a money transmitter and that the defendant "willfully participated in Coin Ninja's failure to register as a money services business." *Id.* at 3.  The Government seeks to admit evidence related to the Coin Ninja service as well as the defendant's statements regarding that lack of licensing, including statements made by the defendant to an undercover regarding the expenses involved in the licensing process and the defendant's statements to Coin Ninja employees that the company was too small to be on anyone's radar with regard to enforcing the money transmitter licensing requirement.

## ARGUMENT

### I.   OTHER CRIMES EVIDENCE IS ADMISSIBLE AS INTRINSIC EVIDENCE

The evidence in Category A and Category B of this motion constitutes intrinsic evidence of the defendant's conspiracies and criminal activity.

As the D.C. Circuit has explained, "Generally intrinsic evidence includes 'act[s] that [are] part of the charged offense' or 'some uncharged acts performed contemporaneously with the charged crime … if they facilitate the commission of the charged crime.'"[1] *United States v. Bell*,

---

1 The D.C. Circuit previously mirrored its sister circuits in articulating the standard for intrinsic evidence by observing, "Evidence of criminal activity other than the charged offense is not considered extrinsic if it is an uncharged offense which arose out of the same transaction or series of transactions as the charged offense, if it was inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of the crime of trial."  *United States v. Badru*, 97 F.3d 1471, 1474 (D.C. Cir. 1996) (quoting *United States v. Weeks*, 716 F.2d 830, 832 (11th Cir. 1983)).  However, in *United States v. Bowie*, a panel expressed skepticism about the

795 F.3d 88, 100 (D.C. Cir. 2015) (quoting *United States v. Bowie*, 232 F.3d 923, 929 (D.C. Cir. 2000)); *see also United States v. McGill*, 815 F.3d 846, 879 (D.C. Cir. 2016) (approvingly quoting *Bowie,* 232 F.3d at 929); *United States v. Moore*, 651 F.3d 30, 63 (D.C. Cir. 2011) (approvingly quoting *Bowie,* 232 F.3d at 929); *United States v. Alexander*, 331 F.3d 116, 126 (D.C. Cir. 2003) ("[I]f evidence is offered as direct evidence of a fact in issue, not as circumstantial evidence requiring an inference regarding the character of the accused, it is properly considered intrinsic.") (internal quotations omitted); *United States v. Chin*, 83 F.3d 83, 88 (4th Cir. 1996) ("[A]cts are intrinsic when they are inextricably intertwined or [the] acts are part of a single criminal episode or the other acts were necessary preliminaries to the crime charged.") (internal quotations omitted).

Evidence of uncharged acts that tend to prove the existence of a charged conspiracy is admissible as direct evidence of the charged offense. *See United States v. Lorenzana-Cordon*, No. 03-CR-331-13 (CKK), 2018 WL 10373745, at *5 (D.D.C. Jan. 18, 2018) ("Where the crime charged is conspiracy, evidence closely related to the conspiracy alleged in the indictment is admissible as intrinsic evidence"); *see also United States v. McGauley*, 279 F.3d 62, 72-73 (1st

---

term "inextricably intertwined" as unhelpful and circular and criticized the term "complete the story" as overbroad, despite their broad use in other circuits. 232 F.3d 923, 928 (D.C. Cir. 2000). In *United States v. Gooch*, another court in this District rejected the argument that *Bowie* represented a new and narrower test in the D.C. Circuit for intrinsic evidence. 514 F. Supp. 2d 63 (D.D.C. 2007). The court in *Gooch* noted that "a single panel cannot reverse [the] circuit precedent" established in *Badru*, 97 F.3d at 1474-75, *United States v. Washington*, 12 F.3d 1128, 1135 (D.C. Cir. 1994), and *United States v. Allen*, 960 F.2d 1055, 1058 (D.C. Cir. 1992), in which the D.C. Circuit ruled that uncharged acts which are "inextricably intertwined" with the charged offenses are intrinsic to the charged offenses and exempt from an analysis under Federal Rule of Evidence 404(b). *Gooch*, 514 F. Supp. 2d 63 at 69-70. *Bowie* also concerned factually distinguishable circumstances, where the defendant was charged with a single instance of possession of counterfeit currency, and the government introduced evidence of a prior occasion on which the defendant possessed counterfeit currency—which is far different from the interconnected conspiracy and scheme offenses charged in this case. *See* 232 F.3d, at 927-28. Nonetheless, subsequent D.C. Circuit panel decisions have approvingly quoted *Bowie*'s standard for intrinsic evidence. *See United States v. McGill*, 815 F.3d 846, 879 (D.C. Cir. 2016); *United States v. Bell*, 795 F.3d 88, 100 (D.C. Cir. 2015); *United States v. Moore*, 651 F.3d 30, 63 (D.C. Cir. 2011); *but see United States v. Mahdi*, 598 F.3d 883, 890-91 (D.C. Cir. 2010) (finding no error in admission of testimony regarding evidence of uncharged instances of violence by defendant in VICAR and RICO case, characterizing testimony as "intrinsic evidence" of defendant's "organizational control"). The government here conservatively notes the decision in *Bowie* but does not concede that it has entirely supplanted the standard articulated in *Badru* for admission of other-crimes evidence that is intrinsic to the charged offenses.

Cir. 2002) (evidence that defendant fraudulently obtained 217 refund checks in uncharged transactions was directly relevant to 3 counts of mail fraud because it tended to prove existence of "*a scheme* for obtaining underserved refunds" and "was part and parcel of the charged scheme") (emphasis in original), *United States v. Parker*, 553 F.3d 1309 (10th Cir. 2009) (finding no error in admission of three uncharged sales of faulty aircraft engines during period of charged conspiracy to sell other faulty aircraft engines because the uncharged transactions were "intrinsic to the crime and substantiate[d] the criminal conspiracy"), *United States v. Powers*, 168 F.3d 741, 749 (5th Cir. 1999) (evidence of uncharged transactions was "intrinsic" because it "tend[ed] to show the conspiratorial relationship" between the defendant and his co-conspirator), *United States v. Diaz*, 878 F.2d 608, 614-15 (2d Cir. 1989) (evidence of a cocaine seizure predating period of charged conspiracy was directly relevant because it supported the inference connections between a stash house, pay phone, and the charged cocaine conspiracy).  In cases involving ongoing conspiracies or schemes, courts have found that evidence of uncharged conduct involving the same individuals can be intrinsic evidence of the charged offenses.  *See, e.g.*, *United States v. Madrid*, 610 F. App'x 359, 384-85, 2015 WL 3875435, at *19 (5th Cir. June 24, 2015) (unpublished) (in conspiracy to defraud the United States by fraudulently procuring federal funds, evidence that conspirators bribed a judge was "inextricably intertwined" with conspiracy and showed the "conspiratorial relationship" and "relevant contextual evidence regarding the nature and extent of the conspiracy").

(A) Category A (Operation of Grams, Related Narcotics Distribution Conspiracies, and Additional Illicit Funds Laundered Through Helix) Is Admissible as Intrinsic Evidence

The evidence discussed in Category A above regarding Grams shows that the defendant maintained ongoing conspiratorial relationships with darknet market administrators and vendors,

as relevant to the money laundering conspiracy charged in Count 1 of the Indictment and the "dirty money" prong of the unlicensed money transmitter statute charged in Count 2.

As stated in the indictment, the goal of the money laundering conspiracy charged in Count 1 was for the defendant and other co-conspirators to "unlawfully enrich themselves by operating a bitcoin money laundering service which would conceal and promote illegal Darknet drug sales and other illegal activity" Indictment 5, ECF No. 1.  The money laundering conspiracy charged in the indictment requires the Government to prove that the defendant conspired to launder illicit proceeds knowing that the property represented the proceeds of drug sales and 1) with the intent to promote the carrying on of those drug sales, in violation of 18 U.S.C. § 1956(a)(1)(A)(i); or 2) knowing that the transactions were designed to conceal and disguise the nature, location, source, ownership, and control of those proceeds, in violation of 18 U.S.C. § 1956(a)(1)(B)(i).  The defendant is also charged with operating an unlicensed money transmitting business that "involved the transportation and transmission of funds known to HARMON to have been derived from a criminal offense and intended to be used to promote and support unlawful activity," in violation of 18 U.S.C. § 1960(a)(3).  Indictment 6, ECF No. 1. The defendant's knowledge of the nature of the funds moving through Helix is therefore intrinsic to the offenses charged and is an essential area of the Government's proof.  Grams operated largely contemporaneously with Helix—Grams launched in or about April 2014, with Helix following shortly thereafter in July 2014, and both shuttered in or about December 2017—and they were bundled together as part of a suite of interconnected services.  Since Helix's integration with Grams, Grams' other services, and the related agreements between the defendant and the darknet market administrators and vendors is critical to the charged schemes, it is

appropriately admitted as direct evidence, rather than as indirect evidence under 404(B) to show, *inter alia*, the defendant's knowledge of the specified unlawful activity.

B. Category B (Additional Financial Crimes) Is Appropriately Admitted As Intrinsic Evidence

Category B describes the multiple sophisticated sub-schemes that the defendant undertook to launder his proceeds from Helix, converting the illicit bitcoin into fiat currency that the defendant could spend on real-world items. The Government ultimately identified the defendant as the operator of Helix by tracing proceeds from Helix to the defendant through the various money laundering and fraud schemes described in Section B. Since the Government bears the burden of proof at trial to show that the defendant was the operator of Helix, it will need to admit in its case in chief evidence from Category B necessary to show that the defendant was the individual responsible for the crimes alleged.

Furthermore, the Government in this case is seeking forfeiture of a variety of assets, including several pieces of real property; a car; multiple business bank accounts, including those controlled by Harmon Web Innovations and Coin Ninja; and bitcoin recovered from devices seized from the defendant's business properties. In order to forfeit those properties, the Government must establish the requisite nexus between the property and the offense. Fed. R. Crim. P. 32.2. The evidence set forth in Section B is needed to explain this nexus; as such, the evidence is best viewed as intrinsic and should be admitted in the Government's case in chief.

## II.   The Other Crimes Evidence is Alternatively Admissible To Prove Intent, Preparation, Plan, Knowledge, Identity, and Absence of Mistake or Accident

Alternatively, all of the evidence in in categories (A) and (B) of this motion are admissible under Rule 404(b) to prove, *inter alia*, intent, preparation, plan, knowledge, identity, and absence of mistake or accident.  As the D.C. Circuit has summarized:

> Federal Rule of Evidence 404(b) authorizes admission of "[e]vidence of other crimes, wrongs, or acts" provided it is offered not "to prove the character of a person in order to show action in conformity therewith" but rather "for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

*United States v. Mahdi*, 598 F.3d 883, 891 (D.C. Cir. 2010).

The D.C. Circuit has adopted a two-pronged test for determining whether evidence of other bad acts is admissible under Rule 404(b).  First, the evidence must be "probative of a material issue other than character."  *United States v. Miller*, 895 F.2d 1431, 1435 (D.C. Cir. 1990); *see also United States v. Douglas*, 482 F.3d 591, 596 (D.C. Cir. 2007) ("A proper analysis under Rule 404(b) begins with the question of relevance: is the other crime or act relevant and, if so, relevant to something other than the defendant's character or propensity [to commit crime]? If yes, the evidence is admissible unless excluded under other rules of evidence such as Rule 403.").  Second, the evidence is subject to the balancing test of Fed. R. Evid. 403, so that it is inadmissible only if the prejudicial effect of admitting the evidence "substantially outweighs" its probative value.  *Miller*, 895 F.2d at 1435; *see also United States v. Lerma-Plata*, 919 F. Supp. 2d 152, 156 (D.D.C. 2013) ("In addressing trial court determinations on the admissibility of 'other crimes' evidence under the Federal Rules of Evidence, this Circuit has employed a two-step mode of analysis.  Under the first step, which addresses Rule 404(b), '[the court] must determine whether the evidence is relevant to a material issue other than character. If so, [the court] proceeds to the second inquiry,' under Federal Rule of Evidence 403, 'whether the

probative value is substantially outweighed by the prejudice.'") *(quoting United States v. Burch,* 156 F.3d 1315, 1323 (D.C. Cir. 1998) (internal quotations omitted).

On the first step, it is significant that, "under Rule 404(b), *any* purpose for which bad-acts evidence is introduced is a proper purpose so long as the evidence is not offered *solely* to prove character." *Miller*, 895 F.2d at 1436 (emphasis in original).  In other words, Rule 404(b) "is a rule of inclusion rather than exclusion" and it is "quite permissive, excluding evidence only if it is offered for the sole purpose of proving that a person's actions conformed to his or her character." *United States v. Long*, 328 F.3d 655, 660-61 (D.C. Cir. 2003) (internal quotation marks omitted); *see also Douglas*, 482 F.3d at  596, *Bowie*, 232 F.3d at  929-30, *United States v. Crowder*, 141 F.3d 1202, 1206  (D.C. Cir. 1998) (en banc), *United States v. Lawson*, 410 F.3d 735, 740 (D.C. Cir. 2005).  The D.C. Circuit previously observed, "Only one series of evidential hypotheses is forbidden in criminal cases by Rule 404: a man who commits a crime probably has a defect of character; a man with such a defect of character is more likely than men generally to have committed the act in question." *Miller*, 895 F.2d at 1436 (quoting 2 J. Weinstein & M. Berger, *Weinstein's Evidence* ¶ 404[8], at 404-52 (1989).

On the second step, the D.C. Circuit has emphasized that exclusion of otherwise relevant evidence is not appropriate if the evidence is merely prejudicial; the prejudice must be "unfair." *See United States v. Cassell*, 292 F.3d 788, 796 (D.C. Cir. 2002) ("Virtually all evidence is prejudicial or it isn't material.  The prejudice must be unfair.") (internal quotation marks omitted).  In close cases, the rule tilts toward admission.  *See United States v. Johnson*, 802 F.2d 1459, 1464 (D.C. Cir. 1986) ("[T]he balance should generally be struck in favor of admission when the evidence indicates a close relationship to the offense charged.") (internal quotation marks omitted).

Further, the Government is entitled to introduce evidence pursuant to Rule 404(b) in its case in chief to anticipate a defendant's likely defense of lack of intent or knowledge.  *See, e.g.*, *United States v. Brown*, 597 F.3d 399, 404 (D.C. Cir. 2010) (extrinsic evidence of defendant's "knowledge, motive, and the absence of mistake or accident" was admissible under Rule 404(b) "to show his specific intent to defraud"); *see also United States v. Inserra*, 34 F.3d 83, 90 (2d Cir. 1994) ("[Rule 404(b) other crimes evidence] is admissible during the Government's case-in-chief if it is apparent that the defendant will dispute that issue."), *United States v. Estabrook*, 774 F.2d 284, 289 (8th Cir. 1985) ("[W]here it is made clear at the outset of the trial that the defendant's principal defense is a lack of knowledge or intent, and thus the issue is unarguably in dispute, the government may take the defendant at his word and introduce the evidence in its case-in-chief"), *United States v. Lewis*, 759 F.2d 1316, 1349 n. 14 (8th Cir. 1985) ("It was not necessary for the government to await defendant's denial of intent or knowledge before introducing [Rule 404(b) other crimes] evidence; instead the government may anticipate the defense and introduce it in its case-in-chief").

Here, all of the evidence in categories (A) and (B) of this motion are admissible for multiple purposes pursuant to Rule 404(b).  *See Crowder*, 141 F.3d at 1208 (Rule 404(b) evidence "will often have . . . multiple utility, showing at once intent, knowledge, motive, preparation and the like").

(A) <u>Category A (Operation of Grams, Related Narcotics Distribution Conspiracies, and Additional Illicit Funds Laundered Through Helix) Is Admissible Pursuant to Rule 404(b)</u>

As articulated in Section I, above, the information covered in Category A establishes the defendant's knowledge of the source and illicit nature of the funds laundered through Helix.  The

previously articulated arguments for why the evidence is intrinsic to the charged offenses similarly apply to show that the evidence would be appropriately admitted under Rule 404(b) to prove, *inter alia*, the defendant's intent, motive, preparation, plan, knowledge, identity, and absence of mistake or accident. *See* Fed. R. Evid. 404(b)(2)

The defendant's extensive dealings with darknet market administrators and vendors in his operation of other Grams services, and his involvement with other criminal platforms, all show that the defendant had knowledge of the illicit nature of the funds that Helix was used to launder. The defendant's robust darknet activity shows that the use of Helix to launder narcotics proceeds was not an accident or mistake, but instead was an intentional aspect of the defendant's plan.

The preparations involved in launching and operating Helix, including conversations with darknet markets and vendors to promote Grams/Helix, will be instrumental in rebutting a likely defense that the defendant was unaware that the funds moved through Helix were the proceeds of unlawful activity. The evidence in Category A shows the logical shortcomings of any such defense and goes to, *inter alia*, the defendant's knowledge and intent.

Furthermore, the information regarding the defendant's arrangements with co-conspirators, including darknet market administrators and vendors, helps to explain the background of the conspiracy. As this court has recognized, "When a conspiracy is alleged, a legitimate purpose under Rule 404(b) for introducing 'extrinsic' acts is to provide background in order to show both association and how a criminal relationship developed." *United States v. Morrow*, No. 04-355 (CKK), 2005 U.S. Dist. LEXIS 23512, at *17 (D.D.C. Apr. 7, 2005) (unpublished). The Government, in a conspiracy prosecution, "is usually allowed considerable leeway in offering evidence of other offenses to inform the jury of the background of the conspiracy charged, to complete the story of the crimes charged, and to explain to the jury how

the illegal relationship between the participants in the crime developed." *United States v. Mathis*, 216 F.3d 18, 26 (D.C. Cir. 2000) (quoting *United States v. Williams*, 205 F.3d 23, 33-34 (2d Cir. 2000)); *see also United States v. Pipola*, 83 F.3d 556, 566 (2d Cir. 1996) ("One legitimate purpose for presenting evidence of extrinsic acts is to explain how a criminal relationship developed; this sort of proof furnishes admissible background information in a conspiracy case.") (citing *United States v. Lasanta*, 978 F.2d 1300, 1307-08 (2d Cir. 1992)),  *United States v. Rosa*, 11 F.3d 315, 334 (2d Cir. 1993) ("We have repeatedly held that it is within the court's discretion to admit evidence of prior bad acts to inform the jury of the background of the conspiracy charged, in order to help explain how the illegal relationship between participants in the crime developed, or to explain the mutual trust that existed between coconspirators."), *United States v. Tse*, 375 F.3d 148, 155 (1st Cir. 2004) ("In a conspiracy case, the district court may admit evidence of other bad acts if they tend to suggest a criminal association between the alleged conspirators.").

     (B) <u>Category B (Other Financial Crimes) Is Admissible Pursuant to Rule 404(b)</u>

     The Government expects the defendant to claim that he was unaware that the funds laundered through Helix were tied to illegal activity.  Such a defense is undercut by the evidence in Category B showing the dramatic lengths to which the defendant went to avoid connecting his profits from Helix to his true identity and his real-world financial accounts.  Put simply, if the defendant believed Helix to be a legitimate business, he would not have falsified invoices, submitted fraudulent documentation to financial institutions, converted the bitcoin proceeds to cash using straw sellers, enlisted associates to act as money mules to transmit the cash back to him, laundered the money through his bank accounts, and then filed false tax returns to legitimize the income.  The evidence therefore is highly probative of the defendant's intent to

commit money laundering and move ill-gotten gains through his unlicensed money services business, and his knowledge that the money was, in fact, dirty.  The information will further help to rebut any defense that the defendant moved the proceeds of crime by accident or due to a mistake or oversight.

The evidence regarding the defendant's operation of Coin Ninja and DropBit without the needed licenses is further probative of the defendant's knowledge of the narcotics proceeds moving through Helix.  The evidence shows that the defendant knew that Coin Ninja needed to be licensed and that the defendant declined to acquire the needed licenses, but that the defendant nonetheless ran the company openly, without concealing his identity or the nature of the company's business.  This stands in stark contract to the defendant's extensive efforts to conceal his association with Helix, which catered specifically to criminals but whose business model was otherwise similar to that of Coin Ninja.  This dichotomy undercuts any argument by the defendant seeking to "explain away" the self-laundering activity described throughout Category B as simply an effort to avoid regulatory scrutiny or civil enforcement.  If that were truly the defendant's concern, he would have concealed his Coin Ninja activity in the same manner.

Also, as discussed in Section I, above, the evidence regarding the defendant's subsequent movement of proceeds from Helix is instrumental to establishing the defendant's identity as the operator of Helix.

C.   The Probative Value of the Evidence from Category A and Category B Is Not Substantially Outweighed by Potential Prejudice

The probative value of the evidence from Category A and Category B is significant and is set forth in the sections above.  The potential prejudice from the Rule 404(b) evidence in Category A and Category B does not "substantially outweigh" its probative value.  The

defendant is charged with an extensive money laundering conspiracy, wherein he allegedly laundered hundreds of millions of dollars of narcotics proceeds from some of the most notorious darknet drug markets in operation at the time.  There is little risk that introduction of the additional evidence of darknet activity or of financial crimes will tend to inflame the jury or cause it to make a decision on an emotional basis.  *See United States v. Ring*, 706 F.3d 460, 471 (D.C. Cir. 2014) (explaining that "unfair prejudice" means "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one") (internal quotation marks omitted).  To the contrary, it will be helpful to the jury in understanding the defendant's schemes and establishing the requisite elements of the charged offenses.

Any concern regarding improper use of evidence admitted pursuant to Rule 404(b) can be appropriately addressed with a limiting instruction.  *See United States v. Thorne*, No. 18-389 (BAH), 2020 U.S. Dist. LEXIS 4291, at *52-53 (D.D.C. Jan. 10, 2020) ("Limiting instructions will further 'guard the space between the permissible and impermissible' uses for the prior conviction evidence.") (quoting *United States v. Mitchell*, 49 F.3d 769, 777 (D.C. Cir. 1995)); *see also Crowder*, 141 F.3d at 1210 (considering "the effect of a limiting instruction" in conducting balancing under Rule 403) (cited in *Thorne*, 2020 U.S. Dist. LEXIS 4291, at *53).

## **CONCLUSION**

For the foregoing reasons, the government respectfully requests permission to introduce the above-described evidence as intrinsic evidence and/or other crimes evidence pursuant to Fed. R. Evid. 404(b).

Respectfully submitted,

MICHAEL R. SHERWIN
ACTING UNITED STATES ATTORNEY
New York Bar No. 4444188

By:     /s/ *C. Alden Pelker*
        C. Alden Pelker, Maryland Bar
        S. Riane Harper, D.C. Bar No. 230233
        Trial Attorneys, U.S. Department of Justice
        1301 New York Ave. N.W., Suite 600
        Washington, D.C. 20005
        Christopher B. Brown, D.C. Bar No. 1008763
        Assistant United States Attorney
        555 4th Street, N.W.
        Washington, D.C. 20530
        Phone:  (202) 616-5007 (Pelker)
        Fax:  (202) 514-6113
        Catherine.Pelker@usdoj.gov
        *Counsel for the United States*