**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| v. | § | No. 1:19-cr-00395 |
| | § | |
| LARRY DEAN HARMON | § | |

**DEFENDANT'S REPLY IN SUPPORT OF MOTION FOR RECONSIDERATION**

TO THE HONORABLE CHIEF JUDGE BERYL HOWELL:

COMES NOW, LARRY HARMON, by and through his attorney, Charles Flood, and respectfully submits his reply to the Government's Supplemental Memorandum in Opposition to the Defendant's Motion for Reconsideration. (ECF No. 69).

**I.   Mr. Harmon's Motion for Reconsideration should be granted because no license was required by DISB as the operation of Helix did not involve national currency.**

The Government alleges that Mr. Harmon operated HELIX "starting in or about July 2014" and that "Harmon began to shut down operations for...Helix in or about December 2017." (Indictment at ¶ 3, 9). The Government claims that Helix was required "[u]nder District of Columbia law . . . to obtain a license from [DISB], and the failure to do so was a felony." (*Id.* at ¶ 10.) Because Helix did *not* require a license from DISB, the Motion for Reconsideration should be granted.

The January 2015 DISB Memo (ECF No. 62-1) notes, as Mr. Harmon argued in the Motion to Dismiss, that the DC Money Transmitters Act does not itself define "money." *Id*. at 6. So, relying in part on *Black's Law Dictionary* and in part on IRS guidance treating bitcoin as property and not currency, the DISB decided in 2015 that "the Department has

decided not to treat virtual currency as 'money' for the purposes of money transmission." *Id*.  DISB explained that the exchange of virtual currency for other virtual currency does "not require a license because it does not involve the transfer of a medium of exchange adopted by a government."  *Id.* at 6-7; *see also id.* at 8 (email from DISB licensing manager T. Hicks, June 2, 2016, explaining that where "national currency is neither received, dispersed, nor used . . .  a money transmitter license is not required because the transactions do not involve the transmission of 'money'").

DISB confirmed that position that the exchange of virtual currency for virtual currency does not require a license in June 2016 when, in a letter to the CEO of COEPTIS, DISB applied the rationale in the Memo to conclude that COEPTIS did not need a license for its business because "the transactions as described do not involve the transmission of money."  (*Id*. at 2).  That is so, explained DISB, because that "business model that does not involve the transfer of money or a medium of exchange authorized or adopted by a government as a part of its currency."  *Id*. (internal quotations omitted).

The defense is unaware of *any* instance *during the time of Helix's operation* in which the DISB required a license for the exchange of one virtual currency for another.  The Government, despite being invited to do so, has pointed to no such instance.  Instead, as the Court pointed out at oral argument, all the examples provided by the Government are DISB licensing virtual currency businesses which all involved "real currency" and thus "are all ones that fit within DISB's interpretation of its MTA."  (Hrg. Tr. at 16:2-17:7).  During the hearing on Defendant's Motion for Reconsideration (ECF No. 63) the Court invited the Government to provide briefing and a reply from DISB as to whether similar

applications for businesses like Helix had been considered by DISB or an opinion from DISB about how they may have viewed Helix . Despite "wishing to be helpful," DISB has declined the Government's invitation and has provided no guidance to the Court. Importantly, the Government has provided no response to the Court's questions regarding DISB's opinion of Helix.

Based on the information before the Court, it is clear that in 2015 DISB decided not to treat virtual currency as money, and without the involvement of national currency DISB would not have required a license during the time period covered by the indictment. The Motion to Reconsider should be granted.

II.   **Aside from the above, the extensive briefing before this Court and before Judge Berman Jackson in the E-gold matter suggests that Defendant's motion should be granted by operation of the Rule of Lenity**.

Even if the Court concludes that the motion cannot be granted for the reasons described above, the Motion should still be granted because due process and the rule of lenity require it. This case demonstrates why any "ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity." *Skilling v. United States,* 561 U.S. 358, 410 (2010) (citation omitted). The rule of lenity, of course, "not only vindicates the fundamental principle that no citizen should be held accountable for a violation of a statute whose commands are uncertain . . . [i]t also places the weight of inertia upon the party that can best induce Congress to speak more clearly and keeps courts from making criminal law in Congress's stead." *United States v. Santos*, 553 U.S. 507, 514 (2008). Here, the Government's position that this Court ultimately decides who under D.C. Code should be licensed by DISB does just that – it puts this Court making law in the legislature's stead.

It essentially makes this Court the regulatory authority retroactively deciding who needed a license and who did not. The Government's position leads to the absurd result that COEPTIS could currently be charged for violating D.C. Code because it needed a license despite being told by DISB that it did not.  This ambiguity and absurd result are  precisely the kinds of things that lenity should forbid: "In these circumstances — where text, structure, and history fail to establish that the Government's position is unambiguously correct — we apply the rule of lenity and resolve the ambiguity in [Defendant's] favor. *United States v. Granderson*, 511 U.S. 40, 54, (1994).   The tenuousness of the Government's position was quickly revealed during the prior hearing and underscores why the rule of lenity (to say nothing of the related guarantees of due process) supports the granting of Defendant's motion.

The Court pointedly asked whether it was the Government's position that it "can basically render moot whatever the local regulatory agency decides and how it's going to enforce the local statute by prosecuting a violation of the regulatory statute in federal court because you can?" (Hrg Tr. 14:24-15:3).  In response, the Government evaded, pivoting to discussion of the E-gold case and referring to what it called "more of a substantive defense[…]".  *Id.* at 15:4-17.  Later, the Court asked the same question a different way.  This time (at 24:19-25:2) the Court asked whether it was the Government's position: "that the federal court can reinterpret local law and where you have this jurisdictional anomaly here in the District of Columbia, the U.S. Attorney's Office here, no matter what the local regulatory agency or the local government says about how it's going to enforce and interpret its local law, a federal court, the Feds can step in and enforce

it however they'd like? Is that the Government's position here?" Again, the government started to dodge, but when pressed for a "yes or no" the Government said unambiguously "Your Honor, yes." *Id.* at 25:3-5.

That cannot be. The Government cannot, consistent with the constitutional guarantee of due process, use its novel interpretation of DC law to prosecute Mr. Harmon for failing to have a license years ago, at a time when the very issuer of that license would not have required it. *See, e.g., United States v. Lanier,* 520 U.S. 259, 266 (1997) (holding "due process bars courts from applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope").

In light of the DISB memo and a similar interpretation from the Florida banking regulator, the Government's current construction of DC law is at least "novel."  After all, lawyers and officials at DISB considered and concluded, as Mr. Harmon argued here, that bitcoin and other virtual currencies were not money because they are not "money or a medium of exchange authorized or adopted by a government as a part of its currency." DISB Memo (ECF No. 62-1 at 8); *See e.g., also* Defendant's Motion to Dismiss Count Two and Three (ECF No. 31).  As we now know, Florida regulators held a similar view that something other than a national currency cannot be "money" under its laws. *See, e.g. United States v. E-Gold, Ltd., et al.*, No. 07-cr-109 (RMC) (D.D.C.) (ECF No. 211-9) (explaining E-gold is not regulated because it is not "money of the United States or of any other country which is designated as legal tender.")

At a minimum, the extraordinary writ proceedings before Judge Berman Jackson and the extended proceedings in this Court demonstrate that this is a circumstance "where text, structure, and history fail to establish that the Government's position is unambiguously correct," and thus the Court must "apply the rule of lenity and resolve the ambiguity in [Defendant's] favor." *Granderson, 511 U.S.* at 54.

### III.   DISB's opinion is entitled to full deference.

Lastly, even doing a *Chevron*[1] analysis (which the Court clearly thought was not necessary) this Court should reconsider its prior Order and grant Defendant's Motion to Dismiss.

The Department of Insurance, Securities, and Banking is granted by Congress the authority to make rules.  This authority comes from § 26-1024 of the D.C. Code which grants the Superintendent [Commissioner] "authority to promulgate rules and regulations to implement this chapter. D.C. Code § 26-1024.  It is in this exercise of its congressionally granted authority that it formulates legal opinions and determines licensure requirements. The January 2015 DISB "legal and policy position" memo and the COEPTIS email are precisely the type of regulatory rulemaking decisions that Congress intended DISB to make and should be granted full deference by this Court.  They are both similar to the Comptroller's letter addressed by Justice Ginsburg in *NationsBank of North Carolina, N.A. v. Variable Annuity Life Insurance Co*, 513 U.S. 251 (1995).  *NationsBank* addressed what deference should be given to a Comptroller's letter that gave NationsBank the authority to

---

[1] *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc*., 467 U.S. 837 (1984).

broker annuities.  Like DISB, the Comptroller was congressionally authorized to supervise "the business of banking." *Id.* at 256.  The Supreme Court gave full deference to an unpublished letter granting NationBank's application.  Quoting *Chevron* the Court held: "If the administrator's reading fills a gap or defines a term in a way that is reasonable in light of the legislature's revealed design, we give the administrator's judgment 'controlling weight.'" *NationsBank* at 257, citing *Chevron*, 467 U.S. at 844.

## IV.     Conclusion

Defendant prays that this court will reconsider its prior Memorandum Opinion denying his Motion to Dismiss Counts Two and Three and dismiss the first means within Count Two and Count Three in its entirety.

Respectfully submitted,

*/s/ Charles Flood*
Charles Flood
FLOOD & FLOOD
914 Preston at Main, Suite 800
Houston, TX 77002
(713) 223-8877
(713) 223-8879 fax
Email: charles@floodandflood.com
Federal I.D. No. 22508

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 5, 2020 I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system which will send notification of such filing to all counsel of record.

*/s/ Charles Flood*   
Charles Flood
