## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Civil Action No. 19-cv-395 (BAH) |
| LARRY DEAN HARMON, | Chief Judge Beryl A. Howell |
| Defendant. | |

## <u>MEMORANDUM OPINION</u>

Defendant, Larry Dean Harmon, is charged in three counts, including violating the

District of Columbia's Money Transmitters Act ("MTA"), D.C. Code § 26-1023(c), by engaging,

without a money transmitter's license, in the business of money transmission, as defined in D.C.

Code § 26-1001(10), when, between 2014 and 2017, he allegedly owned and operated the bitcoin

business called Helix. *See* Indictment ¶¶ 19–20 (Count Three), ECF No. 1. The MTA violation

in Count Three is also a partial predicate for Count Two, which charges defendant with operating

an unlicensed money transmitting business, in violation of 18 U.S.C. § 1960(a). *Id.*, Count Two,

¶¶ 17–18. Shortly after defendant's motion to dismiss Counts Two and Three was denied, *see*

*United States v. Harmon* ("*Harmon*") at *7, Crim. Action No. 19-395 (BAH), 2020 WL 4251347

(D.D.C. Jul. 24, 2020), the government filed a notice of supplemental authority consisting of a

2016 letter, with two attachments, issued by the District of Columbia Department of Insurance,

Securities and Banking ("DISB"), the local MTA licensing authority, *see* Gov't's Notice of

Supplemental Authority ("Gov't's Not."), ECF No. 62. DISB indicated in this letter that, during

the same period defendant is charged with allegedly operating a bitcoin money transmitter

without a license in violation the MTA, another virtual currency operation was permitted to

operate without a license and that DISB construed the term "money" in the MTA to exclude

certain virtual currency transmitters from the MTA licensing requirement.  *See id*, Attachment,

Letter from Charlotte W. Parker, Assistant General Counsel, DISB, to William A. Cunningham,

Chief Exec. Officer, COEPTIS (Jun. 23, 2016) ("DISB Letter"), at 1–2, ECF No. 62-1.  In light

of this new information about DISB's apparent view as to the MTA's application to certain

virtual currency operations, defendant now seeks reconsideration of his motion to dismiss Counts

Two and Three, reiterating the argument previously rejected by this Court that "bitcoin is not

money pursuant to the MTA."  Def.'s Mot. Reconsider ("Def.'s Mot.") ¶ 5, ECF No. 63; *see also*

*id.* ¶ 6.

For the reasons explained below, defendant's Motion to Reconsider is denied.

# I.      BACKGROUND

The background underlying the charges in this case is detailed in *Harmon,* 2020 WL

4251347 at *1–5, and will not be repeated here, except as pertinent to resolution of the pending

motion for reconsideration.

Defendant allegedly operated the online service Helix between 2014 and 2017 as a

"bitcoin tumbler," meaning that customers' bitcoin sent to Helix were "tumbled" by stripping

them of identifying information, "enabl[ing] customers . . . to send bitcoins to designated

recipients in a manner which was designed to conceal and obfuscate the source or owner of the

bitcoins."  Indictment ¶¶ 3–4.  The service was "advertised . . . as a way to conceal transactions

from law enforcement," *id.* ¶ 5, especially for transactions via the Darknet market AlphaBay,

which offered customers the opportunity "to purchase a variety of illegal drugs, guns, and other

illegal goods," *id.* ¶ 6.  Helix was used to "exchange[] . . . approximately 354,468 bitcoins – the

equivalent of approximately $311 million in U.S. dollars."  *Id.* at ¶ 8.

Based on these and other relevant facts alleged by the government, defendant was indicted, on December 3, 2019, on three counts for conspiracy to launder monetary instruments, in violation of 18 U.S.C. §1956(h), *id.* ¶¶ 14–16 (Count One); operating an unlicensed money transmitting business, in violation of 18 U.S.C. §1960(a), *id.* ¶¶ 17–18 (Count Two); and engaging in the business of money transmission without a license, in violation of the MTA, *id.* ¶¶ 19–20 (Count Three).  Defendant sought dismissal of Counts Two and Three on grounds that both charges relied on the allegation that defendant "broke District of Columbia law by engaging in money transmission without a D.C. license to do so," Def.'s Mem. Supp. Mot. to Dismiss ("Def.'s MTD") at 1, ECF No. 31, but failed to state an offense because bitcoin is not money for the purposes of the MTA, *id.* at 2, and Helix, as a bitcoin tumbler, was not a money transmitting business under 18 U.S.C. § 1960, *id.* at 4.

After close examination of the ordinary meaning of the term "money" and the statutory history and construction of the MTA, this Court held that "bitcoin qualifies as money under the MTA," *Harmon,* 2020 WL 4251347 at *6, *15, and that "Helix was in the business of money transmission for purposes of the MTA," *id.* at *6.  Consequently, defendant's motion to dismiss Count Three and the portion of Count Two charging a violation of 18 U.S.C. § 1960(b)(1)(A) (failing to comply with the District's money transmitter requirements), was denied.  *Id.*  Further, finding that Helix's business "was receiving bitcoin to send to another location or person in order to mask the original source of the bitcoin," *id.* at *7—as opposed to defendant's characterization of the business as merely "provid[ing] bitcoin back to the user from whom it was sent," *id.* (quoting Def.'s Reply Supp. Mot. to Dismiss at 2, ECF No. 49)—this Court also held that this business model "qualifies as money transmission," warranting denial of defendant's motion to dismiss the portion of Count Two charging a violation of 18 U.S.C. § 1960(b)(1)(B) for

"'fail[ing] to comply with the money transmitting business registration requirements under' 31 U.S.C. § 5330 of the [Bank Secrecy Act], or 'regulations prescribed under such section'", *id.* (quoting 18 U.S.C. § 1960(b)(1)(B)); *id.* at *16 ("Helix, as described in the indictment, satisfies the definition of 'unlicensed money transmitting business' at § 1960(b)(1)(B) because Helix's core business was receiving bitcoin and transmitting that bitcoin to another location or person.").[1]

Six weeks after denial of defendant's motion to dismiss, the government provided notice of an exhibit to a post-conviction Petition for Writ of Error Coram Nobis filed in another case before this Court, *United States v. E-Gold Ltd.*, Crim. Action No. 07-cr-00109 (ABJ), which exhibit, the government conceded, was pertinent to "the Court's July 24, 2020 ruling that 'bitcoin qualifies as money'" under the MTA.  Gov't Not. ¶ 1 (citing *Harmon*, 2020 WL 4251347 at *15).[2]  This exhibit is a "heretofore non-public letter," *id.*, dated June 23, 2016, from DISB's Assistant General Counsel to the Chief Executive Officer of a company, named COEPTIS, responding to the company's inquiry in October 2015 about whether it "needs to obtain a money transmitter license in D.C" for its "privately issued currency (AUG) that will be 100% reserved by physical gold," DISB Letter, at 1–2.  In particular, the DISB Letter advised that "COEPTIS does not require a money transmitter license," *id.* at 2, based on the description

---

[1]　Count Two further alleges that defendant violated 18 U.S.C. § 1960(a) by engaging in "the transportation and transmission of funds known to [defendant] to have been derived from a criminal offense and intended to be used to promote and support unlawful activity," as defined by 18 U.S.C. § 1960(b)(1)(C), Indictment ¶ 18(c), but this prong of Count Two was not challenged in defendant's motion to dismiss, *Harmon,* 2020 WL 4251347 at *7, and thus is not at issue in the pending motion for reconsideration.

[2]　Although the DISB Letter was filed in *E-Gold* on July 2, 2020, nearly two weeks before oral argument in this case on defendant's motion to dismiss and nearly a month before *Harmon* was issued, *see* Gov't's Suppl. Opp'n to Def.'s Mot. Reconsideration ("Gov't Suppl. Opp'n") at 2, ECF No. 69, the prosecution team in this case "only became aware of the *E-Gold* petition" on August 26, 2020, because the *E-Gold* litigation is handled by the separate Special Proceedings Division of the U.S. Attorney's Office, *id.*  "To date, the government is also unaware of how the non-public" DISB Letter "came to the attention of the *E-Gold* defendants." *Id.* at 3.  Following "informal discussions with DISB on September 3, 2020," the government filed its Notice of Supplemental Authority in this case on September 9, 2020.  *Id.*  Consistent with its position in this case, the government has not conceded error in *E-Gold,* where the Petition for Writ of Error Coram Nobis remains pending.

of its operations "in Exhibit A," *id.* at 1, as "a closed/centralized settlement platform . . . to make internet payments," in which "[n]ational currency will not be received, dispensed, or used . . . [and] COEPTIS will not provide for any conversion of [privately issued currency], to national currency . . . ," *id.* at 1.[3]  This conclusion was further "[b]ased on" the legal conclusions contained in two exhibits to the DISB Letter, Exhibits B and C, which were "incorporated [t]herein by reference," *id.* at 2, and, unlike Exhibit A, provided as part of the government's Notice.

Exhibit B is an internal 5-page DISB memorandum, dated January 16, 2015, from DISB's Associate Commissioner for Banking, through a DISB Assistant General Counsel, to DISB's Acting Commissioner, regarding "Regulatory Treatment of the Sale or Exchange of Decentralized Virtual Currency under the Federal Bank Secrecy Act and the District of Columbia Money Transmitters Act of 2000" ("DISB Opinion Memo").  DISB Letter, Ex. B, at 3–7, ECF No. 62-1.[4]  Citing the DISB Opinion Memo, DISB informed COEPTIS "that COEPTIS does not require a money transmitter license pursuant to the District of Columbia [MTA] because 'the transactions as described do not involve the transmission of money.'" DISB Letter at 2.  DISB also cited Exhibit C, an intra-agency email, dated June 2, 2016, from a DISB Licensing Manager to DISB's Assistant General Counsel ("DISB Email"), which had concluded that the company "'is engaged in a two party business model that does not involve the transfer of

---

[3]     The DISB Letter's "Exhibit A," which provides details as the COEPTIS business operation and was the basis for DISB's opinion that COEPTIS did not need to obtain an MTA license, is not part of the government's Notice and has not been disclosed in this case. The DISB Letter itself, however, makes clear that the "privately issued currency" used by COEPTIS was not bitcoin.
[4]     Citations to Exhibits B and C to the DISB Letter use the pagination automatically assigned by the Court's Case Management/Electronic Filing (CM/ECF) system.

money or a medium of exchange authorized or adopted by a government as part of its currency,'"  DISB Letter at 2 (quoting DISB E-mail, at 8, ECF No. 62-1).[5]

Three weeks after the government filed its notice of supplemental authority, on September 30, 2020, defendant moved for reconsideration of his motion to dismiss, supported by a single page of argument.  *See* Def.'s Mot. at 1.  The government responded the following day with a single-paragraph opposition, which incorporated the Notice's two paragraphs arguing that the DISB Letter "should not alter the Court's analysis of the D.C. [MTA]" in *Harmon*, Gov't's Opp'n Mot. Reconsider ("Gov't's Opp'n") at ¶ 1, ECF No. 64, and reiterated that "defendant offers no reason why the discovery of this non-public letter warrants reconsideration of the Court's decision . . . [which] already considered, and rejected, the sole basis for the DISB [L]etter's reasoning—a single definition in Black's Law Dictionary—and engaged in a much more thorough and far-reaching analysis of the [D.C.] MTA using all the tools of statutory interpretation," *id*.

Given the "minimal" briefing "on all sides," Hr'g Tr. 3:18–3:19, Oct. 23, 2020, ECF No. 71, the Court held a hearing for the government to explain, *inter alia*, its theory of imposing criminal liability on defendant for operating Helix without a money transmitter license when, during the relevant time period, DISB may have deemed such a license unnecessary, *see e.g.*, *id.* 13:4–17:22, and whether DISB's licensing practices had changed at any point after January 2015, *id.* 17:23–20:12.[6]  At the parties' request, the Court granted an opportunity for post-

---

[5]       The DISB Opinion Memo distinguishes between what it calls a "two party" versus a "three party" virtual exchange, defining the former as a "model involv[ing] companies that have already purchased virtual currency, or acquired it through mining, and wish to sell or exchange it for real currency or another type of virtual currency," DISB Opinion Memo at 4, while the latter "three party" model "involves selling or exchanging virtual currency through the use of an intermediary," *id.*  The government characterizes this distinction as "dubious" and argues that it is predicated on "a misapplication" of federal Financial Crimes Enforcement Network ("FinCEN") guidance. Gov't's Suppl. Opp'n at 11; *see* further discussion, *infra* in Part III.A.3.

[6]       As to the latter query regarding DISB's current licensing policy or timing of any change of policy, the government suggested in its notice that "[i]t is far from clear whether the DISB Letter represents DISB's present

hearing supplemental briefing, *see id.* 26:25–27:4; Min. Order (Oct. 23, 2020), which is now complete. Defendant's motion for reconsideration is now ripe for resolution.

## II.   LEGAL STANDARD

The Federal Rules of Criminal Procedure do not expressly provide authority for motions to reconsider interlocutory orders in criminal actions, but every circuit court of appeals to address this issue has acknowledged the inherent authority of district courts to decide such motions. *See, e.g., United States v. Crowe*, Nos. 20-5347/5374, 2020 U.S. App. LEXIS 31662, at *3 (6th Cir. Oct. 5, 2020) ("Motions to reconsider, while not expressly authorized by the Federal Rules of Criminal Procedure, are permitted in criminal cases as ordinary elements of federal practice.") (citation omitted); *United States v. Collins*, No. 17-14598-EE, 2019 U.S. App. LEXIS 12593, at *2 (11th Cir. Apr. 25, 2019) ("Although the Federal Rules of Criminal Procedure do not expressly provide for motion for reconsideration, both the Supreme Court and this Court have permitted such motions . . . ."); *United States v. Tropea*, 670 F. App'x 139, 139 n.* (4th Cir. 2016) (per curiam) ("[W]e have acknowledged that, in certain circumstances, district courts have the inherent authority to decide motions for reconsideration in criminal cases." (citing *United States v. Goodwyn,* 596 F.3d 233, 236 (4th Cir. 2010)); *United States v. Bravo-Fernandez*, 790 F.3d 41, 61 n.14 (1st Cir. 2015) ("[D]istrict courts have the inherent authority to reconsider their interlocutory orders outside the sentencing context."); *United States v. Laraneta*, 700 F.3d 983, 985 (7th Cir. 2012) ("[M]otions to reconsider (in district courts) and petitions for rehearing (in courts of appeals) are ordinary elements of federal practice that exist

---

understanding of the MTA," Gov't's Not. ¶ 2, and subsequently advised that "the prosecution team contacted DISB again on October 26, 2020 and inquired as to DISB supplementing the record for this case. DISB wishes to be helpful to this Court, but, at this time, it is not in a position to submit a public declaration on behalf of the agency in this proceeding." Gov't's Suppl. Opp'n at 3. Thus, whether the DISB Letter reflects DISB's current licensing policy for bitcoin and other virtual currency operations remains, as the government puts it, "far from clear."

in criminal prosecutions despite their omission from the Rules of Criminal Procedure." (quoting *United States v. Rollins*, 607 F.3d 500, 502 (7th Cir. 2010)); *United States v. Aguirre*, 214 F.3d 1122, 1124 (9th Cir. 2000) ("While district courts generally have 'inherent authority' to decide motions for reconsideration and rehearing of orders in criminal proceedings, 18 U.S.C. § 3582 . . . expressly limits the court's authority in sentencing."); *United States v. Green*, 414 F.2d 1174, 1175 (D.C. Cir. 1969) (holding that district judge was authorized to withdraw oral ruling granting defendant's motion to dismiss indictment since such a ruling "is not immutable, and is of course subject to further reflection, reconsideration, and change.").

"[T]he power to grant relief from erroneous interlocutory orders, exercised in justice and good conscience, has long been recognized as within the plenary power of courts until entry of final judgment and is not inconsistent with any of the Rules." *United States v. Jerry,* 487 F.2d 600, 604 (3d Cir. 1973). Indeed, the Federal Rules of Criminal Procedure "are to be interpreted to provide for the just determination of every criminal proceeding," FED. R. CRIM. P. 2, and, in line with this mandate, where the procedural rules are silent, flexibility is provided so that "[a] judge may regulate practice in any manner consistent with federal law, these rules, and the local rules of the district," FED. R. CRIM. P. 57(b). In sum, reconsideration of an interlocutory order in a criminal case, before a final judgment has been entered, is guided by the over-arching concern of reaching a "just determination," which may be informed by the reasons warranting reconsideration identified in analogous circumstances in other federal procedural rules. *See, e.g.*, FED. R. CIV. P. 60(b) (enumerating reasons for relief from final judgment, order or proceeding, including "mistake, inadvertence, surprise, or excusable neglect" and "newly discovered evidence that, with reasonable diligence, could not have been discovered in time . . .").

III.    DISCUSSION

Defendant urges reconsideration of the conclusion reached in *Harmon* that "bitcoin is money pursuant to the MTA," in light of the newly revealed DISB Letter.  In defendant's view, the DISB Letter shows that the Court's prior conclusion was based on "an incomplete understanding of District precedent," which is "core to the allegation[s] in Count Three" and two of the three prongs in Count Two.  Def.'s Mot. ¶ 5.  Absent a showing by the government that DISB viewed bitcoin as money and would have required Helix to obtain a money transmitter license, defendant contends that he cannot be lawfully indicted under Count Three or the parts of Count Two that rest on violations of DISB's licensure requirements.  *Id.* ¶¶ 5–6.  This argument is far from frivolous, as the government's initial single-paragraph opposition appeared to treat it.

In supplemental briefing, the government cautions against reconsidering *Harmon*'s holding on the proper construction of the MTA by "relying on the accidental discovery of a five-year-old, non-public DISB Opinion Letter to issue a new ruling that would effectively strip DISB of its jurisdiction to regulate a significant share of virtual currency transmitters," Gov't's Suppl. Opp'n Def.'s Mot. Reconsideration ("Gov't's Suppl. Opp'n") at 16, ECF No. 69, and thereby effectively elevate the non-public DISB Letter, and exhibits, as "the authoritative construction of the statute," *id*.[7]  In addition to this pragmatic concern, the government counters defendant's arguments for reconsideration with several legal arguments.  The government first points to the "bedrock principle that courts, and not executive branch agencies, construe the law in criminal

---

[7]     Building on this point, the government contends that "if this Court were to jettison its July 24, 2020 ruling on the meaning of 'money' within the MTA," Gov't's Suppl. Opp'n at 16, this would "force the hand of DISB into committing to a public legal position" even though "DISB has made the decision *not* to announce its own construction of the statute in a formalized, binding manner," *id.* at 17 (emphasis in original).  The agency's approach, according to the government, "allows the agency to respond nimbly to new developments in the law, technology, or regulatory landscape," which is "especially appropriate in a dynamic and fast-changing field like virtual currencies."  *Id.* at 16.

prosecutions," *id.* at 4, and urges that the DISB Letter therefore be considered "irrelevant," *id.*  In any event, the government further contends that, given the letter's non-public form and other attributes, including its "weak rationale, minimal analysis, and failure to consider relevant legal authorities and precedents," *id.* at 15, the DISB Letter is entitled to no deference under the framework set out in *Chevron, U.S.A., Inc. v. NRDC, Inc.* ("*Chevron*"), 467 U.S. 837 (1984), *id.* at 6, and should be found unpersuasive, *id.* at 10.  Next, as to defendant's multiple fairness arguments, the government argues that the DISB Letter does not render the *Harmon* construction of the MTA "impermissibly retroactive," *id.* at 19; or violative of due process, *id.* at 21, and the rule of lenity, *see* Gov't's Surreply Opp'n Def.'s Mot. ("Gov't's Surreply") at 4, ECF No. 76. Consideration of the merits of these arguments confirms that no reconsideration of *Harmon* is necessary.

### A.    Even If *Chevron* Framework Applies, DISB Letter Warrants No Deference

The government first insists that because courts construe criminal law, not executive branch agencies, the DISB Letter "should be considered 'not relevant at all' and not 'entitled to any deference.'" Gov't's Suppl. Opp'n at 4–5 (quoting *Abramski v. United States*, 573 U.S. 169, 191 (2014) ("criminal laws are for courts, not the Government, to construe."), *United States v. Apel*, 571 U.S. 359, 369 (2014) ("we have never held that the Government's reading of a criminal statute is entitled to any deference."), and citing *Crandon v. United States*, 494 U.S. 152, 177 (1990) (Scalia, J., concurring in judgment) ("we have never thought that the interpretation of those charged with prosecuting criminal statutes is entitled to deference.")). This position overstates the current state of binding precedent in this Circuit.  Furthermore, in approving the MTA as adopted in the District of Columbia, Congress has delegated to DISB sufficient authority to warrant application of *Chevron* to its interpretation of the MTA.

Nonetheless, as explained below, the DISB Letter reflects such a seriously flawed and erroneous interpretation of the MTA that it is entitled to no deference.

   **1.**  ***Applicability of* Chevron *Framework To Agency Interpretation of Criminal Statute***

   The government acknowledges that despite the broad language in *Abramski* and *Apel* quoted above, counseling against applying *Chevron* to agency interpretations of statutes that have criminal-law implications, under some circumstances an "agency interpretation of a criminal statute satisfies the conditions for *Chevron* deference."  Gov't's Suppl. Mem. at 5. Indeed, while observing that "the Supreme Court has signaled some wariness about deferring to the government's interpretations of criminal statutes," *Guedes v. BAFTE*, 920 F.3d 1, 25 (D.C. Cir. 2019) (citing *Abramski*, 573 U.S. at 191, and *Apel*, 571 U.S. at 369), the D.C. Circuit has expressly rejected the position that "*Chevron* deference has no application to regulations interpreting statutes . . . because they impose criminal penalties on violators," *id*. at 23; *id*. at 24 (finding defendants "have failed to demonstrate a likelihood of success in establishing a general rule against applying *Chevron* to agency interpretations of statutes that have criminal-law implications. To the contrary, precedent says otherwise."); *see also PHH Corp. v. Consumer Fin. Prot. Bureau*, 881 F.3d 75, 112 (D.C. Cir. 2018) (Tatel, J., concurring) ("Though there is some dispute about whether *Chevron* deference remains appropriate for agency interpretations of statutes with both civil and criminal applications, our court continues to adhere to the view that it is.") (internal citations omitted), *overturned in part on separate grounds by Seila Law LLC v. Consumer Fin. Prot. Bureau*, 140 S. Ct. 2183 (2020); *Competitive Enterprise Institute v. Department of Transportation*, 863 F.3d 911, 915 n.4 (D.C. Cir. 2017) ("We apply the *Chevron* framework to this facial challenge even though violating [the statute] can bring criminal penalties."); *United States v. Kanchanalak,* 192 F.3d 1037, 1047 n.17 (D.C. Cir.

1999) (rejecting defendants' argument in criminal case "that this court should not

give *Chevron* deference to the FEC's interpretation of an ambiguous statute in a criminal

proceeding," noting that "[d]efendants' support for this proposition is scant" and "[t]hat criminal

liability is at issue does not alter the fact that reasonable interpretations of the act are entitled to

deference.").[8]

In reviewing the precedent applying *Chevron* to criminal statutes, the D.C. Circuit has

highlighted that the *Chevron* framework is "a doctrine about statutory meaning—specifically,

about how courts should construe a statute." *Guedes*, 920 F.3d at 22.  Where the statute is

ambiguous and, importantly, Congress has delegated to an agency the power "to fill in the

statutory gaps," *id.* (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159

(2000), then deference is owed to the agency in determining the meaning of the statute.  Thus,

for example, in *Chevron* itself, the Supreme Court deferred to the Environmental Protection

Agency's ("EPA") interpretation of a term used in a provision of the Clean Air Act, when

violations of that provision carried criminal penalties, *id.* at 24 (discussing *Chevron*, 467 U.S. at

840), since the agency was granted "broad discretion in implementing" the provision, *Chevron*,

467 U.S. at 862.  The D.C. Circuit also pointed to *Babbitt v. Sweet Home Chapter of*

*Communities for a Great Oregon*, 515 U.S. 687, 704 n.18 (1995), where "notwithstanding the

statute's criminal penalties," the Supreme Court gave *Chevron* deference to the interpretation of

---

[8]     "[W]hether courts owe deference to an executive agency's interpretation of a law that contemplates both criminal and administrative enforcement," *Whitman v. United States*, 135 S. Ct. 352, 353 (2014) (Scalia, J., statement respecting denial of certiorari), has been expressly critiqued by some Supreme Court Justices because "deference to agency interpretations of statutory provisions to which criminal prohibitions are attached [means that] federal administrators can in effect create (and uncreate) new crimes at will," in direct conflict with the "norm that legislatures, not executive officers, define crimes," *id.  See also Guedes v. BATFE*, 140 S. Ct. 789, 790 (2020) (Gorsuch, J., concurring in denial of certiorari) (observing that "*Chevron's* application in this case may be doubtful" because the law at issue "carries the possibility of criminal sanctions," and opining that "*Chevron* . . . has no role to play when liberty is at stake.").

a term in the Endangered Species Act ("ESA") by the Secretary of the Interior.  *Guedes*, 920 F.3d at 24.  *See also Humane Soc'y v. Zinke*, 865 F.3d 585, 591, 595 (D.C. Cir. 2017) (applying *Chevron* deference to the Secretary of the Interior's interpretation of the ESA where violation of the rule would result in "criminal sanctions").  Likewise, where Congress has granted broad authority "to prescribe legislative rules" to the Securities and Exchange Commission ("SEC"), "[t]he SEC's interpretation of [securities] laws regularly receive *Chevron* treatment, even though their violation often triggers criminal liability."  *Guedes*, 920 F.3d at 24 (discussing *United States v. O'Hagan*, 521 U.S. 642, 673 (1997) (granting "controlling weight" to the SEC's interpretation of statutory provision that rendered defendant's conduct a crime) and citing *Nat'l Ass'n of Mfrs. v. SEC*, 748 F.3d 359, 366 (D.C. Cir. 2014); *Am. Equity Inv. Life Ins. Co. v. SEC*, 613 F.3d 166, 172–73 (D.C. Cir. 2010); and *Markowski v. SEC*, 274 F.3d 525, 528–29 (D.C. Cir. 2001)).

Consistent with this "binding precedent," the *Guedes* Court determined that Congress delegated "authority to administer the National Firearms Act and the Gun Control Act to the Attorney General, [that] the Attorney General promulgated a legislative rule in the exercise of that authority," and, consequently, "that the *Chevron* framework is applicable" to the agency's interpretation of the term "machinegun," as used in a criminal statute outlawing the "possession" of a "machinegun,"  26 U.S.C. § 5845(b), 18 U.S.C. § 924(a)(2), to cover bump stocks.  *Guedes*, 920 F.3d at 27–28.[9]

---

[9]     The government in *Guedes* "declined to invoke *Chevron* throughout the course of the litigation," "expressly disclaimed any entitlement to *Chevron* deference," and "at oral argument [before the D.C. Circuit], . . . went so far as to indicate that, while it believes the Rule should be upheld as the best reading of the statute without any need for *Chevron* deference, if the Rule's validity turns on the applicability of *Chevron*, it would prefer that the Rule be set aside rather than upheld under *Chevron*."  *Guedes*, 920 F.3d at 21.  The government's opening position in this case similarly posits that the *Chevron* framework has no applicability to interpreting criminal liability under the MTA.

By contrast, where Congress has delegated no or narrow rulemaking authority, which does not encompass the agency action with criminal implications, then *Chevron* treatment is not appropriate.  The *Guedes* Court cited as an example *Gonzales v. Oregon*, 546 U.S. 243 (2006), where "the Court found that the Attorney General lacked power to interpret a particular criminal provision of the Controlled Substances Act because the delegation of rulemaking authority was too narrow and 'did not delegate to the Attorney General authority to carry out or effect *all* provisions of the CSA.'"  *Guedes*, 920 F.3d at 25 (quoting *Gonzales*, 546 U.S. at 259). Similarly, a congressional enactment of an exclusively criminal statute, unaccompanied by any rulemaking authority, presents no "regulation or other *Chevron*-eligible instrument," *id.* at 26, to apply that framework for statutory interpretation, leaving the job solely to the courts.  The *Guedes* Court placed both *Abramski* and *Apel* in this latter category of cases, "outside the context of a *Chevron*-eligible interpretation—that is, outside the context of an agency 'speaking with the force of law.'"  *Id.* at 25 (quoting *U.S. v. Mead Corp.*, 533 U.S. 218, 229 (2001)); *Abramski v. United States*, 573 U.S. at 191 (finding government's "old" interpretation of a criminal statute, 18 U.S.C. § 922(a)(6), making illegal a false statement on a firearms purchase form, as "not relevant at all," when "nothing suggests that Congress—the entity whose voice *does* matter—limited its prohibition of a straw purchaser's misrepresentation in the way [defendant] proposes.") (emphasis in original); *United States v. Apel*, 571 U.S. at 359, 369 (eschewing reliance on "some Executive Branch documents" in interpreting criminal statute, 18 U.S.C. § 1382, making it a crime to reenter a "military . . . installation" after having been ordered not to do so "by any officer or  person in command," because "we have never held that the Government's reading of a criminal statute is entitled to any deference." (citing *Crandon*, 494 U.S. at 177)).

Set against this legal landscape, a determination of whether the *Chevron* framework applies—what is called "in academic parlance, the 'Chevron Step Zero' issue," *Fox v. Clinton*, 684 F.3d 67, 83 (D.C. Cir. 2012) (Williams, J., concurring)—turns on the extent of any congressional grant to DISB of rulemaking authority under the MTA and, if that framework is applicable, whether any deference is due to the DISB Letter.

### 2.    *DISB Letter Likely Was Not Intended To Have Force of Law*

The government contends that the DISB Letter cannot survive *Chevron* "step zero," *see* Gov't's Suppl. Opp'n at 6, which requires a showing that the agency "acted pursuant to congressionally delegated authority to make law and with the intent to act with the force of law . . . ." *Safari Club Int'l v. Zinke*, 878 F.3d 316, 326 (D.C. Cir. 2017).  The first part of this analysis, addressing DISB's "congressionally delegated authority to make law," *id.*, is easily dispatched, before turning to whether the DISB Letter reflects an "intent to act with the force of law."

At the outset, the *Chevron* framework only applies "when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority." *Mead Corp.*, 533 U.S. at 226–27.  In other words, "[w]hat makes an agency's interpretation of a provision special is that Congress has manifested its intent that the agency's interpretation of that provision *be* special . . . and that an agency's interpretation is deserving of the court's deference." *AKM LLC v. Sec'y of Labor*, 675 F.3d 752, 765 (D.C. Cir. 2012) (Henderson, J., concurring) (emphasis in original) (citing *Chevron*, 467 U.S. at 483–44).  Thus, "*Chevron* . . . is about interpretive deference only for federal agencies, and there is no analogue for when Congress delegates interpretive work to the states." Abbe R. Gluck, *Intrastatutory Federalism and*

15

*Statutory Interpretation: State Implementation of Federal Law in Health Reform and Beyond*,

121 YALE L. J. 534, 557 (2011).  Here, of course, DISB is a District agency, but that fact alone

does not render *Chevron* inapplicable.

   The District of Columbia enjoys a unique relationship with Congress, which has ultimate

legislative authority over the Nation's Capital under article I, § 8 of the U.S. Constitution.  *See*

District of Columbia Self-Government and Governmental Reorganization Act of 1973 ("Home

Rule Act"), Pub. L. 93-198, § 102(a), 87 Stat. 774 (1973) (codified as amended at D.C. Code §

1-201.02(a)) (". . . the intent of Congress is to delegate certain legislative powers to the

government of the District of Columbia . . . [and] relieve Congress of the burden of legislating

upon essentially local District matters.").  Congress has delegated that authority to the D.C.

Council under the Home Rule Act, while retaining the power to disapprove laws promulgated by

the D.C. Council.  *See id*. § 602(c)(1) (codified as amended at D.C. Code § 1-206.02(c)(1))

(providing that duly passed laws by D.C. Council "shall take effect upon the expiration of the 30-

calendar-day period . . . unless during such 30-day period, there has been enacted into law a joint

resolution disapproving such act" and "such resolution, upon becoming law, subsequent to the

expiration of such 30-day period, shall be deemed to have repealed such act, as of the date such

resolution becomes law"); *id.* § 602(c)(2) (codified as amended at D.C. Code § 1-206.02(c)(2))

(providing for enactment of laws codified in Title 22, 23, or 24 of the District of Columbia Code

governing criminal law and procedure and prisoners, unless following transmission to Congress,

"during such 60-day period, there has been enacted into law a joint resolution disapproving such

act.").[10]  Consequently, *Chevron*'s congressional authority delegation requirement may be

---

[10]    To be sure, the mechanism of disapproval by Congress of District laws may be a more attenuated reflection of Congress' intent than a direct congressional delegation of rulemaking authority to a federal agency, but in analogous circumstances, where the agency action at issue has become effective pursuant to a similar legal regime requiring congressional disapproval or veto, *Chevron* deference has been applied.  *See, e.g., AFL-CIO v. FEC*, 333

satisfied by grant of authority to local agencies under the D.C. Code.  *See* Home Rule Act *id.* §
404(a) ("Subject to the limitations specified in title VI of this Act . . . , the legislative power
granted to the District by this Act is vested in and shall be exercised by the Council in
accordance with this Act.").

The MTA, an act properly promulgated by the D.C. Council under the Home Rule Act,
and not disapproved or vetoed by Congress, grants the "Commissioner of the Department of
Insurance, Securities, and Banking," D.C. Code § 26–1001 (15), the authority to review,
"approve or deny every application for an original license" under the MTA, *id.* § 26–1009(a),
(b); to "suspend or revoke a licensee's license," *id.* § 26–1015; "to compromise, settle, and
collect civil penalties" for "violations of any provision of this chapter, or of any rule, regulation
or order issued or promulgated" thereunder, *id.* § 26–1021(c); and to "institute an administrative"
enforcement proceedings for MTA licensing violations, *id.* § 26–1022(a).   Most pertinent here,
the Commissioner of DISB "is authorized to promulgate rules and regulations to implement this
chapter."  *Id.* § 26–1024.  *See Mead Corp.*, 533 U.S. at 229 ("We have recognized a very good
indicator of delegation meriting *Chevron* treatment in express congressional authorizations to
engage in the process of rulemaking or adjudication that produces regulations or rulings for
which deference is claimed.").  In sum, DISB has broad authority, approved by Congress, to
exercise licensing and rulemaking authority under the MTA, with the interpretive power that
those authorities inherently require, and the subject matter of the DISB Letter falls well within
the scope of that authority.  *See id.* at 226–27 (holding "that administrative implementation of a

---

F.3d 168 (D.C. Cir. 2003) (concluding that, at *Chevron* Step Two, the Circuit would normally "accord 'considerable deference' to the [FEC] . . . particularly where . . . Congress took no action to disapprove the regulation when the agency submitted it for review . . ." (citing *Kanchanalak*, 338 192 F.3d at 1049 and *FEC v. Democratic Senatorial Campaign Comm.*, 454 U.S. 27 (1981)); *United States v. Kelley*, 956 F.2d 748, 753–54 (8th Cir. 1992) (noting that a policy statement in the U.S. Sentencing Guidelines had "to be taken seriously" in part because Congress had "the same chance to disapprove [the policy]. . . as it had to disapprove [the] guidelines").

particular statutory provision qualifies for *Chevron* deference when it appears that Congress

delegated authority to the agency generally to make rules carrying the force of law, and that the

agency interpretation claiming deference was promulgated in the exercise of that authority.").

The remaining hurdle to proceed past *Chevron* "Step Zero," is consideration of whether

DISB intended to act with the force of law in the DISB Letter.  To determine if the DISB Letter's

interpretation of the MTA was intended to have the force of law, courts rely on a series of factors

outlined by the Supreme Court in *Barnhart v. Walton*, 535 U.S. 212 (2002), and *United States v.

Mead Corp.*, 533 U.S. at 231–34.  Indications of such intent may include "interpretation through

means less formal than 'notice and comment' rulemaking," *Barnhart*, 535 U.S. at 221 (quoting 5

U.S.C. § 553), including "'the interstitial nature of the legal question, the related expertise of the

Agency, the importance of the question to administration of the statute, the complexity of that

administration, and the careful consideration the Agency has given the question over a long

period of time may indicate that *Chevron* provides the appropriate legal lens through which to

view the legality of a disputed Agency interpretation' of its authorizing statute," *Fox v. Clinton*,

684 F.3d 67, 77 (D.C. Cir. 2012) (quoting *Barnhart*, 535 U.S. at 222); *see Mead*, 533 U.S. at

230-231 ("The want of" notice and comment "does not decide the case").

Here, the DISB Letter was indisputably issued without notice and comment and is

predicated on no formal rulemaking by the agency that would trigger deference.  *See Fogo de

Chao (Holdings) Inc. v. United States Dep't of Homeland Sec.*, 769 F.3d 1127, 1136 (D.C. Cir.

2014) (noting that agency "decision, and any legal interpretations contained within it, were the

product of informal adjudication within the Service, rather than a formal adjudication or notice-

and-comment rulemaking" and the absence of "those 'relatively formal administrative

procedure[s]' that 'tend[] to foster the fairness and deliberation that should underlie a

pronouncement' of legal interpretation, weighs against the application of *Chevron* deference")
(quoting *Mead*, 533 U.S. at 230) (alterations in original)); *Fox*, 684 F.3d at 76 ("We owe no
deference to the Department's interpretation of its own regulations covering applications [at
issue], because there are no agency regulations at issue in this case.").

Consideration of the other *Barnhart* factors further demonstrate that the DISB Letter was
not intended to have the force of law.  First, as to "the interstitial nature of the legal question,"
whether the term "money" in the MTA encompasses bitcoin is a question of straight-forward
statutory interpretation rather than an inquiry requiring sophisticated or specialized expertise to
resolve, and thus no reason for deference to an administrative agency's interpretation arises from
this factor.

Second, while DISB is the local agency with expertise in banking and currency regulation
that is tasked with implementing and determining the businesses subject to licensure under the
MTA, neither the DISB Letter nor its exhibits were made public, suggesting that these
documents were not considered significant or even important to the administration of the MTA.
Rather, the DISB Letter is only an informal opinion about the status of a single company and
does not purport to express broader principles about application of the MTA.  *See Kaufman v.
Nielsen*, 896 F.3d 475, 484-85 (D.C. Cir. 2018) (finding no *Chevron* deference warranted for
informal agency letter that was not "'clearly intended to have general applicability and the force
of law' when the letter singularly focused on Kaufman." (quoting *Fox*, 684 F.3d at 78)); *Fogo de
Chao*, 769 F.3d at 1136–37 (finding agency decision was not exercise of authority to make rules
carrying the force of law "because the decision's 'binding character as a ruling stops short of
third parties' and is 'conclusive only as between [the agency] itself and the [petitioner] to whom
it was issued.'" (quoting *Mead*, 533 U.S. at 233)); *Fox*, 684 F.3d at 78.  Instead, the DISB Letter

itself made clear that its conclusion regarding COEPTIS not requiring a money transmitter license was subject to change if "any of the facts in the attached Exhibits change, including any change of ownership or name," and required COEPTIS to "submit those changes to the Department for further review and analysis." DISB Letter at 2. Thus, the DISB Letter amounts to an informal, one-off decision in response to a company inquiry, rather than an expression of binding opinion generally applicable to all virtual currency operations in the District, let alone virtual currency operations not involving "a privately issued currency [] that will be 100% reserved by physical gold." DISB Letter at 1; *see Kaufman,* 896 F.3d at 484–85 ("On its face, the letter did 'not purport to set policy for future . . . determinations,' and [the author of agency letter] never suggested that the letter established the agency's general policy for the entire country." (quoting *Fox,* 684 F.3d at 78)); *see also Christensen v. Harris County*, 529 U.S. 576, 587 (2000) (warning that agency "[i]nterpretations such as those in opinion letters -- like interpretations contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law -- do not warrant *Chevron*-style deference") (citations omitted).

Third, as to whether the DISB Letter reflects "careful consideration . . . over a long period of time" of the meaning of the term "money" in the MTA or that statute's application to virtual currency operations, the answer is plainly no. The DISB Letter relies heavily on the conclusion in its attached DISB Opinion Memo "not to treat virtual currency as 'money' for purposes of money transmission," DISB Opinion Memo at 6, but no information is provided in the record as to how long a period of time DISB studied and considered this question before issuing this opinion. Certainly, the consideration DISB gave to this question does not meet the requisite "careful" standard. Indeed, as the government points out, neither the DISB Letter nor the DISB Opinion Memo discussed "the *sole public precedent* at the time regarding application

of the MTA to virtual currency businesses: the 2007 prosecution of E-Gold, Ltd. and its

principals for operating a virtual currency transmitting business in the District of Columbia

without a license as required under D.C. Code § 26-1002, among other offenses," Gov't's Suppl.

Mem. at 13 (emphasis in original), even though "the case was well-publicized and resulted in

published decisions at both the trial and appellate level," *id.* (citing *United States v. E-Gold, Ltd.*,

521 F.3d 411 (D.C. Cir. 2008), *United States v. E-Gold, Ltd.*, 550 F. Supp. 2d 82 (D.D.C. 2008)

and *United States v. E-Gold, Ltd.*, 2007 WL 2103602 (D.D.C. July 20, 2007)).  For this and other

reasons, discussed *infra*, in Part III.A.3, the DISB Letter, together with its exhibits, simply do not

reflect the "careful consideration" required to fulfill *Barnhart*'s final factor.

      In sum, review of the DISB Letter in light of the *Bernhardt* factors indicates that the

agency's decision as to the MTA licensing status of COEPTIS and the conclusions reflected in

the DISB Opinion Memo and DISB Email do not reflect firm legal pronouncements to be given

the force of law as to the agency's position on the scope of its regulatory authority over virtual

currency, and therefore weighs against affording *Chevron* deference here.

### 3.    *DISB Letter Is Entirely Unpersuasive*

      Even if the DISB Letter purported to render a judgment " carrying the force of

law," *Mead*, 533 U.S. at 227, warranting *Chevron* deference, this agency action would still fail to

qualify for such deference due to its lack of reasoned or even persuasive decisionmaking, *see*

*Pub. Citizen, Inc. v. U.S. Dep't of Health & Human Servs.*, 332 F.3d 654, 661 (D.C. Cir. 2003)

(holding that "even if we were prepared to accord *Chevron* deference to the [agency's

interpretation of the statute expressed in its manual], that document contains no interpretation of

[the statute] to which we might defer").  As a threshold matter, the term "money" in the MTA is

not so ambiguous under *Chevron* Step One as to instruct reliance on a five-year-old, weakly

supported, non-public informal opinion letter pertaining to a single company that expressly cautions that the opinion might change with any alteration in still undisclosed facts. *See, supra*, n.3. Moreover, even if the inquiry were to reach *Chevron* Step Two, the deficiencies in reasoning are fatal to qualify the DISB Letter and its exhibits for any deference.

    *Chevron* "'comes into play' only when [the Court] must resolve statutory ambiguity," *United States Ass'n of Reptile Keepers v. Zinke*, 852 F.3d 1131, 1138 (D.C. Cir. 2017) (citing *S. Cal. Edison Co. v. FERC*, 195 F.3d 17, 23 (D.C. Cir. 1999)), and so *Chevron* Step One asks "whether Congress has directly spoken to the precise question at issue," *Chevron*, 467 U.S. at 842. Even though "[t]he MTA does not . . . define money," *Harmon*, 2020 WL 4251347 at *7, "the existence of ambiguity is not enough per se to warrant deference to the agency's interpretation . . . [but] must be such as to make it appear that Congress either explicitly or implicitly delegated authority to cure that ambiguity. Mere ambiguity in a statute is not evidence of congressional delegation of authority." *Hearth, Patio & Barbecue Ass'n v. United States DOE*, 706 F.3d 499, 504 (D.C. Cir. 2013) (quoting *ABA v. FTC*, 430 F.3d 457, 469 (D.C. Cir. 2005)); *see also Sea-Land Serv., Inc. v. Dep't of Transp*., 137 F.3d 640, 645 (D.C. Cir. 1998) (Chevron "deference comes into play . . . only as a consequence of statutory ambiguity, and then only if the reviewing court finds an implicit delegation of authority to the agency").

    *Harmon* determined that "[c]lues in the MTA indicate that the Council intended for money to be given its ordinary meaning," *Harmon*, 2020 WL 4251347, at *10, and thus did not intend for DISB to "cure" any ambiguity as in the term "money," *see Cal. Indep. Sys. Operator Corp. v. FERC*, 372 F.3d 395 (D.C. Cir. 2005) (finding that courts "assume 'that the legislative purpose is expressed by the ordinary meaning of the words used.'" (citing *Sec. Indus. Ass'n v. Bd. of Governors*, 468 U.S. 137, 149 (1984)). Further, the extended analysis in *Harmon*, which

used a variety of tools for statutory interpretation and supportive sources beyond the statutory text, rejected defendant's arguments predicated on a finding of ambiguity, responding directly and more broadly that "the MTA adopts the ordinary definition of money" and that the statute's "language, structure and legislative history all point to the conclusion that the MTA's definition of 'money' encompasses bitcoin." *Harmon*, 2020 WL 4251347 at *15.  Thus, under *Chevron* Step One, no deference is owed to the DISB Letter and exhibits as to the meaning of the term "money" under the MTA.

Moreover, considered at *Chevron* Step Two, the DISB Letter does not pass muster as persuasive reasoning, but instead is based on superficial and faulty misapplication of the cited references.  Three examples make this abundantly clear.

First, the DISB Letter relied on "and incorporated" the DISB Opinion Memo, DISB Letter at 2, which in turn found guidance issued in 2013 by FinCEN as "most instructive on how the District should regulate transactions involving virtual currencies," DISB Opinion Memo at 5. Despite discussing this "instructive" FinCEN guidance and regulations, however, DISB simply and inexplicably failed to apply it.  DISB correctly noted FinCEN's conclusions (1) "not to draw a distinction between virtual currency and real currency for purposes of money transmission," *id*.; (2) "that '[a]ccepting and transmitting anything of value that substitutes for currency makes a person a money transmitter under the regulations implementing the [Bank Secrecy Act],'" *id*. (quoting U.S. Dep't of Treasury, FinCEN, Guidance FIN-2013-G001: *Application of FinCEN's Regulations to Persons Administering, Exchanging, or Using Virtual Currencies* (Mar. 18, 2013), http://fincen.gov/statutes_regs/guidance/pdf/FIN-2013-G001.pdf ("FinCEN Guidance")); and (3) that both a "two-party business model would require registration with FinCEN as a money transmitter," *id*. at 6, and a "three party virtual currency business model could be

classified at an exchanger and a money transmitter . . . ," *id*. Yet, contrary to the FinCEN

Guidance, DISB decided instead "not to treat virtual currency as 'money' for purposes of money

transmission," *id*., nor to require a license for "the two party virtual currency business model,"

*id*. Scouring the DISB Opinion Memo would be in vain to discover any discernible explanation

for holding up the FinCEN guidance as "instructive" only to ignore its teachings.

The DISB Opinion Memo does reference an aspect of FinCEN Guidance discussing the

definition of currency exchange, which "requires the exchange of the currency of two countries,"

*id*. at 5, and the consequent exclusion of "a person who accepts real currency in exchange for

virtual currency, or *vice versa*," as "a dealer in foreign exchange under FinCEN's regulations,"

*id*. (quoting FinCEN Guidance at 5–6). DISB notes that "a company engaged in the two party

virtual currency exchange business model would not be required to register with FinCEN as a

currency exchange dealer because the company is not exchanging the currency of a country." *Id*.

at 5–6; *id*. at 7 (same). Although not entirely clear because the reasoning is so opaque, DISB

appears to leap from the FinCEN definition of "currency exchange" to exclude a two-party

model from the licensing requirement "because it does not involve the transfer of a medium of

exchange adopted by a government." *Id*. at 7. At best, this conclusion grossly misapplied

relevant FinCEN guidance, which *declined* to distinguish "between virtual currency and real

currency," deemed "transmitting *anything of value* that substitutes for currency" to qualify as

money transmission under the BSA, and, as DISB acknowledged, would require a money

transmitter license for *both* so-called two- and three- party virtual currency business models.

Second, the DISB Opinion Memo limited MTA coverage to only certain types of virtual

currency operations, *id.* at 6, based "almost exclusively" on a definition of "money" in BLACK'S

LAW DICTIONARY and a single IRS Notice meant to be used for tax, not regulatory, purposes.

Gov't's Suppl. Opp'n at 10, 11 n.3.  Reliance on the first of multiple definitions of "money" in BLACK'S LAW DICTIONARY as the appropriate meaning of this term under the MTA was rejected in *Harmon*, "[g]iven that money is an 'ordinary English word[] and should be given [its] ordinary meaning,'" and BLACK'S "'would only be relevant if [the legislature] intended that' money 'be given [a] special meaning[] as [a] legal 'term[] of art.'"  *Harmon*, 2020 WL 4251347 at *7 n.6 (quoting *United States v. Faiella*, 39 F. Supp. 3d 544, 545 n.2 (S.D.N.Y 2014)). Instead, the ordinary meaning for money was intended to be used in the MTA, for reasons fully explained in *Harmon*. *Id*. at *7 -*12.

  Third, as the government points out, the legal conclusions in the DISB Letter make "little sense as a matter of sound financial regulation."  Gov't's Suppl. Opp'n at 12.  The distinction drawn by DISB between "two party" and "three party" business models, with only the latter requiring a license under the MTA, apparently turns on whether the business exchanges fiat government currency for virtual currency.  The MTA, however, regulates more broadly than just currency exchangers, and requires licenses for all money transmitters.  *Id*.  In discussing the FinCEN guidance, DISB noted FinCEN's definition of currency exchange and, further, that "[t]he District of Columbia does not currently have a law requiring a license for companies engaged in the business of currency exchange," DISB Opinion Memo at 6, 7, implicitly acknowledging that the MTA was different.  Nonetheless, DISB appears to have applied the limitation applicable to the FinCEN definition of "currency exchange" to the definition of "money" in the MTA, without discussing or even recognizing the potential scope differences between the two definitions and regulatory regimes.

  Finally, in addition to the flawed reasoning and analysis of the authorities relied upon in the DISB Letter, the *coup de grace* is the complete absence of any consideration of publicly

available legal or agency precedent governing money transmitting in the District of Columbia.
As noted, the DISB Letter and attached DISB Opinion Memo failed to address the *E-Gold*
precedent, a case in which the defendants who operated a virtual currency business were charged
with violations of the MTA, among other offenses and two defendants pled guilty to the D.C.
charge alone.  *See* Plea Agreement of R. Jackson, *United States v. E-Gold, Ltd.*, No. 07-cr-109
(D.D.C. Jul. 21, 2008), ECF No. 130; Plea Agreement of B. Downey*, United States v. E-Gold,
Ltd.*, No. 07-cr-109 (D.D.C. Jul. 21, 2008), ECF No. 142.  In addition, by as early as January
2015, the date of the DISB Opinion Memo, and by June 2016, when the DISB Letter was issued,
a number of courts had addressed the issue of whether virtual currency, including bitcoin,
qualified as "money" and had concluded affirmatively, consistent with this Court's holding in
*Harmon*, yet DISB seemingly ignored those legal developments.  *See, e.g*., *United States v.
Budovsky,* No. 13cr368 (DLC), 2015 U.S. Dist. LEXIS 127717, at *37–38  (S.D.N.Y. Sep. 23,
2015) (finding bitcoin qualified as "funds" for purposes of 18 U.S.C. § 1960); *United States v.
Faiella,* 39 F. Supp. 3d 544, 545 (S.D.N.Y. 2014) ("Bitcoin clearly qualifies as 'money' or
'funds' under these plain meaning definitions" for purposes of operating an
unlicensed money transmitting business in violation of 18 U.S.C. § 1960); *United States v.
Ulbricht*, 31 F. Supp. 3d 540, 570 (S.D.N.Y. 2014) ("One can money launder using Bitcoin.").
The DISB Letter and DISB Opinion Memo also failed to mention, let alone discuss, the agency's
experience in issuing, or not, money transmitting licenses for virtual currency businesses.  *See
Harmon*, 2020 WL 4251347 at *13 (noting that "[f]ive virtual currency companies have obtained
money transmitter licenses from DISB," including "Coinbase and Circle both obtained licenses
in 2015," signaling "awareness among these companies that the District's MTA reaches virtual
currency.").

Defendant is just wrong that reconsideration is warranted because the DISB Letter is "precisely the type of regulatory rulemaking decision that Congress intended DISB to make." Def.'s Reply at 6.  In other cases where agency action has been found entitled to deference despite the lack of notice-and-comment rulemaking or formal adjudications under the APA, the agency's statutory interpretation at issue was thoroughly and persuasively explained, plus reflective of the agency's considered and long-standing position.  *Cf. Menkes v. United States Dep't of Homeland Sec.*, 637 F.3d 319, 331-32, 326 (D.C. Cir. 2011) (deferring to agency's interpretation provided in an "exhaustive decision" that "addressed the issues raised by this court" in remanding case for consideration of "precisely the sort of complex, interstitial questions that the [agency] deserves deference to address," and agency's judgment "reflect[ed] a longstanding agency policy."); *Mylan Laboratories, Inc. v. Thompson*, 389 F.3d 1272, 1279-80 (D.C. Cir. 2004) (deferring to two Food and Drug Administration letters issued to private disputants, citing "the complexity of the statutory regime under which the [agency] operate[d]," the agency's "expertise," the "careful craft of the scheme it devised to reconcile the various statutory provisions," and the fact that the agency's "decision made no great legal leap but relied in large part on its previous determination of the same or similar issues and on its own regulations.").  By contrast, the DISB Letter and DISB Opinion Memo contain flawed and abbreviated research and reasoning, entirely lacking in persuasiveness.  Accordingly, no deference is due to the DISB Letter.

### B.   *Harmon*'s Holding Raises No Due Process Issues

Defendant reprises arguments from his original motion to dismiss that the rule of lenity and due process require reconsideration, even if DISB would have required defendant to obtain a license under the MTA to operate Helix.  *See* Def.'s Reply at 3–6.  *Harmon* previously held that "the rule of lenity does not apply" because the "rule is triggered only when 'a reasonable doubt

persists about a statute's intended scope even *after* resort to'" other standard tools of statutory interpretation. *Harmon*, 2020 WL 4251347 at *15 (citing *Moskal v. United States*, 498 U.S. 103 (1990) and *Parol Comm'n v. Noble*, 693 A.2d 1084, 1103–04 (D.C. 1997)).  Finding that typical interpretive tools, namely "[t]he MTA's language, structure and legislative history," all "point[ed] to the conclusion that" the statute covers bitcoin as "money," *Harmon* determined that "defendant's arguments do not render the MTA ambiguous enough to trigger the rule of lenity." *Id*.  This finding remains in force.

*Harmon* interpreted the meaning of word "money" in the statute to cover bitcoin and applied that meaning to the circumstances of the instant case, issuing "an authoritative statement of what the statute meant *before* as well as after the decision . . . ."  *U.S. v. McKie*, 73 F.3d 1149, 1153 (D.C. Cir. 1996) (emphasis in original) (quoting *Rivers v. Roadway Express, Inc.*, 114 S. Ct. 150, 1519 (1994)).  The rule of lenity, even in light of the DISB Letter, is not applicable "merely because it was possible to articulate" the term "money" "more narrow[ly]," as the defendant urges.  *Moskal v. United States*, 498 U.S. 103, 108 (1990).  Indeed, the rule only applies if, "after considering text, structure history, and purpose, there remains a grievous ambiguity or uncertainty in the statute."  *PHH Corp.*, 881 F.3d at 112 (quoting *United States v. Castleman*, 572 U.S. 157, 172–73 (2014) (quoting *Barber* v. *Thomas*, 560 U. S. 474, 488 (2010))); *see also Young v. United States*, 943 F.3d 460, 464 (D.C. Cir. 2019) ("Given the lack of ambiguity, we have no recourse to the rule of lenity."); *United States v. Slatten*, 865 F.3d 767, 784 (D.C. Cir. 2017) (finding that "the rule of lenity is inapplicable" when, "to the extent—if any—that [statute]'s text is ambiguous, [statute]'s 'context, structure, history, and purpose resolve it.'") (quoting *Abramski v. United States*, 573 U.S. at 188 n.10 (2014)).  *Harmon* has

already performed that analysis.  Further interrogation of the MTA's proper interpretation would retread the ground already plowed in *Harmon* and lead to the same result.

Defendant's due process argument raises concerns about retroactivity and fair notice, *see* Def.'s Reply at 3, but *Harmon*, even in light of the DISB Letter and attached exhibits, was not a retroactive decision that deprived defendant of due process.  Statutory retroactivity is barred by the *ex post facto* prohibition, but requires that the law be "retrospective – that is, 'it must apply to events occurring before its enactment' – and it 'must disadvantage the offender affected by it,'" *Lynce v. Mathis*, 519 U.S. 433, 441 (1997) (citing *Weaver v. Graham*, 450 U.S. 24, 29 (1981)), by "altering the definition of criminal conduct or increasing the punishment for the crime," *id.* (citing *Collins v. Youngblood*, 497 U.S. 37, 50 (1990)).  In other words, retroactivity requires "notice that turn[ed] out to be affirmatively and harmfully misleading." *Sash v. Zenk*, 439 F.3d 61, 64 (2d Cir. 2006).  As the government correctly notes, nothing in *Harmon* changed the meaning of the law in hindsight or created a "novel construction of [the] criminal statute," *see United States v. Lanier*, 520 U.S. 259, 266 (1997), as defendant alleges, to make that decision impermissibly retroactive.  *See* Gov't's Suppl. Opp'n at 19.  The DISB Letter does little more than reflect the agency's non-public, informal decision as to a single company's licensing status under the MTA, based on facts still not fully known and legal reasoning in the DISB Opinion Memo that was patently flawed and deficient.  Based on the comprehensive and relevant authority reviewed in *Harmon,* the unambiguous meaning of the term "money" under the MTA encompasses virtual currency, including bitcoin, and applied to defendant at the time he allegedly operated Helix without a money transmitting license.

**IV.    CONCLUSION**

For the foregoing reasons, defendant's Motion to Reconsider, ECF No. 63, is DENIED.

An order consistent with this Memorandum Opinion will be entered contemporaneously.


Date: December 24, 2020

                                             _____

                                             BERYL A. HOWELL
                                             Chief Judge