UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>LARRY DEAN HARMON,<br><br>Defendant. | Criminal Case No. 19-cr-395 (BAH)<br><br>Chief Judge Beryl A. Howell |

## MEMORANDUM OPINION

For the third time, defendant Larry Dean Harmon moves to dismiss certain parts of the three-count indictment charging him with, *inter alia*, violating 18 U.S.C. § 1960(a), *see* Indictment ¶ 18, ECF No. 1, by operating a money transmitting business without an appropriate money transmitting license in the District of Columbia ("state licensing" prong), under §1960(b)(1)(A), and failing to comply with the money transmitting business registration requirements of the Bank Secrecy Act ("BSA"), 31 U.S.C. § 5330, ("federal licensing" prong), under §1960(b)(1)(B), *see* Indictment ¶¶ 17–18(a) and (b) (Count Two), and by engaging, without a license, in the business of money transmission, as defined in D.C. Code § 26-1001(10), in violation of the District of Columbia's Money Transmitters Act (MTA), D.C. Code § 26-1023(c), *see* Indictment ¶¶ 19–20 (Count Three).[1] After denial of defendant's prior motions to dismiss these challenged charges for failure to state a claim and for due process concerns of lack of fair notice and running afoul of the rule of lenity, *see United States v. Harmon* ("*Harmon I*"),

---

[1] To be clear, defendant has not challenged in this or his prior motions, the charges, in Count One, of conspiracy to launder monetary instruments, in violation of 18 U.S.C. § 1956(h), Indictment, ¶¶ 14–16; or the "illegal funds" prong of Count Two, alleging that he engaged in "the transportation and transmission of funds known to [defendant] to have been derived from a criminal offense and intended to be used to promote and support unlawful activity," as defined under 18 U.S.C. § 1960(b)(1)(C), in violation of 18 U.S.C. § 1960(a), Indictment, ¶ 18(c).

474 F. Supp. 3d 76 (D.D.C. 2020); *United States v. Harmon* ("*Harmon II*"), Criminal Action No. 19-395 (BAH), 2020 U.S. Dist. LEXIS 242228 (D.D.C. Dec. 24, 2020), this time around, defendant argues dismissal is warranted, pursuant to Federal Rule of Criminal Procedure 12(b), because the criminal statutes, as applied here, are void for vagueness, *see* Def.'s Mot. to Dismiss Portions of Count Two and Count Three as Void for Vagueness ("Def.'s Mem.") at 1, ECF No. 83; *see* FED. R. CRIM. P. 12(b)(3)(B).  For the reasons explained below, defendant's motion to dismiss is denied.

I. **BACKGROUND**

Familiarity with the background to this case, as detailed in *Harmon I*, 474 F. Supp. 3d at 80–85 and *Harmon II*, 2020 U.S. Dist. LEXIS 242228 at *3–9, is assumed and will not be repeated here, except briefly.

A. **Factual Background**

Defendant is charged with conspiring to launder monetary instruments, unlawfully transmitting funds derived from, and intended to further, criminal offenses, and operating an unlicensed money transmitting business, *see generally* Indictment, based upon his alleged operation of the online service Helix between 2014 and 2017 as a "bitcoin tumbler," meaning that customers' bitcoin sent to Helix were "tumbled" by stripping them of identifying information, "enabl[ing] customers . . . to send bitcoins to designated recipients in a manner which was designed to conceal and obfuscate the source or owner of the bitcoins," *id*. ¶¶ 3–4. The service was "advertised . . . as a way to conceal transactions from law enforcement," *id.* ¶ 5, especially for transactions via the Darknet market AlphaBay, which offered customers the opportunity "to purchase a variety of illegal drugs, guns, and other illegal goods," *id.* ¶ 6.  Helix was used to "exchange[] . . . approximately 354,468 bitcoins—the equivalent of approximately $311 million in U.S. dollars." *Id.* ¶ 8.

Defendant initially moved to dismiss the federal and state licensing prongs of Count Two and the entirety of the MTA violation charged in Count Three of the Indictment for failure to state a claim on the grounds that "bitcoin is not money" and "Helix, as a bitcoin tumbler, was not a money transmitting business under 18 U.S.C. § 1960." *Harmon I*, 474 F. Supp. 3d at 87 (internal quotation marks and citation omitted). After close examination of the ordinary meaning of the term "money" and the statutory history and construction of the MTA, this Court held that "bitcoin qualifies as money under the MTA," *id.* at 87, 90, and that "Helix was in the business of money transmission for purposes of the MTA," *id.* at 87. Consequently, defendant's motion to dismiss the state licensing prong of Count Two, under 18 U.S.C. § 1960(b)(1)(A) (prohibiting failure to comply with the District's money transmitter requirements), and the MTA violation charged in Count Three, was denied. *Id.* at 99–100. Further, finding that Helix's business "was receiving bitcoin to send to another location or person in order to mask the original source of the bitcoin," *id.* at 88, this Court also held that the Helix business model "qualifies as money transmission," under the BSA, 31 U.S.C. § 5330, warranting denial of defendant's motion to dismiss the federal licensing prong of Count Two under 18 U.S.C. § 1960(b)(1)(B) (prohibiting failure to comply with BSA's money transmitting business registration requirements), *Harmon I*, 474 F. Supp. 3d at 88. As the Court explained, "Helix, as described in the indictment, satisfies the definition of 'unlicensed money transmitting business' at § 1960(b)(1)(B) because Helix's core business was receiving customers' bitcoin and transmitting that bitcoin to another location or person." *Id.* at 100–01.

As relevant here, *Harmon I* further held, in response to defendant's invocation of the principle that "any 'ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity,'" *id.* at 98 (quoting Def.'s Mot. to Dismiss Counts Two and Three for Failure to

3

State an Offense and Mem. P. & A. Supp. ("Def.'s First MTD Mem.") at 4, ECF No. 31 (quoting *Skilling v. United States*, 561 U.S. 358, 410 (2010))), that the rule of lenity does not apply to the MTA because "[t]hat rule is triggered only when 'a reasonable doubt persists about a statute's intended scope even *after* resort to 'the language and structure, legislative history, and motivating policies' of the statute," *id.* (quoting *Moskal v. United States*, 498 U.S. 103, 108 (1990) (emphasis in original) (quoting *Bifulco v. United States*, 447 U.S. 381, 387 (1980))). Finding that the "text, structure, history, and purpose of the MTA show[s] that the MTA adopts the ordinary definition of money," and that such definition "encompasses bitcoin,'" *id.* at 99, *Harmon I* determined that "the MTA [is not] ambiguous enough to trigger the rule of lenity," *id.* (citing *United States v. Burwell*, 690 F.3d 500, 515 (D.C. Cir. 2012)).

Six weeks after the denial of defendant's motion to dismiss in *Harmon I*, the government provided notice of an exhibit to a post-conviction Petition for Writ of Error Coram Nobis filed in another case, *United States v. e-Gold Ltd.*, Criminal Action No. 07-cr-00109 (ABJ). *See* Gov't's Notice of Suppl. Authority ("Gov't's Not."), ECF No. 62. This exhibit was a "heretofore non-public letter," *id.* ¶ 1, dated June 23, 2016, from the District of Columbia Department of Insurance, Securities and Banking ("DISB") to the CEO of a company called COEPTIS, responding to the company's inquiry in October 2015 about whether it "need[ed] to obtain a money transmitter license in D.C." for its "privately issued currency," Gov't's Not., Attach., Letter from Charlotte W. Parker, Assistant General Counsel, DISB, to William A. Cunningham, Chief Exec. Officer, COEPTIS (Jun. 23, 2016) ("DISB Letter"), at 1–2, ECF No. 62-1. The DISB Letter advised that COEPTIS need not acquire a money transmitter license, *id.* at 2, based on the description of its operations "in Exhibit A," *id.* at 1, as "a closed/centralized settlement platform . . . to make internet payments," in which "[n]ational currency will not be received,

4

dispensed, or used . . . [and] COEPTIS will not provide for any conversion of [privately issued currency], to national currency . . . ," *id.*[2]  This conclusion was further "[b]ased on" the legal conclusions contained in Exhibits B and C to the DISB Letter that were provided as part of the government's Notice.[3]

In response to the government's disclosure of the DISB Letter, defendant moved for reconsideration of the ruling that "bitcoin is money pursuant to the MTA," Def.'s Mot. for Reconsideration at 2, ECF No. 63, arguing, *inter alia*, that the rule of lenity and due process right to fair notice required reconsideration, *see* Def.'s Reply Supp. Mot. Reconsideration ("Def.'s Mot. Reconsideration Reply") at 3–6, ECF No. 74.  This second effort to dismiss parts of the indictment was no more successful than the first.  As explained in *Harmon II,* the DISB Letter was both unpersuasive and entitled to no deference because it was not intended to have the force of law, *Harmon II*, 2020 U.S. Dist. LEXIS 242228 at *15–39, and therefore warranted no modification of the *Harmon I* determination that bitcoin is money for the purposes of the MTA, *id*. at *14.  Moreover, *Harmon II* rejected defendant's due process argument both because the MTA is not "ambiguous enough to trigger the rule of lenity," *id.* at *39–40, and because the DISB Letter failed to show *Harmon I* was a "retroactive decision that deprived defendant of due process," *id.* at *41–42.

---

[2]     The DISB Letter's "Exhibit A," which provides details as to the COEPTIS business operation and was the basis for DISB's opinion that COEPTIS did not need to obtain an MTA license, is not part of the government's Notice and has not been disclosed in this case.

[3]     Citations to the DISB Letter's Exhibits B and C use the pagination automatically assigned by the Court's Case Management/Electronic Filing (CM/ECF) system.  Exhibit B is an internal DISB memorandum, dated January 16, 2015, from DISB's Associate Commissioner for Banking, through a DISB Assistant General Counsel, to DISB's Acting Commissioner, regarding "Regulatory Treatment of the Sale or Exchange of Decentralized Virtual Currency under the Federal Bank Secrecy Act and the District of Columbia Money Transmitters Act of 2000" ("DISB Opinion Memo").  DISB Letter, Ex. B, at 3–7, ECF No. 62-1.  Exhibit C is an intra-agency email, dated June 2, 2016, from a DISB Licensing Manager to DISB's Assistant General Counsel ("DISB Email"), which concluded that the company "'is engaged in a two party business model that does not involve the transfer of 'money' or a 'medium of exchange authorized or adopted by a government as part of its currency,'" DISB Letter at 2 (quoting DISB Email, at 8, ECF No. 62-1).

Defendant has now moved, again, to dismiss the federal and state licensing prongs of Count Two and the MTA violation charged in Count Three of the indictment on the related due process grounds that, as applied here, the criminal statutes are void-for-vagueness.

## II.   LEGAL STANDARD

A criminal defendant "may raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits." FED. R. CRIM. P. 12(b)(1).  Such pretrial motion may challenge "a defect in the indictment or information" if "the basis for the motion is then reasonably available and the motion can be determined without a trial on the merits." FED. R. CRIM. P. 12(b)(3)(B).  Although a court's supervisory powers provide the authority to dismiss an indictment, "dismissal is granted only in unusual circumstances." *United States v. Ballestas*, 795 F.3d 138, 148 (D.C. Cir. 2015).

## III.   DISCUSSION

Defendant argues that the federal and state licensing prongs of Count Two and the MTA violation charged in Count Three of the indictment are impermissibly vague as-applied because "the law . . . [defendant] now stands accused of breaking failed to provide him fair warning of the conduct the government insists they proscribe." Def.'s Mem. at 1.  According to defendant, "the federal and District of Columbia statutes in question were so vague that individuals of common intelligence would have to guess as to whether their conduct was proscribed" during the time defendant operated Grams and Helix between 2014 and 2017. Def.'s Mem. at 1–2; Def.'s Corrected Reply Gov't's Opp'n Def.'s Mot. Dismiss Portions of Count Two and Count Three as Void for Vagueness ("Def.'s Reply") at 3, 4, ECF No. 91 (asserting defendant "was not on sufficient notice that the act of 'tumbling' bitcoin could violate" the MTA or BSA).  The government disagrees, explaining that neither the BSA nor the MTA are vague, in light of

binding D.C. Circuit precedent and prior findings by this Court. Gov't's Opp'n Def.'s Mot. Dismiss Portions of Count Two and Count Three as Void for Vaguenses ("Gov't's Opp'n") at 1, ECF No. 87. The government is correct and, again for the third time, defendant's motion to dismiss parts of the indictment is denied.

### A. Vagueness Standard Generally

A criminal statute is unconstitutionally vague if it "fails to give ordinary people fair notice of the conduct it punishes, or [is] so standardless that it invites arbitrary enforcement." *United States v. Bronstein*, 849 F.3d 1101, 1106 (D.C. Cir. 2017) (alteration in original) (quoting *Johnson v. United States*, 576 U.S. 591, 595 (2015)); *see also Nat'l Ass'n of Mfrs. v. Taylor*, 582 F.3d 1, 23 (D.C. Cir. 2009) (noting that criminal statute must "'provide adequate notice to a person of ordinary intelligence that his contemplated conduct is illegal.'" (quoting *Buckley v. Valeo*, 424 U.S. 1, 77 (1976))). "[T]he touchstone is whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal." *United States v. Lanier*, 520 U.S. 259, 267 (1997).

This is a stringent standard. Thus, a void-for-vagueness challenge is unavailing when posed to a statute that merely "'requires a person to conform his conduct to an imprecise but comprehensible normative standard,' whose satisfaction may vary depending upon whom you ask." *Bronstein*, 849 F.3d at 1107 (quoting *Coates v. Cincinnati*, 402 U.S. 611, 614 (1971)). Instead, unconstitutional vagueness arises only if the statute "specifies no standard of conduct at all." *Id.* (alterations and internal quotation marks omitted) (quoting *Coates*, 402 U.S. at 614 and citing *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 495 n.7 (1982)). "[A] statute's vagueness is either susceptible to judicial construction or is void for vagueness based on the application of traditional rules of statutory interpretation." *Id.* at 1106 (citing *Bouie v. Columbia*, 378 U.S. 347, 355 n.5 (1964)). Thus, "the question is whether the

7

term provides a discernible standard when legally construed," *id.* at 1107 (citing *Coates*, 402 U.S. at 612), such that a statute is impermissibly vague "[o]nly if no construction can save the Act from the claim of unconstitutionality," *id.* (quoting *Screws v. United States*, 325 U.S. 91, 100 (1945)).

Vagueness challenges are either facial or as-applied. "[T]he distinction between facial and as-applied challenges . . . goes to the breadth of the remedy employed by the Court, not what must be pleaded in a complaint." *Edwards v. District of Columbia*, 755 F.3d 996, 1001 (D.C. Cir. 2014) (quoting *Citizens United v. FEC*, 588 U.S. 310, 331 (2010)); *cf. Gross v. United States*, 771 F.3d 10, 15 (D.C. Cir. 2014) (finding the distinction between facial and as-applied immaterial in addressing an Equal Protection Clause challenge to the 28 U.S.C. § 2680 foreign country exception to the waiver of sovereign immunity from tort claims under of the Federal Tort Claims Act). "The substantive rule of law," however, "is the same for both challenges." *Id.* at 1001 (citing *Legal Aid Servs. of Or. v. Legal Servs. Corp.*, 608 F.3d 1084, 1096 (9th Cir. 2010)).

### B. BSA and MTA Are Not Vague Statutes As Applied to Alleged Offense Conduct

Defendant challenges as unconstitutionally vague the federal and state licensing prongs of 18 U.S.C. § 1960(b)(1), and D.C. Code § 26-1023(c), as applied to his alleged conduct, asserting that he "was under no notice that either [the MTA or the BSA] would apply to a bitcoin-to-bitcoin swap that occurred solely on the global bitcoin ledger and which involved no national currency or fiat." Def.'s Reply at 1.[4]   In support, defendant cites "[t]he Constitution's

---

[4]    Defendant takes issue with the government's characterization of his vagueness challenge as seeking a "sweeping constitutional ruling," Gov't's Opp'n at 1, but his clarification that he seeks only "to declare the application of these particular portions of the MTA and the BSA unconstitutional as applied to [defendant's] alleged conduct," Def.'s Reply at 2, does little to address the government's concern since "the substantive rule of law is the same for both [facial and as-applied] challenges," *Edwards*, 755 F.3d at 1001 (citing *Legal Servs. Corp.*, 608 F.3d at 1096).

8

requirement of 'fair warning,'" which protects against "a statute [] void for vagueness," and claims that the statutes as applied here "'forbids or requires the doing of [acts] in terms so vague that men of common intelligence must necessarily guess at [their] meaning and differ as to [their] application,'" Def.'s Mem. at 3 (quoting *Lanier*, 520 U.S. at 266); *see also United States v. e-Gold, Ltd.*, 550 F. Supp. 2d 82, 98 (D.D.C. 2008).

At the outset, as the government notes, defendant does not point to any specific language in the BSA and MTA as vague, *see* Gov't's Mem. at 1, contending instead that he need not "identify specific words in a statute whose meaning, in isolation, is unknown" because "[n]owhere has this Court, the D.C. Circuit, or the Supreme Court" so required, Def.'s Reply at 2. Given this broad, non-specific challenge, defendant's vagueness challenge is reviewed as pertaining to the statutory language as a whole. Set against the standard for vagueness, however, defendant fails to show the relevant sections of the BSA and MTA either failed to give fair notice or are so "standardless" as to invite "arbitrary enforcement." *Bronstein*, 849 F.3d at 1106.[5]

---

[5] The government characterizes defendant's focus as "solely on the 'notice' prong of the vagueness doctrine," Gov't's Opp'n at 2 n.1, and, in fact, defendant makes only cursory reference to enforcement discretion, *see* Def.'s Mem. at 4 (positing, without further discussion on this point, that MTA and BSA are void-for-vagueness by failing to "guard[] against arbitrary or discriminatory law enforcement" (quoting *Sessions v. Dimaya*, 138 S. Ct. 1204, 1212 (2018)); Def.'s Reply at 3 (asserting, briefly, that the MTA and BSA "fail to set reasonably clear guidelines for law enforcement officials and triers of fact"). Certainly, "[l]aws that 'regulate persons or entities,' . . . must be sufficiently clear 'that those enforcing the law do not act in an arbitrary or discriminatory way.'" *Beckles v. United States*, 137 S. Ct. 886, 894 (2017) (quoting *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012)); *see also Kolender v. Lawson*, 461 U.S. 352, 358 (1983) (stating "the more important aspect of the vagueness doctrine is not actual notice, but the other principal element of the doctrine -- the requirement that a legislature establish minimal guidelines to govern law enforcement." (internal quotations and citation omitted)). To evaluate a vagueness claim stemming from arbitrary enforcement, courts ask whether the challenged statute "establish[es] minimal guidelines to govern law enforcement," *Kolender*, 461 U.S. at 358, since a law may "require law enforcement officers to use their discretion without being unconstitutionally vague," *Agnew v. Gov't of the Dist. of Columbia*, 920 F.3d 49, 55 (D.C. Cir. 2019). At the same time, context matters. As the Supreme Court has explained, economic regulation, for example, "is subject to a less strict vagueness test because its subject matter is often more narrow, and because businesses, which face economic demands to plan behavior carefully, can be expected to consult relevant legislation in advance of action . . . [and] may have the ability to clarify the meaning of the regulation by its own inquiry, or by resort to an administrative process." *Village of Hoffman Estates*, 455 U.S. at 498; *see also Copeland v. Vance,* 893 F.3d 101, 114 (2d Cir. 2018) (applying "only a moderately stringent vagueness test" where criminal statute was not claimed to inhibit the exercise of constitutional rights); *CMR D.N.*

### *1.    MTA Is Not Unconstitutionally Vague*

Defendant's vagueness challenge to the state licensing prong in Count Two and Count Three, both of which are predicated on violations of the MTA, fails to demonstrate a lack of fair notice. This challenge simply reploughs ground already covered, by posing two arguments fully addressed and rejected in *Harmon I* and *Harmon II*: first, that "there was no guidance" indicating that "bitcoin is money for purposes of the statute . . . during the alleged behavior," Def.'s Mem at 5, and, second, that the existence of the DISB Letter signifies a "disagreement between [] DISB and this Court [that] is evidence of the vagueness of the MTA," *id.*

As to defendant's first argument, the statutory language gave defendant, a "person of ordinary intelligence," a "reasonable opportunity to know" that bitcoin tumbling was prohibited. *See Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). The relevant statutory language makes it a crime to "engage[] in the business of money transmission without a license" as provided in the MTA, D.C. Code § 26-1023(c), where "money transmission" is defined as "the sale or issuance of payment instruments or engaging in the business of receiving money for transmission or transmitting money within the United States, or to locations abroad, by any and all means, including but not limited to payment instrument, wire, facsimile, or electronic transfer," *id.* § 26-1001(10).

---

*Corp. & Marina Towers Ltd. v. City of Phila.*, 703 F.3d 612, 631 (3d Cir. 2013) (rejecting developer's vagueness challenge to city regulations, noting that "[i]f a developer of reasonable intelligence faces a close call after analyzing the constructions in the district, it can apply for a permit to eliminate any remaining ambiguity. This is sufficient to comply with constitutional requirements."). A scienter requirement may also "mitigate a law's vagueness," *Village of Hoffman Estates*, 455 U.S. at 499, though a "more exacting" "standard of certainty" is imposed for criminal statutes than in noncriminal statutes, *Barenblatt v. United States*, 360 U.S. 109, 137 (1959). By contrast to the company inquiry that prompted the DISB Letter, defendant did not avail himself of any administrative process to assess the legality of his conduct under the MTA or BSA, each of which statute includes a scienter requirement and neither of which statute defendant here challenges as otherwise inhibiting his exercise of his constitutionally protected rights. In any event, as discussed in the text, both the MTA and BSA meet the constitutionally required minimal threshold of providing standards without "vest[ing] virtually complete discretion in the hands of [law enforcement] to determine whether the suspect has satisfied the statute." *Kolender*, 461 U.S. at 358.

*Harmon I* gave "judicial construction" to the term "money" using "traditional rules for statutory interpretation," *Bronstein*, 849 F.3d at 1106, exhaustively showing "bitcoin" falls under the ordinary meaning of the word "money," *Harmon I*, 474 F. Supp. 3d at 88–95.  Indeed, "[m]oney, in common parlance, is a medium exchange," a "token that can be traded for goods or services," *id.* at 88 (citing *Money*, AM. HERITAGE DICTIONARY (4th ed. 2000), *Money*, OXFORD ENGLISH DICTIONARY (3d ed. 2002), and *Money*, MERRIAM-WEBSTER ONLINE, https://www.merriam-webster.com/dictionary/money)), or a "store of value," *id.* at 88–89 (citing *Money*, OXFORD ENGLISH DICTIONARY (3d ed. 2002)).  Based on these definitions of "money," multiple technical authorities describing how bitcoin works and how it is used, *id.* at 89–90, confirmed by holdings of other federal courts that determined "bitcoin qualifies as money under . . . ordinary definitions," *id.* at 90, *Harmon I* concluded that "[b]itcoin is . . . a medium of exchange, method of payment, and store of value" that falls under the definition of money, *id.* at 89.

Moreover, *Harmon I* was able to use "a variety of [additional] tools for statutory interpretation and supportive sources beyond the statutory text," *Harmon II*, 2020 U.S. Dist. LEXIS 242228 at *31–32, and rely on the statute's "language, structure, and legislative history," *Harmon I*, 474 F. Supp. 3d at 98, to conclude that "the MTA adopts the ordinary definition of money," which "encompasses bitcoin," *id.* at 87.  Defendant had ample opportunity to "familiarize [him]self with [the statute's] terms and to comply" with the law—or even to seek DISB's licensure review, as another company did—before allegedly operating Helix, *see Bronstein*, 849 F.3d at 1107 (quoting *Texaco, Inc. v. Short*, 454 U.S. 516 (1982)), and his failure to do so does not render the statutory text vague.[6]

---

[6] The parties dispute whether this Court's prior conclusion that the rule of lenity is inapplicable automatically forecloses defendant's instant vagueness challenge to the MTA.  Relying on the determinations that "[d]efendant's

Defendant's second argument that the DISB Letter shows "confusion [among] Courts, law enforcement and citizens" about whether bitcoin tumbling was "money transmitting," Def.'s Mem. at 1; *see also id*. at 5 (claiming "attorneys for the District's [DISB] believed during that time (and may still today) that bitcoin was not money pursuant to the MTA"); Def.'s Reply at 3 (questioning fair notice "[i]f the very people in charge of enforcing the statute cannot agree on what it means"), is also foreclosed. *Harmon II* determined that this letter was limited in its application and wholly unpersuasive. *Harmon II*, 2020 U.S. Dist. LEXIS 242228 at *20–39.

As an initial matter, the relevant inquiry in assessing fair notice for vagueness is not whether a local administrative agency exercised discretion in a particular manner or even whether every interpretation of the statute by a judicial or law enforcement officer applies the statute in exactly the same way. Rather, the focus must be on whether the statute "give[s] ordinary people fair notice of the conduct it punishes." *Bronstein*, 849 F.3d at 1106. The MTA, which is "susceptible to judicial construction," *id.*, and "provides a discernible standard when legally construed," *id.* at 1107, is thus not made vague by divergent interpretations issued by this

---

arguments do not render the MTA ambiguous enough to trigger the rule of lenity," *Harmon I*, 474 F. Supp. 3d at 99 (citing *Burwell*, 690 F.3d at 515), and that "[t]he rule of lenity, even in light of the DISB Letter, is not applicable 'merely because it was possible to articulate' the term 'money' 'more narrow[ly],'" *Harmon II*, 2020 U.S. Dist. LEXIS 242228 at *40 (quoting *Moskal*, 498 U.S. at 108), the government argues that "a statute . . . insufficiently ambiguous to trigger the Rule of Lenity" necessarily cannot be "so vague that it must be struck down as unconstitutional," Gov't's Opp'n at 5–6 (citing *United States v. Lanier*, 520 U.S. 259, 266 (1997) (describing lenity as "a sort of 'junior version of the vagueness doctrine.'")). Defendant disagrees, without citation, asserting merely that "this Court's previous ruling on the Rule of Lenity does not change the constitutionally compelled conclusion that the MTA is vague as applied," Def.'s Reply at 3. While the government is correct that "[v]agueness and the Rule of Lenity are closely related," Gov't's Mem. at 5, as two protections provided by the constitutional "fair warning" requirement, *Lanier*, 520 U.S. at 266 (describing as "related manifestations of the fair warning requirement . . . the vagueness doctrine. . . [and] the canon of strict construction of criminal statutes, or rule of lenity"), they are not identical or coextensive doctrines and thus inapplicability of the rule of lenity may not necessarily foreclose a vagueness challenge, as the government suggests. This dispute need not be resolved, however, since analysis of whether the MTA is unconstitutionally vague as applied here reaches the same conclusion that defendant's vagueness challenge does not merit dismissal of the challenged charges.

Court and a local agency, respectively, applying the statutory standard to different companies based on different records.

In fact, the DISB Letter is hardly probative of "disagreement" between this Court and DISB, as the DISB Letter "is only an informal opinion about the status of a single company and does not purport to express broader principles about the application of the MTA." *Harmon II*, 2020 U.S. Dist. LEXIS 242228, at *26. This "one-off decision in response to a company inquiry" is not an "expression of binding opinion generally applicable to all virtual currency operations in the District." *See id.* at *27. Set against the absence of any public guidance from DISB, beyond the statutory language, regarding the MTA's coverage of bitcoin tumbling, between 2014 and 2017 or otherwise, and the "[f]ive virtual currency companies that have obtained money transmitter licenses from DISB" between 2015 and 2019, apparently aware "that the District's MTA reaches virtual currency," *Harmon I*, 47 F. Supp. 3d at 95–96, defendant's argument that the DISB "attorneys [generally]. . . believed during that time . . . that bitcoin was not money pursuant to the MTA" is an overstatement, Def.'s Mem. at 5. Put simply, the DISB Letter is properly read as a limited determination as to a single company, rather than a definitive construction of the MTA intended for public guidance on the scope of that statute in the context of evolving new virtual currency services.[7] Moreover, it bears noting that the DISB Letter was generated in response to a company query, in 2015, whether a license was required for a virtual currency business without conversion of national currency, so the scope of coverage of the MTA

---

[7] Even if the DISB Letter purported to reflect DISB's attitude toward bitcoin tumbling at the time, no deference is warranted under *Chevron* to the local agency's view "due to its lack of reasoned or even persuasive decisionmaking." *Harmon II*, 2020 U.S. Dist. LEXIS 242228, at *30 (citing *Pub. Citizen, Inc. v. U.S. Dep't of Health & Human Servs.*, 332 F.3d 654, 661 (D.C. Cir. 2003)). Indeed, the DISB Letter is "based on superficial and faulty misapplication" of the references cited in the DISB Letter's attached exhibits, *id.* at *32, misapplied relevant 2013 Financial Crimes Enforcement Network (FinCEN) guidance, *id.* at *32–34, relied on only two, niche definitions of the term "money," *id.* at *34–36, and omitted "any consideration of publicly available legal or agency precedent governing money transmitting in the District of Columbia," *id.* at *36–38.

to this type of operation was sufficiently clear to others in the virtual currency business to seek administrative guidance on the need for licensure.[8]

Finally, defendant argues that the MTA is vague as-applied, "[f]rom prior to 2014 to the end of 2017," noting that "the D.C. Council had [not] enacted legislation specifically governing the operation of a bitcoin tumbler," Def.'s Mem. at 4, and there was "no statement from any branch of . . . district law that a bitcoin-to-bitcoin transaction would violate the law . . . [and] no prior indication to the public to this effect," *id*. As the MTA itself demonstrates, however, legislation does not have to use the precise term "bitcoin tumbler" to cover that form of money transmission. Furthermore, defendant's insistence on the presence of explicit reference to "bitcoin tumbler" in legislative or administrative guidance is not the measure of whether a statute is constitutionally void-for-vagueness. To the contrary, "perfect clarity and precise guidance have never been required even of regulations that restrict [protected] activity." *United States v. Class*, 930 F.3d 460, 467 (D.C. Cir. 2019) (alteration in original) (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989)). Instead, "flexibility and reasonable breadth" in the statutory text passes constitutional muster, *Agnew*, 920 F.3d at 55 (quoting *Grayned*, 408 U.S. at 110), provided the statute provides "an imprecise but comprehensible normative standard," *Bronstein*, 849 F.3d at 1107 (quoting *Coates*, 402 U.S. at 614). The MTA's title, text and announced purpose make clear that the statute governs "money transmitting" broadly in the District of Columbia and is sufficiently clear for the ordinary person to recognize that a bitcoin-to-bitcoin tumbler, such as Helix, was subject to regulation. *See Harmon I*, 474 F. Supp. 3d at 100–01.

---

[8] Another indication of the limited determination in the DISB Letter is the fact that DISB's decision not to require a money transmitter license for COEPTIS was based on the specific record before the agency and was subject to close monitoring, such that any "change, including any change in ownership or name," was required to be submitted to the agency "for review and analysis." DISB Letter at 2.

Accordingly, any lack of specific legislative or administrative guidance as to the precise alleged conduct at issue here is not probative of vagueness in this case.

### 2. *BSA Is Not Unconstitutionally Vague*

Defendant's vagueness challenge to the federal licensing prong of 18 U.S.C. § 1960(b)(1) amounts to a rehash of his arguments rejected in *Harmon I*. In his original dismissal motion, defendant urged that "Helix . . . was not an 'unlicensed money transmitting business' under 18 U.S.C. § 1960(b)(1)(B) 'because the Indictment fails to allege that Helix did anything other than provide bitcoin back to the user to whom it was sent.'" *Harmon I*, 474 F. Supp. 3d at 100 (quoting Def.'s Reply Supp. Mot. to Dismiss Counts Two and Three for Failure to State and Offense ("Def.'s First MTD Reply") at 2, ECF No. 49). *Harmon I* found otherwise, determining that Helix was, indeed, an "unlicensed money transmitting business" under the BSA because "Helix's core business was receiving customers' bitcoin and transmitting that bitcoin to another location or person." *Id.* at 100–01. Here, again, defendant urges that he had "insufficient notice . . . that his conduct would invoke the BSA" because it was not clear that "bitcoin-to-bitcoin swap[ping] occurring solely on the internet based global ledger would constitute money transmission or operating a money transmitting business" under 18 U.S.C. § 1960(a). Def.'s Reply at 4.

Based on close review of the statutory and regulatory language, including relevant definitions, used in the federal licensing prong of 18 U.S.C. § 1960(b)(1)(B), *Harmon I*, 474 F. Supp. 3d at 101–03, combined with a detailed examination of how Helix transactions were accomplished, *id.* at 103–05, *Harmon I* concluded that defendant operated a business that "receiv[ed] customers' bitcoins and transmitt[ed those] bitcoin[s] to another location or person," *id.* at 100–01, thereby "satisf[ying] the definition of 'unlicensed money transmitting business' at § 1960(b)(1)(B)," *id.* at 109. This extensive analysis, which will not be repeated here,

establishes that this statutory provision sets out a complex, but "comprehensible normative standard" for criminal behavior, *Coates*, 402 U.S. at 614, affording "adequate notice to a person of ordinary intelligence" that defendant's conduct was proscribed, *Taylor*, 582 F.3d at 23 (quoting *Buckley*, 424 U.S. at 77).

Without directly confronting the analysis in *Harmon I*, defendant nonetheless raises three arguments to challenge 18 U.S.C. § 1960(b)(1)(B) as impermissibly vague as applied to his operation of Helix, but none of these arguments is persuasive. First, as with the state licensing prong, under §1960(b)(1)(A), defendant cites the lack of specific guidance from federal authorities about the scope of the federal licensing prong of §1960(b)(1)(B). According to defendant, "[i]t was not until 2019 that . . . FinCEN[] gave any guidance regarding whether a tumbler was a money transmitter subject to [the Treasury Department's] regulation." Def.'s Mem. at 5 (citing U.S. DEP'T OF THE TREASURY, FINCEN, FIN-2019-G001, APPLICATION OF FINCEN'S REGULATIONS TO CERTAIN BUSINESS MODELS INVOLVING CONVERTIBLE VIRTUAL CURRENCIES (May 9, 2019) ("2019 FinCEN Guidance")). Given the purported "overlapping regulation and confusion between the Commodity Futures Trading Commission, the Internal Revenue Service, the Securities and Exchange Commission and other government entities on how to classify and regulate" bitcoin tumblers, defendant contends that "regulations regarding bitcoin tumbling qualifying as money transmitting business[es] could not have been sufficiently clear between 2014 and 2017." *Id.* at 5. Defendant makes little effort to back up his observation about divergent conclusions about bitcoin-to-bitcoin transfers among different federal agencies, but given markedly different missions, responsibilities and expertise of different agencies, even if that observation were correct, it would not be probative of whether the MTA is vague as-applied to defendant. More importantly, even if the 2019 FinCEN Guidance were the first

guidance issued by the agency referring expressly to bitcoin tumbling, regulatory updates and clarifications are not proof of statutory vagueness.  *See Class*, 930 F.3d at 467.

In any event, this argument fails to acknowledge earlier FinCEN guidance that was sufficiently broad to cover bitcoin tumbling operations like Helix.  FinCEN issued regulatory guidance for virtual currencies as early as 2013, before defendant began operating Helix.  *See* U.S. DEP'T OF THE TREASURY, FINCEN, FIN-2013-G001, APPLICATION OF FINCEN'S REGULATIONS TO PERSONS ADMINISTERING, EXCHANGING, OR USING VIRTUAL CURRENCIES ("2013 FinCEN Guidance") (Mar. 18, 2013).  *Harmon II*, as the government points out, recognized that this guidance explicitly "*declined* to distinguish 'between virtual currency and real currency,' [and] deemed 'transmitting *anything of value* that substitutes for currency' to qualify as transmission under the BSA."  *Harmon II*, 2020 U.S. Dist. LEXIS 242228 at *34 (emphasis in original) (quoting 2013 FinCEN Guidance); *see also* Gov't's Opp'n at 10 n.7.  As relevant here, this 2013 FinCEN Guidance also described a quintessential example of "money transmission" as "the transfer of value from a customer's currency or commodity position to the account of another customer," 2013 FinCEN Guidance, thereby establishing that "the definition of a money transmitter does not differentiate between real currencies and convertible currencies," *id.*  Further, this guidance explains that "a person is an exchanger and a money transmitter if the person accepts . . . de-centralized convertible virtual currency from one person and transmits it to another person as part of the acceptance and transfer of currency, funds, or other value that substitutes for currency."  *Id.*  Consequently, this guidance squarely includes a bitcoin tumbler like Helix that "work[s] by literally mixing up a user's payment with lots of other payments from other users," *Harmon I*, 474 F. Supp. 3d at 82 (quoting Usha R. Rodrigues, *Law and the Blockchain*, 104 IOWA L. REV. 679, 712 n.224 (2019)), in order to provide customers

"with new bitcoins 'which have never been to the darknet before,'" *id.* at 83 (quoting Indictment ¶ 5); *see also id.* at 103–09 (finding Helix, as described in the Indictment, moved money from one person or place to another). In short, the 2013 FinCEN Guidance belies defendant's assertion that, prior to 2019, "no statement from any branch of federal [government]," Def.'s Mem. at 4, signaled that a "bitcoin-to-bitcoin transaction would violate" the BSA, *id.*

Second, defendant complains that the "bitcoin industry and bitcoin enthusiast[s]" made "no indication that tumbling bitcoin could be a potentially illegal act." Def.'s Reply at 4–5. As support, defendant cites various online articles that do not discuss, analyze or even mention the legality of bitcoin tumbling. *See id.* (citing Kevin Helms, *US Treasury Unveils Stifling Crypto Wallet Regulation — Experts Break Down the Rules*, BITCOIN NEWS (Dec. 19, 2020), https://news.bitcoin.com/us-treasury-cryptocurrency-wallet-regulation-experts-break-down-rules/ (last accessed Apr. 16, 2021); Michael J. Casey, *Privacy is Vital to Crypto – and the Global Economy*, COINDESK (Jun. 27, 2018), https://www.coindesk.com/privacy-vital-crypto-global-economy (last accessed Apr. 16, 2021); Jamie Redman, *Tumbling Bitcoins: A Guide Through the Rinse Cycle*, BITCOIN NEWS (Jul. 21, 2016), https://news.bitcoin.com/tumbling-bitcoins-guide-rinse-cycle/ (last accessed Apr. 16, 2021). Aside from the fact that bitcoin industry "enthusiasts" are woefully unpersuasive as authorities on the legality of bitcoin tumbling operations, the handful of online articles defendant cites are largely irrelevant to the instant constitutional challenge to charges in the Indictment. For example, one article, published in December 2020, well after Helix shuttered, discusses new proposed rules announced by FinCEN that "aim[] at closing anti-money laundering regulatory gaps for certain . . . [CVC] and digital asset transactions," and makes no mention of bitcoin-to-bitcoin transfers in the context of bitcoin tumblers. *See* Helms, *supra*. Another article, published in June 2018, also after Helix shut

down, mentions "bitcoin mixers" only in passing as part of an argument against bitcoin regulation for the sake of economic privacy for users. *See* Casey, *supra*. The only article defendant cites that was published while Helix was operational advises potential bitcoin tumbler users about how to access such services, *see* Redman, *supra*, but makes no representations about the legality of operating a bitcoin tumbler, other than cautioning that using "the Dark Net to visit marketplaces . . . puts . . . users at risk of jail time and criminal penalty," *see id.* When weighed against legal analysis set out in *Harmon I* and *II* regarding 18 U.S.C. § 1960(b)(1)(B) and relevant BSA provisions and administrative guidance, these layperson's views fall far short of providing comprehensive, much less persuasive, authority about the regulatory landscape to support defendant's constitutional challenge.

Third, in response to the government's argument that "numerous other courts . . . have similarly analyzed the BSA and concluded that it covers virtual currency," Gov't's Opp'n at 12, defendant notes that the cases cited "had a national currency component" not present here, Def.'s Reply at 5. While defendant is correct that some of the pre-2017 cases the government cites concerned criminal conduct involving fiat currency, *see United States v. Faiella*, 39 F. Supp. 3d 544, 546 (S.D.N.Y. 2014) (finding defendant's activities constituted "transmitting" money under 18 U.S.C. § 1960 in part because he "sold Bitcoin as a product in and of itself" in exchange for "cash deposits"); *United States v. Budovsky*, No. 13cr368 (DLC), 2015 U.S. Dist. LEXIS 127717 at *3 (S.D.N.Y. Sept. 23, 2015) (ruling against defendant on motion to dismiss indictment under Fed. R. Crim. P. 7(c)(1) and the Fifth Amendment where defendant's company was alleged to have "processed an estimated 55 million separate financial transactions and laundered more than $6 billion in criminal proceeds"), defendant incorrectly supposes that the lack of a prior prosecution based on bitcoin tumbling supports a vagueness determination here. The fact that, as

the government concedes, "this is the first U.S. prosecution of a cryptocurrency mixer," Gov't's Opp'n at 13, does not, standing alone, render a statutory application so novel as to be unconstitutional for vagueness. [9] "The void-for-vagueness doctrine is not designed to convert into a constitutional dilemma the practical difficulties in drawing criminal statutes both general enough to take into account a variety of human conduct and sufficiently specific to provide fair warning that certain kinds of conduct are prohibited." *United States v. Maude*, 481 F.2d 1062, 1068 (D.C. Cir. 1973) (quoting *Colten v. Kentucky*, 407 U.S. 104, 110 (1972)); *see also Lanier*, 520 U.S. at 271 (noting that "a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though 'the very action in question has [not] previously been held unlawful." (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987))). Put simply, the fact that defendant is the first person to be prosecuted under 5 U.S.C. § 1960(b)(1)(B) for operating a bitcoin tumbler does not render provision vague.

## IV. CONCLUSION

For the foregoing reasons, the defendant's motion to dismiss parts of Count Two and Count Three of the Indictment because the criminal statutes he is charged with violating, namely, 18 U.S.C. §§ 1960(b)(1)(A) and (B) and D.C. Code §26-1023(c), are impermissibly void-for-vagueness as applied to him, is denied.

An Order consistent with this Memorandum Opinion will be filed contemporaneously.

Date: April 16, 2021

                                                                                                                   _____
                                                                                                                    BERYL A. HOWELL
                                                                                                                    Chief Judge

---

[9] Defendant briefly asserts that "[t]his Court's conclusion that bitcoin is money for the purpose of the MTA is a novel construction," Def.'s Mem. at 6, seemingly invoking the *ex post facto* prohibition of the constitutional fair warning guarantee, but this argument has already been rejected. *See Harmon II*, 2020 U.S. Dist. LEXIS 242228 at *41 (finding that *Harmon I* "was not a retroactive decision," which would be "barred by the *ex post facto* prohibition" because "nothing in *Harmon* changed the meaning of the law in hindsight or created a 'novel construction of [the] criminal statute.'" (alteration in original) (quoting *Lanier*, 520 U.S. at 266)).