<pre>
                    UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF COLUMBIA

   *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
UNITED STATES OF AMERICA,          )  Criminal Action
                                   )  No. 19-395
vs.                                )
                                   )
LARRY DEAN HARMON,                 )  March 13, 2020
                                   )  9:23 a.m.
               Defendant.          )  Washington, D.C.
   *  *  *  *  *  *  *  *  *  *  *  *  *  *  *


                       TRANSCRIPT OF HEARING
             BEFORE THE HONORABLE BERYL A. HOWELL,
              UNITED STATES DISTRICT COURT CHIEF JUDGE
</pre>

**<u>APPEARANCES</u>:**

<pre>
FOR THE UNITED STATES:    CHRISTOPHER B. BROWN
                          S. RIANE HARPER
                          C. ALDEN PELKER
                          U.S. Attorney's Office
                          For the District of Columbia
                          555 Fourth Street, NW
                          Washington, DC 20530
                          (202) 252-7153
                          Email: christopher.brown6@usdoj.gov


FOR THE DEFENDANT:        CHARLES FLOOD
                          FLOOD & FLOOD
                          914 Preston Street
                          Suite 800
                          Houston, TX 77002
                          (713) 223-8877
                          Email: charles@floodandflood.com


ALSO PRESENT:             TAKEYSHA ROBINSON, Pretrial Services
                          CHRISTINE SCHUCK, Pretrial Services

Court Reporter:           Elizabeth SaintLoth, RPR, FCRR
                          Official Court Reporter


         Proceedings reported by machine shorthand, transcript
              produced by computer-aided transcription.
</pre>

1                        **P R O C E E D I N G S**

2                THE COURTROOM DEPUTY:  Matter before the Court,

3     Criminal Case No. 19-395, United States of America versus

4     Larry Dean Harmon.

5                Counsel, please come forward and state your names

6     for the record.

7                MR. BROWN:  Good morning, Chief Judge.

8     Christopher Brown for the government.  And with me at

9     counsel table is Alden Pelker and Riane Harper.

10               THE COURT:  Okay.  Which is which?

11               MS. PELKER:  Your Honor, Alden Pelker.

12               MS. HARPER:  Riane Harper, good morning.

13               THE COURT:  Okay.  Good morning.

14               MR. FLOOD:  Good morning, Your Honor.

15               Charles Flood for Mr. Harmon, who is also present.

16               THE COURT:  Yes.  Good morning, Mr. Flood.

17               Good morning, Mr. Harmon.

18               All right.  So from my review of the docket, I

19    have two motions in front of me this morning.  One motion is

20    Mr. Harmon's motion for pretrial release, and the other

21    motion is the government's motion that I reserved on from

22    the last status conference for exclusion of time under the

23    Speedy Trial Act by designating this case as a complex case.

24               So I think I'll deal with the detention part of

25    this hearing -- the detention motion first, and then I will

1    turn to the complex case designation which Mr. Flood, at the

2    last status conference, opposed.

3              So, Mr. Flood, this is your motion; so I will hear

4    from you first.

5              MR. FLOOD:  Thank you, Your Honor.

6              I just want to make sure also, Your Honor, you've

7    received my document, 19, which was my reply to the

8    government's --

9              THE COURT:  I have seen that.

10             MR. FLOOD:  Okay.  Thank you, Your Honor.

11             It is our position, Your Honor, that the

12   magistrate court erred in finding that Mr. Harmon should be

13   detained.

14             The main -- and I apologize, if you have read

15   this, to be repetitive, Your Honor.

16             The main issue is obviously she found that he has

17   significant ties to Belize, the country of Belize.  And she

18   found --

19             THE COURT:  Well, let's stop right there.

20             What are his connections to Belize?

21             I know he leased an apartment there.  He is also

22   arguing that he ran his Helix business, I guess, from

23   outside this country.  I presume that means his argument is

24   that he ran his helix business from Belize; is that the

25   assertion?

1          MR. FLOOD:  I don't think they have made that

2     assertion, Your Honor.  I think --

3          THE COURT:  No, it's your assertion.

4          You are saying that the weight of the evidence is

5     in Mr. Harmon's favor because at least some of the claim --

6     the charges in this case which, I guess, in your view have

7     to arise from activity within the United States actually

8     arose outside the United States?

9          MR. FLOOD:  Your Honor, that was --

10         THE COURT:  Did I understand that correctly?

11         MR. FLOOD:  Yes, Your Honor.  And that was their

12    proof at the bond hearing, that one of their documents says

13    that Mr. --

14         THE COURT:  Because as I understand your argument,

15    it's related to Count Two of the indictment which charges

16    operation of a money transmitting business without a

17    license, in violation of federal law.

18         The defendant argued that -- in your opening

19    brief, that due to the nature of its services, Helix was not

20    required to register as a money transmitting service or a

21    money services business, so it was not required to have a

22    license; and, therefore, even if Mr. Harmon were the

23    administrator of Helix, he couldn't be prosecuted for

24    violation of the federal statute prohibiting operating an

25    unlicensed transmitting business.

1          And then I thought you shifted your argument in

2     reply and said nothing about -- relating to the weight of

3     the evidence in Count Two, operating the money transmitting

4     business -- you didn't talk about the nature of the business

5     anymore, but said, Helix was not, quote-unquote, within the

6     United States and, thus, did not need to register; that was

7     at your reply on page 6.

8          So I understood that you were shifting your

9     arguments on the weight of the evidence with respect to

10     Helix in terms of where Mr. Harmon may have been operating

11     Helix.

12          And so my question to you is:  If Helix was not

13     being operated within the United States, and that's now your

14     argument that you are making in reply, are you saying that

15     he was operating that from Belize?

16          That's your argument, not the Government's

17     argument.

18          MR. FLOOD:  Your Honor, at the bond hearing, I

19     didn't recognize a shift between the two arguments.  But --

20          THE COURT:  Am I wrong?  Am I misunderstanding?

21          MR. FLOOD:  No, Your Honor.

22          And I think your preliminary statement about my

23     preliminary argument is the argument I'm intending to make.

24          THE COURT:  So what did you mean to make when you

25     said in your reply, at page 6, ECF 19, that Count Two -- the

1    weight of the evidence with respect to Count Two of the

2    indictment, in operating a money transmitting business

3    without a license in violation of federal law can't hold

4    because he was not operating it within the United States.

5              And let me just say, I -- this is going to be my

6    first case where I am dealing with this statute.  It may be

7    a legal issue among the novel legal issues as to whether a

8    business has to be operated out of the United States or

9    whether operating outside the United States with effects

10   within the United States is sufficient to support a charge.

11             Those are all legal issues that I am not going to

12   resolve within the context of a detention hearing.  But I

13   think you were flagging legal issues to challenge the weight

14   of the evidence, Mr. Flood.

15             And so you start off by saying that the magistrate

16   judge had an incorrect view of his connections to Belize

17   because he did not have good -- or strong contacts to

18   Belize.

19             So I bring back to you, when you say Helix was not

20   operating within the United States, where are you saying he

21   was operating it from?

22             MR. FLOOD:  Well, Your Honor, at this point

23   Mr. Harmon is presumed innocent, and I rest on that

24   presumption.  I am not going to -- we are not taking an

25   assertion as to where it was operating from.

```
 1                    The government's --
 2              THE COURT:  You are saying it is not operated
 3    within the United States?
 4              MR. FLOOD:  That was their proof, Your Honor.
 5              THE COURT:  Okay.
 6              MR. FLOOD:  At the bond hearing they said it was
 7    not operated within the United States; and so I shifted that
 8    to them because that should be their burden.
 9              THE COURT:  I see.  So you don't want to say where
10    it was being operated?
11              MR. FLOOD:  Your Honor, they said it's not
12    operated within the United States --
13              THE COURT:  I see.  Okay.  I will ask them.
14              MR. FLOOD:  I am not taking issue with that.
15              THE COURT:  Okay.  So did he or did he not live in
16    Belize for a few years between 2014 and 2017?
17              MR. FLOOD:  He did not, Your Honor.  He lived
18    there I believe for almost one year at one point.  His
19    friend --
20              THE COURT:  When?
21              MR. FLOOD:  I believe that was 2014, Your Honor.
22    His friend had died in a fire; he moved to Belize, and then
23    moved back to Ohio.  He kept the place there that he leased,
24    Your Honor, and would go there to vacation.  I think that's
25    the -- as the government points out --
```

```
 1              THE COURT:  Well, "vacation" can be a broad term
 2      depending on -- what does "vacation" mean?  I mean, does
 3      that mean like two weeks a year; and that's it? -- even
 4      though he leased a house year-round?
 5              MR. FLOOD:  Yes, Your Honor; that's what that
 6      means.
 7              THE COURT:  Two weeks a year, that's it?
 8              MR. FLOOD:  I can ask.
 9              THE COURT:  Because misrepresentations -- I mean,
10      part of, I think, what moved the magistrate judge in Akron
11      is what she viewed as "slippery statements," so let's not be
12      slippery.
13              MR. FLOOD:  Well, I do want to actually clarify a
14      statement that I made that's incorrect, Your Honor.  Thank
15      you, because I wanted to say that first.
16              Mr. Harmon is not a college graduate.  In my reply
17      I said Mr. Harmon was a college graduate, and I misspoke,
18      Your Honor.  Mr. Harmon attended Kent State and did not
19      graduate, and so I want to clarify that because I don't want
20      to make misstatements to the Court, Your Honor.
21              So I don't -- my understanding of this vacation
22      place in Belize was just that; he went there to vacation.  I
23      can get a more clear, fulsome picture for the Court of how
24      many weeks per year that is if the Court would like, Your
25      Honor.
```

1          THE COURT:  Yes.  Thank you.

2          (Whereupon, Mr. Flood and the defendant confer.)

3          MR. FLOOD:  Your Honor, if I could clarify.  It

4    was in approximately 2012 when he moved there for about

5    eight months.  After that, from '14 to '17, during the

6    pending of this case, he would spend about a month a year

7    there; otherwise, his family would go to Belize.

8          THE COURT:  Okay.  So let's get down to what I

9    view as the rightly troubling misstatements that I think was

10   part of the underpinning of the magistrate judge's decision

11   in Akron.

12         And one of the things that I understand, from

13   looking at the hearing transcript from that detention

14   hearing, is that the defendant told pretrial services in

15   Ohio about his current residence, about his different debts;

16   and he didn't report any lease payments or other properties

17   in his name, leased or owned.  And then it was a surprise

18   when the property in Belize came to the attention of

19   pretrial services in Akron and the magistrate judge.

20         So could you explain that?

21         MR. FLOOD:  Your Honor, I think --

22         UNIDENTIFIED SPEAKER:  (Unintelligible.)

23         MR. FLOOD:  I apologize.

24         THE COURT:  I'm sorry.  Who -- do you know the

25   people in the audience?

1          MR. FLOOD:  That was Larry Harmon, Senior, Your

2    Honor.  I don't know what he spoke.

3          THE COURT:  Okay.  If I hear another outburst, you

4    will be excused from the court.  Is that understood?

5          MR. HARMON, SR.:  Yes, Your Honor.

6          MR. FLOOD:  Your Honor, I believe they asked him

7    about his assets.  I don't think lease properties are

8    assets, frankly.  But we certainly admit -- and he said --

9    one of the issues at the bond hearing I am speaking of --

10   and I would like to also get to the pretrial services

11   officer he met with in D.C.

12          They asked about his assets.  He said the

13   government has seized all of my assets, and that's, frankly,

14   true, Your Honor; the government has seized all of his

15   assets.  The pretrial services officer said I didn't know

16   anything about Belize.

17          THE COURT:  Could you just pause on that, when you

18   say "the government has seized all of his assets"?  I would

19   like a description -- a little bit fuller description from

20   you about what that means.

21          I appreciate when the government gets court orders

22   to freeze bank accounts, and I appreciate when the

23   government executes a search warrant and seizes physical

24   cash and assets.  So when you say the government has seized

25   all of his assets, are you talking about either one of those

1    two things?

2          MR. FLOOD:  Both of those things, Your Honor.

3    Yes.

4          THE COURT:  Okay.

5          MR. FLOOD:  So they have done that on numerous

6    properties in Ohio; all of his bank accounts.

7          And the issue -- frankly, the issue is this amount

8    of bitcoin that he holds, right?  And that's what the

9    magistrate judge was concerned about, and that is what the

10   government is concerned about:  Is there access to large

11   sums of money?  The short answer is no, Your Honor.

12         The government has seized all of the items that

13   contain any money -- any substantial money -- I think they

14   even seized all of his bank accounts.  So maybe it's easier

15   to say "any money" -- any money of note, the government has

16   seized it; he cannot access it.  Even if released he cannot

17   access it.

18         THE COURT:  So when the pretrial services officer

19   in Ohio talked about not having Mr. Harmon disclose to

20   pretrial services the fact that he had bitcoin assets, is it

21   your statement that when he said the government seized all

22   of his assets Mr. Harmon was including in that all of

23   that -- his bitcoin assets?

24         MR. FLOOD:  Yes, Your Honor.

25         As he told them -- unfortunately, I don't have the

1    bail report in front of me.  He told them they had seized

2    all of his bitcoin, and that's not noted; but he did.

3            Again, I want to address the alleged misstatements

4    to pretrial services here in the District.  They came and

5    met with him, and he had already -- he had been through that

6    hearing and did not want to be accused of making a false

7    statement and said, No, I want to list all my assets.

8            And the woman said, No, no, no -- no, please, let

9    me do it.

10           THE COURT:  I am just going to interrupt you right

11   now, and I am going to ask our pretrial services to step

12   forward.

13           MR. FLOOD:  Please.

14           THE COURT:  You may be seated.

15           MR. FLOOD:  Thank you, Your Honor.

16           THE COURT:  As I alerted you, Mr. Harmon's

17   interview by pretrial services here has become a little bit

18   of an issue between the parties, so could you identify

19   yourself, for the record, and then explain how that

20   interview proceeded.

21           PRETRIAL AGENT:  Sure.

22           Takeysha Robinson, pretrial services.

23           At pretrial in Washington, D.C., in the federal

24   district court, we do not ask any questions about assets.

25   That section that appears on page 3 of the pretrial services

1   report -- where it indicates "unknown" as a default because

2   we do not ask those questions.

3                THE COURT:  Okay.  Thank you.

4                Did Mr. Harmon offer to detail for you any assets

5   that he had?

6                PRETRIAL AGENT:  He may have offered to give the

7   information to the pretrial services officer that

8   interviewed him, and they are told to not take any

9   information -- don't even go further into a conversation.

10               THE COURT:  Okay.  Is that because it's the

11  practice in this district, both in superior court and the

12  district court --

13               PRETRIAL AGENT:  That is correct.

14               THE COURT:  -- not to have secured bonds?

15               PRETRIAL AGENT:  That is correct.

16               THE COURT:  Thank you, Ms. Robinson.

17               I think that clears up that issue.  We don't have

18  to spend another second on it.

19               MR. FLOOD:  Thank you very much, Your Honor.

20               I believe -- Your Honor, I think it may be easier

21  if I just ask what are your other concerns?

22               I know you have read all of the briefing.  I

23  wanted to address Belize.  I think the outstanding assets

24  are the two big issues that the magistrate judge had with

25  granting Mr. Harmon bond.  I just want to see if you have

1    any additional questions about our position on things, Your

2    Honor.

3              THE COURT:  No.  I mean, I appreciate that

4    Mr. Harmon is willing to be subject to location monitoring

5    for reporting to -- you have to, in some ways, report to

6    pretrial services in two spots were he to be released with

7    monitoring and home detention in Akron with telephonic

8    conversations here.  And were there other aspects --

9    certainly turning over passports, no travel outside Akron --

10             MR. FLOOD:  Your Honor, anything you can think of

11   we're okay with.  And that kind of brings me to one other

12   thing I just wanted to add.

13             And I apologize to Mr. Brown I didn't brief this;

14   I don't have any case law, even old cases from different

15   districts.  There is obviously a new issue with this

16   COVID-19 thing, and I think it becomes a health issue, Your

17   Honor.

18             THE COURT:  Does he have underlying conditions?

19             MR. FLOOD:  I was informed by his wife this

20   morning he was a long-time smoker; he doesn't smoke anymore.

21   We don't know if that makes him particularly susceptible; I

22   have no idea, Judge.  But I do think when you are dealing

23   with someone who is presumed innocent -- I sure wouldn't get

24   on a cruise ship right now, and I sure wouldn't blame anyone

25   for not wanting to be in a jail right now.

1           THE COURT:  All right.

2           MR. FLOOD:  So I do ask the Court to consider that

3     as well.

4           THE COURT:  All right.  Well, at the last status

5     conference when we initiated -- although we did not

6     complete, we initiated discussion about the complex case

7     designation, you basically thought this was not complex at

8     all.  So I was surprised to see there was some mention in

9     your brief about how there were some novel issues and that

10    there was some concern on your part about being able to have

11    as full a consultation with your client as you might like

12    given some of the issues in the case.

13          Do you want to elaborate on that?

14          MR. FLOOD:  I do, Your Honor.

15          At the last hearing I had said I am going to file

16    a motion to revoke the detention order; and we will, of

17    course, more fully address the complexity of the case, and

18    that's what I intend to do now.

19          It is a complex case; it is a matter of first

20    impression.  This tumbler or mixer has never been prosecuted

21    before.  I know it's got terabytes and terabytes of data,

22    and, obviously, I need Mr. Harmon to be able to help me

23    defend him.  I didn't say it wasn't complex so much as I am

24    going to need time to address that, Your Honor; and I want

25    to address it now because --

1            THE COURT:  Okay.  I heard you distinctly saying

2      the terabytes of data were all movies; you can go through

3      that fairly quickly.

4            MR. FLOOD:  I said some of the terabytes of data

5      may be movies, and I still haven't seen it, Your Honor.  But

6      I am going to need his help; there is no question.

7            THE COURT:  All right.  Thank you, Mr. Flood.

8            I'm sorry.  I have got a number of other people

9      waiting, so I am going to -- I don't want to be repetitive

10     of the things that are in the papers.

11            Okay.  Mr. Brown.

12            MR. BROWN:  Good morning, Chief Judge.

13            I think if I can address the cryptocurrency

14     holdings because I think there is a serious factual issue

15     here which is -- there are three main points on the

16     cryptocurrency.  Number one, cryptocurrency can be

17     accessed -- like bitcoin, can be accessed and spent from

18     anywhere in the world as long as you have the private wallet

19     information.  This is the information -- it's like a file;

20     think of it like your email password.  You may have that

21     password written down in more than one place; you could

22     memorize it; you could save it on a thumb drive.  But just

23     because the government has that thumb drive doesn't mean you

24     don't have another copy somewhere.

25            THE COURT:  Is this what you called the "seed"

1    phrase or something like that?

2              MR. BROWN:  That's right; that's the second point.

3              THE COURT:  I thought you found that.

4              MR. BROWN:  So we found some seed phrase.  We have

5    only been able to reconstitute one very small wallet from

6    those seed phrases.

7              The way that seed phrases work is it's a 12- to

8    24-word mnemonic that you basically plug into a set

9    algorithm.  If you have a Trezor device, you can use that

10   Trezor device -- even a brand new one -- using your seed

11   phrase that you set up in the original Trezor device and it

12   will reconstitute that private key information that will

13   allow you to access that bitcoin.  So simply because we have

14   a Trezor device in our possession doesn't mean that

15   Mr. Harmon either has a memorized 24-word phrase or has

16   other places where he's hidden these phrases.

17             And, by the way, we found Trezor devices, ledger

18   devices, seed keys in at least --

19             THE COURT:  And the Trezor device is just a big

20   storage device?

21             MR. FLOOD:  Yes.  And there is a picture of it in

22   the detention exhibit, I think Detention Exhibit 15, where

23   he actually had it taped to the underside of a desk.  So

24   it's like a thumb drive, basically -- a glorified thumb

25   drive where you can store this information.  But, like I

1  said, he could reconstitute those wallets from anywhere in

2  the world potentially from memory.

3          And the third salient issue is the --

4          THE COURT:  I know that's a salient issue,

5  Mr. Brown.  But, you know, you have made a point that his --

6  he is operating this digital-related company now.  You have

7  said that his family members -- some of his family members

8  work in that company, so he is not the only one in his

9  family, perhaps, with technological expertise.

10         So to the extent that you're concerned that people

11  with technical expertise, including him, might be able to

12  access these seed phrase and access this cryptocurrency, why

13  couldn't his wife be doing that right now?

14         MR. BROWN:  Well, his wife --

15         THE COURT:  And is that a reason to hold -- detain

16  Mr. Harmon?

17         MR. BROWN:  Yes.  Because if Mr. Harmon -- if his

18  wife accesses that cryptocurrency now and Mr. Harmon is

19  detained, he cannot flee because he's detained.

20         If his wife accesses that cryptocurrency now and

21  he's released, he can flee; he can finance his entire

22  family's flight to another country.

23         The third salient characteristic is we know that

24  he is very well aware of the most sophisticated security

25  precautions for these devices, this pass phrase feature.  In

1    fact, he wrote about it in his own blog, about creating

2    secret wallets within the wallets; and that's exactly what

3    we have seen in our examination of these devices.

4              So there is virtually -- we have an evidentiary

5    basis -- in Agent Haynie's testimony, in the exhibits that

6    have been submitted before the magistrate in Ohio, in this

7    court -- that he has potentially tens of millions of dollars

8    in cryptocurrency assets that he generated.

9              These are illegal proceeds from Helix, and we have

10   not been able to secure those assets.  Until we can secure

11   them and transfer them to a government wallet, those are

12   available for him or his family members to transfer them

13   and --

14             THE COURT:  Well, you cite *Bikundi* throughout this

15   case, and that's a case with which both of us are very

16   familiar.

17             MR. BROWN:  Yes, Your Honor.

18             THE COURT:  And in that case, it wasn't just the

19   financial resources that might have been hidden, it was a

20   number of other factors that led to detention in that case;

21   it was huge contacts and family members abroad, prior fraud

22   convictions -- it was a number of different things that led

23   to detention in that case, and not just the potential hidden

24   assets.  Isn't that right?

25             MR. BROWN:  Yes, Your Honor.

1          THE COURT:  I mean, I found the citation to

2     *Bikundi* a little bit -- though correct, as far as it went --

3     not the complete picture of what was going on in that case.

4          MR. BROWN:  Yes, Your Honor.

5          This is a very unique case in front of us today,

6     and that's why -- of course, *Bikundi* is not going to be 100

7     percent apposite to this case --

8          THE COURT:  Not only is it not on all fours, it's

9     not on -- it's like on one wobbly leg.

10         MR. BROWN:  Well, let's talk about the 3142(g)

11    factors here.  We have a defendant who, under the

12    guidelines, is facing a sentence of 19 years -- over 19

13    years at the bottom of the guidelines range, well above the

14    20-year statutory maximum.  We have overwhelming evidence --

15    so overwhelming that he barely disputed it.  Of course, his

16    defense counsel now has, sort of, backtracked and said,

17    Well, the government has to prove --

18         THE COURT:  How did you tie Mr. Harmon to the

19    Reddit -- just remind me.  How did you tie Mr. Harmon to the

20    Reddit entries?

21         MR. BROWN:  So the easiest piece of evidence to

22    explain --

23         THE COURT:  I mean, is it the kind of thing that

24    you just, sort of, get the user name from Reddit?

25         MR. BROWN:  So we did do a search warrant on

1    Reddit for the user name.  He didn't sign up with his true

2    name.

3                  THE COURT:  Of course.

4                  MR. BROWN:  So the best piece of evidence is we

5    have a substantial amount of his computer browsing and

6    search history.

7                  THE COURT:  Well, that's what I'm going to get to.

8    Is your best evidence in that the picture of the person

9    looking at the screen --

10                 MR. BROWN:  Well, I mean, that's the most vivid

11   evidence, that he was the Helix and Grams administrator.

12   And, of course, the administrator --

13                 THE COURT:  Administrator.  But that's not --

14   that's not how you connected him to the Reddit entries?

15                 MR. BROWN:  In addition to this -- so he chose

16   internet traffic to the sub-Reddit -- which was the specific

17   forum that was established to talk about Grams-Helix where

18   the Grams admin moniker used that sub-Reddit -- that forum

19   to issue news to advertise its services -- he was accessing

20   that sub-Reddit before it went live.  So the day before that

21   sub-Reddit was actually created, he was accessing that web

22   page.

23                 So in addition to the evidence that he was, in

24   fact, the Grams-Helix administrator, we have evidence that

25   he was the one who created -- who set up that sub-Reddit

1    that he used to communicate with the public, anonymously

2    hiding behind the internet, about his illegal services.

3            THE COURT:  How much of the defendant's bitcoin

4    has the government seized?

5            MR. BROWN:  So from, essentially, a bank account,

6    a Block5 account, we seized approximately 65 --

7            THE COURT:  What kind of account?

8            MR. BROWN:  It's a company called Block5 --

9            THE COURT:  Block5.

10           MR. BROWN:  -- which is a bitcoin savings company;

11   it's like a bank account, but savings account.  We have

12   seized approximately $3.2 million.  From his Trezor devices

13   and seed recovery keys, we've seized approximately $20,000

14   of bitcoin, which is just a fraction of the 10s -- 50,

15   $47 million in cryptocurrency that we believe he has.

16           Moreover, in both the phone evidence and the

17   account spreadsheet --

18           THE COURT:  But having seized all of his computer

19   equipment, does that slow down, at least, if not block the

20   ability to access more bitcoin even if you have the seed

21   phrase?

22           MR. BROWN:  Your Honor, we have some seed phrases.

23           As we have shown in our exhibits, he actually

24   wrote about hiding seed phrases; they can be hidden

25   anywhere.  They can be buried underground, they can be

1    hidden in an electrical guitar, anywhere.  We don't know --

2            THE COURT:  That was a clever story.

3            MR. BROWN:  We don't know what we don't have.

4            And the second point, Your Honor, is -- so, first

5    of all, simply possessing the drive essentially that has,

6    you know, the analogy is your email password; that doesn't

7    mean that if you can recreate that email password elsewhere

8    you can't access your email.

9            So we have physical custody of certain computer

10   and electronic devices, but we don't -- we know he uses seed

11   phrase to recreate bitcoin.  We know we found those in

12   multiple locations -- and these are just the locations that

13   are in his own name.

14           THE COURT:  So one of the government's arguments

15   is that he has got these strong ties to Belize where he had

16   a leased out -- clearly spent eight months of his life, at

17   least, and has vacationed.  Does the government have an

18   extradition treaty with Belize?

19           MR. BROWN:  Your Honor, I don't know off the top

20   of my head.  I believe we would, given the degree of

21   cooperation that we have with Belize.

22           I would say it is -- well, first of all, he paid

23   $2,000 a month -- that was in Agent Haynie's testimony --

24   $2,000 a month in cash to rent a vacation home that he

25   claims he only spent a month in per year.

1          We found two Trezors and a safe -- two

2    cryptocurrency storage devices and a safe with other papers

3    that we haven't even had a chance to go through in Belize.

4          Not only did he have that vacation property, but

5    while the Belizean authorities were undertaking their

6    search, there was this very strange incident where this

7    person identifying himself as an attorney who turns out to

8    be the son of the former finance minister of Belize showed

9    up on the scene and started -- essentially tried to

10   intervene in the search.

11         THE COURT:  Can I just say that it's not that

12   unusual if -- for an attorney who represents a client to

13   want to show up and see what is being searched and how it's

14   being done?

15         MR. BROWN:  Your Honor --

16         THE COURT:  You are making sort of a big deal

17   about that.  Was that really such a big deal?

18         MR. BROWN:  With respect, this was not a search

19   that was announced on Belizean TV beforehand.

20         It is a little unusual that somebody would see

21   that this is happening while it's happening and show up, and

22   not only try to intervene but they have certain political

23   connections that we haven't fully had a chance to

24   investigate.

25         We believe Mr. Harmon has spread around his wealth

1    in Belize.  He has had a chance to establish himself in the

2    Belizean ex-pat community.  He has friends; he has contacts

3    down there.  And not just Belize, he has private jet travel

4    to Belize, but also to Jamaica; that was also in Agent

5    Haynie's testimony.

6         He is the guru of the dark net.  He created the

7    Google of the dark net.  He knows better than anybody what

8    is available there, so it would be trivial for him to use

9    his cryptocurrency wealth to acquire false passports, false

10   IDs, and travel anywhere in the world where he can live a

11   life of luxury and enjoy the fruits of his illegal

12   activities and he can have his family come out and visit any

13   time he wants.

14        THE COURT:  Okay.  Thank you.

15        Mr. Flood, do you want to respond?

16        MR. FLOOD:  Just very briefly, Your Honor.

17        I think it's key that they said "we don't know

18   what we don't have" because it means they don't know what

19   they do have either.  They have the seed words, Your Honor.

20        You know, if someone takes my phone, I don't know

21   any of my passwords, I am just telling you.  They took the

22   seed words; he can can't access those devices if he's here,

23   if he's there -- anywhere.

24        As to this notion that he can somehow get on the

25   dark web and get a passport and get a jet -- the government

1    has been monitoring his Facebook for a year; they know that

2    was a wedding in Jamaica that he flew to.  They were

3    watching --

4              THE COURT:  That was a what?

5              MR. FLOOD:  It was a wedding.  He flew to a

6    wedding and then came back.

7              As they showed at the bond hearing, they were

8    watching him as early as 2018.  He is not a flight risk,

9    Your Honor.  He will appear as directed.

10             As I pointed out in my briefing, of all these

11   cryptocurrency cases -- the ones I have cited -- the people

12   are given bond, and they appear.

13             Mr. Harmon will appear as ordered.

14             THE COURT:  I am not -- I don't particularly care

15   about what happened in the other cases on bond; it is really

16   limited relevance to me.

17             MR. FLOOD:  I understand.

18             THE COURT:  I look at this individual and these

19   circumstances --

20             MR. FLOOD:  Sure.  Sure, Your Honor.

21             I won't rehash it, but he doesn't have close ties

22   to any other country.  He doesn't have access to substantial

23   assets.  He has strong family ties, Your Honor.  We would

24   ask that he be released.

25             THE COURT:  All right.  I am going to issue my

1    ruling now.

2              Under the Bail Reform Act, detention before trial

3    shall -- that's the statutory word, "shall" -- be ordered if

4    a judicial officer determines that no condition or

5    combination of conditions will reasonably assure the

6    appearance of the person as required and the safety of any

7    other person and the community.  See 18 U.S.C. Section

8    3142(e)(1).

9              The charges in this case do not give rise to a

10   rebuttable presumption favoring detention.  See 18 U.S.C.

11   Section 3142(e)(2) through (e)(3).

12             A magistrate judge in the Northern District of

13   Ohio made a finding, and ordered that there was no condition

14   or combination of conditions to reasonably assure

15   Mr. Harmon's appearance, and ordered that he be detained

16   before trial.  See the magistrate judge order of detention,

17   which is Exhibit 3 to the defendant's motion at ECF No. 15.

18             The defendant has now moved, under 18 U.S.C.

19   Section 3145(b), to revoke the magistrate judge's detention.

20             The standard of review for review of a magistrate

21   judge's order for release is *de novo*, and a district judge

22   conducting that review must promptly, under 18 U.S.C.

23   Section 3145(b), make an independent determination whether

24   conditions of release exist that will reasonably assure the

25   defendant's appearance in court or the safety of any other

1    person or the community pursuant to Section 3142(e)(1).

2         In making the essential determination about

3    whether any conditions of release will reasonably assure the

4    appearance of the defendant as required, the Court must take

5    into account the available information concerning four

6    factors that are set out in Section 3142(g).

7         Those factors are:  The nature and circumstances

8    of the offense charged; the weight of the evidence against

9    the person; the history and characteristics of the person,

10   including the person's character, physical or mental

11   condition, family ties, employment, financial resources,

12   length of residence in the community, community ties, past

13   conduct, history relating to drug or alcohol abuse, criminal

14   history, and record concerning appearance at court

15   proceedings.  Finally, the Court has to consider the nature

16   and seriousness of the danger to any person or the community

17   that would be posed by the person's release.

18        I am going to address each one of those factors.

19   And I determine that, at this stage, these factors weigh in

20   favor of release.

21        The nature and -- under very stringent conditions.

22        Starting with the nature and circumstances of the

23   offense charged, he's charged in a three-count indictment.

24        Count One, charging conspiracy to launder money

25   instruments, in violation of 18 U.S.C. Section 1956(h),

1   which carries the penalty of the object of the conspiracy --

2   and, here, the objects of the charged conspiracy include:

3   Promotional money laundering and concealment money

4   laundering, both of which carry maximum sentences of 20

5   years' imprisonment.

6          Counts Two and Three charge:  Operating a money

7   transmitting business without a license in violation of both

8   federal and D.C. law.  See 18 U.S.C. Section 1960(a) and

9   D.C. Code Section 26-1023(c).  Both of those charges carry

10  penalties of up to five years.

11         The government proffers that the charges arise out

12  of a long-term investigation into defendant's operation of

13  services on the dark net between 2014 and 2017.  The dark

14  net is essentially a collection of secret websites linked

15  through a network of global computers on something called

16  the Tor network.  These websites are secret, or dark,

17  because there is no way to see publicly the internet

18  protocol addresses of servers hosting those websites on the

19  dark net.

20         The services the defendant operated, according to

21  the government, included Grams and Helix.  Grams was

22  apparently launched in April 2014 as a search engine for

23  different markets on the dark net.  And in July 2014,

24  according to the government, the defendant launched Helix,

25  which is a bitcoin tumbler or mixer, allowing customers to

1   send bitcoins in a way that obscured the source or ownership

2   of the bitcoins.

3        Helix apparently was linked to the same dark net

4   marketplaces that Grams could search.  These marketplaces on

5   the dark net include AlphaBay, Agora Market, Nucleus, and

6   Dream Market.  And the government says that the defendant's

7   co-conspirators actually included the administrator of

8   AlphaBay which was one of the bigger marketplaces on the

9   dark net, according to the indictment and the government's

10   briefing, for the sale of all sorts of illegal stuff, like

11   drugs and guns, and so on.

12        The government describes these marketplaces as

13   platforms for customers to purchase a variety of, as I said,

14   illegal drugs, guns, and other illegal drugs -- goods.

15        Helix was recommended actually on AlphaBay which

16   was, at the time, the largest dark net marketplace, and

17   AlphaBay provided a link to the Tor network website for

18   Grams and Helix.

19        The government proffers that Helix mixed at least

20   354,468 bitcoins, which is about $311 million at the time,

21   and that the largest volume of funds came from dark net

22   markets.  The government says that the defendant wound down

23   Grams and Helix in December of 2017 and, since then,

24   defendant has controlled other web companies, including

25   something called Coin Ninja and a bitcoin payment app called

1    DropBit.

2         The government has argued both in its briefing and

3    at the detention hearing today that, under the applicable

4    sentencing guidelines, his guidelines range on Count One

5    alone would be very near or exceed even the 20-year

6    statutory maximum.  And that is based on a preliminary

7    estimate on the volume of transactions, $13 million in value

8    between AlphaBay and Helix, and the defendant's knowledge

9    that the funds were the proceeds of drug offenses.  Although

10   the defense disputes this prediction about the guidelines

11   range, the prediction about the sentencing guidelines range

12   is not necessary to the conclusion that the defendant does,

13   under factor one, face very serious charges here.

14        The government also argues that the nature of the

15   money laundering scheme weighs in favor of detention and

16   proffers comments made by the defendant online stating that

17   the defendant created his dark net sites to make it easier

18   for people to use the dark net which the defendant also

19   acknowledged in comments was 90 percent drugs and illegal

20   items for sale.  I am citing Exhibit C of the government's

21   motion which is, I think, a Reddit statement.

22        The government also points to comments stating

23   that the sites were used to help people using the dark net

24   to avoid detection by "LE," or law enforcement.

25        Although Helix and Grams were undoubtedly complex

1    and sophisticated -- and that fact tells us about the

2    seriousness of the offense -- the comments by the defendant

3    about his intent are evidence of mens rea for the

4    government's case-in-chief; they're not evidence of a desire

5    to flee law enforcement in the present which is the

6    determination that this Court must make at this stage of the

7    case.

8         That said, the nature and circumstances of the

9    offense do ultimately weigh in favor of detention.  The

10   three charges have statutory maximums of 20 years, 5 years,

11   and 5 years, and he also faces a significant financial

12   penalty if convicted.  That is considerable exposure, and I

13   agree with the government that such considerable exposure

14   does create an incentive to flee.  And so, with that, I will

15   credit to the government that the nature and the

16   circumstances of this offense do weigh slightly in favor of

17   detention because of those circumstances.

18        Also, the circumstances that the government has

19   described about the defendant despite seizure of some

20   substantial property of the defendant, that -- the

21   circumstances are that he may have a pool of additional

22   cryptocurrency that is hidden that can help fund flight.  So

23   I will credit that the government has established that that

24   first factor weigh in favor of detention.

25        I will now turn to the weight of the evidence

1    against the defendant.

2         The government argues the evidence is overwhelming

3    but, at the same time, does concede that this is a complex

4    and, in some way, novel prosecution.

5         Some of the cases the government cited in its

6    briefing involving prior bitcoin prosecutions were very

7    helpful and illuminating, and I am sure I will have an

8    opportunity, later in these proceedings, to dig down into

9    them more.  But from what I can see, this is the first

10   prosecution involving a bitcoin-to-bitcoin transaction that

11   the government is charging violated criminal statutes, so

12   this is going to be a novel prosecution.

13        The defendant has identified potential weaknesses

14   in the precision of the government's evidence in the

15   government's legal theories, but I, nonetheless, find that

16   at this stage the weight -- without prejudging a lot of

17   those novel legal issues, that the weight of the evidence

18   ultimately does tip in favor of detention.

19        The government has strong evidence that the

20   defendant was, indeed, the administrator of Grams and Helix,

21   as outlined in pages 13 through 15 of the government's

22   opposition, docketed at ECF 16, including, I might add,

23   statements after the defendant's arrest by his own family

24   members to the media that the defendant was the

25   administrator.

1          Mr. Flood has -- that's his challenge, to make the

2     family appreciate that media statements are free fodder for

3     the government to develop further evidence, but that's his

4     cross to bear.

5          This also includes the government's evidence, a

6     Google spreadsheet, and a financial management application

7     that appear to reflect the defendant held cryptocurrency and

8     U.S. dollar assets in the $50 million range which the

9     government says would be consistent with the proceeds of

10    operating Helix between 2014 and 2017, apparently because

11    Helix charged a 2.5 percent fee on each transaction that

12    would, by the government's estimate, have generated nearly

13    8,861 bitcoins, which is close to $69 million in today's

14    money.

15         Also, interestingly, the government has seized

16    photographs apparently taken in Belize when the defendant

17    was there and where he had a picture of him operating the

18    Grams-Helix administrator page.

19         The government also has solid evidence that the

20    defendant knew that Helix was being used to launder proceeds

21    from illegal transactions on the dark net.  In attempting to

22    poke holes in that evidence, the defendant focuses on what

23    he sees as the government's lack of proof of individual

24    dirty transactions going through Helix.

25         As an example, the defendant emphasizes that the

1   IRS special agent, who testified at the detention hearing in

2   Ohio, said the government has only traced 10 to 15 percent

3   of the coins that went through Helix as originating in dark

4   net marketplaces.  The other bitcoins, the agent said, were

5   from sources that are still unknown.  On this micropoint,

6   the government says it has traced more than $21 million of

7   the money that went through Helix to dark net markets --

8   which is a significant sum.  But, more broadly, the

9   government points out that the defendant's focus

10  misunderstands what the government will need to prove at

11  trial, which is that the conspirators intended to launder

12  money -- not the specific transactions that were dirty, or

13  that the defendant knew that specific transactions were

14  dirty.

15          The government says its proof on this -- and is

16  correct on this -- includes the defendant's comments on

17  Reddit about his intent in operating Helix references the

18  defendant's text messages to have some dirty and some clean

19  bitcoins, some evidence that the defendant conspired with

20  the administrator of AlphaBay and cultivated relationships

21  with the administrators of other dark net marketplaces.

22          As to Count One, the weight of the evidence tips

23  in favor of detention.

24          On Count Two, the defendant argues that due to the

25  nature of its services, Helix was not required to register

1   as a money transmitting service or a money services business

2   and was, thus, not required to have a license and, thus,

3   Helix's administrator cannot be prosecuted for a violation

4   of the federal statute prohibiting operating an unlicensed

5   money laundering business.  And as I understood the

6   defendant's reply, he also said that the defendant wasn't

7   even required to register under federal law because Helix

8   wasn't operating within the United States.

9          Again, I am not going to prejudge and resolve

10  these complex legal, statutory issues at the detention

11  hearing and -- but I do note that these are significant

12  issues that may have an impact on the weight of the evidence

13  as to Counts Two and Three.

14         The government describes cases and FinCEN guidance

15  stating that virtual currency operations can be money

16  transmitting businesses and are required to register,

17  including a case by Judge Collyer in this district, *U.S. v*

18  *E-Gold LTD* from 2008.  And despite these cases and the

19  guidance, this is an area of the law that is not yet fully

20  developed.  And given that context, the case will pose some

21  novel questions of fact and law along the lines of those the

22  defendant is putting forward in his briefing.

23         The government even acknowledged this outright in

24  its motion for speedy trial exclusion and designating this

25  as a complex case.  So, in light of that factor, the weight

1    of the evidence on Counts Two and Three is, at best,

2    neutral.

3            Let me turn now to the history and characteristics

4    of the defendant because this factor weighs heavily in favor

5    of release.

6            The government, of course, argues the opposite,

7    saying that it weighs in favor of detention because of his

8    collection of cryptocurrency assets, which the government

9    believes are only partly so far accounted for, and his ties

10   to Belize.  And the magistrate judge found the defendant

11   appeared to have considerable assets remaining that could be

12   accessed by him or even through other persons who may have

13   access to the assets.  And the magistrate judge found that

14   the defendant had concealed assets and debts from the

15   pretrial services in Ohio, including his lease on a property

16   in Belize.

17           The defendant says that the government has seized

18   all of his assets and suggests that his access to computers

19   and cryptocurrency could be restricted as a condition of his

20   release, an invitation I will accept.

21           While the possibility that the defendant has

22   significant funds or that he or a family member could access

23   such concerns -- could access such funds is certainly a

24   concern and that, when I look at potential conditions of

25   release, a restriction on his computer and cryptocurrency

1       access could help mitigate that concern.

2               The government also characterizes the defendant's

3       ties to Belize as substantial.  To my mind, at this point,

4       that appears to be an overstatement of the current evidence.

5               Certainly, he's leased an apartment in Belize and

6       actually lived there for some period of time; and he had

7       property that he stored there including, quite possibly,

8       valuable property because the Belizean authorities who

9       searched his property in Belize found hard drives, some of

10      which contained movies, I suppose, as well as two bitcoin

11      wallets on Trezor devices.  It's clear the defendant has

12      some personal ties to Belize.  And as the magistrate judge

13      found, they also -- there is testimony that the defendant

14      has a history of using private jets to travel both to

15      Jamaica and Belize on private jets.

16              I do find that these are clear ties to Belize but

17      I don't find that they are significant to overwhelm the fact

18      that the defendant has his closest ties to Akron where he --

19      his whole family lives, where he has established his

20      businesses, where he has property, where he grew up.  And so

21      some of the risk of him traveling can be mitigated by

22      conditions of him turning over his passports and any other

23      travel documents which I think pretrial services may already

24      have in hand.  So the government's concerns about flight

25      overseas can certainly be mitigated with some conditions.

1       He has no criminal history, and given his strong

2   ties to the Akron area, this weighs heavily in favor of

3   release.

4       The government has also pointed out that some of

5   the defendant's family members may have been involved in

6   drafting logos for Helix and maybe helping with Coin Ninja,

7   which is one of the defendant's current businesses, but none

8   of his family members have been charged in this case.  And

9   to the extent that the government is suggesting that these

10  are family members who are compromised and might have a

11  motive to help the defendant flee, as the government seems

12  to be implying, I find this evidence so far very thin.

13      I am also persuaded by the fact that this is going

14  to be a complex case and that the defendant, as he mentioned

15  both at the hearing and in his brief, will have to be

16  assisting his counsel in sorting through the terabytes of

17  data and explaining any activity that may implicate him in

18  that and that that is, in a complex case raising novel

19  issues of not just complexity in terms of the amount of

20  evidence, but understanding the technical nature of this

21  evidence, that Mr. Flood could benefit from his client being

22  available to assist.

23      Finally, the fourth factor is not contested.  The

24  defendant certainly does not pose a danger to the community

25  if released.

1          So upon consideration of the proffered evidence

2     presented, the factors set forth in 18 U.S.C. Section

3     3142(g), and the possible release conditions set forth in

4     Section 3142(c), the Court finds that two of the statutory

5     factors weigh in favor of detention, but that the other two

6     statutory factors weigh more heavily in favor of release

7     under stringent conditions.

8          As a consequence, the government has not met its

9     burden to show by a preponderance of the evidence to show

10     that no condition or combination of conditions will

11     reasonably assure the appearance of the defendant.

12          The Court finds that the series of conditions that

13     the Court intends to impose, including home detention and

14     restricted, monitored use of any computers in that home,

15     will reasonably assure the appearance of the defendant in

16     court.

17          So the defendant's motion to revoke the order of

18     detention is granted.

19          The defendant will be released on the following

20     conditions:  He will have to report weekly by telephone to

21     pretrial services at a number that will be provided by

22     pretrial services.

23          He may not possess any firearms.

24          He must live at an address in Akron, Ohio, at a

25     phone number that has been provided to pretrial services.

1          He will report to the pretrial services office in

2     D.C. any and every contact he has with law enforcement

3     personnel, including arrests, questioning, or any traffic

4     stops.

5          He will surrender all passports to pretrial

6     services.  He may not apply for or possess a passport or any

7     other international travel document.  He may not travel

8     outside of Akron, Ohio, without permission from pretrial

9     services, and he may have no travel, to emphasize that,

10    outside the continental United States.

11         He will be monitored by radio frequency monitoring

12    technology and must follow the rules and regulations of the

13    location monitoring program.  This form of location

14    monitoring technology will be used to monitor the

15    restrictions on movement in his community, and he is

16    restricted to his residence at all times except for:

17    Employment, education, religious services, medical,

18    substance abuse or mental health treatment, attorney visits,

19    court appearances, court-ordered obligations, or other

20    activities as preapproved by the pretrial services officer.

21         He must report by 8:30 Monday morning to the

22    pretrial services office in Akron, Ohio -- they're expecting

23    him -- to have a location monitoring device attached to his

24    leg.

25         He is also ordered to allow pretrial services to

1    monitor any electronic device, that includes a telephone or

2    computer, that he possesses or has in his home.

3              Any further conditions that the government would

4    suggest?

5              MR. BROWN:  Yes, Your Honor.

6              In terms of conditions, the government would

7    emphasize -- we would ask for an absolute restriction on

8    access to computers or internet-connected devices, including

9    mobile phones, given our concerns about his ability to

10   reconstitute bitcoin wallets.

11             THE COURT:  How is he going to speak to Mr. Flood?

12             MR. BROWN:  He can have a flip phone or a dial-up

13   phone.  There are many other kinds of phones.

14             We would ask for an absolute freeze on any

15   cryptocurrency transactions.  We would ask for -- and that's

16   buy, sell, move, do anything -- any sort of transaction; and

17   we will see because we see some of these bitcoins on the

18   block chain even if we can't access that.

19             THE COURT:  I appreciate that, Mr. Brown.

20             MR. BROWN:  We would ask for a freeze on any new

21   financial accounts.

22             And, Your Honor, in terms of the access to the

23   internet or internet-connected devices, I think even

24   pretrial services will concede that that is not a condition

25   that they can adequately police.  And I am not sure how they

43

1    can actually monitor his use of computers or electronic

2    devices, but we would ask for an absolute prohibition on

3    those accesses.

4              THE COURT:  Ms. Robinson.

5              I know with sex offenders they monitor all the

6    time.

7              PRETRIAL AGENT:  And they do as well for financial

8    crimes.  I will have to check with the Akron office to see

9    if they have the computer-monitoring program.

10             THE COURT:  Okay.  Thank you.

11             MR. BROWN:  Your Honor, he could use somebody

12   else's smartphone.  He can borrow a smartphone and access

13   the internet.  There are so many ways that you can do that;

14   that's why we have such profound concerns.

15             The other thing we would ask for is we would ask

16   for the same sort of monitoring at home as well as any sort

17   of workplace and -- you know, we would ask for no access to

18   computers or internet-connected devices at the workplace,

19   too.

20             THE COURT:  Okay.

21             MR. FLOOD:  Just very briefly, Your Honor.

22             We are not opposed to Conditions 2 and 3.  And,

23   frankly, I think Condition 2 that they propose -- which is

24   don't transact any cryptocurrency, bitcoin, or anything like

25   that -- solves the problem.

1          As to the government's request to Condition

2     Number 1, ironically, just last night they said, Here is the

3     discovery; you have got to log in to look at it.  It's a

4     computer-based case.  I am going to need Mr. Harmon's help,

5     whether he be in Akron, and I in Houston.  If he needs to

6     look at the evidence or the discovery, or things like that,

7     I am going to need his help in that regard.  He may have to

8     send me an email, Judge.  He is not going to transact any

9     bitcoin.  He is not going to go anywhere, Your Honor.

10          THE COURT:  Given the nature of the evidence in

11     this case -- I do have some concern about him having zero

12     access to any computer which is why my alternative was to

13     have it monitored.

14          MR. BROWN:  Your Honor, he can review the evidence

15     in the presence of his counsel; and, in fact, that's the --

16     that's exactly what is set out in the protective

17     order which --

18          THE COURT:  Excuse me.

19          Mr. Harmon is going to be -- my understanding is

20     Mr. Flood lives outside of Akron; is that correct?

21          MR. FLOOD:  Houston, Texas.

22          THE COURT:  Houston.  Thank you.

23          MR. BROWN:  Well, that's another issue.  But --

24          THE COURT:  I don't think Mr. Flood is going to

25     move in with Mr. Harmon.

1          MR. BROWN:  Your Honor, we have already entered

2     into a protective order, which the defense has not opposed,

3     that states that certain evidence designated as "sensitive"

4     cannot be retained solely in the possession of the

5     defendant.  It must be reviewed in the presence of his

6     counsel; that's something that they agreed to unopposed.

7          It is not an unusual or an unreasonable request

8     for us to ask that he reviews electronic evidence in the

9     presence of his counsel; that's something they have already

10    agreed to and already contemplated.

11         THE COURT:  Okay.  So I am going to impose, over

12    the defendant's objection, the conditions that the

13    government has requested; and I will bar Mr. Harmon from

14    engaging in any cryptocurrency transactions whatsoever.

15         He will also be barred from opening any new bank

16    accounts or any kind of financial accounts of any kind.

17         I will bar him from having or accessing any device

18    that has internet connections, particularly since I have --

19    I have reviewed the protective order, but I didn't remember

20    that so -- thank you, government -- that if he connects to

21    the internet to look at any of the evidence in the case it

22    will be with Mr. Harmon's [sic] assistance.

23         Mr. Harmon [sic], if this becomes too difficult or

24    raises an issue, I am here every day.  So you will come back

25    to me if you cannot work that out with Mr. Brown.

1          MR. FLOOD:  Thank you.

2          THE COURT:  All right.

3          Let me just say, Mr. Harmon, that I need to

4    caution you about your conduct while you are on release

5    pending trial and of certain penalties that can apply to

6    you.  This will be a very sensitive time for you.

7          First, if you fail to appear in court as required

8    it is a crime for which you can be sentenced to

9    imprisonment.  And you can be sentenced to imprisonment

10   for -- that will be added on to any term of imprisonment you

11   receive if convicted of the underlying charge.

12         Do you understand that?

13         THE DEFENDANT:  Yes.

14         THE COURT:  So you have to keep in very close

15   touch with Mr. Flood about when your court appearance dates

16   are.  If you violate any condition of your release, a

17   warrant for your arrest may be issued, you may be jailed

18   until trial, and you may be prosecuted for contempt of

19   court.

20         Committing a crime while you are on release may

21   lead to more severe punishment than you would receive for

22   committing the same crime at any other time.

23         Finally, it is a crime to try to influence a

24   juror, threaten or attempt to bribe a witness or any other

25   person who may have information about the case, or to

1    retaliate against anyone providing information about the

2    case, or to otherwise obstruct the administration of

3    justice; and violating that crime will be just an additional

4    crime with which you are charged and you could end up

5    serving consecutive time, meaning piled-on time.

6                   Do you understand that?

7                   THE DEFENDANT:  Yes.

8                   THE COURT:  All right.

9                   Let's set a date for our next status conference,

10   and I want to turn to the government's motion for complex

11   case designation.

12                  So there is a lot of evidence in this case.  Have

13   the parties conferred?

14                  Why don't you take a moment to confer.

15                  MR. FLOOD:  Your Honor, just to clarify, you like

16   Friday court dates, if I recall.

17                  THE COURT:  Typically, yes.

18                  MR. FLOOD:  Your Honor, we're looking at May 29th

19   for a status conference, if that's okay with the Court.

20                  THE COURT:  All right.  I will set this down for

21   the next status conference on May 29th at 9:15.

22                  And let's now turn to -- I can exclude time from

23   the Speedy Trial Act on a date-by-date basis, but let's

24   discuss the government's motion for a complex case

25   designation.

```
1            MR. FLOOD:  We're unopposed, Your Honor.

2            THE COURT:  Unopposed.  Okay.

3            I will designate this case as a complex case.

4            The government originally moved for exclusion of

5    180 days under the Speedy Trial Act, under 18 U.S.C. Section

6    3161(h)(7)(B)(ii), which permits exclusion of time due to

7    the complexity of the case such that it is unreasonable to

8    expect adequate preparation for pretrial proceedings or for

9    the trial itself within the time limits established and, to

10   my mind, that standard is plainly met here given the amount

11   of discovery in this case, which amounts to terabytes of

12   data; and it's a volume of discovery that has to be reviewed

13   by defense counsel, given the seriousness of the charges in

14   this case; and it also raises novel questions of fact and law.

15           I will grant that exclusion of time until

16   September 11th, 2020, and find that this exclusion of time

17   is in the interest of justice and that those interests

18   outweigh the interests of the parties and the public in a

19   speedier trial.

20           Is that sufficient, Mr. Brown?

21           MR. BROWN:  Yes, Your Honor.

22           THE COURT:  All right.  Is there anything further

23   from the government today?

24           MR. BROWN:  No, Your Honor.

25           THE COURT:  Mr. Flood?
```

1          MR. FLOOD:  Nothing from the defense, Your Honor.

2          THE COURT:  All right.  You are all excused.

3          MR. FLOOD:  Thank you, Your Honor.

4          THE COURT:  And I would ask that Mr. Harmon be

5     released from the cell block if that's possible.

6          PRETRIAL AGENT:  Excuse me, Your Honor.

7          Would you like to review the release order before

8     you sign it and have the defendant sign it?

9          THE COURT:  Yes, please.  Thank you.

10          Mr. Brown, would you like your exhibits back?

11          MR. BROWN:  Thank you, Your Honor.

12          THE COURT:  Thank you.

13          (Whereupon, the proceeding concludes, 10:28 a.m.)

14                          **CERTIFICATE**

15          I, ELIZABETH SAINT-LOTH, RPR, FCRR, do hereby
     certify that the foregoing constitutes a true and accurate
16     transcript of my stenographic notes, and is a full, true,
     and complete transcript of the proceedings to the best of my
17     ability.

18          This certificate shall be considered null and void
     if the transcript is disassembled in any manner by any party
19     without authorization of the signatory below.

20

21          Dated this 20th day of April, 2021.

22          /s/ Elizabeth Saint-Loth, RPR, FCRR
            Official Court Reporter
23

24

25